**UNITED STATES v. ALUMINUM CO. OF AMERICA et al.**

Eq. No. 85-73.

District Court, S. D. New York.

Sept, 30, Oct. 1, 2, 3, 4, 6, 7, 8, 9 and 10, 1941.

See, also, D.C., 2 F.R.D. 224.

John C. Herberg, of Washington, D. C., Norman A. Adler, of New York City, and F. Gwyn Harper, Jr., of Washington, D. C., Sp. Assts. to the Atty. Gen., and James S. Kempner, Jr., Gareth M. Neville, and Ralph Andresen, all of Washington, D. C., Sp. Attys., for the Government.

Smith, Buchanan & Ingersoll, and William Watson Smith, Frank B. Ingersoll, and Leon E. Hickman, all of Pittsburgh, Pa., and Hughes, Richards, Hubbard & Ewing, and Charles E. Hughes, Jr., Leighton H. Surbeck, and William T. Gossett, all of New York City, for Aluminum Company of America et al.

Milbank, Tweed & Hope, of New York City (Morris Hadley, Timothy N. Pfeiffer, Edgar P. Baker, and William Shields, Jr., all of New York City, of counsel), for Aluminium Limited et al.

104

Hughes, Richards, Hubbard & Ewing, of New York City, (Charles E. Hughes, Jr., Leighton H. Surbeck, and William T. Gossett, all of New York City, of counsel), for Aluminum Manufactures, Inc.

Baldwin, Todd & Young, of New York City, and Nash & Nash, of Manitowoc, Wis., (Roger S. Baldwin and Hiram C. Todd, both of New York City, of counsel), for Aluminum Goods Manufacturing Co.

New York, September 30, 1941

CAFFEY, District Judge.

I approach the rendition of a decision with great diffidence. There are several reasons for this. Some of them I think should be explained.

For me there are four chief difficulties. The first is the size of the record. The second is a condition of the law applicable, —to which I shall refer. The third is the outcome, including especially the divergencies in the outcome, of sundry previous litigations. The fourth is certain features of the testimony, particularly conflicts, imposing the responsibility of passing on relative credibility of witnesses.

According to my estimate, the record consists of upwards of 58,000 pages. That number is made up of 41,722 pages of minutes, what counsel on both sides have referred to as 15,000 pages of exhibits and what, according to my own estimate, exceeds 1,500 pages of answers to interrogatories.

The size of the record is not surprising in view of the proceedings which continued for two years and two months, actually consumed in the trial, regardless of certain proceedings that occurred preceding the commencement of the trial on June 1, 1938, and certain proceedings which have followed the closing of the taking of testimony on August 14, 1940.*

During the time of the actual trial there were 155 witnesses. There were introduced or offered, and mostly introduced, 1,803 exhibits. The interrogatories and answers, nearly all printed but partly typewritten, are about nine inches thick. Many of the pages in the exhibits and in the answers to the interrogatories would consume as much as four pages of the ordinary size for minutes, others three pages, others two.

So that in giving you my estimate of 58,000 pages I think not improbably it is considerably under the actual number if we were to translate the exhibits and the interrogatories into pages of the ordinary court minutes size.

The second trouble is with the law. There are three branches that are brought into the case and as to which there must be rulings. These are the Sherman Act, the patent law and the tariff law—including the Anti-Dumping Act, 19 U.S.C.A. §§ 160 to 173.

At the moment I shall not discuss the provisions of the patent law or the tariff law, but shall take up those later when I reach a branch of the case to which they chiefly relate. For the present I shall discuss only the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and that to the limited extent of trying to make clear to you what, as I conceive, is the difficulty that arises from the law itself in reaching a correct decision in the case at bar.

In a lay sense every sale of every article, of any kind, that is the subject of interstate or international transaction, restrains trade. A shopkeeper who sells an apple restrains the trade of his next-door neighbor who also sells apples. Plainly, and as matter of common sense, that is not the meaning of restraint of trade as the phrase is used in the Sherman Act. That the Sherman Act does not employ "restraint of trade" in any such sense has been decided, and attention called to its real significance, by the Supreme Court over and over again. So also the Supreme Court has specifically directed attention to the fact that every sale restrains some other sale.

In Board of Trade v. United States, 246 U.S. 231, at page 238, 38 S.Ct. 242, at page 244, 62 L.Ed. 683, Ann.Cas.1918D, 1207 the Court said:

---

*NOTE: Throughout this opinion all citations of trial minutes refer to the typewritten transcript.

"The case was rested upon the bald proposition, that a rule or agreement by which men occupying positions of strength in any branch of trade, fixed prices at which they would buy or sell during an important part of the business day, is an illegal restraint of trade under the Anti-Trust Law. But the legality of an agreement or regulation cannot be determined by so simple a test, as whether it restrains competition. Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition."

So the Court, as I have indicated, has frequently drawn attention to the sources from which we are to derive the meaning of "restraint of trade" as that term is employed in the Sherman Act.

■ The Sherman Act was adopted in 1890. As is manifest from reading the proceedings in Congress during its consideration, and indeed from considering only what appears on its face, the terms employed in the Sherman Act were derived directly from the common law. The consequence is that those words have the meaning which they had at common law.

During the pendency of the trial of this case, on May 27, 1940, an opinion was handed down by the Supreme Court in Apex Hosiery Company v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. There, after referring to the statute as having been adopted by Congress in 1890, at pages 497, 498 of 310 U.S., at page 994 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044, the Court said this:

"In seeking more effective protection of the public from the growing evils of restraints on the competitive system effected by the concentrated commercial power of 'trusts' and 'combinations' at the close of the nineteenth century, the legislators found ready at their hand the common law concept of illegal restraints of trade or commerce. In enacting the Sherman law they took over that concept by condemning such restraints wherever they occur in or affect commerce between the states."

I refer to the Apex Hosiery case, however, for a more important purpose than that of reading the extract I have just quoted. At page 489 of 310 U.S., at page 989 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044, there occurs a statement which really focuses attention on the exceeding responsibility and on the difficulty of a judge who has to decide a Sherman Act case. No longer than last year the Court said this:

"The prohibitions of the Sherman Act were not stated in terms of precision or of crystal clarity and the Act itself did not define them. In consequence of the vagueness of its language, perhaps not uncalculated, the courts have been left to give content to the statute, and in the performance of that function it is appropriate that courts should interpret its word in the light of its legislative history and of the particular evils at which the legislation was aimed."

■ The Court has gone further and a number of times has issued admonitions addressed to the judges, perhaps also intended for members of the bar. Three extracts from those opinions will illustrate these.

In Maple Flooring Association v. United States, 268 U.S. 563, at page 579, 45 S.Ct. 578, at page 583, 69 L.Ed. 1093, in 1925 the Court said:

" * * * it should be remembered that this court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, * * *."

Again, in Sugar Institute v. United States, 297 U.S. 553, at page 600, 56 S.Ct. 629, at page 642, 80 L.Ed. 859 in 1936 the Court said:

" * * * the Sherman Act, * * * does not go into detailed definitions. * * * in applying its broad prohibitions, each case demands a close scrutiny of its own facts."

So also in United States v. Hutcheson, 312 U.S. 219, at page 230, 61 S.Ct. 463, at page 465, 85 L.Ed. 788, in which the opinion was handed down this year, the Court, when speaking as of the date of the adoption of the Clayton Act, said:

"By the generality of its terms the Sherman Law had necessarily compelled the courts to work out its meaning from case to case."

Both on the facts and the law, if there were no other features, I think, therefore, we should realize that decision of a case of the kind now on trial imposes on the judge who must make it a responsibility which is grave and a burden which is heavy.

106

The third feature contributing to my difficulties arises out of the volume of anti-trust proceedings against Alcoa which have been heretofore terminated, including an account of what happened in those proceedings.

The first of these was a suit by the Government, brought in the United States District Court for the Western District of Pennsylvania, the proceedings in which are in evidence in the present case as Exhibits 1009 and 1010. The decree in the case was rendered on June 7, 1912. There will be occasion several times later to refer to that case and I shall call it, as it has frequently been called at the trial, the Pittsburgh case.

The decree contained sweeping injunction provisions. Sections 1, 6 and 7 particularly include clauses which are quite broad. In so far as there were issues in that case which are raised or sought to be raised also in this case, what was determined in the Pittsburgh case is res adjudicata and cannot be made the foundation and cannot contribute to sustaining a foundation basis for this suit. In other words, when charges have been made and adjudicated by the courts, those same charges and the bases for them cannot be employed as the basis of another suit; they have exhausted the ground of complaint growing out of what was involved in that case and adjudicated by the decree in that case.

The result is that, so far as concerns what was brought within that case by the pleadings and was passed on there must be excluded from my consideration as a part of the cause of action sued on in the case at bar. The limit to which I can go is that, in determining the intent of the Aluminum Company of America, the sole defendant in that case, I may take into account things done by the company that are in evidence here which were mentioned in that case.

The second legal proceeding was that brought by the Federal Trade Commission against the Aluminum Company of America, to which I shall refer, as we have referred to it throughout the trial, as Alcoa. In that suit the complaint was about transactions related to the Cleveland Metal Products Company.

The Cleveland company was in financial difficulties. The evidence in the case at bar indicates that those difficulties grew primarily out of Government action during the World War. At any rate, the officials of the Cleveland company informed Alcoa of their embarrassment and asked for help. Alcoa was a creditor for a considerable amount. A plan was worked out for the formation of a new corporation, called the Aluminum Rolling Mill Company. The stock in that new corporation was divided between the Cleveland Metal Products Company, or its proprietors, and Alcoa. The Federal Trade Commission brought suit to compel Alcoa to divest itself of the part of the stock that it had received. The Commission was successful. There was an appeal to the Circuit Court of Appeals for the Third Circuit. In 1922 the decision below was affirmed in Aluminum Co. of America v. Federal Trade Comm., 284 F. 401.

As matter of course Alcoa proceeded, as it was directed, to divest itself of the stock. Nevertheless, the debt to Alcoa had not been paid. There was merely an unscrambling operation. Accordingly, Alcoa brought suit to recover a judgment on its debt. The Commission thereupon renewed its proceeding and sought an order adverse to Alcoa. However, that suit was not successful, and the Commission's petition to modify the earlier decree was denied in 1924. The denial of the petition, by the same Circuit Court of Appeals, is in 299 F. 361.

The third legal proceeding to which I call your attention is one that was brought by the Federal Trade Commission against Alcoa. There were numerous charges and grounds of complaint. The proceeding was pending from 1925 to 1930. The testimony was approximately 10,000 pages and there were numerous exhibits.

The violations of law charged were under the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq. and the Clayton Act. Nevertheless, as you will see from what I shall read in a moment, there were issues of fact of the identical kind that can be raised under the Sherman Act and what makes the particular proceeding of greater consequence in its bearing on creating difficulties for the judge is that among the issues determined, as between the Commission and Alcoa, were some which were identical with issues that are now involved in the case at bar.

The Examiner made findings on December 16, 1929. The whole history of the case can be obtained by reading Exhibits 138, 139, 153 and 256. These exhibits

are to be found at exhibit pages 602-18, 827-42, 1716-89 and when I say "exhibit pages" I think all of us understand that the reference is to the printed copies of exhibits.

The findings of the Examiner were affirmed by the Commission and were in favor of Alcoa. The findings are at pages 1784-9 of the printed exhibits; also at pages 6655-61 of the minutes of the present trial.

The findings are quite extensive. I shall refer to only eight and from these I shall read only brief extracts. The respondent in this proceeding, as I have already explained, was Alcoa. Among the findings the Examiner made were eight, as follows:

1. "The record also shows that respondent [Alcoa] never attempted to monopolize the scrap market; that it is impossible to do so, the scrap market being so scattered and diversified and in such great available quantities that one concern, no matter how large its purchases, could never corner the said market."

2. "Respondent has no monopoly on bauxite (the ore of aluminum); there being sufficient supplies of bauxite in the world, exclusive of respondent's holdings, available for many generations to come."

3. "Respondent has no monopoly on water power; its holdings now being only a small per cent of the available water power in the world."

4. "The respondent does not now nor has it ever attempted to control or dominate the policy of the Aluminum Goods Manufacturing Company."

5. "Respondent has never attempted to control and does not now control the market for foreign aluminum in the United States."

6. "That foreign aluminum is imported into the United States and competes with respondent in the sale of virgin aluminum ingots."

7. "There is no arbitrary or direct differential between the purchase price of scrap aluminum and the selling price of virgin aluminum. The purchase price of scrap depends upon the law of supply and demand."

8. "That respondent has never had a monopoly of the sand casting industry of the United States."

Of course, I realize that what the Commission found is not evidence in support of or adverse to the position of Alcoa in this case, nor has it any direct bearing upon this case. For one thing, the pleadings here are quite different. They extend over a period long following the period that was covered by the Commission. In referring to the matter my sole concern is to draw attention to the circumstances as indicative of the difficulty that faces the judge who must decide this case. It is to be noted, for example, that on some of the exact issues now facing me the Commission found squarely in favor of Alcoa. Yet twelve years later, partly on substantially the same evidence and partly on additional evidence, I am asked to hold the other way.

The fourth litigation was a suit brought by Mr. Haskell, who was president of the Baush Machine Tool Company. Defendants in that suit were the executors of Mr. James B. Duke. The complaint by Mr. Haskell was of violations of the Sherman Act by which he individually suffered damage. There was a judgment for him in the trial court.

An appeal was taken to the Circuit Court of Appeals for the Third Circuit. Its opinion on the appeal, handed down in 1929, is found in Perkins v. Haskell, 31 F.2d 53. The judgment below was reversed. In its opinion the Court of Appeals reviewed the testimony and declared that there was no evidence to sustain a finding of an agreement between Mr. Duke and Mr. Haskell with respect to the matters involved,—which related to the aluminum industry and Alcoa.

The fifth litigation is one which occurred between the Baush Machine Tool Company and Alcoa. The suit was first brought in 1928 in Massachusetts. It was not pressed there. Another suit for the same cause of action was brought by the same plaintiff against the same defendant in the United States District Court for Connecticut in 1931. The case was tried twice, once for eleven weeks at New Haven in 1933 and again at Hartford for nine weeks in 1935. In one trial Alcoa won; in the other trial Baush won. In other words, there were two trials of the same case. The plaintiff succeeded in one and the defendant in the other. Both decisions were reversed by the Circuit Court of Appeals for this Circuit, in Baush Machine Tool Co. v. Aluminum Co. of America, 72 F.2d 236 and Id., 79 F.2d 217.

I shall not go into any details of explanation, because it is not essential, as to why the decisions below were reversed. The significance is that two juries in the same case, perhaps because there was some variance in the testimony, reached opposite conclusions.

The fourth difficulty arises out of my having to pass on the credibility of a great many witnesses. That difficulty would not be so great but for these circumstances: The testimony runs over a period of more than 50 years. Many persons having first-hand knowledge have died or were not produced. We are therefore without the benefit of testimony which, if the case had been tried a great many years ago, might have been available.

I explain again that my sole purpose in referring to the facts into which I have gone at some length is to point out the difficulties that I am compelled to face in rendering a decision. The variegated nature of the conclusions reached in the proceedings mentioned, of itself, carries a warning that my task is not easy.

Sixty-three defendants were named in the present suit. Ten were not served. There was a dismissal as to one. One corporation included as a defendant was dissolved before the suit was commenced. Deducting those twelve from sixty-three left fifty-one defendants. Of the fifty-one, several individuals died and the suit has been revived as against their successors. Of the fifty-one also two corporations were dissolved pending suit. That left, therefore, forty-nine defendants.

The forty-nine defendants are divided into four groups or rather, to state it more accurately, the defendants consist of two groups and two individual companies.

The first group has been referred to throughout the trial as Alcoa. It is composed not alone of the Aluminum Company of America (commonly called Alcoa) itself but also of its subsidiaries, directors, officers and stockholders who have been named as defendants.

The original name of the principal defendant was Pittsburgh Reduction Company. This was changed in 1907 to Aluminum Company of America. Again in 1925 there was a merger and the same name was taken by the new company.

I shall continue to refer to the entire first group, as counsel have done during the course of the trial, as Alcoa. Further-more, as matter of fact, the evidence shows that the subsidiaries actually are mere departments of Alcoa.

The second group is made up of a Canadian company, called Aluminium Limited, and three of its officers. They also will be treated as one, under the name, which we have employed throughout the trial in identifying them, of Aluminium.

One of the additional corporate defendants is Aluminum Manufactures, Inc., which stands out, without subsidiaries or directors or officials or anybody connected with it, as a single defendant. As heretofore, this will be hereafter referred to as Manufactures.

The last individual corporate defendant is the Aluminum Goods Manufacturing Company. As in the case of Manufactures, this last named company has no officers or directors or subsidiaries who are parties to this suit and will be called, as it has heretofore been called, Goods.

### Issues

The lawsuit divides itself into three topics, and three only. These are:

1. Monopolization.
2. Conspiracy.
3. Other misconduct.

The sense in which each of these words is used will be defined. Unless so defined, use of them might lead to misunderstanding. On the other hand, if properly understood, their employment will reduce the number of things that must be taken into account.

I am convinced that I can make a clearer presentation of what I have to say if I adhere to the three named topics as describing everything I am going to say. I shall take up monopolization first.

Later I shall also divide the lengthy branches of my discussion into sub-topics under one or more of the major headings I have given. I think this also will be helpful,—especially with respect to monopolization,—to getting clarity and a balanced view. The result may be some repetition; but, even so, the fault will be a small price to pay for assistance toward getting an accurate understanding.

Near the commencement of this trial I announced that I should make an effort to adhere to a practice I have followed ever since I came on the bench; that is, to render oral opinions in non-jury cases. I

said to you then that I was not sure that I should be able to do this in the present case and the fact is, as I have now determined, that I cannot carry out my original intentions fully. This is due to the fact that in the case there are so many things which are highly technical or complex or which involve statistics or giving numerous pages that it is physically impossible for me accurately to make my statement and compose everything I say as I go along with respect to any such matters as those. In consequence, there will be parts of what I have to say as to which my notes are practically as full as if I had written out such parts.

Toward the end of the trial, when both sides asked for early disposition, I told you that I should be unable to give you that unless I confined myself to crucial issues; and in the course of my work in reaching the point of decision I found, in addition, that it is much better that I confine myself to the crucial issues.

So also the number of issues is so great that I shall not hold myself responsible for giving more than one reason for any single conclusion. I may sometimes give more than one, but the fact that I give only one does not mean that I feel that there are not other valid reasons. There are numerous instances in the record in which I could assign quite a good many reasons for a conclusion I have reached.

Another thing I call to your attention is that counsel disagreed, particularly at the oral argument and to a considerable extent, indeed, in their briefs, as to what the record shows on particular issues. The result of that has been that I have had to search the record,—and I agreed that I would search the record,—as to each of those issues. I have endeavored to do that. Whether I have succeeded or not, I do not know.

Again, where I have felt that there was occasion to furnish citations to the record, I have done so or am prepared to do so. That also I could not do unless I had very full notes.

The method of procedure which I shall follow does not mean that there will be any single issue in the case on which I shall not make a definite finding if there is occasion to do so. With the purpose of reaching a decision of the case I shall, as I have already indicated, however, confine myself to what I conceive to be the crucial and determining issues.

* * * * *

As a commercial article, it is correct or substantially correct to say that aluminum made from bauxite is but little more than fifty years of age in the United States. It has interested me to make a bit of inquiry into the relative ages of aluminum and a few other metals. The investigation was not exhaustive and for statements of the facts as to other metals I have relied on the Encyclopedia Britannica.

First, copper: That has been known from the most ancient periods of which we have any historical account. Its alloy with tin is and to remote times has been referred to as bronze. That runs back so far that we have what we refer to as the Bronze Age. Bronze is the first metallic compound used by mankind of which we have a record. It was known preceding 3500 years before Christ. The account of it in the Encyclopedia Britannica of the fourteenth edition will be found in volume 4 at page 240 and volume 6 at page 401.

The second metal I looked into is steel. Its working and hardening were common 3000 years ago in Greece. It probably required a number of centuries for it to reach the stage that it had arrived at in Greece three thousand years ago. The production of Damascus steel has been generally practiced from very remote periods in oriental countries. For this see volume 12, page 649, and volume 7, page 4.

There are numerous other metals than aluminum, but there is no occasion to mention them. The two examples given indicate how young, commercially, aluminum is.

In this country commercial aluminum is made from bauxite. That is an ore. There are, in the United States, however, other ores from which aluminum can be made. Among them is alunite. According to the reports, that exists in great quantities in Utah, for example, and, according to some of the statements, exists elsewhere in the United States. For that see the fourteenth edition of the Encyclopedia Britannica, volume 1, page 720. You will recall also the testimony with respect to this given by Mr. Bohn and Mr. Markey, particularly by Mr. Markey.

Another ore from which aluminum can be made is leucite. According to the state-

ments of some of the experts, it can also be made of clay—common clay—one of the most plentiful articles that covers the surface of the earth. I have gathered from sundry general statements as well as from the testimony, however, that, so long as there are available better materials like bauxite, alunite, leucite and others, it would be inadvisable to resort to clay, because of the increased expense of producing aluminum from it.

As I have previously remarked, the name of the Aluminum Company of America was first Pittsburgh Reduction Company. The name was changed to Aluminum Company of America in 1907. If I refer to Alcoa preceding 1907, which is the more convenient thing to do, you will understand, of course, that the name actually used then was Pittsburgh Reduction Company.

The financial and business history of Alcoa to the end of 1939 runs back but 51-1/3 years. It began with a total capitalization of $20,000. On December 31, 1939, its capitalization, according to Exhibit 1663, was $242,000,000. Up to June 4, 1928, Alcoa, for a good many years, owned interests in quite a number of companies and properties in foreign countries. A great part of those foreign holdings were transferred at that time to Aluminium, which was then organized. At the moment I go no further into details with respect to the story of Aluminium or the story of Alcoa, because it is not necessary to do so now in order that my meaning may be clear later.

In a considerable part of what I am going to say—much the greater part—I shall deal with the case only as it affects Alcoa. In doing that, however, incidental reference will be made to other defendants—Aluminium, Manufactures and Goods—but that will be only incidental. Later those three defendants will be taken up separately.

So far as concerns Alcoa, all three of the major classes of charges have been made; namely, it has been charged with monopolization, with conspiracy and with other misconduct. I shall first take up monopolization.

## I. MONOPOLIZATION

As I have said, I have adopted the term monopolization largely as matter of convenience. It has a more extensive meaning than can be derived from a single word.

The source of the charge of monopolization is Section 2 of the Sherman Act, 15 U.S.C.A., § 2; see, also, 26 Stat. 209, c. 647. This reads as follows:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, * * *."

By monopolization I mean to include everything specified in Section 2 of the statute as constituting an offense. There are three things. These are, first, to monopolize; second, to attempt to monopolize; and, third, to combine or conspire with any other person or persons to monopolize,—all of course relating to trade or commerce among the several States or with foreign nations.

In order to avoid misunderstanding, I repeat that I shall use monopolization to cover all that I have specified as being embraced in Section 2 of the Sherman Act.

It may clarify the meaning of monopolization if I draw your attention to a statement by the Supreme Court. There an effort was made to distinguish or discriminate between monopolization and conspiracy. In United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, in footnote 59, 60 S.Ct. 811, 845, 84 L.Ed. 1129, the difference between the two offenses of monopolization and conspiracy was stated.

In the case cited the prosecution was for a price-fixing conspiracy. It was brought, of course, under Section 1. Yet the line of demarcation was drawn between the two sections. In footnote 59 on page 226 of 310 U.S., at page 845 of 60 S.Ct., 84 L.Ed. 1129, the Court said:

"The existence or exertion of power to accomplish the desired objective (United States v. United States Steel Corp., 251 U.S. 417, 444-451, 40 S.Ct. 293, 296-299, 64 L.Ed. 343, 8 A.L.R. 1121; United States v. International Harvester Co., 274 U.S. 693, 708, 709, 47 S.Ct. 748, 753, 754, 71 L.Ed. 1302) becomes important only in cases where the offense charged is the actual monopolizing of any part of trade or commerce in violation of § 2 of the Act * * *. An intent and a power to produce the result which the law condemns are then necessary. As stated in Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 279, 49 L.Ed. 518, ' * * * when that

intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result.' But the crime under § 1 is legally distinct from that under § 2 (United States v. MacAndrews & Forbes Co., C.C., 149 F. 836; United States v. Buchalter, 2 Cir., 88 F.2d 625) though the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1. Standard Oil Co. v. United States, 221 U.S. 1, 59–61, 31 S.Ct. 502, 515, 516, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734; Patterson v. United States, supra [6 Cir., 222 F. 599], page 620."

Charges of monopolization against Alcoa, and sometimes against some of the others, are in twelve sections. All of those charges are, as they must be, under the statute, allegations of offenses or what the Government claims are offenses against the United States; but so far as concerns monopolization in the United States, the twelve subjects into which these charges divide themselves are (1) bauxite; (2) water power; (3) alumina; (4) virgin aluminum (pig and ingot); (5) castings; (6) cooking utensils; (7) pistons; (8) extrusions and structural shapes; (9) foil; (10) miscellaneous fabricated articles; (11) sheet; and (12) cable.

The second of the charges or subjects to which I have referred is water power. As will be drawn to your attention when I reach the subject, there is room for controversy as to what is the nature of the offense charged in regard to water power. I shall not go into that for the moment.

The eleventh and twelfth subjects which I have named are sheet and cable. If these had been taken up in their logical order, they would not have been placed at the end. I put them at the end, however, as matter of convenience, because both those subjects involve a controversy that has much engaged counsel in regard to the alleged spread. I deem it more convenient, therefore, to postpone treatment of sheet and cable until after I have finished the other subjects, so that there will be no misunderstanding as to my discussion of spread.

I have said there are three branches of the law with which we are compelled to deal in this case. These are (1), the anti-trust law; (2), the patent law; and (3), the tariff law. All have to do with or have a bearing on monopolization. Nevertheless, it should be noted that the word monopoly as used in connection with the Sherman Act and in the patent law has different meanings. We must, therefore, keep in mind under which branch of the law we use the word monopoly.

There are three periods which must be covered in discussing the subject of monopolization as it affects the charges against Alcoa. The first is from 1888 to 1909 or, to be precise, from September 1, 1888, until the 2nd day of February, 1909. That I shall refer to as the patent period. The second is from 1909 to 1928 or, to be precise, from February 3, 1909, to June 4, 1928, which, from the end of the patent period, precedes the setting up of Aluminium on the 4th day of June, 1928. The third followed the separation off of Aluminium and runs to date. For the present I shall consider only the patent period.

### Patent Period

Alcoa was founded on patents. Those were issued to Mr. Hall. His invention and his application for the first patent were in 1886. The patent was granted in 1889. Its life being but seventeen years, it therefore expired in 1906. It is not amiss for us to remember that the patent law, and the rights growing out of the patent law, are all derived primarily from the Constitution of the United States itself. In Article 1, Section 8, Clause 8 of the Constitution, in part it is provided as follows:

"The Congress shall have Power * * * To promote the Progress of Science and useful Arts, by securing for limited Times to * * * Inventors the exclusive Right to their respective * * * Discoveries; * * *."

You will observe, therefore, as I have said, that the right of a patent comes direct from the Constitution itself.

The first patent statute was enacted in 1790, 1 Stat. 109. In that the grant was described as being "the sole and exclusive right" in whatever invention was involved. Later there were changes. What was included in section 4884 of the Revised Statutes was carried forward into and is now included in 35 U.S.C.A. § 40. There the pertinent provision is as follows:

"Every patent shall contain * * * a grant to the patentee, * * * for the term of seventeen years, of the exclusive right to make, use, and vend the invention

* * * throughout the United States and the Territories thereof, * * *."

The Supreme Court, in referring to a grant under the patent statute, has characterized it as "exclusive." United States v. Dubilier Condenser Corp., 289 U.S. 178, 186, 53 S.Ct. 554, 77 L.Ed. 1114, 85 A.L.R. 1488.

I shall, of course, have more to say about the Hall patents later.

In 1883, three years preceding the Hall invention, one Bradley applied for a patent. That was issued in 1892. It expired, as heretofore said, on February 2, 1909. At this point it is not necessary to go into further details about it.

As I have said, bauxite is the ore from which aluminum comes. The first product direct from bauxite is alumina ($Al_2O_3$). Alumina is made by the Bayer process. At one time this process was protected by a patent. That patent expired a great many years ago. For some years after Alcoa began its business career it did not make alumina; it bought its alumina from others. It did not prepare itself to produce alumina from bauxite until approximately 1903.

Exhibit 1008, referred to at pages 18371–2; 18398–406 of the minutes, describes an aluminum furnace or pot. It is to be noticed that bauxite and alumina are not at all covered by the Hall patent. The making of alumina from bauxite was by the Bayer process and when Alcoa reached the point of going into the production of alumina it employed the Bayer process, and, as I recall, at that time the patent on the Bayer process had already expired or expired soon after.

Exhibit 1008, which I have mentioned, is a picture or representation of the furnace or pot employed in making aluminum from alumina. The Hall patent covers the making of aluminum. In that process, under the Hall patent, there was employed in this furnace or pot a cryolite bath, carbon electrodes and alumina. An electric current, which produced heat, great heat, was applied. The elements embraced in alumina ($Al_2O_3$) were separated by the use of this process and the application of the electric current. The oxygen of the $Al_2O_3$ passed off. The aluminum which resulted fell to the bottom of the pot. That was tapped off from the bottom of the pot as pig. When remelted, pig runs off as ingot and is the common commercial article we mean to refer to as primary aluminum or virgin aluminum.

Cryolite, in a fused state, will dissolve alumina and an electric current, when passed through such solution, will separate the alumina into oxygen and aluminum before the current attacks the cryolite itself. The reason for this is that cryolite is more resistant to decomposition than alumina. I am not going into the details of this in a technical way, but solely by way of general description in lay language so as to be of assistance in understanding the testimony which will later be discussed.

As I have said, an electric current which produces a great deal of heat is necessary to bring about the result of the decomposition of the elements contained in alumina. External heat, applied from the outside to the pot, may be sufficient to keep the cryolite bath in a fused or melted state. It has been frequently applied, and was customarily applied, in the early history of the Hall patent and it can be applied today. But a more convenient and more efficient, as well as less expensive, method of supplying the heat is through an electric current that passes through the material in the pot. The passing of the electrical current fuses the cryolite. As I have said, fused cryolite is the solvent. It is the electric current passing through the fused cryolite that decomposes the alumina. That solvent is lighter than aluminum. The electric current, in a sense, is substituted and was early substituted in the operation of the Hall process for external heat.

Mr. Hall died in 1914. It may be interesting to note that about the same time he made his invention, an almost identical invention was made in France by a scientist or engineer named Herault. Surprise was expressed by one of the counsel in this case as to how remarkable it was that this incident should have happened. As I recall, I told him at the time, and whether I told him or not, from my experience in the trial of patent cases, I know it is true that it is really not infrequent that two workers arrive at inventions of substantially the same thing at substantially the same time without either ever having heard of the other.

The Herault patent was granted in France but no United States patent was ever granted or could have been granted to Herault on his invention, because the Hall patent, so far as this country is concerned, preceded it.

Following the issuance of the Hall and Bradley patents, there was litigation over them. The first suit was between Alcoa and what we have referred to as the Cowles Company. The title of the case is Pittsburgh Reduction Company v. Cowles Electric Smelting & Aluminum Company, C.C., N.D.Ohio, 55 F. 301, the decision having been rendered in 1893 and the opinion written by then Circuit Judge Taft, afterwards Chief Justice of the United States.

Another decision of vital consequence to understand is that of Electric Smelting & Aluminum Company v. Pittsburgh Reduction Company, 2 Cir., 125 F. 926, rendered in 1903, the opinion being written by Judge Coxe (whose son is now one of the judges of this court).

In the case before Judge Taft, Alcoa was successful and procured an injunction against the Cowles Company using the Hall invention.

In the case in which Judge Coxe wrote the opinion, the suit was brought in the United States Circuit Court at Buffalo by the Electric Smelting & Aluminum Company, which belonged to the Cowles group of companies, against Alcoa. The decision in the Circuit Court was in favor of Alcoa. On appeal to the Circuit Court of Appeals for the Second Circuit the Circuit Court was reversed in the case, reported in 125 F., as I described to you, where the opinion was written by Judge Coxe.

For the purpose of the present case it is not necessary to go into the details of the two litigations I have mentioned. If one be interested in getting the details, however, he need read nothing else than the opinions of Judge Taft and Judge Coxe. What I have said about the litigation between Alcoa and Cowles is quite adequate for an understanding of the only real question that arises in the case at bar in regard to the conflicting claims made by the litigants in those two cases.

Note that in the case before Judge Taft Alcoa procured an injunction. That was followed by hearings before a master to determine the amount of damages to which Alcoa was entitled because of infringement by Cowles of the Hall patent. Before the suit at Buffalo was begun, the Cowles people acquired the Bradley patents. On the basis of ownership of one Bradley patent, Cowles sought a recovery against Alcoa for infringement of that patent.

During the period of the pendency of the litigations,—the Taft decision, you will recall, having been rendered in 1893 and the Coxe decision in 1903,—during the intervening ten years a good many things had happened. There had been a great deal of expense; an injunction had been granted against Cowles and was outstanding in Ohio; the master in the Ohio case had found that Alcoa's damages from infringement of the Hall patent aggregated a large sum; there had been a recovery against Alcoa in New York. In consequence, as not infrequently happens in patent controversies, negotiations for an adjustment ensued. These led to an agreement in 1903 on an adjustment between Cowles and Alcoa. That agreement is Exhibit 265.

That such a method of adjustment is lawful, in principle, was held by the Supreme Court in United States v. United Shoe Mach. Co., 247 U.S. 32, 51, 52, 38 S.Ct. 473, 62 L.Ed. 968.

It would be unfortunate if such a composure did not have the approval and sanction of a court, because here there had arisen a deadlock,—as often occurs between disputants where there are different patents outstanding relating to the same subject. The two litigants could have spent years in further litigation, at enormous expense and with doubt as to the outcome. Instead, both took the view that they preferred to put their time on making aluminum.

Out of the adjustment there arises the first or a preliminary charge against Alcoa of monopolization.

The initial charge of monopolization against Alcoa rests exclusively, or well-nigh exclusively, upon a paragraph of the settlement agreement of 1903 between Alcoa and Cowles. In substance Cowles agreed not to produce aluminum by electrolysis from a fused bath. The first sentence of paragraph 12 is as follows:

"The parties of the first and second parts [those being the two Cowles companies] and their officers jointly and severally agree, that during the term of this contract, they will not engage, directly or indirectly, in the manufacture of aluminum in the United States, by electrolysis from a fused bath."

The period of the contract was for the balance of the life of the Bradley patents. The contention of the Government is that this so-called restrictive covenant is evi-

dence of monopolization. My response is that if the contract had not contained the assailed provision at all, from the date of the contract until the expiration of the longest lived Bradley patent protecting the invention, by force of other provisions of the contract, Alcoa would have had the exclusive right to use the invention covered by these patents. If that be so, then incontrovertibly the contract cannot be evidence of monopolization.

In order to see more about what were the terms of the 1903 settlement agreement, let us read from paragraphs 2, 3 and 4.

In paragraph 2 there is a clause as follows:

" * * * the said parties of the first and second part [being; as I have heretofore said, the two Cowles companies] do hereby grant to the party of the third part [that being Alcoa] the sole and exclusive right, nonassignable in whole or in part, within and throughout the United States and its territories and dependencies to use in the manufacture of aluminum and aluminum alloys the inventions described" in the Bradley patents.

In paragraph 3 of the agreement there are provisions for payments by Alcoa to the Cowles companies for the exclusive license of the Bradley patents. Among the payments was to be a royalty for all aluminum made under the patents "by electrolysis from a fused bath."

In paragraph 8 it is recited that the parties to the agreement believe that the patents, which are identified by number, "are effective to cover all commercial methods of manufacturing aluminum by electrolysis from fused baths." In other words, the clause by which the Cowles companies committed themselves not to produce aluminum by electrolysis from a fused bath was merely saying that they promised not to violate the grant they had made. The thing they said they would not do is the thing which by the license they had conferred or undertaken to confer on Alcoa the exclusive right to do.

The Supreme Court had previously held that an exclusive license carried with it a right which was the equivalent of the licensee having thereby been made the owner of the patent which was licensed for the period covered by the license. In this instance the period covered was to the expiration of the license. For that see Waterman v. Mackenzie, 138 U.S. 252, 255,

256, 11 S.Ct. 334, 34 L.Ed. 923, a case to which I called the attention of counsel about the time the controversy first arose over the effect of the settlement agreement and again called to their attention near the close of the case. In support of the same proposition see also Richmond Screw Anchor Co. v. United States, 275 U.S. 331, 344, 345, 48 S.Ct. 194, 72 L.Ed. 303.

There is, therefore, no basis whatsoever for treating the so-called restrictive covenant as conveying anything to Alcoa which Alcoa did not already have by virtue of the grant of an exclusive license.

Again, what is it that was included in the Bradley patents? What was actually included, and as the agreement itself recites what both parties understood to be included, was a right to produce aluminum by electrolysis from a fused bath.

In consequence, nothing outside of a right to produce aluminum by electrolysis from a fused bath was granted nor did paragraph 12 recite anything else as having been granted.

The Government argues that Cowles was a predecessor of Alcoa because Mr. Davis in his testimony or in his pleading had claimed that Cowles for two years, 1891 to 1893, had waged ruinous competition against Alcoa. The fact is, however, that this testimony is nothing more than a claim by Mr. Davis that Cowles had infringed the Hall patents. That is all the testimony or the claim of Mr. Davis consists of; and Judge Taft held, preceding the case in which Judge Coxe wrote the opinion, that Cowles had infringed the Hall patents. After the rendition of the Taft decision in 1893, in the proceedings before a master, which were pending for a long time, the master determined that, as a result of the infringement, Cowles was liable to Alcoa in a considerable sum for damages,—the amount, stated by the master, as I recall, aggregating approximately $195,000.

As I see it, there is no escape, therefore, from the proposition that, under the law as laid down by the Supreme Court, the provision in paragraph 12 of the 1903 agreement was not a restrictive covenant at all nor was there elsewhere in the agreement any restrictive covenant; and the reason, I repeat why this is true is that if the provision in paragraph 12 had been omitted Alcoa, under the terms of the other paragraphs of the agreement and as matter of law, by reason of the fact that it became an

exclusive licensee to the end of the life of the patents, would have had just exactly as much right as if paragraph 12 had been omitted from the agreement.

■ There are other alleged restrictive covenants to which the Government calls attention. These are in agreements with the General Chemical Company in 1905, with the Pennsylvania Salt Company in 1907 and with the Norton Company in 1909. Those agreements, however, are the identical agreements on which in considerable part the bill of complaint in the Pittsburgh case rested. They are the identical agreements there complained of and there having been a decree in that case by which those agreements were cancelled, none of them can now be given weight toward the support of a cause of action in the case at bar.

Why is that so? The reason seems to me manifest.

It is true because, having been complained of and a decree having been granted, the original rights under the agreements no longer had any existence. They became merged in the decree. One result of the decree was that the issues raised in regard to those matters were completely adjudicated. If the contracts mentioned were now treated as the basis of a present cause of action, then there is nothing that can be adjudicated in any case and ripen into a judgment which cannot be sued on again the very next day. The claim of such a right to maintain a fresh suit, of course, rests on a wholly unsound proposition.

■ That the three contracts are no part whatsoever of a cause of action in the case at bar is settled, in principle at least, by numerous decisions of the Supreme Court. One of these is Baltimore S. S. Co. v. Phillips, 274 U.S. 316, 47 S.Ct. 600, 71 L. Ed. 1069. As heretofore remarked, however, I conceive that I may give some consideration to the fact that the agreements were entered into as part of the history of the conduct of Alcoa in so far as that is of assistance in determining the intent with which Alcoa may have done other things that may properly be complained of in this suit; but I think I cannot properly go further.

There is one circumstance in this connection which is rather extraordinary and which I did not discover until during my recent study of the case. This is a clause in the bill of complaint in the Pittsburgh case (Exhibit 1010). The portion to which I draw your attention is two extracts from paragraph XIV, exhibit pages 4971-2. The paragraph has a sub-title which reads "WHEREIN THE ANTITRUST LAW HAS BEEN AND IS BEING VIOLATED." In the body of the paragraph are the two statements to which I referred. The first is as follows:

"It is not claimed by petitioner [that being the Government] that it was unlawful for defendant to exclude all others from the manufacture of aluminum while it was operating under the Hall and Bradley patents, and hence it is not insisted that the monopoly held by defendant [that is, Alcoa] in the manufacture of aluminum in the United States when said patents expired in 1909 was an unlawful one."

Later in the same paragraph it is said: " * * * petitioner concedes that defendant's practical monopoly in both bauxite and the manufacture of aluminum in the United States which it held at the expiration of said patents was lawful, * * *."

In other words, here we have of record an unequivocal admission by the Government that up to February 2, 1909, there had been no monopolizing by Alcoa and this for the reason that it was protected in its patent monopoly up to that date, that being the date when the Bradley patents expired.

As I have said heretofore, I have seen no occasion for describing what was embodied in the Hall patent or in the Bradley patents, further than was done in my statement above. Nor do I think now there is occasion to go into details, because to the extent that the details have a bearing they are embodied in the opinions of the courts in the Ohio case and in the case that went to the Second Circuit Court of Appeals.

There is one thing which is important, however. This is in the opinion of Judge Coxe. There, in substance, he said that the Hall patent was, to the extent that there was conflict between the two patents, an improvement on the Bradley patent; with the consequence, as he held, that the Bradley patents could not be operated for the making of aluminum without the use for that purpose thereby infringing the Hall patent.

Again, it must be remembered that up to the time of the settlement the injunction granted in the Ohio case was still standing

against the Cowles Company. In addition to the bearing that this fact had on the proposition that the settlement agreement was not a restrictive covenant, it also has the significance of further showing the extent to which there was confusion and an impossible situation as between Alcoa and Cowles which justified, and in a sense demanded, that there be an adjustment between the companies if either of them wanted to do any business. As I conceive, Alcoa was in the stronger position. This is so because it had practiced under the Hall patent the making of aluminum by the use of external heat. The result is that, in order to continue making aluminum under its patent, Alcoa was not required to use electric equipment in the way covered by and in a way which would have infringed the Bradley patents.

The conclusion from all of this is that up to February 2, 1909, when the patent protection of Alcoa came to an end, no real ground has been shown for an accusation against Alcoa of monopolization. The period which I call the first period and named the "patent period" may therefore be disregarded and certainly disregarded insofar as the Government has called to my attention any ground or contention on its part for the existence of monopolization up to the date mentioned. Disregarding details, as I see it, to that day Alcoa had availed of no more than a right expressly conferred on it by the patent statute, which in turn had been enacted to implement the constitutional provision with respect to inventions.

### (1) Bauxite

We are, therefore, brought to the first of the twelve subjects that I announced I would take up in the discussion of the issue as to whether or not monopolization has been shown. The period that will be examined in regard to the issues as to all those subjects is from February 2, 1909, down to the date of the close of the taking of testimony in this case.

The first charge is confined to the subject of bauxite and bauxite in the United States. The charges of monopolization made in connection with bauxite are contained in paragraphs 40, 43 and 83 of the bill of complaint. In paragraph 40 the allegations with respect to bauxite are as follows:

"Defendants have violated and are now violating the provisions of said Sherman Antitrust Act, by monopolizing, attempting to monopolize, combining and conspiring to monopolize, * * * interstate and foreign trade and commerce, and more particularly by enabling the Aluminum Company to acquire and maintain a monopoly of bauxite, * * * and by excluding others from the fair opportunity to engage in interstate and foreign trade and commerce in said articles."

In paragraph 43 the allegations are these:

"Defendant The Republic Mining and Manufacturing Company, wholly owned subsidiary of Aluminum Company, owns or holds more than 90 per cent of the bauxite deposits in the United States commercially suitable for the production of aluminum; and Aluminum Company controls and uses 100 per cent of the bauxite produced in the United States for the manufacture of aluminum."

In paragraph 83 it is alleged:

"For the purpose and with the effect of * * * maintaining an illegal monopoly in the United States in the production and sale of bauxite, * * * defendants have engaged in the following activities in the United States and foreign countries from about 1890 to the present: They have entered into agreements and understandings with competitors and potential competitors to limit production, fix prices, allocate markets and restrict production and sale of bauxite, * * * and have acquired, in excess of their reasonable needs, * * * bauxite, bauxite deposits, * * * and have acquired bauxite * * * and properties and rights therefrom and interests therein; * * * and have fixed unreasonable, arbitrary, discriminatory and oppressive prices for bauxite, * * * and have fixed prices for bauxite, * * *."

As I have remarked heretofore, bauxite is an ore. It is dug from the ground much like other ores. It requires two tons of bauxite to make one ton of alumina; it requires two tons of alumina to make one ton of aluminum (p. 2346). It follows that it requires four tons of bauxite to make one ton of aluminum.

Alumina is a white powder. It is not needful to go into other details in respect of what alumina is. It is, however, important to understand what must be the grade of bauxite in order that there may be economical production out of it of alumina in the present state of the art. It does not follow that alumina may not be made out of bauxite of a lower grade. It is true, however, that if the bauxite be of a lower grade the alumina would cost a

good deal more to produce. The result of this is that bauxite which is spoken of as commercially fit for the production of alumina is called aluminum grade.

Aluminum grade means that the bauxite must have 55 per cent or more of alumina and that it must not have in excess of 7 per cent of silica. There is no need to go into explanation of what those two chemical elements are. All that is of consequence for us to know in that connection is that bauxite must be of the quality I have described in order to reach aluminum grade and in order to be fit for the production from it of alumina without excessive expense.

Outside the United States the supply of bauxite is practically inexhaustible. We are not concerned, however, with that fact in connection with the present matter. What is complained of here is the monopolization of bauxite in the United States, not of monopolization of bauxite in the world.

Bauxite has been found in seven States in this country. In only one, so far as the proof shows, was the supply of bauxite ever very large. The seven States are Pennsylvania, Virginia, Georgia, Tennessee, Alabama, Mississippi and Arkansas.

The evidence discloses that in 1940, outside of Arkansas, so far as presently discovered, there were not exceeding 45,000 tons of bauxite of aluminum grade. Of course 45,000 tons, in and of itself, is of consequence and is of importance. Nevertheless, for the purpose with which we are now concerned, we can ignore it absolutely, because, in comparison with the quantity of bauxite of aluminum grade in Arkansas, 45,000 tons is entirely too small to change a fraction of the bauxite in Arkansas much more than a feather's weight. The 45,000 tons therefore may be disregarded, because our inquiry really is reduced to and concerns only Arkansas.

The Government has made the charge that Alcoa monopolizes bauxite. The burden to prove this allegation rests on the Government. In other words, for the purposes of this lawsuit with respect to bauxite, Alcoa could remain silent and unless by affirmative proof the Government establish that Alcoa has monopolized bauxite, the Government must fail so far as concerns the allegation of monopolizing bauxite.

Two witnesses for the Government have mentioned the subject of bauxite. One is Mr. Uihlein; the other is Mr. Haskell.

Mr. Uihlein inquired into bauxite in the United States about 1917. He testified that he found little or none outside of Arkansas. He testified further that there were about seven million tons in Arkansas. He added that all of that was owned by Alcoa (pp. 5879; 6141-2). The search of Mr. Uihlein, however, according to his own testimony, was merely superficial. There was no showing by his testimony or otherwise that he was qualified to make an estimate of or to express an opinion upon the quantity of bauxite in Arkansas or elsewhere in the United States. His own statement shows that he was not qualified to furnish us any such opinion (pp. 5878-80; 6139-49; 6153-4; 6246).

Mr. Haskell made no statement of what he regarded as the quantity of bauxite available in the United States apart from what was owned by Alcoa. In 1924 he told Mr. Duke that he knew of no bauxite in the United States other than that owned by Alcoa (p. 2395). His search also was merely superficial. It was not shown by him or otherwise in the testimony that he was qualified to furnish information or to express an opinion as to the amount of bauxite, much less the amount of bauxite of aluminum grade, in the United States (pp. 2348; 2618; 2845-7).

In the state of the record described, therefore, Alcoa was entitled to prevail without putting in any testimony whatsoever with regard to the amount of bauxite of aluminum grade in the United States.

It appeared in evidence that it is common to speak of bauxite land. This means land under which it is believed that bauxite can be found. It was shown by the testimony that in the so-called dumbbell area of Arkansas there were lands that came within the general class which were called bauxite lands; part of which were owned by Alcoa and part of which were not owned by Alcoa. The percentage of the surface space in land so referred to that was owned by Alcoa was much larger than the remaining land in that area. On the basis of that the Government has made the argument that, based merely on the percentage area of the surface, there is some evidence of the proportion of the bauxite land in Arkansas owned by Alcoa or, more precisely, the proportion of the bauxite in Arkansas owned by Alcoa.

In the first place, even if what has just been said about the dumbbell area were true, it would not be enough to sustain

the Government. This is so because the accompanying evidence does not show that the bauxite which lay beneath, way under the ground beneath the surface, owned by Alcoa was of aluminum grade or fit for the production from it of alumina. More important than that, however, and what is conclusive that the Government's argument on the point has no significance or value, is that it is indisputably established by the proof that beneath land such as I have referred to, commonly spoken of as bauxite land, bauxite does not lie uniformly; it lies scattered about, sometimes in what are called pockets, and there is no indication whatsoever that, if one man owns 95 per cent of the surface and another man owns 5 per cent of the surface, the owner of 95 per cent of the surface may not own much less bauxite than is owned by the man who has the 5 per cent. There is no dispute in the testimony to this effect.

If, therefore, to the testimony of Mr. Uihlein and Mr. Haskell were added the testimony as to area owned by Alcoa and area owned by others, it would not strengthen the Government's case.

What, however, as I said in a different connection today, escaped my attention until engaged in studying this case, is another piece of proof that was put in by the Government. The Government itself offered and there was admitted in evidence against Alcoa the answer of Aluminium to an interrogatory. That interrogatory is subdivision (d) of interrogatory 114. The interrogatory asks for this information: "Acreage of bauxite lands known to be underlaid by bauxite." That is the precise question. Here is the answer,—this answer having been brought into the evidence by the Government: "In the investigation of bauxite deposits no attempt is made to determine specific acreages of surface under which bauxite may be found since such determinations are of no value in estimating the tonnage of bauxite available for commercial use. It is impossible to foretell with any degree of accuracy the bauxite which underlies any given acreage because of the irregularity in the natural placement of the ore."

By proof for which it stood sponsor by introducing it, therefore, the Government itself has declared that the area argument should not prevail.

Alcoa offered two witnesses to testify on the subject of bauxite. Their testimony covered much more than bauxite in Ar-

kansas and much more than bauxite of aluminum grade. As I have previously indicated, however, in the present connection, we really are not concerned with bauxite in the United States outside of Arkansas or with bauxite outside the United States. I shall therefore go into the testimony that was given with respect to bauxite of aluminum grade owned by Alcoa and bauxite of aluminum grade owned by others than Alcoa in Arkansas.

The two witnesses who testified at the instance of Alcoa, are Dr. Branner and Mr. Litchfield. Dr. Branner is the State Geologist of Arkansas. He has occupied that office since 1923 continuously. Mr. Litchfield is an official of Alcoa. He has been in charge of its bauxite since 1925. I shall give you first the results of the estimates made by these experts. I shall then discuss the method by which their estimates were made.

Dr. Branner gave his estimates of aluminum grade bauxite in Arkansas as of May 1, 1940. That was the date or approximate date as of which he had completed his investigations in Arkansas particularly and, for the most part, outside of Arkansas. His estimate was this: In Arkansas Alcoa owned bauxite of aluminum grade, as of the date I have given you, totalling 4,898,703 tons (pp. 37737; 38365-7). Others than Alcoa as of the same date owned the same kind of bauxite, aggregating the holdings of quite a number of owners, of 5,398,293 tons (pp. 37663; 37753; 38365-6). The total owned by Alcoa and by others, therefore, was 10,296,996 tons. When reduced to percentages, that owned by Alcoa constituted 47 plus per cent, say 48 per cent; that owned by others constituted 52 plus per cent, say 52 per cent. In other words, outsiders other than Alcoa, in Arkansas, owned approximately 4 per cent more of bauxite of aluminum grade than Alcoa owned.

Mr. Litchfield, who was, as I have said, an Alcoa official and whose testimony showed the most intimate acquaintance with its business and the conduct of its business and the methods of its business, insofar as concerns bauxite, testified without as much detail as Dr. Branner; in fact, with much less detail than Dr. Branner. Mr. Litchfield said his estimate was that Alcoa owned 6,000,000 tons (p. 36669) and that others owned about 5,500,000 tons (pp. 36692; 36799-801). The total of these two amounts is 11,500,000 tons. Reduced to approximate-

percentages, according to the estimate of Mr. Litchfield Alcoa owned 52 per cent and others owned 48 per cent of bauxite of aluminum grade in Arkansas. In other words, as the estimate was given by Mr. Litchfield, Alcoa owned 4 per cent more than others owned of bauxite in Arkansas of the grade specified.

In general, the testimony of Mr. Litchfield corroborates the testimony of Dr. Branner. On the other hand, he gave no exact date as of which his estimates were made and furnished fewer details than Dr. Branner. As matter of fact, there were not drawn out from Mr. Litchfield by questions numerous details that would have been helpful, if they be not really essential to me in estimating the value of his appraisal in accordance with the principle which the Supreme Court has laid down, as set out in The Conqueror, 166 U.S. 110, 131, 133, 17 S.Ct. 510, 41 L.Ed. 937.

Both of the experts, Dr. Branner and Mr. Litchfield, were highly qualified and I regard both as reliable. There was some criticism of Dr. Branner in argument. I do not feel that the criticism was justified. I feel, therefore, that I ought to add that he impressed me as modest, learned and conscientious. Moreover, Dr. Branner fortified his opinions quite fully by the details he gave.

Now what was the method by which the investigation was carried on by Dr. Branner on which he based his precise estimates?

The bauxite is hidden down under the ground. It is at various distances below the surface. Only in exceptional instances may one investigating it get any very complete view and rarely a view so complete that he sees all of the ore. There has grown up, therefore, in Arkansas, a customary method of making an inquiry into the amount and quality of bauxite on anybody's place. Among the important things about the investigation is the use of what are called test holes and their use by people who are experienced in the business. By the test holes, according to the testimony of the witnesses, competent investigators are able to map out with approximate accuracy the exterior boundaries or perimeter of a deposit of bauxite. So also by the borings from which the test holes grow, the investigators gather samples and by use of the samples they can determine not merely the thickness of the deposit but also its quality and can definitely determine whether it contains the percentage of alumina or the percentage of silica that is required,—the percentages to which all agree in order that the bauxite may come within the aluminum grade.

The method which I have thus very briefly described has been practiced in Arkansas for a long time. Many people there are familiar with it. There are people who do certain parts of it who are relied on. The method has been accepted among people interested in the bauxite industry and, so far as disclosed, no other method has yet been applied or is known.

In making his estimate, Dr. Branner relied on a good deal of information that he personally did not gather, but which was submitted to him and which it is customary for people making estimates of this kind to rely on. A part of the material was records in the shape of reports, particularly reports under the tax laws, that are filed in the public offices and are required to be filed in the public offices by the owners of the property underneath which bauxite lays. Other records which it is customary also to use and which are relied on are records made by so-called drillers, a class of people who put down the test holes and who gather the information on the basis of which there will be analyses which disclose the chemical composition of the samples of bauxite and also from which records are gotten of the depth and the perimeter of the several deposits of bauxite.

At the trial there was controversy at to whether, under the rules of evidence, it was permissible to rely on such information as that which was gathered by other people than Dr. Branner himself who, as an expert, went over the material and used it in making his estimates.

In addition, numerous documents, including tabulations, relating to bauxite (the majority of which were prepared by or under the direction of Dr. Branner) were introduced in evidence. Among them are Exhibits 1670; 1672-4; 1677-8; 1680; 1682-5; 1688-95; and 1698 (see also Exhibits 1686 and 1687 for identification). I do not feel that it is necessary to go into these papers at the present stage. Nevertheless, they will be found very useful to one reviewing the testimony of the bauxite experts.

In my memorandum of November 15, 1940, afterwards published in D.C., 35 F. Supp. page 820, I dealt with the question of

the competency of the testimony given and the documents brought in by Dr. Branner and discussed it fully. It was my view that such evidence is admissible under the laws of evidence as those laws of evidence are applied in this court. Since that time the Circuit Court of Appeals for this circuit has rendered an opinion which, as I believe, confirms precisely the rule of evidence which was applied in this court in regard to the testimony of Dr. Branner and the material he used. That decision is United States v. Mortimer, 2 Cir., 118 F.2d 266, at page 269, handed down on March 17, 1941.

The testimony given by these two experts was quite extensive and quite thorough. It occupied approximately 1,900 pages of the record. These are pages 36464 to 38447, except for 53 pages covering the testimony of an out-of-town witness, which was quite brief. And, so far as I can see, the testimony of the Government in regard to the amount of aluminum grade bauxite in Arkansas completely fails to sustain its contention. I think the testimony of the two experts is the best we can get and is the kind of testimony which we must rely on if we are to have any information at all on a subject like this.

If the estimate of either of the experts, which, as you will see, varies somewhat, be accepted, it completely negatives the monopolization charge and the allegation in paragraph 43 of the bill, that Alcoa owns upwards of 90 per cent of the bauxite in Arkansas.

These witnesses estimated that Alcoa had a supply of aluminum grade bauxite in Arkansas to last, at the then rate of consumption, that is, at its rate of consumption, as prevailed back in the Spring of 1939, for eight years.

Suppose, however, that we were to reject all the testimony of the experts. What would be the situation? Obviously the Government would not be materially helped. Its case on the bauxite issue would be left completely unsustained. Though it has the burden, it has made no proof whatever in support of its allegation—none on which we can rely.

Furthermore, it must be borne in mind that what we are doing here is making a comparison—a comparison of the quantity of bauxite that is owned by Alcoa and the quantity that is owned by others. The scheme employed to ascertain the respective quantities of the two groups was the same for each group. If we have no reason to doubt that the estimate made of the amount owned by Alcoa is correct, then why should we doubt that the estimate of the amount owned by others is correct or approximately so? In other words, in determining whether or not there is evidence of the guilt of monopolization of bauxite by Alcoa, all that we are concerned with is to compare what Alcoa has with what somebody else has and, as I have said, I see no reason to suppose that if it be correct as to one, it is not correct as to the other.

There is one feature of the material produced by Dr. Branner in explanation of how he made his computations that was impressive. That is this: He identified, by township, range, section and quarter or half-section, or other fraction of a section, every single unit of land under which he made his investigation. Anybody who is an expert is therefore in position to go there and find the particular piece of land, with almost the identical portion of the land he looked into. He has given the names of the owners of each of those pieces of land, identified in the way I have described, under which there exists bauxite which he has put together as owned by Alcoa or as owned by others than Alcoa.

In order to determine the quantity of gas or the quantity of oil beneath the ground, methods in general similar to those used by Dr. Branner are applied. I have had the experience of trying both oil and gas cases. Of course, the methods shift in detail, the one to apply to gas, another to apply to oil and another to apply to ore; but from listening to the testimony in the oil and gas cases I have been satisfied that the testimony given by the experts is reliable and that approximately correct results can be reached. From listening to the testimony in those cases and listening to the testimony as to ore in this case, my strong impression is that it is easier to make an approximately correct estimate as to the amount of an ore than it is of the amount of gas or the amount of oil.

A witness named Moore appeared here and testified in regard to his connection with a concern called the Central Aluminum Company of Montgomery, Alabama. While spoken of as a company, that was probably a misnomer. Under the evidence I could not discover that it was more than a prospect, and perhaps that is too strong—possibly I should say any more than a hope.

In 1924, according to the statement of Mr. Moore, he desired to purchase alumina from Mr. Uihlein, the witness to whom I have referred heretofore; or, if not that, to buy some bauxite land from Mr. Uihlein that is situated in South America. But the testimony is very indefinite. I haven't the slightest doubt that Mr. Moore had a hope. Yet there is no testimony in the case that Alcoa or anybody connected with Alcoa ever heard of him; and Alcoa cannot properly be accused of excluding Mr. Moore if it never heard of him.

I have said that this case, so far as concerns bauxite, relates only to bauxite of aluminum grade and that is true for the reason that we have comparatively little, if any, interest in bauxite which is not of the grade which, in the present state of the art of producing aluminum, is of a quality that can be economically used commercially in producing aluminum. Nevertheless, it does not follow that aluminum may not be made of bauxite of grades quite inferior to the grades now used and particularly to the grade called aluminum grade.

In the testimony as to bauxite in Arkansas, it was estimated by Dr. Branner that in the State there is what is referred to as potential bauxite, which is estimated to be up to from ten to twenty million tons. I lay no stress on this testimony, not because I have any doubt about it but because the case does not require that we reach a conclusion, and indeed I doubt if the technical evidence in the case is sufficient to enable us to reach a conclusion, as to whether, in considering the amount of available bauxite, we are entitled to include for consideration bauxite which is merely potential.

My conclusion, therefore, as to bauxite is that the Government has not proved its allegation in support of its charge of monopolization with respect to bauxite.

## (2) Water Power.

We come now to the second charge. This relates to water power. There is some ambiguity in the pleadings as to what is the Government's position; as to whether it claims that what has been done by Alcoa constitutes monopolization of water power. That there exists some ambiguity can best be brought out by reading an extract from paragraph 83 of the bill. There this is said:

"For the purpose and with the effect of * * * maintaining an illegal monopoly in the United States in the production and sale of * * * aluminum and products manufactured therefrom, defendants have engaged in the following activities in the United States and foreign countries from about 1890 to the present: They * * * have acquired, in excess of their reasonable needs, water power sites, power plants, power equipment, * * * and have entered into unreasonable and restrictive power contracts designed to prevent potential competitors from obtaining water power for the manufacture of aluminum; and have acquired water power rights in excess of their reasonable needs for the production of aluminum; * * * and have acquired * * * power companies and properties and rights therefrom and interests therein; * * *."

Because of a feeling of doubt as to what the Government's position was with respect to water power, I have gone into other material furnished me by the Government in the hope that it might assist me in interpreting the allegations I have just quoted.

The first document supplementing the pleading that I have examined is a brief by the Government submitted to me, dated September 21, 1938. My recollection is that before we adjourned for a holiday in the summer of 1938 I asked counsel if they wished to supply me briefs somewhat elucidating and clarifying their positions on several points. What I hold in my hand is the brief of the Government. It came in response to that suggestion. At page 56, running over to page 57, there are these statements by the Government:

"The unparallelled success of the Aluminum Company's monopoly creates a strong inference that there existed abnormal or artificial barriers to competition. We believe that the evidence will show that such barriers were created by the Aluminum Company's monopolization of supplies of suitable bauxite and cheap power, a monopolization which, while not absolute, was sufficiently [sufficient—sic?] effectively to bar competition. * * * The two requisites for successful commercial production of virgin aluminum are an assured supply of bauxite of the proper quality and an assured supply of cheap water power properly located. If either bauxite supplies or cheap water power could be readily procured, a partial

monopoly of the other could be overcome by determined effort. * * * partial monopolization of either of these requisites to successful commercial production produces a monopolizing effect vastly greater than that which would ordinarily flow from such partial monopoly itself."

Again, on page 59 this brief continues:

"* * * Acquisition of such a proportion of the available supply of an essential raw material that competitors are effectively barred from entering the field, prevents the competitive process from operating * * *."

On page 60 there is added this statement:

"* * * the Aluminum Company's power to exact a monopolistic price for virgin aluminum rests upon its effective monopolization of essential raw materials."

On October 24, 1938, Mr. Rice, counsel for the Government, made a statement on the record at the trial (pp. 5035-7) as follows:

"* * * Aside from any allegations of conspiracy between Aluminium Limited and Alcoa, we charge that the Aluminum Company's monopoly in the United States is effective for a number of reasons. * * * the Aluminum Company preempted the commercially available bauxite deposits in the United States and it preempted the commercially available water power which was strategically located and which was never permitted to be available to competitors, and the consequence of that is * * * that other potential competitors who might wish to compete against the Aluminum Company's monopoly in the United States, cannot get bauxite in the United States and in the past they have not been able to get power. * * *

"* * * I am assuming that there is no question of conspiracy between Alcoa and Aluminium Limited, then I say aside from that this court must take into account, in determining whether or not the Aluminum Company's one hundred per cent control of production in this country, whether it is control of bauxite, of power and facilities for the manufacture of aluminum is an illegal monopoly; that the court must take into account the availability of power. Now, * * * if there was no available water power on the American continent for potential competitors, that is

a relevant fact which the court will take into consideration along with a lot of other facts in determining the extent of the Aluminum Company's power; the extent to which it had preempted the field, so that potential competitors could not enter the field."

Lastly, in the Government's reply brief, at pages 91-2, it is said:

"* * * The Government's charge of monopoly applies to the aluminum industry, not the power industry. The Government does charge, however, in Paragraphs 83, 84 and 85 that one of the means employed in gaining monopolistic control of the aluminum industry in the United States was the corralling of power suitable for aluminum manufacture to the point where potential competitors would not be able to get such water power. * * * Nowhere is there any blanket charge of water power monopoly made by the Government."

After studying all the statements of the Government's positions just quoted, I must say in frankness that I am still in doubt as to what is its actual position with respect to water power. Possibly the Government draws a line between a monopoly of water power and a monopoly of power suitable for aluminum manufacture.

In view of the circumstances it seems to me, therefore, that if there be no charge of monopolization of water power, then the water power issue is out of the case. On the other hand, if the bill is to be interpreted as some of the statements made by Government counsel would indicate,— namely, that it is intended to be taken as charging monopolization of water power,—then obviously I should go into the evidence to determine whether or not the testimony sustains the monopolization charge.

The charges are contained in paragraphs 83, 84, 85, 96 and 97 of the bill. In substance, what they allege is this:

1. Alcoa has monopolized water power suitable for making aluminum in the United States and Canada, so that no one could obtain water power or a site for producing it.

2. In 1925 and 1926 Alcoa acquired (at an exaggerated price) large water power in Canada with the intent of eliminating, and has eliminated, potential competition in the production of aluminum and with the further purpose and effect

of deterring European producers from competing and selling aluminum in the United States (paragraphs 83, 96 and 97).

3. Alcoa has acquired water power sites and facilities in the United States and in Canada in excess of its reasonable needs.

4. Alcoa has caused restrictive covenants, which are still in effect, to be imposed on the production of water power by the Niagara Falls (New York) Power Company in 1894 (paragraph 84) and by the Shawinigan Falls (Canada) Power Company in 1902 (paragraph 85), obligating them not to sell or supply power to any other aluminum producer.

5. Alcoa has entered into other restrictive contracts in the United States and Canada designed to prevent potential competitors from obtaining water power for the manufacture of aluminum (paragraph 83).

In answer to the allegations just summarized, it seems to me enough to say that statistics published by the Federal Power Commission (Exhibits 1576 and 1577), standing alone, completely disprove the charge of monopolization by Alcoa of water power in the United States.

So far as I can discover, Mr. Uihlein was the sole witness for the Government on the issue. He made no personal search in the United States. It does not appear that he had any reliable information. Accordingly, as I see it, his testimony on the point under those circumstances must be ignored. The Government has the burden of proof in establishing the charge. It has furnished no evidence whatever in support of the charge.

As of December 31, 1938 (Exhibit 1577, exhibit pages 6821-3; see also minutes page 32406), there had already been developed in the United States 4,088 electric generating plants. These were owned by 1,632 establishments. During 1938 the electric energy produced in the United States was approximately 117 billion kilowatt-hours. The output of water power was approximately 45 billion kilowatt-hours. In 1920 privately-owned hydro-electric plants produced less than 3,600,000 and publicly-owned less than 200,000 kilowatts. By the end of 1937 the amount produced by both had grown to upwards of ten and one-half million, and by the end of 1938 to over eleven million kilowatts.

In 1935, the last year for which Federal Power Commission figures on the subject appear to be available (Exhibit 1576; Table 14, exhibit page 6815), there were 1,883 undeveloped water power sites in the United States. These had an estimated annual average potential output of about 276 billion kilowatt-hours, with a capacity as estimated by the Commission, when developed, of 53 billion kilowatts (pp. 32402-4).

To appreciate the significance of the kilowatt figures just given, two things should be borne in mind:

(1) In manufacturing aluminum, electricity at the rate of 10 kilowatt-hours to one pound of aluminum is required.

(2) One horsepower represents about three-quarters of a kilowatt (pp. 32985-6; 32404-6; 32671; 32675-6).

Mr. Growdon gave testimony to the same effect. He is a highly qualified hydraulic engineer. He is and for 16 years past has been in the service of Alcoa. He testified as to most of the items mentioned of his own personal knowledge and as to the remaining items apparently in reliance on Government publications.

Mr. Growdon said that there are available in the United States undeveloped water power sites of an approximate capacity of from 9,900,000 to 11,000,000 horsepower which is suitable for the production of aluminum at dams of substantially the same general type as those owned by Alcoa (pp. 32384-401; 32409-420; 32556-8; 32703-7; 32709-15; 32722-6; 32987-96; 33016-7; 33022; 33029). He also described power developed during the period Alcoa had been engaged in constructing dams, and of the general type of power projects, running into very large numbers of horsepower (ibid.).

The testimony of Mr. Arthur V. Davis corroborates Mr. Growdon on the subject (pp. 18432-8). Other witnesses also corroborated Mr. Growdon.

At the end of 1937 Alcoa had in the United States 408,000 horsepower (equivalent to 306,000 kilowatts) of developed electric energy (Alcoa's answer to interrogatory 4(c) ) and a comparatively small amount of undeveloped water power (Alcoa's answer to interrogatory 109, interrogatory page 265; minutes, pp. 32638-46).

Four or five of Alcoa's sites are undeveloped or were at the time Mr. Growdon testified. These are Nantahala, Glenville, Tuckerton, Fontana, and possibly Needmore (pp. 32707; 32757-8). By 1940 Alcoa

# 124

had developed water power capacity of 540,000 horsepower (equivalent to 360,000 kilowatts). All this was either used by Alcoa or sold or exchanged by an economical method which avoided waste (pp. 32566-70; 32765; 32772; 33017).

Moreover, Alcoa employs steam power when needed. Production of this is growing cheaper (p. 23318). Whether a manufacturer shall use steam or water is a question of cost; and that varies from time to time. What is of greater consequence, however, is that the Germans use steam exclusively in producing power and their production of aluminum by 1939 had surpassed in quantity that of Alcoa. What the Germans have done with steam can be done also in the United States.

It is plain that the amount of power developed or potential and fit to produce aluminum, owned by Alcoa, is but an insignificant portion of the total available in the United States (p. 18432). In other words, the charge against Alcoa of monopolization of water power in the United States is entirely without foundation.

The Court judicially knows that within recent years (about 25 years) the United States Government has developed large amounts of water power. These are partially described in the record (pp. 18434-6; 23312-17; 32383; 32397-9; 32411-3; 32558-9; 32567-8; 32653-4; 32680; 32693-702; 32729-30; see also p. 32401). The proof shows that what is owned by Alcoa in the United States is but a small fraction of what is owned in the United States by the Government itself or of what is owned by non-Government concerns other than Alcoa. Alcoa's water power sites are not and have never been a substantial portion of all the sites capable of producing water power in the United States (p. 18432).

So far as concerns Canada there is no evidence showing the extent of the water power resources there, other than on the Saguenay River. It is impossible, therefore, to estimate what proportion the Saguenay power is of all the power throughout Canada. The burden of proof to show that rested on the Government. The monopolization charge as to Canada, therefore, is not established.

▮ I think that, on the evidence, the failure of the Government with respect to its water power monopolization charges is so clear that there is no real necessity for going further with the subject. Neverthe-

less, the controversy has taken a range so much wider than what I have already covered, that I deem it advisable to comment on several aspects not already specifically dealt with.

October 1, 1941

\* \* \* \* \* \*

In the further consideration of the second charge, of monopolization of water power, we are brought now to some discussion of the Saguenay River.

That river is entirely in Canada. The Government claims that the acquisition of water power and rights by Alcoa on the river in 1925 and 1926 were as follows:

1. A water power site capable of producing 780,000 horsepower at the Lower Development,—sometimes referred to as Shipshaw and located near Chicoutimi.

2. 53-⅓ per cent of the stock of the Duke-Price Company, which owned a water power site capable of producing 400,000 horsepower at the Upper Development,—which is sometimes referred to as Ile Maligne, near the outlet of Lake St. John.

3. A contract right to 100,000 horsepower annually at the Upper Development for 50 years.

These totals, we may say are (as they approximate) a million horsepower. Yet, while Mr. Duke said there were 400,000 primary horsepower at the Upper Development, it may be noted that when he and Alcoa were trading he assumed that the capacity there was only 300,000 horsepower (pp. 20166-8). Moreover, the evidence shows that the dam at the Lower Development, begun in 1925 and completed in 1931, was capable of furnishing 260,000 horsepower (p. 32857). The evidence also shows that the installed capacity of the Upper Development in 1926 was 365,000 horsepower and that today it is about 540,000 horsepower (pp. 32774-6).

Although the evidence shows otherwise, let us assume, however, that Alcoa acquired all the horsepower that existed on the Saguenay River—that which was originally owned by the Duke-Price Company at the Upper Development, in its entirety, as well as all that was acquired by Alcoa at the Lower Development. This, say, would aggregate about 1,200,000 horsepower.

For purposes of illustration let us go further. Paragraph 97 of the bill alleges that the total facilities for the production of electric energy on the Saguenay aggregated

approximately 1,540,000 horsepower. This is not borne out by the evidence. But if we take it as true, it would not at all change the case.

Preceding the Duke-Alcoa merger of 1925, the natural supply of water resources on the Saguenay River were supplemented by raising the level of Lake St. John, out of which the river rose. The level of the lake was raised about 17-½ feet (pp. 32559-60). But the evidence shows a substantial number of rivers in the United States, each affording a greater supply of water than the Saguenay if we take its capacity at the pleaded figure of 1,540,000 horsepower. If, as is true, the evidence does not show the supply of water power on other rivers than the Saguenay in Canada, then the proof furnishes no basis for the monopolization charged in Canada. Determination of the issue of the monopolization charge necessitates our having in hand not alone what is the power from the Saguenay but also what is the power from other sources in Canada as well.

The Government further charges that Alcoa had water power in excess of its reasonable needs, and has laid great emphasis on this allegation. The charge is made in two paragraphs of the bill. These are 83 and 96.

In paragraph 83 it is alleged that, for the purpose and with the effect of acquiring and maintaining "an illegal monopoly in the United States," the defendants "have acquired, in excess of their reasonable needs, water power sites, power plants, power equipment, * * * and have acquired water power rights in excess of their reasonable needs for the production of aluminum; * * * and have acquired * * * power companies and properties and rights therefrom and interests therein; * * *."

In paragraph 96 it is alleged that in 1925, through its merger agreement with Mr. Duke, Alcoa acquired "power sites on the Saguenay River"; also that

"The additional water power acquired by Aluminum Company was far in excess of its legitimate requirements, and was not needed for the normal operation and development of Aluminum Company."

The evidence affords several answers to this charge. It is sufficient, however, to mention a part only.

First, no definition is given of the phrase "reasonable needs." In its absence, at best it may well be doubted whether any violation of law whatsoever is stated.

 Second, as it seems to me, at least in its argument, the Government assumes that if water power sites be not availed of promptly after acquisition by actual construction of dams or other facilities for substantially immediate production of power, such delay demonstrates that the acquisition was in excess of reasonable needs. In my view there is no basis for such a proposition. The Sherman Act does not strait-jacket industry in the United States to any such extent or in any such artificial manner. Under the statute there is sufficient leeway for the exercise of a reasonable, honest judgment, without subjecting one's self to a penalty.

Third, there is no evidence from which it can be inferred that sites acquired by Alcoa, either in the United States or in Canada, were capable of producing more water power than business men in charge of its affairs might have reasonably concluded would probably be needed for future development of the company, including its expansion within a reasonable additional time. Acquisition of what it is prudently anticipated may be needed, as I understand the decisions, does not violate the law or even evidence unlawful intent. On the contrary, under such circumstances it would be imprudent for directors completely to neglect preparations for expansion (pp. 33010; 33020), as witness what might happen in a period of national emergency in event there had been failure in advance to equip the company with additional facilities for use during emergency.

Fourth, the evidence shows that if buying of sites for development of water power is to be on economical terms and construction is to proceed at times when the investment is likely to be profitable, usually plans must be made much in advance and that a long period may elapse before those plans can be consummated. An excellent account of the complexities of the problems can be found in the testimony of Mr. Growdon, who displayed on the stand a great familiarity with the subject (pp. 32285-90; 32294-5; 32299-311; 32335-6; 32562-3; 32566-7; 32607-12; 32615; 32620-39; 32679-89; 32855-9; 33002-7; 33010. See also pp. 4794-5; 22833-5; 40386-7, where other witnesses talked on the same subject).

Reading the account given by Mr. Growdon, and confirmed by other witnesses,

would much assist anyone in gaining an understanding of the nature of the difficulties and responsibilities of reaching a wise or businesslike decision as to when to increase and how much to spend for increasing the water power of any manufacturing company.

Fifth, the evidence shows that heretofore and today, on account of its delay in equipping or failure to equip itself with water power resources adequate to meet its needs for increased production of aluminum, Alcoa has resorted to, and apparently was forced to resort to and (under contracts made in 1936, 1937, 1939 and 1940) is availing itself of, electric energy supplied to it from Government built dams in the TVA and Bonneville areas (Exhibits 1571-1575. See also pp. 32383; 40516-21). Some of these additions have been in connection with the present national emergency, of which, so far as the evidence discloses, there was no advance or adequate warning or one more definite than a speculative guess and which reasonably may not have been anticipated or prepared for.

Sixth, denial by Alcoa (pp. 18432-3; 32344; 33010; 40360) of having obtained water power or water power sites in excess of its reasonable needs, if it was lawful (as I think it was lawful) for it to provide for expected expansion, is sustained by the evidence. If the sense of the law, in the meaning I have ascribed to it, be correct, I think the evidence does not warrant and is far from warranting a finding that Alcoa ever acquired water power or water power sites in excess of its reasonable needs, either in the United States or in Canada.

The Government relies on Exhibit 709 to support the contrary; but, because of its own misinterpretation of the engineering terms used elsewhere in the evidence, I think, as pointed out by Mr. Growdon (pp. 32570-85; 32924-82), that this Government contention, as set out in the percentage computations embraced in Exhibit 709, necessarily rests on theories which are wholly erroneous. In short, as put by Mr. Growdon, the so-called losses of power of which the Government complains in the exhibit "were inherent in the use of power" (p. 32576; see also pp. 32969-71).

We next come to a matter about which a great deal of evidence was taken. This is the alleged exclusion of potential competitors of Alcoa through its Saguenay purchases. In paragraphs 83, 96 and 97 of the bill, in substance, it is alleged as follows:

(1) Alcoa had knowledge of the plans of Mr. Duke and Mr. Haskell to use Mr. Duke's water power from the Saguenay River to manufacture aluminum in Canada.

(2) With the intent to eliminate them as potential competitors, in 1925 Alcoa made an agreement with Mr. Duke.

(3) Under the agreement Alcoa merged with the company controlled by Mr. Duke, which owned undeveloped water power on the Saguenay, and Mr. Duke became a stockholder and director of Alcoa.

(4) Alcoa obtained from Mr. Duke, or companies controlled by him, other water rights on the Saguenay, including 53 per cent of the stock of the Duke-Price Power Company, which owned and operated a hydroelectric plant on the Saguenay that complemented the undeveloped water power Alcoa had obtained or obtained a right to by the merger.

(5) By the means described Mr. Duke and Mr. Haskell were eliminated as potential competitors of Alcoa.

(6) The purpose and effect of the acquisition of the Duke-Price stock by Alcoa was to enlarge Alcoa's capacity for low-cost production outside of the United States, to operate as a further threat to dissuade European producers from interfering with Alcoa's monopoly in the United States.

It is also alleged generally that by the means above recited Alcoa excluded potential competitors "in the production and sale of * * * aluminum and products manufactured therefrom." Specifically, the Government contends that, by its purchases of water power on the Saguenay, Alcoa excluded Mr. Duke, Mr. Haskell and the Uihleins from going into the aluminum business there. No suggestion is made of anyone else having been excluded, or even hindered, from engaging in the aluminum business in Canada. The Government further contends that, through incidental terrorizing, European aluminum producers were prevented from competing with Alcoa in the sales of aluminum and its products in the United States.

Now what are the facts?

The evidence establishes that Mr. Duke concurrently negotiated about Saguenay power with several persons. These were Alcoa, or Mr. Davis or someone else for Alcoa, Mr. Haskell and Mr. Joseph Uihlein

(hereinafter called Mr. Uihlein, unless otherwise indicated, because there were two Uihleins).

Mr. Duke undoubtedly gave consideration to making use of Saguenay power, or some of it, for the production of aluminum. Unfortunately, by reason of his death, which occurred in October, 1925 (p. 20084), we are deprived of his testimony with respect to these matters. The testimony that has come in, however, does contain repetition of statements by him which will be mentioned later.

Alcoa and the Shawinigan Power Company, a Canadian concern, opened negotiations with Mr. Duke about Saguenay power in 1922, apparently early in the year (pp. 4985-6; 20240-1). For about two years, that is during 1922 and 1923, these negotiations were carried on on behalf of both the applicants, that is, on behalf of both Alcoa and the Shawinigan Company, by Mr. Aldred, president of Shawinigan; but they had gone well (pp. 5048-9; 5410; 20241). In October, 1924, Mr. Davis and Mr. Aldred were returning from Europe. They were on the same ship (pp. 5049; 20241). While on board at sea they discussed the matter that had been in progress the preceding two years with Mr. Duke. As a result they agreed that Mr. Davis should take charge of future negotiations (pp. 5049; 20239; 20242). They reached the United States on October 15, 1924 (p. 5409). From then on Mr. Davis acted on behalf of the two companies. Both were concerned to buy an interest in the water power (pp. 20242-3).

Mr. Davis did not take up the business immediately on his arrival in New York; but very soon (Mr. Davis says about as soon as he landed, p. 5410) he had a visit at his office from a Mr. W. S. Lee. Mr. Lee was the chief hydraulic engineer for Mr. Duke (pp. 5049-50; 5411; 20078-9; 20090; 20093). The precise date of that visit is not fixed by the evidence. We know, however, that it was in October, 1924; and, by reason of knowing the date of the arrival of Mr. Davis in New York from his European trip, we know also that the meeting was subsequent to the 15th of October of that year.

The meeting between Mr. Davis and Mr. Lee occurred at the office of Mr. Davis. Mr. Lee announced that he had come to see if he could interest Mr. Davis in using power from the Upper Development (pp. 5049-50; 20076; 20108-9). Out of this conversation there came a suggestion by Mr. Davis however, that Alcoa would like to acquire a participation in the power company itself or a participation in the undeveloped power (pp. 20076-8). Out of this, in turn, at the instance of Mr. Lee, also grew a visit by Mr. Davis to Mr. Duke at Mr. Duke's office on November 6, 1924 (pp. 20076-8). At the meeting in Mr. Duke's office that day Mr. Lee reported what had taken place when he had called at the office of Mr. Davis. Mr. Duke encouraged the taking by Mr. Davis of a large amount of power. Mr. Davis explained that he preferred a proprietary participation in the power, because it did not entail the payment of annual charges by Alcoa, which would be required in bad times if he took power as a tenant.

Mr. Allen, an assistant of Mr. Duke and his business adviser, then suggested that the participation scheme could best be accomplished by a merger. So far as I can discover, that is the first time the notion of merger was ever mentioned (pp. 20079; 20083; 20092; 20099; 20107-9).

Out of the November 6th meeting and other meetings which followed, there resulted an oral agreement early in January, 1925, between Mr. Duke and Mr. Davis. By this agreement, for the Lower Development Mr. Duke would get one-ninth of the securities issued by the merged company, without any specification whatever of what the securities issued by the merged company should consist, whether of stock or of bonds or of both (pp. 5415; 20093-7; 20350). The oral agreement led to the execution of a letter contract dated April 15, 1925 (Exhibit 170). This was of the same purport as the preceding oral agreement, but more exactly defined the terms of the merger. The letter contract was followed by a formal agreement of merger on July 9, 1925 (Exhibit 184).

Thus success was attained after about three years or more of effort by Alcoa to get additional power in Canada,—power which, as it thought, would be needed for the future enlargement of its business (pp. 5061-3; 5070-72). Alcoa thereupon proceeded promptly to develop the property. In fact, the initial steps to that end were taken in January, 1925, after the oral agreement on the terms was made (pp. 5062-4; 20347-64; 23736-9; 32562-4).

Previous to trading with Mr. Davis, Mr. Duke had considered the possibility of himself going into the production of aluminum

on the Saguenay. Yet before he agreed on the merger, whether the date of that be taken as in January or in April or in July, 1925, I think the evidence shows that Mr. Duke had never decided to engage in such production, either alone or in association with Mr. Haskell or with the Uihleins or with anybody else. Much less does the credible evidence show that Mr. Duke ever committed himself to do so or that previous to the consummation of the merger Alcoa, through its president or through any other representative, had knowledge or notice that Mr. Duke had determined or intended to go into such production.

The Government argues that July 9, 1925, was the merger consummation date. At the trial Government counsel said that Alcoa "was not bound until July 9, 1925" (pp. 20331–2). In its original brief (p. 387) the Government said "the merger was not finally consummated until July 9, 1925," —thereby implying that, according to its view, the merger was "finally consummated" on July 9, 1925.

For present purposes, based on reasons to be given hereafter, I do not adopt the date advocated by the Government. Nevertheless, I think it immaterial to go further back than July, 1925, for the time which the Government regards as the date when the merger was "finally consummated." This is true because, as I weigh the credible evidence, I feel that there is no warrant for a finding that by that date Mr. Duke had ever agreed with anybody (other than Alcoa), or himself alone determined, to go into the aluminum business or to engage in the manufacture of aluminum on the Saguenay River or elsewhere (pp. 20329–45).

It is true that at times preceding January, 1925, Mr. Haskell and Mr. Uihlein made investigations into bauxite. Undoubtedly at times both considered the question of going into the production of aluminum. Moreover, it seems clear that Mr. Haskell had the definite desire to engage in such production and it is not impossible that at some time Mr. Joseph Uihlein had the desire. On the other hand, I am fully persuaded by the evidence that neither ever got an express or even an implied agreement from Mr. Duke to join either of them in any kind of an aluminum enterprise beyond what was merely exploratory or investigatory or for the gathering of information.

It is true also that Mr. Duke talked to Mr. Haskell in June, 1924, and talked with Mr. Uihlein in October, 1924, on the subject. But the evidence does not convince me that he committed himself to either or told either at any time that he would or that he intended to go into the aluminum business. As I conceive, mere negotiation with Mr. Duke by Mr. Haskell or by Mr. Uihlein, even if known at the time to Alcoa, was wholly insufficient to impose on Alcoa an obligation to quit its own negotiation with Mr. Duke to obtain water power, particularly when, as appears from the evidence, for more than two years preceding Mr. Haskell or Mr. Uihlein coming on the scene, Alcoa had been seeking such power to meet what it regarded and reasonably could have regarded as needed in its business.

By way of emphasis let me say that I have concluded from the evidence as follows:

1. That on the testimony of Mr. Haskell itself, when analyzed in its entirety, it does not appear that he ever reached an agreement with Mr. Duke to go into the production of aluminum on the Saguenay —which, though of no binding force here, it may be remarked parenthetically is what was decided by the Third Circuit Court of Appeals in Mr. Haskell's suit against the Duke executors in 1929 (pp. 2365–79; 2385–2404; 2411–2522; Exhibits 37 to 65).

2. That there has been a failure to show that, previous to its trading with Mr. Duke (taking the date as July 9, 1925), Alcoa ever knew or had been informed that Mr. Haskell had ever so much as negotiated with Mr. Duke for the establishment of an aluminum plant on the Saguenay or that Mr. Duke contemplated producing aluminum there (pp. 5062; 20329–44; 21670–1; 22663; 26249. See also pp. 6023–4). Indeed, it is a somewhat striking circumstance that the Government itself drew out testimony that, after Mr. Haskell began suit against the Duke executors (which was commenced on September 25, 1925, Exhibit 1135, and therefore within a month preceding the death of Mr. Duke), Mr. Duke specifically told Mr. Davis that he had never agreed with Mr. Haskell or had any plan to go into the aluminum business (pp. 20323; 20343–4; 26341–3).

In this connection it is likewise interesting to note that Mr. Uihlein testified that he had never heard Mr. Duke mention the

name of Mr. Haskell, much less speak of dealings with Mr. Haskell (pp. 6016–23; 6026–7; 6035–40). Especially when it is recalled that the negotiations of Mr. Duke with Mr. Haskell, Mr. Uihlein and Mr. Davis were for most of the time concurrent, the silence of Mr. Duke about Mr. Haskell while talking with Mr. Uihlein may be treated as of some significance. If silent to Mr. Uihlein about Mr. Haskell, why not silent to Mr. Davis about Mr. Haskell and Mr. Uihlein?

So also, by way of emphasis, I wish to add that not alone is there complete failure to show that the Uihleins ever reached an agreement with Mr. Duke, but it is affirmatively established that in September or October, 1924, as well as previously, Mr. A. V. Davis was told by Mr. Joseph Uihlein or by Mr. Robert Uihlein, the brother, or by both, that they had entirely abandoned the idea of going into the aluminum business (pp. 18833-4; 19527-8; 19810; 19834-7; 19841-2; 19849-52; 19927-8; 19996-8; 20017). You may recall the testimony of Mr. Joseph Uihlein about how tired he had grown of carrying the burdens of the family and getting no returns or that in substance.

As I see it, there is no direct evidence, and certainly there is none which is credible, nor is there any evidence whatever which would warrant an inference, either (a) that the purpose of Alcoa in acquiring water power in Canada was to deter competition in the United States by European producers of aluminum or (b) that by any act of Alcoa in relation to water power in Canada such producers, or any of them, were so deterred.

The Government makes two arguments to the contrary. These will now be taken up.

First. It is said that there is testimony to the effect that in a meeting on May 6, 1925, at the Union Club in Cleveland, Ohio, Mr. Davis admitted in substance that Mr. Duke had planned to produce aluminum on the Saguenay; also that Mr. Davis said on that occasion that if the plan were carried out the competition would be hurtful to Alcoa and that the purpose of the merger was to head this off. The Government asks that this testimony be accepted as an adequate refutation of the statements of Mr. Davis on these points while on the stand as a witness in this case.

It is enough to say in reply, however, that the overwhelming testimony of others who attended the Union Club meeting, several of whom were independent and were impressive witnesses, fully sustains Mr. Davis and I am convinced that he made no such admissions or statements as those attributed to him by the Government.

Second. The Government insists in substance that in June, 1925, Mr. Allen put Mr. Davis on notice that Mr. Haskell planned to go into the manufacture of aluminum on the Saguenay; that this was before the merger arrangement between Alcoa and Mr. Duke had been "consummated"; and that disregard of such notice by Alcoa tainted its conduct with the vice of intentionally suppressing a potential competitor.

Mr. Allen was called as a witness by Alcoa. He said he had an interview with Mr. Davis about the middle of June, 1925, shortly preceding the return of Mr. Haskell from Europe (pp. 26044-6; 26053; 26104-17). In this conversation, according to Mr. Allen, he told Mr. Davis that Mr. Haskell previously had had an option on power on the Saguenay. He stated further that Dr. Landis, who was connected generally with some of the companies in which it was said Mr. Duke was interested, had been engaged by Mr. Duke to search for bauxite deposits; that Mr. Haskell also had been searching for bauxite and had inquired whether there was objection to his cooperating with Dr. Landis; and that he had been told that there was not. After this explanation, Mr. Allen says he made an inquiry of Mr. Davis. His testimony as to the conversation was admitted solely for the purpose of showing that the statements were made and not as proof of their truth. They got in, as you may recall, only by an indirect method.

The question to Mr. Davis by Mr. Allen was whether he (Mr. Davis) would put Mr. Allen in position to tell Mr. Haskell that his (Mr. Haskell's) future requirements of aluminum would be furnished by Alcoa on favorable terms. Mr. Allen says that Mr. Davis replied that he would be glad to furnish aluminum to Mr. Haskell on regular terms (pp. 26050-1; 26053; 26104; 26111-12; 26117-8; 26149-53).

On cross examination by the Government, Mr. Davis testified (pp. 20323; 20343) that shortly before the death of Mr. Duke in October, 1925, Mr. Duke told him that he (Mr. Duke) had never made any plans to go into the aluminum business; also that the reason was "because he could

not get any bauxite" (p. 20343. See also pp. 6023-4).

In reliance on what Mr. Allen said, the Government urges that thereby Mr. Davis learned (as early as about the middle of June, 1925) that Mr. Duke intended and had arranged to manufacture aluminum on the Saguenay.

As I view the matter, however, the argument stretches the testimony of Mr. Allen far beyond its permissible meaning. Contrary to the Government's contention, what Mr. Allen said is wholly consistent with Mr. Duke's statement, in substance that, because he had not found a satisfactory supply of bauxite, he had never decided to go into the production of aluminum.

In this connection it may be important to bear in mind that what Mr. Duke had for sale was water power, and that alone. His search for bauxite occurred only after he had failed, up to then, to discover an adequate market for his water power. It is also to be steadily borne in mind that Mr. Duke's dealings were carried on concurrently with Mr. Davis, Mr. Haskell and Mr. Uihlein and that, at least as I view the evidence, there has been failure to show that, preceding the consummation of the merger of the Lower Development with Alcoa, Mr. Davis had notice that Mr. Duke was engaged in negotiation either with Mr. Haskell or with Mr. Uihlein.

Moreover, I repeat that, according to my view, it affirmatively appears that neither Mr. Haskell nor Mr. Uihlein ever reached a point of having an agreement with Mr. Duke with respect to going into the production of aluminum; also that preceding the Pittsburgh interview of Mr. Joseph Uihlein in October, 1924, Mr. Davis had been told by Mr. Robert Uihlein, the brother of Joseph, that the Uihleins had abandoned their idea of going into the aluminum business at all; further, that Mr. Allen had cautioned Mr. Haskell to observe secrecy about his search for bauxite.

Again,—by way of emphasis of what I have heretofore indicated, though not up to this point expressly stated,—I now say definitely that as I measure the evidence, in the first place, it is established that Alcoa had been negotiating with Mr. Duke from time to time since 1922; in the second place, that on May 6, 1925, the day of the conference in the Union

Club at Cleveland of representatives of various holders of Alcoa common stock with Mr. Davis, he had not been informed of negotiations between Mr. Haskell and Mr. Duke with respect to any plan of Mr. Duke to go into the production of aluminum; and, in the third place, that the letter contract of April 15, 1925, between Mr. Davis and Mr. Duke was a complete meeting of minds upon the merger of the Lower Development with Alcoa.

If I be right in regard to these matters, then it would be wholly immaterial even if in June, 1925, two months subsequent to what was essentially a merger agreement, Mr. Allen had definitely told Mr. Davis that negotiations were pending between Mr. Duke and Mr. Haskell for the building of an aluminum plant on the Saguenay.

I need not, however, rest on the premise that there was a meeting of minds on the merger as early as April 15, 1925, or in advance of June 15, 1925, the day of Mr. Allen's talk with Mr. Davis. There is sufficient answer to the Government's contention with respect to the alleged notice by Mr. Allen, even though there was no consummation of the merger agreement until July 9, 1925. I feel that this is so because, as indicated near the beginning of my treatment of this point, what Mr. Allen said was no notice at all that Mr. Haskell himself contemplated or had contemplated going into the production of aluminum.

Exhibit 170 is an agreement between Mr. Duke and Mr. Davis dated April 15, 1925. It is important that you observe the date and the parties to that agreement. Note that it was an agreement between Mr. Davis and Mr. Duke and that it was dated April 15, 1925. On the other hand, it should be observed also that Exhibit 184 is an agreement between Alcoa and— not Mr. Duke—but the Canadian Manufacturing & Development Company. This was dated July 9, 1925. Disregarding form and detail, those two documents contain the terms of the merger and are indeed the sole resort to ascertain the terms on which Mr. Duke sold the Lower Development to Alcoa (that is, the merged company) and received stock of the merged company in payment therefor. The so-called side agreement between Mr. Davis and Mr. Duke, in which Mr. Davis obligated himself to see that additional

shares of common stock should be available for purchase by Mr. Duke at $5 a share (Exhibit 172), is not a part of the terms of the agreement which fixed the price that old Alcoa agreed to pay, and did pay, for the Lower Development. Exhibit 184, the second of the two agreements to which I drew your attention just a moment ago, was between the two constituent companies which were merged.

The parties to the agreement of April 15, 1925, were two individuals, to wit, Mr. Davis and Mr. Duke. The parties to the agreement of July 9, 1925, were two corporations. For convenience, one of the constituent companies which were merged will be called "old Alcoa" and the other (which Mr. Duke controlled) will be called "the Canadian company." The new Alcoa may also be called the "merged company."

Paragraph 96 of the bill furnishes the Government's statement of the terms of sale of the Lower Development to Alcoa. It specifically says that the sale was pursuant to an agreement made in 1925 and that this agreement was between Mr. Duke and Mr. Davis, of necessity meaning thereby Mr. Davis as an individual. In paragraph 96, Mr. Davis as a signatory, was specifically identified as "then President of Aluminum Company, acting on its behalf." That could not possibly have had reference to the agreement of July 9, 1925, for the reason that the agreement of that date was between Alcoa and the Canadian Manufacturing & Development Company. The Aluminum Company referred to also is shown to have been old Alcoa (see paragraph 3 of the bill). Mr. Davis was president at that time; he is referred to in the pleading as then president of Alcoa and acting on its behalf.

It follows from what I have said,— necessarily, as I see it, from the allegation quoted from paragraph 96 of the bill, —that the agreement counted on in the bill is Exhibit 170, dated April 15, 1925, the parties to which were Mr. Davis and Mr. Duke (hereafter in the course of discussion designated as Exhibit 170). That agreement is the only one in evidence which, by any possibility, could fit the Government's description in the bill of the agreement under which the property was sold by Mr. Duke.

In paragraph 96 there are two sets of further allegations to be examined. Preliminarily it is alleged that in 1925 the Canadian company owned "power sites on the Saguenay River in Canada"; also, in effect, that under the terms of Exhibit 170 "said undeveloped water powers in Canada were conveyed to Aluminum Company as a part of said merger." In Exhibit 170 (see exhibit p. 958) it is said that the "properties" with which the instrument deals (exhibit pp. 956-7) constitute what are essential for the construction, etc., of "a hydroelectric development of the Saguenay River located at or near the mouth of the Shipshaw River, as above stated, hereinafter referred to as the Lower Development." Throughout the trial the properties which Mr. Duke caused to be transferred to the merged company for one-ninth of its stock (exhibit p. 962) have been called the Lower Development.

It will be noted further that in the bill what was sold is spoken of as "undeveloped water powers" and that by reason of describing "a hydroelectric development" to be constructed in future, it also was speaking of "undeveloped water powers."

Save for the purpose of further identification of precisely what the merged company bought and of certainly identifying the instruments which govern the definition of what was bought, as well as furnishing an introduction to what was later alleged in paragraph 96, the preliminaries heretofore referred to are relatively unimportant.

The Government next urges that Alcoa made an overpayment to Mr. Duke for the Lower Development on the Saguenay and that this fact, which it contends has been shown, was an indication of bad faith on the part of Alcoa. Is that true? Let us examine the evidence for the answer.

Following the preliminaries above recited, paragraph 96 among other things contains this allegation:

"* * * Under the terms of said merger, Aluminum Company paid many millions of dollars in excess of the true value of the properties acquired by it, * * *."

This constitutes the charge with which at the moment we are concerned.

It is clear, as will be seen by mere scanning of Exhibits 170 and 184, that except for certain things incident to the Lower Development, which themselves are plain and which it is unnecessary now to specify in detail, "the properties acquired by the merged company" under the terms

of Exhibit 170 consist exclusively of the Lower Development. Our only questions for debate, therefore, are these:

1. How much did the merged company pay for the Lower Development in fulfillment of its agreement, Exhibit 170?

2. Did the sum paid exceed the "true value" at the time of this water power site?

3. If so, by how much?

No money passed in the transaction, nor was the price stated in the terms of dollars. The price was stated and payment was made exclusively in stock. Literally, therefore, no "millions of dollars" or "dollars" at all were involved. I take it, however, that the pleading should not be construed so narrowly as to demand evidence of dollar payments and that going to realities our problem is to ascertain the worth of the stock which was delivered to the Canadian company or its stockholders in compliance with the merged company's promise set out in Exhibit 170. The stock constituted payment and its par value is shown by table 1. This table is as follows:

TABLE 1

| Shares | Class | Par value per share | Total par value |
|--------|-------|--------------------|-----------------|
| 163,625 | Preferred | $100 | $16,362,500 |
| 140,250 | Common | 5 | 701,250 |
| Total 303,875 | | | $17,063,750 |

In the first column of the table we have the number of shares, in the second column the class of the shares, in the third column the par value per share of each class of shares and in the final column to the right the total par value of all stock of each class.

The purchase price consisted, in part, of 163,625 shares of preferred stock of the par value of $100 each, making a total par value of $16,362,500. That figure is to be kept in mind for its bearing on what I shall say subsequently. In addition, there were 140,250 shares of common stock of the par value of $5 per share, making a total of $701,250. The total number of shares was 303,875 and the total par value of the shares, of both classes, was $17,063,750. So that on the face if these shares be of the value of par, the price paid for the Lower Development was approximately $17,000,000. Manifestly, however, par value is not evidence of actual value and, so far as I have dis-

covered or has been called to my attention, the record contains no evidence which would show, or at least satisfactorily show, what at the date of the transaction was the "true value" of the $17,063,750 par value of stock.

In the circumstances but for a concession by Alcoa I think the Government would fail completely for lack of evidence of value. In the reply brief of Alcoa (p. 157), however, it is said that "Alcoa concedes that it paid $17,063,750 for the property" (meaning the Lower Development with incidentals as described in Exhibit 170). That sum, therefore, may be taken as the value, unless better evidence has been presented,— a matter which will now be discussed.

One witness testified that Mr. Duke told him that he had paid about one million dollars for the water powers on the Saguenay (pp. 5930; 5983). The Government's original brief (p. 360) and Alcoa's reply brief (p. 156) show that both understand, and I am sure the language of the witness, particularly at page 5930, implies, that he was speaking of the "entire Saguenay property." I also understand, and I believe counsel agree, that what the witness referred to was the direct expense of buying up the physical properties without development or improvement.

If Mr. Duke made the statement attributed to him about the million dollars cost of buying up the properties, I shall assume that he referred merely to the amount of his outlay for the physical properties that he had bought up on the Saguenay—expended simply in the way described by Mr. Davis and Mr. Growdon as the only method by which anyone can prudently buy property of that kind. Even so, the price paid in gross for a great many parcels, and small parcels generally at that, to a great many people, the owners, over a long period, is no test of the value of the water power made available by the purchase. Furthermore, I think no one examining all the evidence on the point would have the temerity to suggest, and I do not think the Government suggests, that in 1925 a million dollars was the fair value of all the Saguenay water power or even of the Lower Development alone. I wholly reject any such notion.

Again, cost alone is not a fair criterion of value. It is only a single piece of evidence which may be considered along with other facts in arriving at an estimate of value. When so considered, though we as-

sume that only a million dollars has been spent for acquiring the water rights on the Saguenay, or even those rights at or appurtenant to the Lower Development, there is one circumstance which, standing apart, prevents acceptance of that figure as stating the "true value" of what was transferred to the merged company. This is that what has been referred to as incidentals accompanying the Lower Development, and embraced in what the merged company acquired, are omitted from consideration and were themselves obviously of great value. In order to ascertain the value of the water site these must be included in the estimate and there is no evidence from which an opinion can be formed as to the extent to which they enhanced what would have been the value of the Lower Development without them. Among such incidentals described in Exhibit 170 (exhibit pp. 958-61) are at least three separate rights, each important, with respect to the value of which the record is silent. Consequently, on that ground alone the Government has failed on the present issue for lack of proof.

The Saguenay River rises in or at,—I cannot tell with precision which,—Lake St. John, whose location is shown in Exhibit 2 attached to Exhibit 258. The Lower Development down the river is 18 or 20 miles from the lake or from Ile Maligne, the Upper Development which is on the river at or near the mouth of the lake. The surface area of the lake is not precisely given, but it is large. Its diameter is from 10 to 18 miles; one witness spoke of it as something like "thirty miles long and eighteen miles wide" (pp. 4987-8; 20101-3; 40392). Preceding the contract Exhibit 170 the surface of the lake had been raised, or arrangements had been made to raise it, by 17-½ feet (pp. 32559-62; 40386. See also Exhibits 258 and 1582). The extra flowage resulting after use by the Upper Development could be re-used at the Lower Development.

Exhibit 170 expressly conferred on the merged company the right to the increased flowage gained by raising the level of Lake St. John; rights along and on both sides of the Saguenay River from Ile Maligne to Shipshaw (sometimes referred to as Chute-a-Caron); and a right (revocable on one year's notice) to 100,000 horsepower generator voltage from Ile Maligne station, at the price of $6.50 per horsepower per annum. Without evidence, it is manifest that those additions to the Lower Develop-

ment, in and of themselves, were of a value which was considerable and probably very great. Without affirmative evidence which would enable us to make a determination, we are unable to fix a value for the properties that the merged company acquired.

It is true that at a later stage controversy arose as to the extent to which the acquisition of the supplemental rights was complete at the time the Lower Development was transferred; but I think there can be no doubt but that at the time of the transfer Alcoa considered that it was getting the rights as I have described them. So, also, it is indisputable that what we are now seeking to find out is what was the intention of the parties.

I think that in the absence, as here, of direct or circumstantial evidence of the value of the physical properties and of the accompanying rights themselves, taken together, we may properly give consideration to other evidence. The differences of opinion on the subject which have arisen between counsel are as to what, if any, such other evidence in the record may be taken into account and what weight should be given to that which it is permissible to consider.

A valuation, which Alcoa concedes, of $17,063,750 is the same as the book value. The items consist of $16,362,500 for the preferred stock and $701,250 for the common stock as set out in table 1, with which payment was made for the Lower Development. The Government derives its valuation by combining values which it assigns to the same number of shares of preferred stock and to the common stock, but a different number of shares. As we shall see, the Government uses the same valuation of the preferred stock as is used by Alcoa. That is why when I began the discussion of this point I called your attention to the valuation of the preferred stock as set out in the table, being upwards of $16,000,-000. In consequence, the controversies are solely as to how many shares of common stock were turned over in the payment and what was the value per share.

The Government relies on two kinds of evidence as to the value of this common stock. These are, first, capitalization of the merged company's net earnings in 1925 (Exhibit 1709) and, second, the New York market prices of Alcoa stock in that year subsequent to the merger (Exhibit 261). In the circumstances are these trustworthy types of evidence?

134

The first thing that strikes one's attention is the enormous earnings spread which results from employing in the one instance capitalization of earnings and in the other instance stock market prices as bases for valuing the common stock. When using the one the Government computes the payment to have been $64,555,745 and when using the other $29,212,865. The difference is upwards of $35,000,000. I feel that the mere size of this difference begets lack of confidence in the methods employed.

In both the totals the Government includes three items: (1) the preferred stock; (2) the common stock described in Exhibit 170, referred to as the "merger" common stock; and (3) the common stock described in Exhibit 172, referred to as the "bonus" common stock—that is, the common stock which Mr. Davis agreed to procure an opportunity for Mr. Duke to purchase at $5 per share.

As previously noted, both sides use the same valuation for the preferred stock (the first item). I regard the third item as wholly irrelevant; that is to say, it constituted no part of the price the merged company paid for the Lower Development (see pp. 5425-8).

The third item consisted of 80,643 common shares. This was included in the larger total of $17,338,245 (made up by multiplying the number of such group of shares by $115, which is $5 less than what the Government took as the value per share arrived at by using the alleged capitalization of earnings method). It is included in the lesser total as $4,435,365 (made up by multiplying the same number of such shares by $55, which is $5 less than what the Government took as the market price per share). If these erroneously included figures were eliminated, then the total the Government would reach by the capitalization of earnings method would be $47,217,500 and by the market price method it would be $24,777,500. The difference is nearly $23,000,000. I feel, as I said about the other difference, that this difference is so great that it likewise condemns the figures to rejection.

Perhaps if no other facts were available and net earnings over a long period established a reasonably continuous financial behavior by a manufacturing company, then the capitalization method might be helpful or might even be acceptable. On the other hand, I think the mere chance figures of a single year are neither acceptable nor even helpful. One illustration alone will be enough to sustain this conclusion.

Exhibit 1006, put in by the Government, and Exhibit 1665, put in by Alcoa, show that in each of the years 1921, 1922 and 1932 Alcoa suffered large deficits. In 1921 the Government states the deficit at $5,240,000 and Alcoa at $5,913,870. In 1922 one stated it as $6,034,000 and the other as $5,967,666. In 1932 it was stated as $2,893,000 by one and as $2,893,868 by the other. The ground on which I partly rest my feelings that the capitalization method is worthless is brought out sharply by the query which necessarily arises from these figures.

If the capitalization method were satisfactory when there were net earnings, should we not be required to employ it when there were deficits? If so, then in 1921 and 1922 and 1932 Alcoa's stock ceased to have any value whatever. The consequence is that, if Alcoa had purchased the Lower Development in 1921 or 1922 or 1932, according to the Government's theory it would have paid nothing for it; or, on the other hand, the purchaser might have asked Mr. Duke to pay something to have the property taken off his hands.

Again, the capitalization method would be unavailable here because of lack of evidence which would enable us to select the percentage rate on which to make the computation. Obviously, the rate very nearly goes to the root of the .matter and certainly is of crucial consequence.

■ No one disputes that prices at which stocks are sold on an exchange are admissible evidence on the issue of value. That has been held by the Supreme Court itself in Com. of Virginia v. West Virginia, 238 U.S. 202, at pages 211, 212, 35 S.Ct. 795, 59 L.Ed. 1272. Nevertheless, they are not conclusive and I feel that those shown here were so few that they furnish no real or acceptable measure of value (Cf. also ibid., at pages 212, 213 of 238 U.S., 35 S.Ct. 795, 59 L.Ed. 1272).

If we are to substitute quotations as a method of ascertaining the value of the common stock which went into the payment for the Lower Development, then that method must be adequate for use in computing the value of at least 140,250 shares (the number which confessedly went to the Duke group), without including the shares which went to Mr. Duke individually

under the terms of Exhibit 172 for which he paid $5 a share. It is a matter of general knowledge that, save with respect to stock regularly bought and sold in large unit quantities, a great and unusual number of shares cannot be sold at one time, or even within a short period, without, as the phrase goes "breaking the market" and completely upsetting the scale of prices at which sales have to be made.

I feel, therefore, that neither kind of evidence on which the Government relies with respect to the point under consideration is reliable or to be accepted. I feel, further, that if we are to follow any circuitous method, one which, though not wholly satisfactory, would more nearly approach being satisfactory would be to take account of the entire stockholders' equity for a year preceding the occurrence of the transaction. As the facts are not in the record for that exact period, I shall adopt the figures for the calendar year 1925 as the next best choice we can make.

There are two exhibits which undertake to furnish the 1925 stockholders' equity. One is Exhibit 1006, introduced by the Government; the other is Exhibit 1665, put in by Alcoa. The former in column C states the equity as $132,857,975; the latter in column A states it as $154,327,956.

The preferred stock, of course, stands ahead of the common stock. Of the preferred stock there were 1,472,625 shares having a par value of $100 a share. To support it, therefore, assets of the value of $147,262,500 were required. Not until there was an excess above that amount were there any assets supporting the common stock.

According to the Government's figures, therefore (the equity being $132,857,975 and the precedence accorded the preferred demanding assets of $147,262,500 in value), there was a deficiency in the sum which should have stood behind the preferred stock and no support whatever for the common stock. Alcoa's figures showed assets of $7,065,456 value (being the excess of $154,327,956 over $147,262,500) standing behind the total 1,472,625 shares of common stock outstanding. This was at the rate of slightly under $4.80 per share. At that rate, behind the 140,250 shares of common stock which went to Mr. Duke and his associates (stockholders of the Canadian company) in the merger, there were assets of the value of $673,200. This sum added to the $16,362,500, allocated by both sides as the value of the preferred stock, makes a total valuation of the combined preferred and common which composed the stocks with which payment was made in the merger of $17,035,700. This amount is slightly less than the valuation which Alcoa has conceded. I shall, therefore, adopt the latter as correct. If correct, then there was no overpayment for the Lower Development.

There was other power on the Saguenay. The Government criticized the acquiring by Alcoa of two additional blocks of water power (or of rights to water power) on the Saguenay at the Upper Development. These acquisitions were from the Duke-Price Power Company, owner of the Upper Development. One was the purchase of 53-1/3 per cent of the stock in the company. The other was a long-term lease from the company of 100,000 horsepower per year. Both events occurred in 1926 and are separate from or additional to Alcoa's acquisition in 1925 of power at the Lower Development.

The grounds on which the Government bases its objections, in so far as I can discover, are stated in paragraphs 83 and 97 of the bill; but they are not clear. When liberally interpreted, I think they may be said in essence to charge (1) that, when joined with power acquired at the Lower Development, Alcoa's acquisition at the Upper Development was excessive in amount and (2) that the price paid was so disproportionate from the real value of what Alcoa got at the Upper Development as to impeach the good faith of Alcoa.

Specifically it is also alleged by the Government in paragraph 97 of the bill that the purpose and effect of the Duke-Price stock acquisition was to enlarge Alcoa's capacity for low-cost production outside of the United States, "to operate as a further threat to dissuade European producers from interfering with" Alcoa's monopoly in the United States market. As previously remarked, however, the evidence does not sustain the charge.

As heretofore stated, the proportion of Duke-Price stock which Alcoa purchased was 53-1/3 per cent. For the sake of argument accepting the Government's estimate of 400,000 horsepower as the output of which the Upper Development was capable, and treating the acquisition of 100,000 horsepower, or one-fourth, or 25 per cent, as if it were an acquisition of

title, then, out of the total of 400,000 horsepower at the Upper Development, what Alcoa acquired from the Duke-Price Company through the stock and the lease was 78-1/3 per cent. This would be slightly over 313,000 horsepower. For the present purpose, therefore, we may treat the question as if it were an inquiry into Alcoa taking 313,000 horsepower at the Upper Development.

Heretofore I have discussed the question of the quantity of Saguenay power which Alcoa acquired as if it consisted of all of the electric power on the Saguenay. For reasons then given, I think that, even on that assumption, the evidence would not warrant a finding that Alcoa was guilty of monopolization. So, also, when previously dealing with the question, I expressed the view that the Government was wrong in its position that the measure of whether an acquisition is reasonable is what the purchaser needs for immediate use; also that, on the other hand, on grounds explained by Mr. Arthur V. Davis and Mr. Growdon, it is reasonable for officials of a manufacturing company to shape their conduct of its business on a long range program.

If I should adhere, as I do adhere, to those opinions, then the sole additional matter for consideration is whether the prices paid for the Duke-Price stock and the Duke-Price leased power are or whether either is excessive.

There is no showing that when Alcoa purchased the Lower Development it had in mind buying any share in the Upper Development. On the contrary, the evidence discloses that the suggestion of Alcoa acquiring an interest in the Upper Development grew out of an application to Mr. Davis by Mr. Duke's executors for advice. According to the evidence the executors were faced with the problem of raising money out of Mr. Duke's investment in the Duke-Price Company with which to meet estate taxes. Through negotiations with Mr. Davis, and as a result of a request by the executors for his suggestion, he worked out a plan. Without entering into details, through the efforts of himself and Alcoa and through the use of Alcoa's credit, he was able to solve the difficulties by two things being done: first, Alcoa taking the stock on an outlay by it of attorneys' fees of approximately $26,-000 (Exhibit 1133, pp. 5410-11; 14173;

18984; 19537-9; 22825-8; 23319-20; 23323; 23326) and, secondly, Alcoa taking a lease and inducing two others to take leases of electric power, that of Alcoa being for 50 years, for 100,000 horsepower at $12 per horsepower per year (Exhibits 262 and 263, pp. 5064-5; 5070; 5416-7; 14172-88; 16143; 18982-4; 19538-44; 23320-26; 23733-9).

On these facts sufficient comment is that $26,000 was not an excessive price for the stock and that the evidence does not support a conclusion that $12 per horsepower was excessive for the leased power.

The argument of the Government to the contrary is predicated merely on surmise or suspicion. Neither is enough. The burden of proof which rests on it has not been met.

The result is that I conclude, with respect to the Duke-Price stock and the Duke-Price lease, as I have previously concluded with respect to power at the Lower Development, that the prices paid by Alcoa are not shown to have been so excessive as to carry with them a badge of bad faith or even to have been excessive at all.

In 1928 the stock and the lease passed to Aluminium. Since then Alcoa has not been interested in either. It has been urged that, because the property is located in Canada and because there is lack of showing that the transactions involved have even affected the commerce of the United States, there is no occasion for this Court, and possibly this Court is without jurisdiction, to inquire into the acquisition or holding of the Duke-Price stock or the Duke-Price lease. I refrain from going into those aspects of the matter. I deem it unnecessary, for the reason that if these contentions were sustained they would merely supplement the support for the conclusion I have already reached on other grounds (see also Exhibits 262, 263 and 1134; pp. 14171-88; 20105; 22828-9; 40390-2).

The Government makes charges based on alleged restrictive electric power covenants. The bill, in paragraphs 84 and 85, specifically mentions only covenants of the Niagara Falls and Shawinigan Power companies not to furnish power to others than Alcoa for the production of aluminum. There are several covenants of this type in evidence. None corresponds precisely with the allegations in paragraphs 84 and 85.

There is, however, a general charge on the subject in paragraph 83. All such restrictive covenants as to which there is some evidence, whether pleaded or not, will be discussed.

At Niagara Falls there were five such covenants. These were dated at various times from 1895 to 1905. One of them (Exhibit 191) expired in 1920. The others (Exhibits 188, 189, 190 and 192) were cancelled by mutual consent of the parties in 1921,—20 years ago (Exhibit 1026). Mr. A. V. Davis explained that it was by mere oversight that the remaining covenants were not cancelled, as they were intended to be cancelled, some years earlier (pp. 19331; 19343-7; Exhibits 1031 and 1032). Obviously the reference is to cancellations preceding the 1912 decree in the Pittsburgh case, which itself cancelled several restrictive covenants, some of them the same covenants as had theretofore been cancelled by mutual consent. It should be noted also that of those covenants the last to survive was terminated 20 years ago.

Again, let it be noted that, during the period when the Niagara Falls covenants were entered into, that is the period of 1895 to 1905, there was at best uncertainty as to whether the Sherman Act prohibited covenants of the type involved. Alcoa may well have believed in good faith that these covenants, or other covenants of the kind, were permitted by law.

In 1874, preceding the enactment of the Sherman Law, the Supreme Court stated the common law on the subject of restrictive covenants. This is covered in Oregon Steam Navigation Co. v. Winsor, 20 Wall. 64, at pages 68 to 69, 22 L.Ed. 315, as follows:

" * * * a stipulation by a vendee of any trade, business, or establishment, that the vendor shall not exercise the same trade or business, or erect a similar establishment within a reasonable distance, so as not to interfere with the value of the trade, business, or thing purchased, is reasonable and valid. * * * a stipulation by the vendor of an article to be used in a business or trade in which he is himself engaged, that it shall not be used within a reasonable region or distance, so as not to interfere with his said business or trade, is also valid and binding. * * * a stipulation is unobjectionable and binding which imposes the restraint to only such an extent of territory as may be necessary for the protection of the party making the stipulation, provided it does not violate the two indispensable conditions, that the other party be not prevented from pursuing his calling, and that the country be not deprived of the benefit of his exertions."

That was the common law as laid down by the Supreme Court preceding the passage of the Sherman Act. So far as I have discovered, between 1874 and 1895, which is the first of the dates of the period with which we are concerned, there had been no announcement by the Supreme Court of a different view on its part as to what restrictive covenants were lawful under the common law. As late as 1940, in the Apex Hosiery case, the Supreme Court said, in the quotation I read to you yesterday, that even today the meaning of the Sherman Act in many respects is exceedingly ambiguous. At least the Court said that in substance. After the enactment of the Sherman Act the subject of restrictive covenants was discussed by the Supreme Court in a number of decisions. Two of those were United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007, decided in 1897, and United States v. Joint Traffic Association, 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259, decided in 1898.

In the Trans-Missouri case the Court said this at page 329 of 166 U.S., at page 554 of 17 S.Ct., 41 L.Ed. 1007:

"A contract which is the mere accompaniment of the sale of property, and thus entered into for the purpose of enhancing the price at which the vendor sells it, which, in effect, is collateral to such sale, and where the main purpose of the whole contract is accomplished by such sale, might not be included within the letter or spirit of the statute in question."

In the Joint Traffic case, at page 568 of 171 U.S., at page 31 of 19 S.Ct., 43 L.Ed. 259, it was said:

" * * * the sale of a good will of a business with an accompanying agreement not to engage in a similar business was instanced in the Trans-Missouri case as a contract not within the meaning of the act, and it was said that such a contract was collateral to the main contract of sale, and was entered into for the purpose of enhancing the price at which the vendor sells his business. * * * To suppose, as is as-

sumed by counsel, that the effect of the decision in the Trans-Missouri case is to render illegal most business contracts or combinations, however indispensable and necessary they may be, because, as they assert, they all restrain trade in some remote and indirect degree, is to make a most violent assumption, and one not called for or justified by the decision mentioned, or by any other decision of this court."

In Darius Cole Transportation Co. v. White Star Line, 186 F. 63, at page 65, in 1911, citing numerous Supreme Court decisions, the Circuit Court of Appeals for the Sixth Circuit, within which Alcoa had plants and then did business summarized the well settled law as follows:

" * * * the sale of a business, and the surrender of the good will pertaining to that business, and an agreement thereunder, within reasonable limitations as to time and territory, not to enter into competition with the purchaser, when made as part of the sale of the business, and not as a device to control commerce, is not within the federal anti-trust law."

Nevertheless the circumstances will be considered in connection with all the other facts, for the purpose of arriving at a conclusion as to Alcoa's intent. I think we must begin the inquiry with a recognition that at the stage of 1895 to 1905, when the several restrictive covenant contracts now under consideration were made, it was an extremely difficult thing for any lawyer, or for that matter for a court itself, to determine when such restrictive covenants were in violation of the Sherman Act.

As I believe I have remarked previously, the plant of the Shawinigan Falls Company was located in Canada. There were several covenants to which that company was a party. We are concerned with Exhibits 163, 164, 165, 166, 167 and 187. The last of those, Exhibit 187, expired by its own terms in 1940. The first, Exhibit 163, dated in 1899, is the only one that was entered into by Alcoa as a principal. Four years later Alcoa ceased to be a principal under that contract. In 1903, with the consent of Shawinigan, Alcoa transferred its rights under Exhibit 163 to Northern Aluminum Company, Limited (a Canadian subsidiary of Alcoa). The other contracts containing restrictive covenants at their inception were entered into by Northern as the purchaser. Alcoa joined in these only as a

guarantor of Northern. The name of Northern was later, previous to 1928, changed to Aluminum Company of Canada. In 1928 Alcoa transferred to Aluminium all its interest in the Aluminum Company of Canada. Since that date Alcoa has had no interest in or rights to any of the Shawinigan contracts containing restrictive covenants. In 1932 (Exhibit 1028) Aluminium, with the consent of Shawinigan, was substituted as guarantor for the purchaser (that is, the Aluminum Company of Canada) under the Shawinigan contracts. Thereby Alcoa's liability as guarantor for Northern or for the Aluminum Company of Canada ceased.

Apart from justifiable doubts entertained at the time with respect to the meaning of the Sherman Act as applied to restrictive covenants in contracts between two residents of the United States, there is here an additional ground for doubt as to whether, either preceding 1928 or subsequently, the Sherman law had any application to restrictive covenants in contracts made, as were these, between two Canadian corporations such as the Shawinigan Company and Northern (or its successor, Aluminum Company of Canada).

Nevertheless, as said above in regard to the Niagara Falls contracts, the facts about the Shawinigan Falls contracts will be taken into account in determining Alcoa's intent; but, so far as relates to Alcoa, all the covenants, whether with respect to power at Niagara Falls or power at Shawinigan Falls, having long ago expired or ceased to be effective, there is no occasion—and this Court has no authority even if there were in theory occasion—to grant an injunction concerning any of them.

The next charge by the Government is that Alcoa made an overpayment to the Republic Carbon Company. That company owned a plant at Niagara Falls. It was controlled by the Uihleins. It was engaged in manufacturing large carbons. As I called to your attention yesterday, these large carbons are used by being put, along with the other things I described, into the furnace or pot in which aluminum is manufactured.

Alcoa made an investment in the Republic Carbon Company. The Government criticizes the investment. The ground (as it claims) is that Alcoa knowingly paid Republic Company more than the value of

the property it acquired from that company. With a single exception (later mentioned), the pertinent figures are stated in Exhibit 1765. In so far as they are given, these figures are correct.

The relevancy to the present branch of the case of the Government's contention is this: The purpose of the Government is to show that the amount paid was so grossly excessive that it demonstrates that Alcoa acted in bad faith and was trying to get rid of a prospective competitor. Apart from mere details, the evidence affords several convincing answers to the contrary; but I shall discuss only one.

What Alcoa purchased was one-third of the common stock of the Republic Company. The company's assets consisted of the plant mentioned above, at Niagara Falls, for manufacturing carbon electrodes, certain securities and certain bauxite deposits or rights in regard to such deposits in South America. After the purchase the Republic Company property was operated for about nine years. It was then liquidated by sale of the property to National Carbon Company. National took all the assets of Republic except the bauxite deposits. The sale of the stock of Republic took place in December, 1924. Two items of bauxite deposits were included. One item was in British Guiana and the other in Dutch Guiana. The British Guiana deposits were known as Aurora and Lower Semerie. Republic owned those deposits outright. The Dutch Guiana deposits were known as Accaribo. Republic had an option on that group of deposits from the Norton Company, which was the owner.

Otherwise than as heretofore described, assets of Republic consisted of the Aurora and Lower Semerie deposits, an option on the Accaribo deposits, some securities and other miscellaneous property. The securities and preferred stock in Republic were reserved to themselves by the Uihleins and were not included in the sale. Accordingly, what was sold was the plant, the bauxite deposits and the remaining miscellaneous property (other than the securities and the preferred stock). For the moment, however, we are not interested in what the securities were or what the preferred stock was. It will be noted that for all the outstanding preferred stock bonds were later substituted. In form, as well as in reality, the transaction was confined to Republic common stock as the subject matter of the sale. All of this was purchased by Alcoa and two associates.

The three concerns which constituted the group of buyers were Alcoa, Acheson Graphite Company and Carborundum Company. Each took one-third of the common stock. Every participant assumed responsibility on precisely the same terms, except in respect to a loan obtained from Alcoa, which must be understood.

Soon after the purchase of the common stock the bauxite option was exercised. The price for the Accaribo deposits in Dutch Guiana, the subject of the option, was $150,000. Alcoa loaned $100,000 to Republic for use in meeting this. Another partner loaned the balance of $50,000. In other words, one member of the buyer group did not loan Republic anything toward making up the $150,000 option fund. However, we are interested only in Alcoa's participation in the matter. Except as an incident to that, I shall omit reference to the parts played by the other two investors.

I think that the outcome of the investment for Alcoa establishes that from the beginning it might reasonably have been anticipated by the buyers that they would make a profit out of the investment or, if not, at least would not lose anything in the venture. I shall give you the reasons which I think sustain this proposition.

The discussion will hinge mostly around Exhibit 1765. That is the exhibit to which I have previously referred as giving correctly the figures relating to Alcoa's investment in the Republic stock. For convenience, I shall use approximate round figures.

The Uihleins paid only $11,000 for the Aurora and Lower Semerie bauxite deposits in British Guiana. Nevertheless, they incurred a good deal of expense in upholding their title to those deposits, which was disputed by Alcoa, and about which there was long litigation. While Mr. Uihlein was with Mr. Duke on the Saguenay River, in October, 1924, there was talk about the British Guiana deposits. Mr. Uihlein said their cost plus litigation, without separating the two, had been approximately $1,000,000 (pp. 26449-52; 26572-3). On the Republic books, however, they were carried at $156,300.

Precisely as I think that a million dollars is too much, I think also that $11,000 is too small a valuation, for the British Guiana deposits. My impression is that they were

140

probably worth the sum at which they were carried on the books; but even if I be mistaken on that point, it is certain that no one could properly be deemed guilty of bad faith who appraised them at the book value of $156,300. For the purpose of our present inquiry, therefore, they will be taken as·of that value.

Shortly after the purchase of the Republic stock in 1924, the option on the Dutch Guiana bauxite deposits was exercised. As I have previously told you, the price paid for these deposits was $150,000. Of that sum, as heretofore stated, Alcoa loaned Republic $100,000 (which was double its share if all the group of buyers had participated in raising the total fund in proportion to their individual holdings of Republic common stock). The $100,000 loan was. evidenced by a demand note payable to Alcoa, with interest at 5 per cent.

If the book value of the British Guiana properties and the amount paid for the Dutch Guiana properties be accepted for purposes of valuation, then the value of all the bauxite deposits, at the time of their purchase from the Uihleins in 1924, may reasonably have been taken by Alcoa and its associates as $306,300; in other words, the valuation at the book figures as to the British Guiana deposits plus $150,000, which is the precise amount in cash which was paid on the exercise of the option for the Dutch Guiana deposits.

Exhibit 561 consists of correspondence which passed between the Republic and Alcoa in 1925, 1926 and 1933. This shows that $306,300 is the total paid for the deposits after eliminating the interest on the $150,000 borrowed by Republic with which to make the payment for the optioned deposits. Of the $306,300 paid for all the deposits, $102,100 represents Alcoa's share (pp. 10545-50; 10554-7).

We have no precise knowledge of the rate of interest at which the purchasers of the Republic common stock could have borrowed money, say from a bank, with which to pay cash for the stock. For the purposes of a calculation, however, I shall take the interest rate as 3 per cent. I think we are justified in exempting the purchasers from conviction of bad faith if we assume that they believed that they could have procured the money at that rate.

Two analyses have been made of Alcoa's investment in Republic stock. One was made by Alcoa in Exhibit 1765, which I have mentioned before. The other was made by myself in table 2 and is as follows:

TABLE 2

*Computation (in approximate round figures) of amount of Republic Carbon Co. funds applicable to. dividends on common stock of that company held by Alcoa, made on bases explained in note below.*

| | | | |
|---|---|---|---|
| January 7, 1925 | (1) | Alcoa paid for 1/3 of Republic common stock | $366,000 |
| | (2) | 1/3 value of bauxite deposits acquired | 102,100 |
| | (3) | Balance necessary to reimburse (1) · | $264,000 |
| March 10, 1925 | (4) | Advance to working capital | 34,000 |
| June 8, 1934 | (5) | Int. on (3) from Jan. 7, 1935 (9 y. 5 m.) at 3% | 74,580 |
| | (6) | Int. on (4) from Mar. 10, 1925 (9 y. 3 m.) at 3% | 9,435 |
| | (7) | Total necessary to reimburse (1), (4) and int. | $382,015 |
| | (8) | Payment on account | 80,000 |
| | (9) | Balance necessary to reimburse (1) and (4) | $302,000 |
| July 23, 1934 | (10) | Int. on (9) from June 8, 1934 (1-1/2 m.) at 3% | 1,133 |
| | (11) | Loan to retire bonds | 453,400 |
| | (12) | Total necessary to reimburse (1), (4), (11) and int. · | $756,533 |
| | (13) | Payment on account | 753,400 |
| | (14) | Balance necessary to reimburse (1), (4) and (11) | $ 3,000 |
| July 27, 1934 | (15) | Int. on $100,000 loan from Apr. 4, 1925 (9 y. 3 m. 23 d.) at 5% | 47,000 |
| | (16) | Total necessary reimburse (1), (4), (11) and pay int. on loan (15) | $ 50,000 |
| Nov. 21, 1935 | (17) | Int. on (16) (1 y. 4 m.) at 3% | 2,000 |
| | (18) | Total necessary reimburse (1), (4), (11) and pay int. on loan (15) with int. at 3% | 52,000 |
| | (19) | Payment on account | 87,000 |
| | (20) | Applicable to dividends in excess of investment | $ 35,000 |

NOTE: The assets of Republic Carbon Co. consisted of bauxite deposits and other property. It had outstanding common stock and owed certain obligations. All of its property, other than what was reserved from sale to

new common stockholders and other than bauxite deposits, has been liquidated and (except for the $67,000 item near the end called "Dividends received in excess of total investment," which Alcoa contends is its share of the proceeds and of the company's income) has been applied as set out in Exhibit 1765 and that item will hereafter be considered as excluded from the exhibit. The bauxite deposits, which are located in British Guiana and in Dutch Guiana, respectively, are carried on the books of the company at valuations stated in Exhibit 561 (from which, for the purpose of the above computation, the item of $66,179.79, accrued (but unpaid) interest on the $150,000 loan therein described, will be deducted). Such loan was on the terms stated in Exhibit 561 and the principal of $100,000 owing to Alcoa was paid July 27, 1934 (minutes, pp. 40070-2; 40121-3; 40178-82).

In addition, for the purpose of the computation, the following assumptions will be made: (1) Exhibit 1765 and Exhibit 561 are correct. (2) One-third of the bauxite deposits of the company, when acquired, was worth $102,100, being one-third of the book value, less the accrued interest item, carried on the books as shown in item 6 of Exhibit 561. (3) The sum of $102,100 is deductible, as of the date of the investment, from what Alcoa paid for its one-third of the common stock (purchased when the company had other assets than the bauxite deposits and owed certain obligations, later paid out of the proceeds of the liquidation of those assets and out of income). (4) Alcoa could have borrowed money at 3% with which to pay (if it had chosen to obligate itself to pay) interest on amounts equal to the several net balances included in the computation to the extent that they exceed the sums totaling $920,400 available from the Republic Carbon Co. treasury and specified in the computation as paid "on account."

It is to be observed that Exhibit 1765 deals only with Alcoa's individual investment in Republic Carbon Company (consisting, as heretofore noted, of one-third of the common stock). Table 2 deals with that one-third. This table is intended to present a possible alternative to the analysis of the figures in Exhibit 1765. My analysis is made on the plan fully explained in the note to the table.

Exhibit 1765, without giving all the details, shows that on certain dates there specified designated payments were made by Alcoa for the stock, totaling $853,400. Following that there were certain dividends, chiefly out of proceeds from partial liquidation of the property and inventory. The total derived from that source was $664,405.33. Deducting this from the amount Alcoa had paid for the stock, there was a balance of $188,994.67. Against that certain dividends had been received, which were credited to income. These total $255,-994.67. The difference between the last two mentioned sums is $67,000—which Alcoa calls the profit on its investment.

Again, according to the summary of the figures in the last paragraph, the total investment of Alcoa in Republic Carbon stock was $853,400 and the total receipts from the investment were $920,400. In other words, the dividends received exceeded the total investment by $67,000. On the basis of that the contention of Alcoa is that out of the investment in the stock it made a profit of $67,000—and be it noted the Republic Company still owns the bauxite deposits.

I have computed the amount of the profits in a different way. How I made my computation is fully explained in the note to table 2. I have used only approximate round figures. This computation is so long and, in a sense, somewhat so technical that without copies of it in your hands I doubt if you could follow what I have said. I believe therefore that I shall leave you to examine the computation from the minutes when they are furnished you by the reporter; but I think I should call your attention to several things.

One of the chief features of the table is this: In ascertaining what, if any, net dividends Alcoa received on the stock up to the date the last payment shown in Exhibit 1765 was made (November 21, 1935), the value of the bauxite deposits which have stood behind the stock ever since they were acquired, has been credited against the total payment. In other words, in order fairly to compute, it would seem to me that, inasmuch as the bauxite deposits passed at the time of or substantially the time of the acquisition of the stock by Alcoa, the value of those deposits acquired should be credited as of that date against the amount Alcoa had paid for the common stock.

By way of further illustration, let the matter be stated this way: Alcoa paid for one-third of the common stock $366,-000. Its one-third share of the bauxite deposits, as I have stated heretofore, had the value of $102,100. In other words, as of that date, in order to reimburse Alcoa for its investment, there was a balance coming to Alcoa of $264,000—the difference between those two figures. So I have taken each of the items in Exhibit 1765 and credited or charged it in the account

and allowed interest of 3% whenever there was a balance owing. After making the computation in that form—which, according to my own conceptions, is the fair way to make it for the purpose at which we are aiming—my conclusion is that there was a profit of $35,000, instead of $67,000 as computed by Alcoa in Exhibit 1765.

At the time the common stock was purchased the debts and preferred stock had a priority over and so were ahead of the common stock. Subject to the preference of the debts and the like preference of the preferred stock (later superseded by bonds), all assets of Republic stood behind the common stock. As returns came in to Republic from the liquidation of its assets (other than bauxite deposits) and from income earned, the debts (including bonds) were paid off. When those had been paid off (as Exhibit 1765 shows was done by or before November 21, 1935) there remained standing behind the common stock all the bauxite deposits owned by Republic and the excess (if any) of cash earnings left in its treasury after payment of debts.

The promissory notes in favor of stockholders, given as evidence of indebtedness to them for loans they made to Republic for use in exercising the Norton option, were surrendered to Republic upon payment of principal, without payment of interest. Nevertheless, it seems to me that a method for determining whether income available for dividends on the common stock was actually earned would not be fair unless, in making up the account, a sum equal to the stipulated 5% on the loans were first deducted. In the table such deduction has been made.

As previously stated, for the purpose of making up the table, it has been assumed that not more than 3% interest would have been required of Alcoa if it had chosen to borrow from a bank the money with which to make the payments by it shown in the account.

In Exhibit 1765, as I have said, Alcoa computed the dividends it received as in excess of its total investment by $67,000, whereas in the table, as I have also heretofore said, made up in accordance with the plan I have explained, the sum computed, as shown in item 20 on that table, as applicable to dividends in excess of Alcoa's investment on November 21, 1935, was $35,000.

Further discussion of the table would be quite tedious and, perhaps, useless. As I have said, without a copy of it before you it is difficult for you to follow my statement. I shall leave it, therefore, for you to examine when you receive the minutes.

If either Exhibit 1765 or the table be correct, it would seem indisputable that the charge of bad faith in knowingly paying an extravagant amount for Republic common stock has not been and cannot be sustained against Alcoa.

Additional general facts have a bearing on whether Alcoa acted in bad faith. Among these are the following:

(1) Previous to October, 1924, the Uihleins had made several attempts to sell the Republic Carbon Company to Alcoa, but without success (p. 19937).

(2) In October, 1924, Mr. Joseph Uihlein (of his own initiative) sought Alcoa and renewed the suggestion that it buy the Republic Company (p. 18879).

(3) At the October, 1924, meeting between Mr. Davis and Mr. Uihlein, Alcoa refused to go into the enterprise alone. It assigned as a reason that it regarded the investment as too large for it to make single handed at the time. It agreed, however, to continue consideration of the matter if it could find partners who would be interested. Acheson Graphite and Carborundum Company each decided to take one-third, thus leaving Alcoa to take one-third.

(4) At the time of the investment, Alcoa had an experiment in progress. This experiment related to the so-called dry-process method of manufacturing alumina and was being conducted at Arvida in Canada. For the purpose, large carbon electrodes were required. On this account Alcoa felt that it had need of the Republic plant's production or at least of its chief product. In the operation of the plant, after it was acquired, large carbon electrodes were a portion of the output. After Alcoa became a stockholder it purchased these carbon electrodes or a portion of them from Republic and used them in the way it had contemplated. The dry process method, however, turned out to be a failure (pp. 18887-8; 19069-72; 21648-9). Subsequently, the assets (except bauxite deposits) of the Republic Carbon Company, as heretofore stated, were liquidated. Republic, however, as I have

already said, still retains the bauxite deposits.

I think that it is plain that Alcoa had a bona fide hope of getting a needed article at a reduced cost and of making a gain by going into the Republic investment. As the record abundantly establishes, Alcoa has been continuously alert to discover new methods or devices which it regarded as giving promise to advance the aluminum industry. In some instances it has lost money; in others, by its research and foresight, it has made money. The testimony of some of the witnesses, composed of both competitors and customers, has included many expressions of high appreciation by them of the progressiveness of Alcoa in its experimentation and of its generosity in sharing with the industry benefits which it had derived.

The Government makes several arguments in support of its position. These should be and now will be taken up.

First: Before the purchase of Republic, Alcoa referred to two of its engineers the question of whether it would be advisable for it to take part in the purchase. The engineers made a written report (Exhibit 228). In this the engineers expressed the opinion that the price asked by the Uihleins was excessive. Nevertheless, the purchase was made. Apparently assuming that the engineers were right, the Government urges that the overpayment (as claimed) clearly indicates that Alcoa acted in bad faith.

Whether the price paid was so large as of itself to impugn Alcoa's motive is a crucial if not the crucial question. It seems to me if Alcoa came out with a profit, however, that this fact, standing alone, completely negatives the contention that the officials of Alcoa were not justified in overruling the engineers.

As already pointed out, the analysis of the figures followed in Exhibit 1765 is only one way of testing the reasonableness of the price. In it no attention was given to the bauxite deposits which are still owned by the company and are the thing on which the value of the common stock now depends and has depended since completion of the liquidation of all the other assets of the company.

Table 2 is another method of analysis that seems to me permissible. If it be permissible, it is an unanswerable refutation of the Government's argument.

Second: The Government urges further that Alcoa's officials could not have acted in good faith because, in 1924, shortly before the purchase of the Republic stock, Alcoa had invested in the Soderberg process for the manufacture of a new kind of electrode (Alcoa's answer to interrogatories 2, p. 13 and 515, p. 745) and that, therefore, there was no need for the Republic carbon electrodes.

As I see it, the result does not follow. As I have already pointed out, the record is replete with evidence of expenditures by Alcoa of large sums in experimenting with patented inventions and with other devices not patented, designed to improve or to cheapen production of aluminum or its products. Some of the devices covered by these inventions have been disappointing; others have been helpful to Alcoa and have contributed much to the aluminum industry as a whole.

We need not go into the details as to the Soderberg process, however. It is enough to say that it is commercially operative and is still in use by Alcoa. The sole reason that its use has not been further extended is that, after thorough testing, up to date it has been the judgment of Alcoa that the first cost of installation has been so large that its employment is not commercially profitable when account is taken of such first cost (pp. 20717-24).

It must not be overlooked that the investment of Alcoa in Republic under consideration is in common stock. No one with certainty can tell what it will eventually yield. For the moment, however, that is immaterial. Our sole problem is to determine whether the evidence so convincingly shows that at the time of purchase there was no chance of avoiding financial loss in making the investment that this fact, standing alone, demonstrates that Alcoa was guilty of bad faith in making the investment. I am convinced that this has not been shown.

█ Whether the Government has charged or has not charged Alcoa with monopolization of water power, I feel that it has not shown a right of recovery on the water power branch of the case. On the one hand, if it does claim that there was no monopolization, then at least we can say that there has been much loss of time in adducing evidence with respect to the quantity of water power available. On the other hand, if the claim be that

Alcoa has been guilty of monopolization of water power, then I think we can say with equal confidence that the Government has failed to sustain its position.

As to the merger of the Alcoa and Duke properties, I feel also that it has not been shown either (a) that, in advance of the agreement by Alcoa to purchase, it had notice that Duke planned to go into the production of aluminum or (b) that, if a business man be accorded, as I think he must be accorded, the right to look far ahead in conducting his business, the quantity of power Alcoa acquired on the Saguenay can properly be characterized as in excess of what was reasonable.

I desire to make another observation, though I do not regard its acceptance as essential to sustain the view I have taken. What I wish to add is this: Suppose serious negotiations had been pending a long time and while they were still in progress an intermeddler or one with an animus or one having a motive to frustrate them, without warrant, should announce that their consummation would result in the suppression of competition. Under those circumstances I feel that the Sherman Act would not require that the parties engaged in the negotiations abandon them. Mere rumor or untruth is not entitled to be accorded that much weight. If it were otherwise, it seems to me that, contrary to the intention of the statute, easy opportunity would thereby be opened for defeating the conduct of honest business in a lawful way.

It has been argued that many of the transactions we have discussed in connection with the question of whether Alcoa has monopolized water power are outside the jurisdiction of this court; also that this is true either because of their not having occurred within the borders of the United States or because it has not been shown that they directly and materially affect the commerce of the United States. However, so far I have omitted passing on that contention; I have preferred to place my decision on other grounds

On May 4, 1938, at pages 932-3, Government counsel described what he spoke of as the Government's theory of "one of the principal methods whereby this [Alcoa's] monopoly was built up." He said that it could be found "on the face of the bill." Of it he added the following:

"They [Alcoa] excluded others from a fair opportunity to engage in the business, first by getting control of bauxite; second, by getting control of power; and, third, by tying the hands of other potential competitors and intimidating them from competing with the Aluminum Company."

If this Court be right on the conclusions it has reached, that monopolization of bauxite has not been proved and that monopolization of water power has not been proved, then it would seem to me that it well may be argued that the issue of monopolization is at an end in this case.

In order to produce aluminum it is necessary, according to the Government's own statement and as we know from the proof, only to have bauxite and water power; of course, accompanied by energy and industry and brains. So far as materials are concerned, however, only bauxite and water power are needed. There is no patent protection, either of the Bayer process for producing alumina from the bauxite or of the process universally practiced in this country, and largely,. if not wholly, practiced abroad, for producing aluminum. If aluminum be produced, then from it all the variety of articles with which we have become familiar during this trial may be produced.

I shall not go so far at present as to put it stronger than to say that it well may be argued, if I be right in my conclusions as to bauxite and my conclusions as to water power, that there is no basis in this case for sustaining a contention that there has been monopolization by Alcoa. I prefer not to go farther than that, but to continue the discussion on all the other branches that have been assigned in support of its contention by the Government and which I outlined to you yesterday as constituting the ten subjects, in addition to bauxite and water power, which I shall discuss in connection with the major charge of monopolization.

### (3) Alumina

That brings us to the third monopolization charge, and that is with respect to alumina.

Alumina is a white powder ($Al_2O_3$). It is made, as I have previously stated, from bauxite. The process employed consists of grinding and chemical treatment. It is known as the Bayer process.

Though it be repetitious, I add, as a reminder, that aluminum is made from alumina; that it requires two tons of bauxite to make one ton of alumina; and

that it requires two tons of alumina to make one ton of aluminum. So that it requires four tons of bauxite to make one ton of aluminum (pp. 2346; 4220).

Up to 1903 the Merrimac Chemical Company had a license under the Bayer patent in this country. The license expired and the patent expired that year. Since then it has been open to the world to use the Bayer process. From 1888, when it began, down to 1903 Alcoa did not produce alumina; it bought its supply, wholly or almost wholly, from the Pennsylvania Salt Manufacturing Company. As I have said, and as has been true ever since 1903, anybody without any obstruction by patent or otherwise could employ the Bayer process in producing alumina.

The Government charges that Alcoa has monopolized the production and sale of alumina in the United States. In the bill it alleges specifically that Alcoa has excluded others from opportunity to produce or sell alumina. It alleges specifically also that Alcoa, through a subsidiary, produces 100 per cent of the alumina used in the production of aluminum in the United States. All of this is contained in paragraphs 40, 44, 53, 83 and 102 of the bill.

As I see it, the charge in the bill with respect to alumina of necessity falls with the charge as to bauxite. If I be right in regard to that, then there is no occasion to make any further answer to the charge relating to alumina. There is, however, another answer, and, as I conceive, it can best be brought out by a table. I have prepared a table, which is as follows:

This table is in regard to alumina, stated in terms of pounds available during the years 1928 to 1937 to the non-producers of aluminum (counting as so available all alumina produced and sold by the Pennsylvania Salt Manufacturing Company). In the table there are six columns. The first column, A, gives for each of the years 1928 to 1937 the total production in pounds of alumina by Alcoa; the second column, B, gives the total in pounds for each year of such alumina used by Alcoa itself; the third column, C, gives in pounds for each year the quantity of alumina supplied by Alcoa to producers of aluminum; the next column, D, is the alumina available to non-producers of aluminum out of the alumina produced by Alcoa; the next column, E, is the quantity of alumina available to non-producers of aluminum out of what is produced by the Pennsylvania Salt Manufacturing Company. Column D, which gives the quantity of alumina available to non-producers of aluminum out of the alumina produced by Alcoa, is made up by deducting from the figure for any particular year in column A the sum of the figures for that particular year in columns B and C. The last column, F, is the total in pounds of alumina available to non-producers of aluminum and is made up by adding together what is contained in columns D and E.

The grand total of alumina available to non-producers of aluminum, being the footing at the bottom under column F, for all of the years from 1928 to 1937, is 250,945,830 pounds. Of that total the con-

TABLE 3

*Alumina (pounds) available, 1928–1937, to non-producers of aluminum (including as so available all alumina sold by Pennsylvania Salt Mfg. Co.).*

| | Alcoa Production | Used by Alcoa | Supplied by Alcoa to Aluminum Producers | Alumina Available to Non-Producers of Aluminum | | |
| | | | | By Alcoa | By Pa. Salt | Total |
| | A | B | C | D | E | F |
| 1928 | 575,646,896 | 446,532,180 | 107,840,328 | 21,274,388 | 6,284,864 | 27,559,252 |
| 1929 | 598,547,561 | 441,662,198 | 128,528,746 | 28,356,617 | 7,661,309 | 36,017,926 |
| 1930 | 611,486,171 | 455,583,765 | 133,017,404 | 22,885,002 | 8,737,035 | 31,622,037 |
| 1931 | 451,076,117 | 309,047,476 | 127,084,794 | 14,943,847 | 7,364,495 | 22,308,342 |
| 1932 | 249,141,297 | 196,300,811 | 50,963,632 | 1,876,854 | 5,902,036 | 7,778,890 |
| 1933 | 178,045,808 | 159,771,660 | 6,223,240 | 12,050,908 | 9,952,670 | 22,003,578 |
| 1934 | 187,728,784 | 160,500,324 | 16,156,604 | 11,071,856 | 8,358,154 | 19,430,010 |
| 1935 | 307,061,740 | 224,059,882 | 72,062,827 | 10,939,031 | 10,504,987 | 21,444,018 |
| 1936 | 496,416,998 | 419,364,020 | 57,546,848 | 19,506,130 | 10,839,835 | 30,345,965 |
| 1937 | 664,634,277 | 562,652,260 | 78,877,704 | 23,104,313 | 9,331,499 | 32,435,812 |
| | | | | | | |
| Totals | 4,319,785,649 | 3,375,474,576 | 778,302,127 | 166,008,946 | 84,936,884 | 250,945,830 |

NOTE: Computed from Alcoa answers to interrogatories 96 and 100 and Exhibit 981. If production figures of Exhibit 980 were used in column E, totals in column F would be larger.

tribution to it by Alcoa is 66 plus per cent and the contribution to it by the Pennsylvania Salt Manufacturing Company is 33 plus per cent. Of the entire production of alumina by Alcoa over this entire 10-year period, that used by Alcoa itself is 78 per cent and that which it has supplied to other aluminum producers plus that which out of its total was made available to non-producers of aluminum was 21 plus per cent.

Alcoa produces and sells all the alumina used for the production of aluminum in the United States and does so because nobody else produces aluminum in the United States from alumina. Alcoa having the alumina employs it in the manufacture by itself of aluminum; but, so far as the evidence discloses, there is no restraint upon any other person by Alcoa from producing aluminum out of this quantity of alumina which is disclosed by table 3 as available to non-producers of aluminum.

Moreover, all the chemical companies could produce alumina out of bauxite and probably would produce it if the price which they could get for it were sufficiently inviting. As I have indicated, they are free as air to go into the production of aluminum in this country out of alumina.

Let me call your attention again to something I have already said, because it will have a bearing on something I am going to say.

What I wish to repeat is this: From 1888 to 1903 all the alumina Alcoa used was furnished to it by someone else,—chiefly by the Pennsylvania Salt Manufacturing Company and at times wholly by the Pennsylvania Salt Manufacturing Company. Following 1903, the year in which it began the production of alumina, Alcoa still (from 1903 to 1907) procured a substantial portion of its alumina from others.

The Government complains of a contract made in 1907, which is Exhibit 123. Under this contract Alcoa agreed to purchase alumina from the Pennsylvania Salt Manufacturing Company for a period of 10 years; or, to put it more exactly, for a period of 5 years with an option to renew or extend for another 5 years. In the contract there was a covenant by which the Pennsylvania Salt Manufacturing Company agreed not to engage in the manufacture of aluminum during the life of the contract. Complaint of this by the Government is contained in paragraph 87 of the bill.

On the 30th day of January, 1912 (Exhibit 1025), the last mentioned covenant was cancelled by consent of the parties. On June 7, 1912, a decree was rendered in the Pittsburgh case to which I referred yesterday (Exhibit 1009). In paragraph 4 of the decree (exhibit p. 4931) this same covenant was cancelled by the Court. In other words, there was a double cancellation of the covenant in 1912. One of these was by the parties voluntarily on January 30th of that year; the other, on consent of Alcoa, was by the Court June 7th of the same year. As I called to your attention yesterday, the adjudication in the Pittsburgh case exhausted that restrictive covenant as the basis, in whole or in part, of any cause of action in this case. In other words, the same facts which are used in a lawsuit which results in a final adjudication cannot be used as the basis of another lawsuit for the same purpose.

The extent to which any effect can be given to the restrictive covenant of the Pennsylvania Salt Manufacturing Company is to take it into account in determining the intent with which other acts complained of may have been done by Alcoa. There is no other evidence of any misconduct by Alcoa with respect to this restrictive covenant. So also the evidence shows without dispute that Alcoa has sold or been ready to sell alumina to anybody who applied for it, if it had the commodity on hand (pp. 20841; 21831; 40537). There is no evidence that Alcoa ever applied its production wholly to its own wants.

The next specific complaint which the Government makes is in respect to the Merrimac Chemical Company.

Merrimac was the holder of the Bayer license up to its expiration in or about 1903. Its plant was located in Woburn, Massachusetts. Up to 1920 it was in charge of Mr. Howard, who testified as a witness in this case. During the period that it held the Bayer license and thereafter until 1917, the company produced alumina. Subsequently it entered into a contract with Alcoa to buy its requirements of alumina from Alcoa, for the period 1917 to 1927 (Exhibit 1033). The contract prescribed annual instalments of the alumina to go under it from Alcoa to the Merrimac Company. It contained a provision that if the cost of production by Alcoa decreased, the Merrimac should have the benefit of the decrease by a decrease of the price.

There is no claim that the price was excessive. The contract was made on the initiative of Merrimac. Mr. Howard, then at the head of Merrimac, sought Mr. Davis, the head of Alcoa. So also there had been no previous competition between Alcoa and Merrimac. Merrimac's cost of production was greater than the price at which Alcoa sold to it. In addition, as I have called to your attention, there was a clause in the contract which entitled Merrimac to a reduction to the extent, if any, that Alcoa's cost of production decreased during the life of the contract.

There was no limitation whatever put on Merrimac. Except for the cancelled Pennsylvania Salt restrictive covenant of 1907, the evidence furnishes no instance of a covenant suppressing competition or attempting to suppress it with respect to alumina.

The covenant with Pennsylvania was cancelled 29 years ago. The Pennsylvania and Merrimac companies were equipped so that they could produce and sell alumina if the price they got for it or could get for it was attractive. That was true also of others. Among the others who were equipped to manufacture and sell alumina were the Allied Chemical & Dye Corporation and every other well organized chemical manufacturer. The evidence, as I have said heretofore, shows that (if it had on hand sufficient to meet the requirements) Alcoa sold and was willing to sell to anybody who applied to it.

There are also in evidence three distinct instances in which others well equipped to go into the manufacture of aluminum considered producing alumina. I shall discuss these in turn.

The first is the Bohn Aluminum & Brass Corporation. It had the problem under consideration three times: once in 1922, again in 1928 and the last time shown by the evidence in 1932 or 1933. The principal witness who gave us the story as to the Bohn company was Mr. Markey, one of its officials. He said that his company was able to get both power and bauxite or substitutes for bauxite out of which to make alumina. In 1932 actually Bohn contemplated the use of a substitute. The substitute was alunite, of which, according to the evidence, there is quite a large supply in and possibly also in the neighborhood of the State of Utah.

You may recall that when Mr. Markey was on the stand he produced voluminous papers relating, as he stated, to investigations his company had made, with reports of engineers and others, as to the availability of the necessary materials for manufacturing alumina out of which to produce aluminum. Among the papers were reports which he considered of such value to his company that he objected to disclosing them to Alcoa or to any other company engaged in the same business. On that account the papers were submitted to the Court and the Court examined them fully. After the examination a statement was put on the record as to the substance of the contents of the papers, without the revelation of any business secret. It was my understanding that this procedure was satisfactory to both sides, as well as to Mr. Markey.

There was never any interference by Alcoa which frustrated Bohn, or in the slightest prevented or hindered it, from going forward with its enterprise.

According to the testimony of Mr. Markey, the directors of Bohn determined not to go into the branch of the business solely on grounds which had no relation whatsoever to Alcoa. The reasons, as he stated them while on the stand, were solely on account of taxation and legislation situations. The directors, he said, concluded that the possibility of gain from their company itself producing alumina or aluminum from its own produced alumina did not in the judgment of the directors justify the risk. As I think the evidence satisfactorily established, it is clear that in reaching the decision Bohn acted exclusively in its own interest.

For an account of the examination of the papers by the Court, see pages 24643-8; that Bohn acted independently and without interference by Alcoa, see pages 24595-6; 24843.

The second concern which considered going into the production of aluminum from alumina was the Aluminum Products Company, the head of which was Mr. Hastings, who also testified in this case. He considered the matter in 1934 and again in 1936.

The testimony is without dispute that Alcoa agreed to sell Aluminum Products alumina (Exhibits 638 to 660). The prices, because there was a change in the price, were not shown to be unreasonable. As matter of fact, Alcoa offered to sell at about half the price per ton which the British quoted. Mr. Hastings so stated

and further testified that he was not dissatisfied with the quantity which Alcoa was willing to sell him; also that the sole reasons he did not go further were that he was unable to get for his company the financing required if he should go into that branch of production and that he failed to obtain the requisite water power which he hoped to get from the TVA. There is no ground whatever in the evidence on which to criticize Alcoa in connection with the failure of Aluminum Products to go into the production of aluminum.

The third instance was that of the Reynolds Metals Company. In 1940, shortly before the close of taking testimony in this case, evidence was introduced that the Reynolds Metals Company contemplated going and had applied to the Reconstruction Finance Corporation for the advance of money with which to go into the production of alumina from bauxite for the production of aluminum.

So far as the evidence discloses, the Reynolds story before the Court does not go further than I have recited. However, in connection with it there is no evidence whatsoever of any interference or any effort to obstruct on the part of Alcoa.

■ The next complaint by the Government is with respect to new processes and materials. Some of the processes were patented; some were not. Alcoa has been continuously or practically continuously active in seeking out and investigating new processes. The sole aim was cheaper production.

The first complaint is in regard to the Serpek process. The contract as to that was entered into in 1912 (Exhibit 179).

The charge by the Government is in paragraph 91 of the bill. There it is alleged that there was a contract between the French owner of the patents covering the Serpek process, along with several others the names of which are unimportant, and Alcoa for the production of alumina from bauxite. This provided for the organization of a corporation in the United States to own and operate under the patents. The purpose, as is charged, was to prevent the manufacture of alumina under patents by others in the United States and Canada. It is further alleged that the adventure proved impracticable and therefore in 1920 the contract was cancelled. This was 21 years ago.

The process covered by the Serpek patents was for the simultaneous manufacture of alumina and ammonia, with some nitrogen by-products. If it had been successful it would have been cheaper than the Bayer process (pp. 19025-6; 40306-7). After the 1912 contract (Exhibit 179) was executed, Alcoa built an experimental plant. Alcoa operated the plant for two or three years. It concluded, however, that it was unable to make the process work. It, therefore, abandoned the process on that account (pp. 19038-9).

■ What has been described was nothing but the ordinary instance of an experiment on a new process with the hope, if it worked, of thereby advancing the aluminum industry. Moreover, bear this in mind: if it had been a success and anybody who had not taken a license had been excluded from using the process, that would have been nothing but the exercise of the usual patent right. The whole purpose of a patent is to exclude all except the owner or those who have a license from the owner. There would, therefore, have been no misconduct in excluding from operation under the Serpek patents, if it had proved commercially successful.

The next process complained of is the Hoopes process, more generally spoken of as the dry process.

From the year 1904 to the year 1928 Alcoa worked with and over that new proposed method of producing alumina. The experiments of Alcoa were last carried on at Arvida. In 1928 when Aluminium was organized what existed at Arvida, relating to the dry process, was turned over to Aluminium. Thereafter Aluminium continued the experiments.

For a long time those concerned with the dry process were quite hopeful. Aluminium abandoned it because neither Alcoa nor Aluminium itself had been able to rid the product of titanic acid and zirconium oxide. Both the acid and the oxide were objectionable elements, except that at prohibitive expense possibly those elements could have been eliminated. A large amount of money was spent in the effort to effect the production of alumina under the dry process and the very length of the experiment, coupled with the amount of money expended, indicates good faith on the part of those engaged in it.

Here again we have only an ordinary instance of a manufacturer trying to improve and cheapen production, which failed. No possible ground for criticism of Alcoa

in connection with the dry process has been shown.

The third process which is complained of, or in connection with which there is complaint, is the Blanc process which related to leucite.

Leucite is an Italian mineral. It was a proposed substitute for bauxite in the manufacture of alumina and it was anticipated that it would have a potash by-product which would be of value. The company which was to operate the leucite enterprise was Prodotti Chimici Napoli. The charge in regard to the matter is contained in paragraph 71 of the bill. There it is alleged that Alcoa incorporated Prodotti in Italy in 1927 to engage in the refining of alumina from leucite for the purpose and with the effect of obtaining alumina for supplying its European aluminum producing plants, so as to restrain the exportation of aluminum to the United States by threatening European producers with low-cost production and underselling them in their own home markets.

The stock in Prodotti was acquired by Alcoa on May 31, 1928. That was just four days prior to the transfer on June 4, 1928, by Alcoa to Aluminium of nearly all the stocks and other property owned by Alcoa outside of the United States. The agreement, however, on the part of Alcoa to transfer the Prodotti stock to Aluminium was made shortly after the June 4, 1928, arrangement. The transfer was completed in 1931.

Up to the completion of the transfer Alcoa conducted an experiment with the process in Italy. From 1931 to 1935 the experiment was continued by Aluminium. In 1935 the effort was abandoned. It had been worked on by Alcoa and Aluminium for a period of seven years. Quite a large amount of money was expended on it. So far as I can see, there is nothing in the evidence on which can possibly be founded any criticism of the conduct of Alcoa in connection with the leucite experiment.

What happened about the experiment was also but an ordinary effort by a progressive manufacturer to cheapen production, where the experiment turned out to be unsuccessful. The evidence shows that both Alcoa and Aluminium were very hopeful about leucite. There was a bona fide effort by both to find a substitute for bauxite. The very largeness of the amount of money spent by the two companies in the experiment, of itself, refutes any charge of misconduct or bad faith on their part.

I conclude that the Government has wholly failed to prove the charge made with respect to leucite.

Several other materials for producing or substituting for bauxite to produce alumina were mentioned. I shall comment on those briefly.

The first, to which I called attention yesterday, is the so-called potential bauxite in Arkansas. According to the testimony of Dr. Branner the quantity of that may run to from 10 to 20 million tons. Whether, however, the potential bauxite can be employed in a profitable way is a question for the future. I believe, in fact I am very confident from the testimony of Dr. Branner that he believes, that the so-called potential bauxite in Arkansas can be used; but the question really is whether it will not be too expensive to employ, and be so expensive that there will not be profit in the present state of the art in using, that bauxite (pp. 37543-54; 38060-1; 38364-8).

Yesterday I also commented on clay as a material which might be substituted for bauxite. That is one of the most abundant materials extant, familiar to everybody, over the surface of the earth. No doubt alumina can be produced from it. Up to this time, however, it has been too expensive to be adopted as a practical material for producing alumina. What the future holds with respect to clay none can say.

The third suggested possible substitute for bauxite, which was also mentioned yesterday, is alunite. As I look on the evidence, that material has not yet been fully exploited. It probably is what has been referred to as, up to this time, a laboratory material. However, I was impressed by the testimony of the representatives of the Bohn company. Their statements indicated clearly that, when the businessmen constituting its board of directors were considering going into the production of alumina from alunite, they were not deterred from proceeding with the enterprise on account of alunite being the material which they anticipated using. The testimony shows that the laboratory tests had been completely favorable. It also shows that the quantity in this country was very large. I think undoubtedly alunite is worthy of further inquiry.

Alcoa denies the monopolization charge as it relates to alumina. In its answer

(paragraph 53), however, it says as of the date of the filing of the bill that "it does produce and sell all the alumina used for the production of aluminum in the United States and it does produce all the virgin aluminum manufactured in. the United States." The Government charges as to alumina, as well as aluminum, that there is and has been a monopolization per se of these articles. It further argues in that connection that with respect to aluminum it is unnecessary, in order to sustain the charge of monopolization, for the Government to show that Alcoa excluded or attempted to exclude anyone from that branch of the business.

When I take up the next section of my statement I shall go into these issues as they relate to aluminum. What will there be said will apply as well to alumina on the same issues. For this reason at the moment I shall postpone discussing the charges in so far as they relate to alumina.

■ My conclusion is that, apart from the question reserved, the Government has entirely failed to prove any of its charges regarding alumina.

October 2, 1941

(4) Virgin Aluminum

We come next to the fourth monopolization charge. This relates to virgin aluminum. As you will recall, the process employed for manufacturing it was covered by patents up to February 2, 1909. The period, therefore, for present consideration of virgin aluminum is since that date.

In addition to the qualities common to alumina and aluminum, already discussed, I should mention one thing. The elements which compose alumina adhere to each other with great tenacity. It is necessary in producing virgin aluminum to drive off oxygen. The making of aluminum, particularly on account of the persistence with which the elements cling together, is a very difficult as well as very expensive operation.

It was claimed by the Government over and over again, in the bill, in argument and in briefs, that Alcoa and its subsidiaries are the sole producers and sellers of virgin aluminum produced in the United States. There is no dispute about this; it is expressly conceded in the answer.

There are three parts in the bill which mention virgin aluminum. In the first the charge of monopolization is stated. In the second it is alleged that by restraints of foreign competition, and in the third part that by unfair and oppressive tactics, Alcoa has maintained its monopoly. For the moment I shall not discuss the second and third parts. Those will be taken up separately later. In connection with my present treatment of virgin aluminum I shall confine myself to the charges in what I have referred to as the first part. These are quite extensive. They are contained in paragraphs 40 to 53. We are concerned, however, chiefly with three of those paragraphs. These are 40, 45 and 53.

For the purpose of getting a clear comprehension, or as clear as I can state, I think it will be enough to outline the allegations in the three paragraphs mentioned.

In paragraph 40 it is alleged:

"Defendants have violated and are now violating the provisions of said Sherman Antitrust Act, by monopolizing, attempting to monopolize, combining and conspiring to monopolize, * * * interstate and foreign trade and commerce, and more particularly by enabling the Aluminum Company to acquire and maintain a monopoly of * * * aluminum, * * * and by excluding others from the fair opportunity to engage in interstate and foreign trade and commerce in said articles." (the words "said articles" including aluminum and several other commodities which I have not read to you).

In paragraph 45 these are the allegations:

"Aluminum Company, and its wholly owned subsidiary, defendant Carolina Aluminum Company, are the sole producers of virgin aluminum in the United States. Said virgin aluminum is produced at three plants operated by Aluminum Company, at Alcoa, Tennessee, Massena, New York, and Niagara Falls, New York; and at a fourth plant operated by Carolina Aluminum Company at Badin, North Carolina."

You will note, therefore, that there are four aluminum producing plants located at the places I have just stated. In that connection there has come from Alcoa an admission of record, that there it produces all the virgin aluminum that is produced in the United States.

In paragraph 53 it is further alleged:

"By virtue of its 100 per cent monopoly of the production and sale of alumina and virgin aluminum in the United States, Aluminum Company has acquired and is maintaining a monopolistic control of the pro-

duction and sale of * * * aluminum, * * * and possesses the power to fix arbitrary, discriminatory, and unreasonable prices and to extend and perpetually maintain said monopolistic control and to exclude others who would, except for said monopolistic control, engage in competition with Aluminum Company in the production and sale of * * * virgin aluminum, * * *. Because new enterprises desiring to engage in the aluminum industry would be placed at the mercy of a single powerful corporation controlling essential raw materials, and because of the great hazard necessarily involved in venturing into a business so completely monopolized by Aluminum Company and its wholly owned subsidiaries, said monopolistic control has had and will continue to have the direct and immediate effect of suppressing and preventing substantial competition which would otherwise arise in the production and sale in interstate and foreign commerce of * * * aluminum, * * * and is inimical to the public interest and in violation of Section 2 of said Sherman Antitrust Act."

Before we get away from the wording of the three extracts I have just read relating to virgin aluminum, let me call your attention to a fact which I shall take up for discussion later. This fact is that in paragraph 40 and in paragraph 53 the word "and" is employed between the two parts of the allegations made in those two paragraphs with respect to alleged monopolization of aluminum. What follows the word "and" in both of those paragraphs is in paragraph 40 the word "excluding" and in paragraph 53 the word "exclude." I shall not take up for consideration just at this point the significance of the use of those words following the word "and"; but I shall deal with them a bit later. All I ask now is that you bear in mind the use of the words I have mentioned.

As I conceive, it has already been demonstrated, at least it is my view that it has been shown, that Alcoa has never monopolized bauxite or water power or alumina; that Alcoa is not guilty of monopolization of any of those articles. As I conceive also, and I believe in a measure indicated yesterday, strong argument can be made in support of the proposition that monopolization of alumina or monopolization of water power or monopolization of both is a necessary condition precedent to the monopolization of aluminum. I make no final statement of my views on the point at the moment.

Nevertheless, I do not wish the record left without my having called attention to the fact, as I feel, that at least argument of great strength can be advanced in support of the proposition. If the proposition be sound, one of the reasons why it is of the greatest consequence is that perhaps we are wasting time in discussing the other points. However, I shall discuss them. By the additional discussion I hope at least to furnish a supplemental reason for adopting the same conclusion.

Coming back to the use of the words "and" and "excluding" in paragraph 40, and the words "and" and "exclude" in paragraph 53, this means that the Government itself in making the charge of monopolization has used two elements conjunctively. What is the consequence of having used the two conjunctively in the pleading? As I think the Government thereby has committed itself to the view that, in order to establish monopolization, there must be proof to sustain both the elements which have been combined in the description of what constitutes the offense charged.

As I have said, it is without dispute that Alcoa is the sole producer and seller of virgin aluminum manufactured in the United States. There is no controversy about that; there never has been. But if I construe the pleading correctly, then on its own theory, as announced in the pleading, the burden rests on the Government to prove the other element, namely, the element of exclusion.

There has been a great deal of discussion of the element of exclusion throughout the trial. The Government has not adhered to a consistent or definite position with respect to it. What it has said at times, as I read it, is in square conflict with the pleading and parts of what it has said on the point are in square conflict with other statements made on the point.

Of course, I may be in error in my interpretation of the Government's position; but so far I have found no escape from this interpretation. I think, therefore, that I should call attention to the statements of record made by the Government in regard to the matter.

On May 4, 1938, counsel for the Government made this statement, at page 930:

"The theory of this petition is that the defendants have monopolized and conspired to restrain interstate and foreign com-

merce in aluminum. The more important of the offenses charged is that of monopoly. Monopoly, of course, means primarily exclusion of others, engrossing the business to yourself, and excluding others from a free opportunity from engaging in that business."

On the same day, at page 932, Government counsel made this statement:

"If you read this bill of complaint as a whole I am sure that you can gather from it the fact that the Government has pursued the theory that the Aluminum Company of America has a 100% monopoly on virgin aluminum and that it acquired that monopoly by excluding others from a fair opportunity to engage in the business."

On pages 932-3 the Government made this additional statement:

"* * * I submit that you can find on the face of the bill the theory spelled out carefully that that was one of the principal methods whereby this monopoly was built up. They [meaning Alcoa] excluded others from a fair opportunity to engage in the business, first by getting control of bauxite; second, by getting control of power; and, third, by tying the hands of other potential competitors and intimidating them from competing with the Aluminum Company."

Again, on October 25, 1938, which was after the case had been on trial since the 1st of the preceding June, Government counsel said at page 5163:

"* * * we urge that irrespective of intent, that the power to fix prices and to keep others out of the market, the power to control the market, irrespective of intent, is a monopolization."

This injects an additional idea, namely, that to establish monopolization there need be no proof of intent whatever. At least that is the way I read the sentence I have just put on the record.

On the same day, at page 932, Government counsel made the alleged piston patent monopoly. With respect to that, at pages 16755-6, Government counsel made this statement:

"The first proposition, as I stated, is the charge that Alcoa has undertaken to get a monopoly on the manufacture of aluminum pistons. * * * The thing that makes it unlawful is the attempt to engross to one's self the entire manufacture of a particular product with the intent of ac-

quiring that sole right of manufacture plus the exclusion of others from the field."

The Government made a statement as to the matter substantially to the same effect on May 17, 1939, at pages 17374-5.

Again, on November 22, 1939, testimony was being taken about negotiations of Mr. Hastings with Alcoa for the purchase of alumina. He wanted the alumina for the use of Aluminum Products Company, which was his organization, in manufacturing aluminum. As I recall, Mr. Gibbons was on the stand at the time. At pages 22598-9 the following appears to have occurred that day:

"The Court: What is the definition of monopolization? I have understood you to say that it included the element of excluding others.

"Mr. Rice [Government counsel]: Excluding others from the manufacture of it. Now Alcoa does have a monopoly on alumina, that is about a 99 per cent monopoly on alumina, and the fact it is willing to sell its alumina to someone else does not detract from the monopoly at all.

"The Court: I will hear you on that in time, but the element of exclusion is an essential element to the establishment of monopolization, is it not?

"Mr. Rice: Yes, * * *."

I have said to you that, according to my reading, the record also discloses an inconsistency between the pleading and the positions taken by the Government on the record, including statements in its briefs. On June 6, 1938, at pages 1814-5, the following is recorded in the minutes:

"The Court: * * * I am trying to find out, first, whether you conceive that under the admissions of well pleaded facts, in part or whole of the bill, the Government is now entitled to a decree in its favor that they [Alcoa] are monopolizing, and your answer is no, is that right?

"Mr. Rice: Yes. * * *.

"The Court: * * * Now, if you make that admission, that is not enough. What, in addition to that, must the Government establish in order to be entitled to a decree of monopolizing?

"Mr. Rice: the additional fact that we must prove is the fact which we allege in paragraph 53, that is, with this one hundred per cent monopoly of alumina and aluminum, the Aluminum Company

and the other defendants have the power to fix arbitrary or discriminatory or unreasonable prices or the power to extend or perpetually maintain the monopoly or the power to exclude others."

For the first time in this lawsuit, so far as I can discover, the Government took the position that in effect it ought to have drawn its bill by substituting in paragraphs 40 and 53 the word "or" for the word "and" preceding the word "excluding" in paragraph 40 and the word "exclude" in paragraph 53.

At page 1817 the following occurred:

"The Court: * * * Then as I understand it, your position is this, as far as concerns part 1 of the bill, that is the monopolization charge, it is your position that when you couple with the admissions in the answer proof of power by Alcoa, either one, arbitrarily to fix prices, or two, to exclude others from transactions in interstate commerce and foreign commerce in these articles, that entitles you to a decree?

"Mr. Rice: That is correct."

The substance of this was repeated at pages 1818-9. There were further statements by the Government in its briefs upon this phase of the controversy.

In its original brief, at page 6, the Government said:

"Monopolization does not require power to exclude others from entering the industry."

In its original brief, at page 38, the Government intimated, if it did not expressly say, that its position is as follows: "an enterprise producing 100% of the product in a large industry constitutes a monopolization per se in violation of Section 2 of the Sherman Act,"—although on the same page it concedes that "no reported cases will be found squarely ruling upon" what it calls "the narrow question"; and at page 5 of its reply brief it says that there is "absence of direct authority upon this initial proposition."

In the Government's reply brief, at page 8, there is the following statement:

"An accurate restatement of the Government's position was made by the Court following the opening statements, to the effect that the Government claimed the right to a decree under its charge of monopolization if it proved 'power by Alcoa, either one, arbitrarily to fix prices or, two, to exclude others' (R.1817, 2055)."

It would seem, therefore, that the position of the Government finally is (1) that the control of domestic production is monopolization per se and (2) that it is not necessary for the Government to show the exclusion of others in order to establish monopolization.

There is one minor aspect, in regard to the bill as a pleading, to which I wish to call attention; that is, as to its form. It has caused me, and caused me throughout the trial, some difficulty. What I have in mind is that the form of the pleading as to monopolization, in some respects at least, begs the question. It alleges, in effect, what is the result of an existing 100 per cent monopoly. That is the form of words most frequently used; or sometimes what is the result of Alcoa's monopoly. When I have read such allegations it has left me in some uncertainty as to precisely what the Government is talking about. This has been true because our inquiry, and our sole inquiry on this branch of the case, is whether there is any monopoly.

What I am most concerned with is getting help from the Government to understand what it means. It is for this reason that I have had a lot of trouble in construing the bill, particularly on the branch of the case at present under consideration.

As is obvious, up to February 3, 1909, Alcoa's patents protected it, or at least according to the view I have taken and for the reasons I have given I consider they protected it, from the monopolization charge. That is what the patents were for. I think my position on this point has been made clear. Save, therefore, as part of the history, what has been said about the patents and so forth, in fact nearly everything that has been said about Alcoa preceding February 3, 1909, is merely descriptive and helpful to some extent in understanding what the company consisted of, although there are occasions where perhaps—and I have treated it as if it were always true—I might consider these facts as an aid in interpreting the intent of Alcoa. In other words, for the most part evidence as to these facts preceding February 3, 1909, was irrelevant; and we are concerned primarily, if not only, with acts that were subsequent.

"Monopolize," as used in Section 2 of the Sherman Act, is what the grammarians call an active verb. Inherently the neces-

154

sary meaning is directly opposed to an inert condition.

 On principle it seems to me that it would be little short of absurd to construe Section 2 without qualification to mean that production of the entire output in the United States of a particular ·article, or of any article, or ·that the possession or sale of it by the producer, without other complaint or criticism of his conduct, would constitute monopolization of the article. I think that such an interpretation would be wrong. I think it would be wrong, among other things, because if adopted the statute as so interpreted thereby would provide punishment for what others than the producer (even though wholly unrelated to and disconnected from him) might do or had done. That this is so can be brought out, as I conceive, by considering a hypothetical case which I shall state to you.

Assume these facts: (1) A and B were domestic manufacturers of the same article in the same neighborhood and sold it, through the channels of interstate commerce, in the same communities. (2) In the course of time A grew to do his work better and at less cost than B. (3) During the same period, without fault on his part and while working with equal industry, the article B produced was inferior in quality or his cost of production was greater than that of A. (4) In consequence, all the customers of B shifted to A and B was forced to close his factory for lack of customers. (5) The competition between A and B was fair. (6) A has continued to run his factory for 50 years and, ever since the point was reached where he did his work better and at less cost than B, A has sold all the articles marketed in the communities formerly served in part by himself and in part by B.

Those are the facts that I assume. Now what shall we say with respect to application to the facts of a charge against A of monopolization? In the circumstances recited A became the sole domestic producer and seller of the article. Did that render him guilty of monopolization? There is no showing that he unduly or unfairly or at all restrained trade, except in the very literal sense that I referred to on Tuesday. I pointed out that, in the lay sense, any merchant in the world who sells an article restrains trade because his neighbor engaged in the same business has no chance to sell that identical article. But, in the legal sense, that is not monopolization by A. On the contrary, the withdrawal of B from the contest arose wholly out of his own deficiencies.

Customers voluntarily elected to patronize A. Plainly A is not responsible for what B or for what the customers did. Without imposing on A responsibility for what B did, or for what the customers did, or for what B and the customers did, it cannot be said that he caused withdrawal of B from the contest.

It is clear also that it was the difficulty or the financial loss or the risk of financial loss from engaging in the manufacture of the article that led one of the competitors concerned in the industry to discontinue producing the article. This competitor preferred to leave someone else to meet the difficulty or to incur the hazard. Does the statute, without more, prohibit the single remaining manufacturer from continuing in business, or from continuing to produce the article, or from continuing to sell the article? If so, then certainly it would follow necessarily that the only recourse open to him would be to abandon production and thus, so far as concerns domestic production, let it disappear from the commerce of the United States. The construction which brings about such a result should be rejected and I feel certainly will be rejected unless imperatively required by the Sherman Act.

The sole domestic manufacturer might do so well, might charge such reasonable prices and might conduct the marketing of his product so satisfactorily, that everyone in the community would prefer to patronize him. If so, then another citizen who, though without fault on his part, could not carry on the business with equal satisfaction to his customers,—either because his product would be inferior or because greater costs of production would compel him to charge higher prices in order to survive,—would necessarily be driven out of the business. Yet, if the theory of the Government, stated by its counsel, as to what Section 2 of the Sherman Act means be accepted, then obviously A would be punished for what B, or what B's customers, or what B and his customers had done.

 So far as I can discover the Supreme Court has never given the slightest support to such an interpretation as ·the

Government advocates. As I understand the statements of Government counsel in their briefs, they have found no support in the decisions for their proposition. Even they themselves have gone so far as to say that they find no direct support for their position. On the contrary, the Supreme Court, in defining monopolization under Section 2, has coupled with the existence of power to control, or that in essence, the further element of affirmative utilization of that power to keep out or with the purpose of keeping out competitors,—which keeping out is identical in significance and meaning with "excluding."

In other words, to put it differently, the possession of unexerted power to control is not an offense. This was held in United States v. United States Steel Corp., 251 U.S. 417, 451, 460, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121, and United States v. International Harvester Co., 274 U.S. 693, 708, 47 S.Ct. 748, 71 L.Ed. 1302.

The Circuit Court of Appeals for the Second Circuit has ruled to the same effect (National Biscuit Co. v. Federal Trade Commission, 299 F. 733, 736. See, also, Federal Trade Commission v. Paramount Famous-Lasky Corp., 2 Cir., 57 F.2d 152, 157).

In the way described, and as I feel in that way alone, can there be ascertainment of whether an accused is guilty of monopolization. The only way to get an answer to the question is by an inquiry into his conduct.

The Government seeks to distinguish the decisions to which I have referred in support of my own view. Before going into them, however, we should have as background the significance which, in dealing with the subject of monopolization, the Supreme Court has ascribed to the use in Section 2 of verbs instead of a noun or nouns.

On inspection it immediately becomes apparent that Section 2 does not inhibit or even mention a monopoly. On the other hand, the only thing it condemns is "to monopolize" or "attempt to monopolize" or "combine or conspire * * * to monopolize." It follows that if all that governs in the premises be Section 2 of the Sherman Act—and that is all we are concerned with on the branch of the case now under consideration—a monopoly is lawful. Certainly at least Section 2 does not make it unlawful. What the Supreme

Court said on the subject as long ago as 1911 has remained entirely undisturbed and entirely unmodified.

In the Standard Oil case, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A., N.S., 834, Ann.Cas.1912D, 734, attention was called to two features of the law with respect to monopoly as such. First, without going into the great learning there displayed with respect to the common law, it is enough to quote the statement (page 55 of 221 U.S., page 514 of 31 S.Ct., 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas. 1912D, 734) that "nowhere at common law can there be found a prohibition against the creation of monopoly by an individual." Secondly, it was said (page 62, of 221 U.S., page 516 of 31 S.Ct., 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734) that likewise, as at common law, the Sherman Act omitted "any direct prohibition against monopoly in the concrete." The Court went further and, with respect to the statute, made an explanation of the omission last mentioned. We need not pursue this feature further, however, than to call attention to the Court's statement (page 62 of 221 U.S., page 516 of 31 S.Ct., 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann. Cas.1912D, 734) that this omission "indicates a consciousness that the freedom of the individual right to contract, when not unduly or improperly exercised, was the most efficient means for the prevention of monopoly."

In other words, our highest court has declared that the Congress deemed it wiser to leave undisturbed the citizen's right freely to contract than to bar him from creating a monopoly. Instead, in a sense Section 2 prescribes rules of conduct for the citizen. This end is accomplished solely by using verbs in defining prohibitions relating to that conduct.

In 1915 the District Court of the United States for the Western District of New York had before it a suit in which the Government complained that certain acquisitions of property by the defendant had violated Section 2 of the Sherman Act (United States v. Eastman Kodak Co., 226 F. 62). In the course of its opinion the District Court said (page 80 of 226 F.): "There is no limit in this country to the extent to which a business may grow." This proposition seems axiomatic. Yet so far as I have discovered Judge Hazel, who wrote that opinion, made the first specific announcement of it in connection

with a charge of monopolization in contravention of Section 2 of the Sherman Act; but in 1920 the Supreme Court spoke on the subject in United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121.

Before setting out what was decided in the Steel Corporation case, however, consideration should be given to the Government's contention that the case should not be followed because it was decided by a minority of the whole number of Justices, although a majority of those who sat, and because, as the Government claims in effect, the Justices who composed the majority joining in the opinion later used expressions or said things which were at variance with what was said in that opinion.

What are the facts? They are these: Two Justices did not sit; four Justices joined in the majority opinion; three Justices joined in a minority opinion. As will be seen by extracts, however, all of the Justices participating, all the Justices who sat, being the majority, agreed with the statement or the substance of the statement made earlier by Judge Hazel. Indeed, as I read the opinion, in full concurrence with each other all seven of the Justices sitting in the Steel Corporation case went beyond what Judge Hazel had said.

If I rightly construe the opinion, the differences between the two groups who sat were confined to other matters and upon the phase of the decision with which we are at present concerned, the seven Justices were unanimous and in complete accord.

At page 451 of 251 U.S., at page 299 of 40 S.Ct., 64 L.Ed. 343, 8 A.L.R. 1121, Mr. Justice McKenna for the majority said this:

" * * * the law does not make mere size an offense, or the existence of unexerted power an offense. It, we repeat, requires overt acts, and trusts to its prohibition of them and its power to repress or punish them. It does not compel competition, nor require all that is possible."

At pages 460, 461 of 251 U.S., at page 302 of 40 S.Ct., 64 L.Ed. 343, 8 A.L.R. 1121 Mr. Justice Day, speaking for the minority, said:

"I agree that the [Sherman] act offers no objection to the mere size of a corporation, nor to the continued exertion of its lawful power, when that size and power

have been obtained by lawful means and developed by natural growth, although its resources, capital and strength may give to such corporation a dominating place in the business and industry with which it is concerned. It is entitled to maintain its size and the power that legitimately goes with it, provided no law has been transgressed in obtaining it."

If there could have remained any doubt about the proposition, I feel it was conclusively settled in 1927 that unexerted power is not an offense. It was so held in United States v. International Harvester Co., 274 U.S. 693, 708, 47 S.Ct. 748, 753, 71 L.Ed. 1302. The statement there was this:

"The law, however, does not make the mere size of a corporation, however impressive, or the existence of unexerted power on its part, an offense, when unaccompanied by unlawful conduct in the exercise of its power."

Finally, in 1940, the Supreme Court further elucidated the statute generally. It also further fortified its interpretation when speaking generally of cognate features, especially the confinement of the prohibitions of the statute to the conduct of individuals. That was in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044.

▮ The case there was under Section 1. On that account it may be suggested that what was stated about Section 2 was a dictum and need not be followed; but I have not yet reached the point where I disregard what the Supreme Court says, even though I think it may be dictum. It is not within my official province to criticize a dictum by the Supreme Court. I accept its dictums as well as its decisions. If any change is to be made in the law after the Supreme Court announces it, I want the Supreme Court itself to make it, because certainly I am not going intentionally to make or try to make it.

The case contained two relevant statements. The first was this (page 495 of 310 U.S., page 993 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044):

"A second significant circumstance is that this Court has never applied the Sherman Act in any case, whether or not involving labor organizations or activities unless the Court was of opinion that there was some form of restraint upon commercial competition in the marketing of goods or services * * *."

Again, it was said on page 500 of 310 U.S., at page 996 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044:

"In the cases considered by this Court since the Standard Oil case in 1911 some form of restraint of commercial competition has been the sine qua non to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price."

In United States v. Gold, 2 Circ., 115 F. 2d 236, the Court had before it a charge under Section 1 against an official of a labor union. He sought to compel non-union factories to employ only members of his union. Failing in that he caused a strike by the members of the union against the factories. On November 4, 1940, Judge Learned Hand, speaking for the Court, said (page 238 of 115 F.2d):

"There can be no question that the accused intended to acquire a monopoly of the whole supply of the services rendered by the employees; * * *. But the court in the Apex case expressly declared that the Sherman Act did not cover any restraint of competition in such services * * *."

Even though brought under Section 1 and not directly in point here, it seems to me that in general the Apex Hosiery case as construed by Judge Hand at least lends support to the holdings in the Steel Corporation and the International Harvester cases, that a charge of monopolization cannot be sustained by merely showing existence of power to control if such power were never used or designed to be used to keep or drive others out of the business involved. Certainly there is nothing in the Apex Hosiery case at variance with the rule announced in the Steel Corporation and International Harvester cases to which I have referred.

I think there is no decision of the Supreme Court or of the Second Circuit Court of Appeals which lends support to, and certainly no such decision called to my attention supports, the position of the Government as finally announced by it with respect to the question that we are now discussing.

For example, the Government cites the Socony-Vacuum Company case, 310 U.S. 150, and quotes language from page 224, 60 S.Ct. 811, page 844, 84 L.Ed. 1129. It is to be noted, however, that there the Court was not dealing with monopolization; it was concerned only with a price-fixing conspiracy, as I called to the attention of Government counsel when he referred to it. It was in respect to this that the pronouncement was made that the conduct complained of was "illegal per se" (page 223 of 310 U.S., 60 S.Ct. page 844, 84 L.Ed. 1129). That was obviously right. It is so clear and so undisputed, and was so thoroughly established long before this decision was handed down, that there is nothing new about it. At page 224 of 310 U.S., at page 844 of 60 S.Ct., 84 L.Ed. 1129, in the interest of clarity and, I believe, for that purpose only, the Court explained that "Monopoly power * * * is not the only power which the [Sherman] Act strikes down."

When taken in its context it seems to me indisputable that what the Court said was intended to be applicable only under Section 1. It seems to me also that it was in order surely to avoid misunderstanding or confusion that note 59 (pages 224-226 of 310 U.S., pages 845, 846 of 60 S.Ct., 84 L. Ed. 1129) was brought in just at this point.

Let it not be overlooked that in the case at bar we are now dealing with the charge made in part 1 of the bill under Section 2. Note 59 in the Socony-Vacuum case states with precision the distinction between sections 1 and 2. At page 226 of 310 U.S., at page 845 of 60 S.Ct., 84 L.Ed. 1129, it was said that where "actual monopolizing," in violation of Section 2, is charged, an "intent * * * to produce the result which the law condemns" is "then necessary."

What I have said, as I conceive, is in accord with and is sustained by what was said in note 59 to the Socony-Vacuum opinion. Indeed, as I feel, it would be impossible for one having power to control to accomplish exclusion of a competitor unless the power of control were actually exercised and incidentally, therefore, were used with intent to exclude.

I see no doubt, at least I entertain no doubt, that exclusion is one of the essential elements of the crime of monopolization.

There is another entirely separate but related class of cases which specifically deal with exclusion. They hold that it is an essential element of monopolization. As I understand them, in order to establish

monopolization it must be shown that the accused excluded or attempted or by his conduct intended to exclude his competitor or competitors. The decisions to which I call your attention as sustaining the proposition are Patterson v. United States, 6 Cir., 1915, 222 F. 599, 619, 620, certiorari denied 238 U.S. 635, 35 S.Ct. 939, 59 L.Ed. 1499, and cited with apparent approval in United States v. Socony-Vacuum Co., May 6, 1940, 310 U.S. 150, at pages 225, 226, 60 S.Ct. 811, 84 L.Ed. 1129, and National Biscuit Co. v. Federal Trade Commission, 2 Cir., 1924, 299 F. 733, 738.

In the Patterson case, at pages 619 and 620, of 222 F., there appears the following:

"The word 'monopolize' is used in this section [Section 2] in a legal and accurate sense. Its root idea is to exclude. To monopolize trade or commerce, or a part thereof, is to exclude persons therefrom. * * * But in the case of monopolizing under the second section, where there is exclusion by a competitor, or a combination of competitors, of competitors substantially from interstate trade or commerce, it is in order that the former may have the whole or approximately the whole of the field to itself or themselves. It is penalized, so that there may be no such exclusion, and the field may be occupied by all on equal terms."

The Patterson case, having been cited by the Supreme Court and particularly cited so recently as in 1940, takes on, as I feel, a significance that it did not have before. Such citation in the absence of some declaration to the contrary, I take it, is an adoption or approval of the decision.

Again, in the National Biscuit Co. case to which I have referred, this was said (page 738 of 299 F.):

"It is the exclusion of others from the opportunity of doing business that is regarded as monopolizing."

The decision in the National Biscuit Co. case was by the Circuit Court of Appeals to whose decisions I owe obedience. For that reason it takes on a significance for me that I would not accord to it if it were made by a Circuit Court of Appeals for another circuit or made by a District Court.

Throughout this case the Government has done its work with great thoroughness, apparently with a quite adequate staff of competent lawyers. I am in a different position. I have to do all my work myself, without anybody to help me. After having had opportunity thoroughly to investigate the law, the Government properly announced in its briefs, in effect, that it could find nothing in the decisions to sustain or at least directly to sustain its position that exclusion is not an essential element of the crime of monopolization. In view of two decisions,—one cited by the Supreme Court of the United States and the other being by the Circuit Court of Appeals for this circuit,—which squarely and directly do hold that exclusion is a necessary element of the crime of monopolization, however, I feel bound to adhere to that view.

There are numerous other cases I have run across which are to the same general effect as the Patterson and the National Biscuit Co. cases. Nevertheless, I do not cite them because, as guides for me, they stand no higher than my own decisions do and there is no use in citing them. So also, where there have been, as I have found, a decision by a Circuit Court of Appeals for another circuit which the Supreme Court has cited, and a decision by the Circuit Court of Appeals for this circuit, I feel that there is no use of my searching for decisions by Circuit Courts of Appeals for other circuits or by district courts standing on the same level with the district court of which I am a member.

As I read the Government cases dealing with the point, there is no one of them that supports or even tends to support its theory with respect to the element of exclusion.

As I understand the law as laid down in the decisions on which I have relied, it is requisite to success on a monopolization charge that the Government prove the element of exclusion.

You will recall the statement in the Apex Hosiery case, which was a mere repetition or reaffirmance of holdings by the Supreme Court, theretofore, that when we are in doubt as to the meaning of a statute (that is, when it is ambiguous), then we should resort to its legislative history.

Ordinarily I should have recited the legislative history of the Sherman Act before citing the court decisions to which I have referred. In the present instance, however, I preferred to postpone consideration of the legislative history until after I had drawn your attention to some court decisions.

On going over the legislative history of the Sherman Act, it seems to me strong-

ly to confirm the interpretation I have put on Section 2.

In the Apex Hosiery case, 310 U.S. 469, at pages 497, 498, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044, it was said, in substance, that the method for getting at the meaning of terms employed in the Sherman Act having to do with restraint of trade was to ascertain their definition at common law.

Section 2 is, or at least some of the courts have said it is, ambiguous. In fact, there are very few things about the Sherman Act that some courts do not say are ambiguous. That it is ambiguous was announced by Circuit Judge Howell E. Jackson shortly before he became a member of the Supreme Court. He made the announcement in 1892, when sitting in the Circuit Court for the Southern District of Ohio, in the case of In re Greene, 52 F. 104, at page 115. The existence of ambiguity was also recognized in 1911, in the Standard Oil case, 221 U.S. 1, at pages 61, 62, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R. A.,N.S., 834, Ann.Cas.1912D, 734. Lastly, as I have called to your attention heretofore, it was definitely stated in the Apex Hosiery case, 310 U.S. at page 489, 60 S. Ct. at page 989, 84 L.Ed. 1311, 128 A.L. R. 1044 that the language is vague— vague is the word—and I take it this means it is ambiguous.

█ It is a well established rule that ambiguity in a statute permits resort for help to its legislative history. In the Apex Hosiery case, at page 489 of 310 U.S., at page 989 of 60 S.Ct., 84 L.Ed. 1311, 128 A.L.R. 1044, the Court said:

"In consequence of the vagueness of its [the Sherman Act's] language * * * it is appropriate that courts should interpret its word in the light of its legislative history * * *."

In Duplex Printing Press Co. v. Deering, 254 U.S. 443, at pages 474, 475, 41 S. Ct. 172, at page 179, 65 L.Ed. 349, 16 A.L.R. 196, the Court said:

"* * * reports of committees of House or Senate stand upon a more solid footing [that is, more solid than something that had been talked about immediately preceding], and may be regarded as an exposition of the legislative intent in a case where otherwise the meaning of a statute is obscure. * * * And this has been extended to include explanatory statements in the nature of a supplemental report made by the committee member in charge of a bill in course of passage."

Let us, therefore, turn to the Congressional Record and see if we can discover evidence there of the prescribed type for consideration in resolving the meaning of an ambiguous word or phrase used in the Sherman Act and more particularly whether there be in the Congressional Record any assistance that we can get from the prescribed material in determining the meaning of monopolization (monopolization, of course, meaning what I have defined at the beginning as included within Section 2 of the Sherman Act in the three sets of verbs there employed).

The bill which resulted in the adoption of the Sherman Act was known as S1. It was passed at the first session of the Fifty-first Congress. In the Senate Mr. Edmunds of Vermont, Chairman of the Judiciary Committee of the Senate, was in charge of the bill. In the House, as stated by the Chairman of the Judiciary Committee, Mr. Culberson (a member of the committee) was in charge of the bill. There arose in the Senate a discussion, brought on by Senator Kenna of West Virginia. The inquiry made by Mr. Kenna was as to the wording of Section 2 of the bill. That wording, as to the meaning of which he propounded his question, was precisely what is contained in Section 2 of the Sherman Act today.

As shown by the Congressional Record, Volume 21, Part 4, pages 3151-2, the proceedings included the following:

"Mr. Kenna. * * * I would like to ask * * * the Senator from Vermont [that being Senator Edmunds, Chairman of the Judiciary Committee] a question touching the second section: * * *.

"Is it intended by the committee, as the section seems to indicate, that if an individual engaged in trade between States * * *, or between a State and a foreign country, by his own skill and energy, by the propriety of his conduct generally, shall pursue his calling in such a way as to monopolize a trade, his action shall be a crime under this proposed act? * * *.

"Mr. Edmunds. I think I understand the Senator.

"Mr. Kenna. Suppose a citizen of Kentucky is dealing in short-horn cattle and by virtue of his superior skill in that particular product it turns out that he is the only one in the United States to whom an

order comes from Mexico for cattle of that stock for a considerable period, so that he is conceded to have a monopoly of that trade with Mexico; is it intended by the committee that the bill shall make that man a culprit?

"Mr. Edmunds. It is not intended by it and the bill does not do it. Anybody who knows the meaning of the word 'monopoly,' as the courts apply it, would not apply it to such a person at all; * * *.

"Mr. Kenna. * * * here is a provision in the bill which * * * provides a penalty for such conduct on the part of any citizen of this country engaged in the commonest and most legitimate callings of the country, who happens by his skill and energy to command an innocent and legitimate monopoly of a business.

"Mr. Edmunds. It does not do anything of the kind, because in the case stated the gentleman has not any monopoly at all. He has not bought off his adversaries. He has not got the possession of all the horned cattle in the United States. He has not done anything but compete with his adversaries in trade, if he had any, to furnish the commodity for the lowest price. So I assure my friend he need not be disturbed upon that subject."

Senator Gray of Delaware thereupon proposed an amendment to include in Section 2 the element of combining or conspiracy. After discussion, Senator Edmunds said (p. 3152):

"I have only to say, in regard to the amendment suggested by my friend from Delaware and the suggestions of the Senator from West Virginia, that this subject was not lightly considered in the committee, * * * and the best answer I can make to both my friends is to read from Webster's Dictionary the definition of the verb 'to monopolize:'

"1. To purchase or obtain possession of the whole of, as a commodity or goods in market, with the view to appropriate or control the exclusive sale of; as, to monopolize sugar or tea. * * *

"2. To engross or obtain by any means the exclusive right of, especially the right of trading to any place, or with any country or district; as, to monopolize the India or Levant trade."

In the House Mr. Culberson, in commenting on Section 2, quoted Webster's definition of a monopoly as follows (21 Congressional Record, Part 5, p. 4090):

·"To engross, to obtain by any means exclusive right of trade to any place or within any country or district, as to monopolize the trade."

I think, therefore, it is very clear that it was the understanding of Senator Edmunds and of Mr. Culberson, who were in charge of the bill which resulted in the Sherman Act, during the course of the consideration of the bill by the Senate and the House, that the element of exclusion was an essential to monopolization.

If I be right on that interpretation, then it has the support of two court decisions which I have found and, so far as I have discovered, they are the only ones which have spoken specifically on the subject. The first is the case of In re Greene, C.C.S.D.Ohio 1892, 52 F. 104, 116, wherein Circuit Judge Howell E. Jackson, in speaking of Section 2 of the Sherman Act, said this:

"When this section of the act was under consideration in the senate, distinguished members of its judiciary committee and lawyers of great ability explained what they understood the term 'monopoly' to mean; one of them saying: 'It is the sole engrossing to a man's self by means which prevent other men from engaging in fair competition with him.' Another senator defined the term in the language of Webster's Dictionary: 'To engross or obtain, by any means, the exclusive right of, especially the right of trading, to any place or with any country, or district; as to monopolize the India or Levant trade.' It will be noticed that, in all the foregoing definitions of 'monopoly,' there is embraced two leading elements, viz., an exclusive right or privilege, on the one side, and a restriction or restraint on the other, which will operate to prevent the exercise of a right or liberty open to the public before the monopoly was secured. This being, as we think, the general meaning of the term, as employed in the second section of the statute, an 'attempt to monopolize' any part of the trade or commerce among the states must be an attempt to secure or acquire an exclusive right in such trade or commerce by means which prevent or restrain others from engaging therein."

The other decision by a lower court, to which I referred as one commenting on the significance of what occurred during the course of legislative consideration of Section 2 of the Sherman Act, was joined

in by Judge Hook, whose opinions, of course, all lawyers who practice in the Federal courts have read. This was a concurring opinion. It was rendered in 1909 when four Circuit Judges were sitting in the case of the United States v. Standard Oil Co., C.C., 173 F. 177, 195-197. You will recall, of course, that the decision below in that case was affirmed by the Supreme Court in 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L.R.A.,N.S., 834, Ann.Cas.1912D, 734.

What Judge Hook said that is pertinent is set out at pages 195-197 of 173 F. and is as follows:

"One person or corporation may offend against the second section by monopolizing, but the first section contemplates conduct of two or more. * * * That it was the intention of Congress to condemn monopolies, not based on illegal combinations among several, but secured by single persons, natural or artificial, by other means, also appears from the history of the legislation. * * * after much difference of view, the bill, with many amendments, was referred to the judiciary committee of which Senator Edmunds was chairman. * * * A motion was made to amend the second section. * * * But it was rejected. * * *

"During the discussion of the amendment above referred to, apprehension was expressed over the broad language of the second section of the proposed act, and inquiry was made whether the committee having the bill in charge intended it should make it an offense if an individual engaged in interstate and foreign commerce, 'by his own skill and energy, by the propriety of his conduct generally, shall pursue his calling in such a way as to monopolize a trade.' Assurances were given that the term 'monopolize' had no such signification, but that it contemplated the employment of means which prevented others from engaging in fair competition, the engrossing of the trade, and the like. Undoubtedly this view prevailed at the passage of the law."

 If the answer which Senator Edmunds gave to Senator Kenna be accepted, then it seems to me, particularly on the interpretations of Judge Jackson and Judge Hook, the offense of monopolization cannot be established unless there be proved, as one of the constituents, the element of exclusion.

On my own account I may repeat what I have said before, that on the undisputed evidence I think it clear that Alcoa comes squarely and effectively within the horned cattle raiser example about which Senator Kenna put his question. If so, we are entitled to follow the interpretation constituting the response by one in charge of the bill which resulted in the enactment of the Sherman law. If this be true, then at least it follows, on that ground alone, that Alcoa is not guilty of monopolization unless the element of exclusion be proved. This brings us, therefore, to consider the evidence bearing on the exclusion issue.

Assuming that I was not fully justified in saying that, as it seemed to me on the undisputed evidence, the element of exclusion has not been sustained; even though we do not go that far, let us examine all the evidence—any evidence there is in the case —to see whether it does sustain the proposition that, on the part of Alcoa, there was exclusion or attempt to exclude or intention to exclude others from the manufacture of aluminum,—that is, to exclude them from the production of aluminum within the United States.

Outside of what are treated elsewhere under various subdivisions of my statement, including in part things that I have already stated, including also a number of additional things that I shall say, which, as I think, refute the charge that Alcoa excluded others, there is only one instance in the record on which the Government relies for its proposition of exclusion. That instance constituting the single exception, which is most insisted on by the Government, is that of the Southern Aluminium Company (frequently spoken of during the trial as the Southern Aluminum Company and owned by the French Aluminum Company). This should be described at some length.

When the World War broke out August 1, 1914, Southern Aluminium Company was engaged in constructing an aluminum plant at Badin, North Carolina. Much that was planned had not even been started; there had been no construction work on certain parts of it whatever. Much also was merely in its initial stages. The dam (an essential factor) was only between one-eighth and one-fourth finished (pp. 20438; 20464). When the war commenced in Europe all work on the plant ceased. Indeed, the French Government regulations forbade the

162

sending of any further funds out of France for continuance of the work.

After negotiations through American lawyers representing the owners of the property, occurring from time to time over a period of about a year, a sale of the property in its unfinished state was made to Alcoa in 1915 (Exhibits 145 and 152). The property sold was all the assets of Southern (p. 23340). The price, agreed on in francs, was the amount Southern had expended on the project. A statement itemizing the cost in dollars to Alcoa was made up, checked by both sides from Alcoa's books and introduced in evidence by the Government (Exhibit 745; pp. 12996-8; 18202-3).

The gross price in dollars, which Alcoa paid in full, was $6,990,627.02. In the form in which the computation was made, however, there was a deduction of three items of salvage, designated in the exhibit as Schedules D, E and F, leaving a net cost to Alcoa of $6,172,247.59. The net cost was arrived at in this way: the gross price, as I have stated, was $6,990,627.02; the salvage was $818,379.43; deducting the latter from the former, the balance or net cost as shown by Exhibit 745, on exhibit page 3644, was $6,172,247.59.

No definite complaint of the transaction was made in the bill. The only specific mention of it is in paragraph 13. What is there alleged, in substance, is merely that in 1915 Alcoa purchased the Southern property, with which through a subsidiary Alcoa has since been engaged in the production of aluminum at Badin—though (it should be noted) the evidence shows that not until 1917 did Alcoa complete making various changes and finish the plant.

At the trial and in the argument, however, the Government assailed the transaction. In its original brief at page 242 it said that when Alcoa purchased Southern's "partially completed plants and equipment * * * it throttled the potential competition of the first and only project to get as far as to commence construction of an independent aluminum plant in the United States." In argument the Government also asserted that the price at which the property was purchased so greatly exceeded its value that it is shown thereby that the purpose of the purchase by Alcoa was to rid itself of potential competition.

What occurred in the way of sale's negotiations is pertinent for consideration. The evidence without dispute establishes three things:

(1) The negotiations for the sale were initiated, and when suspended were thereafter resumed, by Southern's attorneys.

(2) When the negotiations began the work on the plant had already been completely abandoned and it was never resumed by the French company. It was estimated that it would require seven and a half million dollars to complete the plant (Exhibit 146, exhibit p. 788).

(3) There was neither financial ability by the French company to complete the plant nor the prerequisite French Government leave to spend the money in the United States, if the company had then had it; nor, so far as is shown, was there any prospect of the work ever being taken up again by the French company (pp. 19118-24; 19128; 20390-3; 20398-407; 23447-50).

There were three stages in the negotiations (pp. 20399-402):

(a) Between August 1 and September 14, 1914 (Exhibit 567), one of Southern's New York attorneys sought to interest Alcoa (or its president) in purchasing the company or its assets. Alcoa replied, in substance, that until it ascertained whether it could procure the money needed to make the purchase it would not be interested. After an effort and failure to find the money available, Alcoa notified Southern (Exhibit 567) and declined to proceed further (pp. 19119; 19122-4; 19128; 20390-6; 20399-400).

(b) In June, 1915, one of the New York attorneys resumed the negotiations with Mr. Davis,—and apparently it was the same attorney who had approached Mr. Davis in 1914. Nothing resulted except that Mr. Davis defined the terms on which he was willing to discuss an investment in Southern's bonds and stock, provided the proper United States officials approved and other specified conditions were met. But Alcoa then made no offer (Exhibit 1073, item 1; pp. 19120-2; 20398; 20401). The evidence does not disclose further details with respect to this aspect, but it does show that nothing came of it—that is, of the discussion as to purchasing bonds and stock issued by Southern.

(c) In July or August, 1915, the negotiations were again resumed by one of the New York attorneys of Southern (pp. 20389; 20397; 20399; 20401-7). These resulted in the execution of a contract for the sale—not a contract of sale, but a contract for the sale, looking to the sale—of all

of Southern's assets at Badin at a price of Southern's cost to date (Exhibit 145). The agreement also provided that the matter should be submitted to the Department of Justice with a request for an indication that it (that is, the Department of Justice) would not claim that the agreement violated the injunction contained in the 1912 consent decree in the Pittsburgh case. Southern's lawyers suggested that they ought to present, and they did present, the question to the Department of Justice (Exhibits 146 and 148). Under date of September 3, 1915, the Department replied that it saw "nothing in the facts concerning the proposed transaction as set forth in" the letters from Southern's attorneys, "which would call for any action by it [the Department of Justice] under the decree" (Exhibit 149). This was followed by a confirmatory contract of sale dated November 23, 1915 (Exhibit 152).

Extensive testimony was taken, parts of which that seemed pertinent have heretofore been summarized (pp. 19118-28; 20380-474; 23339-43a; 23438-62; 23776-8; 23818-31; 24023-7; 24120-1; Exhibit 1311).

Unless it be in a certain tax brief submitted by Alcoa to the Bureau of Internal Revenue (Exhibit 156), which remains to be and will be taken up, I discover nothing in the evidence to sustain the Government's contention that, in acquiring the Southern assets, Alcoa acted in bad faith or for the purpose of avoiding prospective competition. As I view the evidence, it does not establish nor is there justification for an inference either that, if Alcoa had not made the purchase, the project at Badin would ever have been completed or even the construction of it resumed by the French company or that any concern other than Alcoa sought to purchase or contemplated purchasing or would have purchased it or that there is likelihood that anyone else would have purchased the property in event it had not been acquired by Alcoa. At best these things are left wholly in the realm of speculation.

The Government insists that the statements of losses in the tax brief are to be taken as admissions by Alcoa of overpayments made by it for the Southern property. This is contested by Alcoa.

Among other things, the evidence with respect to the property shows without dispute the following: The locations for a power house and an aluminum plant, construction of which by Southern had been commenced, were completely changed after Alcoa's purchase. A dam had been planned for Southern so that the flood waters would pass out through a tunnel or tunnels, whereas after the purchase eminent engineers advised Alcoa that this feature was a mistake and that the water when high should go over the top of the dam (pp. 20428-31; 23342). In consequence, the design was altered. There were also several other changes, the details as to which need not be stated.

The application in support of which the brief was submitted sought the allowance of deductions, from what Alcoa had paid for the property, of losses it claimed to have suffered, chiefly through the scrapping of work and materials growing out of the redesigning of the project (pp. 23821-2).

Alcoa's brief represented that the total of its losses was $1,735,699.09. Against this Alcoa credited a gain in exchange, due to the cheapening of the franc, aggregating $491,707.03. Deducting the gain from the total loss there was left a net loss, as claimed by Alcoa, of $1,243,992.06.

Table 4 which I have prepared is a compilation of items contained in Alcoa's brief (Exhibit 156) in support of a request for reassessment of its income taxes, so that what Alcoa called losses might be allowed it as deductions, and that table is as follows:

## TABLE 4

*Computation from Ex. 156 of Alcoa's losses on Southern Aluminium Co. transactions, as claimed in its brief on application to Bureau of Internal Revenue for reassessment of income taxes.*

### At Narrows

| | |
|---|---|
| Abandoned construction work on dam and spillway | $ 504,160.05 |
| Abandoned sub-structure of power house | 207,413.82 |
| Abandoned super-structure of power house | 11,511.08 |
| Unusable equipment at power house (total loss) | 104,964.59 |
| Penstocks-cost, less salvage | 117,632.65 |
| Arbitrators' award to contractors | 236,793.46 |

### At Badin

| | |
|---|---|
| Grading and foundations at abandoned site | 102,156.61 |
| Abandoned sub-structure alumina building, less salvage | 49,603.04 |
| Temporary work, entire loss | 29,585.29 |
| Abandoned transmission system from Whitney, less salvage | 1,707.23 |
| Deficit in supplies inventory | 14,206.67 |
| Miscellaneous items charged off, less proceeds | 48,529.30 |

*At Whitney*

| | |
|---|---|
| Cost building dam abandoned, less salvage | $ 157,162.69 |

*General*

| | |
|---|---|
| Year's expenses charged off | 150,272.61 |
| | |
| Total actual loss | $1,735,699.09 |
| Stated (exhibit p. 858) as | $1,735,699.09 |
| Less gain on exchange fluctuations | 491,707.03 |
| | |
| Net total loss | $1,243,992.06 |

This table purports to be a computation, from the tax brief, of Alcoa's losses on Southern as claimed in the brief, on application to the Bureau of Internal Revenue for reassessment of its income taxes. It subdivides items into certain of them that relate to the Narrows or occurred at the Narrows,—the Narrows being a designation of one of the places included in the property acquired from Southern; next certain items at Badin; next certain items at Whitney; then certain items that were general; and then the final summary at the end.

It is to be observed that each of the items in the brief, which constitute the items included in the table, were taken from Exhibit 745 and that Exhibit 745 was made up from Alcoa's books; also that Exhibit 745 was checked by both sides. It was put in evidence by the Government. It was regarded as correct by both sides and I believe is correct. We are certainly entitled to assume that it is correct.

By reference to table 4 you will observe also that the nature of each item is there stated and that out at the right in money terms is the amount allocated as against the item for which Alcoa claims a loss. For example, under the subdivision relating to the Narrows the first item is "Abandoned construction work on dam and spillway" and out to the right $504,160.05. Another item a little lower down is "Unusable equipment at power house (total loss)" and out to the right $104,964.59. Another item, by way of illustration, is "Temporary work, entire loss"—this is at Badin—and out at the right, $29,585.29.

So it continues, with each item which, according to the description in terms of the item, it might reasonably be contended constituted a loss by Alcoa. The total of all those items claimed to be losses is $1,735,699.09.

It will be further noted that the items in table 4 are identical with the items in the brief, which in turn are identical with Exhibit 745, which in turn are identical with Alcoa's books. In other words, the items in table 4, as in the brief before the Bureau of Internal Revenue, came directly from Alcoa's books.

In the language of the brief itself, the position taken by Alcoa, as shown in Exhibit 156 at exhibit page 852, is that the loss which it incurred, as a consequence of changes in work that had been begun (meaning thereby the portion of the purchase price allocable to the property and equipment rendered unusable and abandoned by reason of the redesigning of the project) "was a loss which was really sustained by it [that is, Alcoa] and one which resulted from bad judgment or faulty engineering in the original location and designing of this partially finished work for which the Aluminum Company had paid."

As I view the matter, in circumstances such as these it cannot properly be said that Alcoa had made an admission that these items were payments in excess of the reasonable value of the property. Indeed, I see no foundation whatsoever for support of any such contention. As I construe the brief, it does not show that Alcoa is guilty of having represented that the property was worth less than was paid for it; much less did Alcoa in the brief admit that it knew what it had paid was in excess of the fair value. I feel, therefore, that the criticism of Alcoa in respect to the Southern transaction has not been sustained.

A great deal has been said about the exclusion of other possible producers of aluminum. But, as I think has been demonstrated already, the evidence does not establish that Alcoa excluded or attempted or intended to exclude from the aluminum business any of the following: Mr. Duke, the Uihleins, Mr. Haskell for himself or for the Baush Company or Central Aluminum Company, of which Mr. Moore was the representative. Something has also been said, but has not been completed, which pointed to the conclusion that there had been no exclusion or attempt to exclude or intention to exclude the Bohn Aluminum & Brass Corporation, the Aluminum Products Company or the Reynolds Metals Company. In respect to all of these, however, there will be additional statements in which I shall summarize the evidence necessarily in connection with other subjects that I am to cover and it would be waste to go into all that evidence at this stage.

So also there has been criticism about the alleged exclusion by Alcoa of the

Norwegian companies, either the Norsk or the DNN company. Hereafter I shall undertake to point out that neither of those companies was excluded by Alcoa nor did Alcoa attempt or intend to exclude either of them from producing aluminum; nor, as I shall undertake also to point out hereafter, did Alcoa drive the Baush Machine Tool Company out of the aluminum business.

By way of supplement I wish to add that, in my view, the evidence satisfactorily shows that, in greater or less degree, there is and for many years past there has been active competition between aluminum produced in the United States and the following:

1. Aluminum of foreign production imported into this country (as I understand is admitted by the Government).

2. Scrap and secondary aluminum, as in fact is alleged, in paragraph 46 of the bill, to be partially competitive and has been proved to be in a high degree competitive. Among other things, the evidence goes to the extent of showing that much secondary aluminum is of precisely the same chemical content as virgin aluminum; also that for some purposes (for example, where brittleness is or certain forms of precise lines or edges are desired) secondary is actually more useful than primary aluminum. At times, particularly when emergencies or wars or other unusual conditions prevail, secondary aluminum sells and has sold in the markets at prices above those of virgin aluminum.

3. Steel (meaning stainless steel), nickel, tin, zinc, copper and lead are affirmatively alleged in paragraph 38 of the bill to be the chief industrial competitors of aluminum. Moreover, the proof establishes that these metals, as well as other materials, are commercial competitors of aluminum for many purposes.

The phase of competition just mentioned, as I have indicated, will be discussed further elsewhere.

As the parties agree, Alcoa through itself and a subsidiary produces and sells all the virgin aluminum produced in the United States; but I hold, as matter of law, that (1) this does not constitute monopolization in the sense or in contravention of the Sherman Act; (2) Alcoa has not excluded or attempted or intended to exclude any competitor or potential competitor from producing or selling virgin aluminum in the United States; (3) in no respect, related to the production or selling of virgin aluminum, has it been shown that Alcoa violated Section 2 of the Sherman Act.

### (5) Castings

We come now to the fifth monopolization charge. This relates to castings.

Paragraph 50 of the bill alleges that Alcoa is the largest producer and seller of aluminum castings moving in interstate trade in the United States; also in paragraph 7 that it is the largest producer in the United States of aluminum sand and die castings.

In briefs and oral argument the Government admits that there is substantial competition in castings. I do not think that either paragraph 7 or paragraph 50 sufficiently charges a violation of the statute. Probably also the Government concession to which I have referred renders it unnecessary to recite the evidence. Nevertheless, the statistics in evidence, standing alone, adequately negative the charges.

There are three methods of making castings: sand, die and permanent mold (including as permanent mold some called semi-permanent mold).

Bohn Aluminum & Brass Corporation makes castings by both sand and permanent mold processes, but not die castings. Aside from Alcoa, the chief maker of die castings in the United States is the Doehler Die Casting Company.

I have made a computation in table 5, which is as follows:

### TABLE 5

#### Sales of Castings.

SECTION 1. SAND CASTINGS (pounds) 1934-8.

| | Bohn | Alcoa |
|------|------|-------|
| 1934 | 14,151,032 | 6,957,517 |
| 1935 | 20,705,576 | 7,059,387 |
| 1936 | 15,291,602 | 7,773,423 |
| 1937 | 8,265,519 | 7,145,840 |
| 1938 | 1,737,332 | 4,195,904 |
| | 60,151,061 | 33,132,071 |

SECTION 2. DIE CASTINGS (pounds) 1934-9.

| | Doehler | Alcoa |
|------|---------|-------|
| 1934 | 2,703,615 | 1,803,055 |
| 1935 | 4,612,884 | 2,345,027 |
| 1936 | 6,488,245 | 3,876,455 |
| 1937 | 8,113,088 | 4,781,522 |
| 1938 | 5,584,418 | 2,651,237 |
| | 27,502,250 | 15,457,296 |
| 1939 | 7,482,225 | 4,255,511 |
| | 34,984,475 | 19,712,807 |

166

SECTION 3. PERMANENT MOLD CASTINGS (pounds) 1934-8.

| | Bohn | Alcoa |
|---|---|---|
| 1934 | 8,595,508 | 11,395,647 |
| 1935 | 11,074,540 | 18,691,754 |
| 1936 | 11,424,491 | 18,839,170 |
| 1937 | 9,181,995 | 15,342,427 |
| 1938 | 4,303,663 | 7,832,425 |
| | 44,580,197 | 72,101,423 |

SECTION 4. PERMANENT MOLD PISTON CASTINGS (pieces) 1934-8.

| | Bohn | Alcoa |
|---|---|---|
| 1934 | 5,705,733 | 4,668,235 |
| 1935 | 7,005,246 | 7,445,275 |
| 1936 | 6,192,359 | 6,111,582 |
| 1937 | 4,982,534 | 4,827,403 |
| 1938 | 2,235,199 | 2,750,552 |
| | 26,121,071 | 25,803,047 |

SECTION 5. SAND, DIE AND PERMANENT MOLD CASTINGS (pounds) COMBINED FROM SECTIONS 1, 2 AND 3 ABOVE.

| | Alcoa | Others |
|---|---|---|
| Section 1 | 33,132,071 | 60,151,061 |
| 2 | 15,457,296 | 27,502,250 |
| 3 | 72,101,423 | 44,580,197 |
| | 120,690,790 | 132,233,508 |
| Sec. 2 (1939) | 4,255,511 | 7,482,225 |
| | 124,946,301 | 139,715,733 |

NOTE: The 1939 figures of Bohn for sections 1 and 3 are not in evidence. The figures for Bohn in section 3 include what are called semi-permanent mold castings (p. 13015).

Table 5 is composed of five sections. It deals in its entirety with the sales of castings. The quantities sold are stated in pounds. In all the sections the years 1934 to 1938 are covered. Those are the only years in respect to which there is comprehensive information in the evidence as to all these different kinds of castings. As to some of the kinds of castings, information is given for the year 1939. Where that is true, separated off first there is a statement in pounds for the years 1934 to 1938; then below the number of pounds for 1939 is set out and a second total is taken which covers the period from 1934 to 1939.

Section 1 deals with sand castings; section 2 deals with die castings; section 3 deals with permanent mold castings; section 4 deals with permanent mold piston castings, but in terms of pieces instead of pounds, the poundage not being available in the evidence; section 5 deals with sand, die and permanent mold castings, in pounds, and combines the poundage as set out in sections 1, 2 and 3.

As I have said, Bohn produces sand castings. In section 1 of the table for each of the years from 1934 to 1938 there is set out under the column to the left the poundage of sales of sand castings by Bohn for each of those years and to the right the like poundage for each of the same years sold by Alcoa. Without giving all the details, but taking the totals, the total sales of Bohn for those years was 60,151,061 pounds; the sales of Alcoa were 33,132,071 pounds. In other words, Bohn's sales were nearly twice those of Alcoa.

In section 2, which relates to die castings for the same period, in pounds, in the column to the left the poundage of Doehler is given for each of the years 1934 to 1938 and in the column to the right the like poundage for the same years sold by Alcoa. For those years the total sales of Doehler were 27,502,250 pounds and the total sales of Alcoa were 15,457,296 pounds—again, sales by Doehler were of somewhere roughly in the neighborhood of nearly twice as much as Alcoa.

For the year 1939, which is added below, the sales of Doehler were 7,482,225 pounds and those of Alcoa were 4,255,511 pounds. Adding those amounts to the preceding totals, for the years 1934 to 1939 the poundage sales of Doehler were 34,984,475 pounds and of Alcoa 19,712,807 pounds—again, somewhere roughly in the neighborhood of twice as much by Doehler as by Alcoa.

As appears by section 3, the same condition of totals does not obtain with respect to permanent mold castings. From 1934 to 1938, in pounds, for Bohn the total was 44,580,197 and for Alcoa the total was 72,101,423. In other words, the relationship was of about 72 for Alcoa to 44 for Bohn.

However, with respect to that relationship between sales, the relationship of 72 Alcoa to 44 Bohn, the table further shows these facts: Section 4 shows the number of pieces of permanent mold piston castings. Those by Bohn total for the period of 1934 to 1938 26,121,071 and those by Alcoa 25,803,047. There, as you will observe, Bohn's sales of permanent mold piston castings in pieces exceeded the total of Alcoa.

Again, in section 5 I have combined for the years 1934 to 1938 the results of sections 1, 2 and 3, not including section 4, which deals with pieces. The result of this combining of the three types of castings is that the total sold by Alcoa was

120,690,790 whereas that for Bohn and Doehler alone combined was 132,233,508. In other words, Bohn and Doehler combined sold approximately eleven or twelve millions more in the period from 1934 to 1938 than Alcoa did.

If to these figures I add the sales by Alcoa, Bohn and Doehler for 1939 so far as given, it shows that for 1939 Alcoa sold 4,255,511 whereas in 1939 Bohn and Doehler sold 7,482,225 pounds, making the totals of these three for the years 1934 to 1939 for Alcoa 124,946,301 and for Bohn and Doehler 139,715,733.

I should call your attention to the fact that, according to my note—it appears right on the face—in section 1, dealing with sand castings, and in section 3, dealing with permanent mold castings, the figures for 1939 are not given as to Bohn or as to Alcoa.

What I have said, however, does not complete the story. There are other companies that produce and sell castings for which the evidence contains statistics.

Among such other companies is the National Bronze & Aluminum Foundry Company. This concern made both sand and permanent mold castings, but apparently not die castings (pp. 23356; 27560). Of the sand and permanent mold castings National produced and sold, in pounds, according to figures which are not separated in the proof (that is, not separated by years), for the period from 1934 to 1938 it sold 48,716,549 pounds and from 1934 to 1939 it sold 53,400,951 pounds (Exhibit 1454, exhibit p. 6522). Now, if we take account of sales by National and add those for the years 1934 to 1938 to the totals in section 5, it would leave the sales of the three kinds of castings, that is, sand, die and permanent mold, by Alcoa a total of 120,690,790 and bring the total for those years of Bohn, Doehler and National up to 180,950,057 pounds.

It is to be noted that the result I have stated is without including figures as to some additional companies to which I am going to call your attention later. Without those, what has been stated, standing alone, is quite enough to refute the charges made by the Government with respect to the excessive amount of the sales and control of the market by Alcoa.

The further figures to which I wish to call your attention are these:

The Advance Aluminum Castings Corporation in 1934 to 1938 produced and apparently sold 23,593,577 pounds and in 1934 to 1939 produced and apparently sold 28,043,974 pounds of sand and permanent mold aluminum castings (Exhibit 1474, exhibit p. 6582).

The Black Hawk Foundry & Machine Company in 1934 to 1938 produced and apparently sold 1,055,113 pounds and in 1934 to 1939 produced and apparently sold 1,313,650 pounds of aluminum castings (Exhibit 1465, exhibit p. 6570).

The United Engine & Machine Company in 1934 to 1938 sold 893,275 pieces of piston castings which it made of aluminum (Exhibit 941, exhibit p. 4609).

There were quite a number of other foundries each of which had a capacity of producing 5 tons a day of castings (pp. 24826-9).

As I have said, I have not embodied in the totals previously given any of the figures except for Alcoa, Bohn, Doehler and National.

In the last few paragraphs, out of abundance of caution, in several instances I have spoken of the output or production as being apparently sold. Of course, the castings were manufactured only for the purpose of sale. The implication from the evidence seems to be clear that the pounds stated were, and I have no doubt that they were in fact, sold by the respective producers. However, other evidence in regard to those particular producers does not specifically and definitely establish that their entire production was sold.

As appears by section 5 of table 5, from 1934 to 1938 Bohn and Doehler alone produced and sold more castings of the three prevailing commercial types than Alcoa did. If to the total there shown for Bohn and Doehler, namely, 132,233,508 pounds, we should add the figure for National Bronze which, as you will recall, produced and sold sand and permanent mold castings, that total, as I believe I have previously told you, would be carried up to 180,950,057 pounds as against Alcoa's total of 120,690,790 pounds. This merely accentuates the result. It would, therefore, be useless to add the totals of the other castings producers which I have named as having actually competed with Alcoa.

There are many other producers and sellers of castings who competed with Al-

coa and were identified by the witnesses whom I have not mentioned by name. In argument the Government stated that there are hundreds of foundries which produce aluminum castings. As matter of fact, the evidence shows that there are approximately two thousand such foundries. The evidence also shows that there has been and is active and vigorous competition among those engaged in the castings business.

The Government claims that Alcoa maltreated or excluded or attempted to exclude Michigan Aluminum Foundry Company or their officials in 1909. But the charge is not sustained by the evidence, nor is it established as charged (pp. 12215-19; 12274; 21128), that Mr. Arthur V. Davis stated in 1909, or at any time, that it was the purpose of Alcoa to control the castings business or the aluminum business or to put out of business foundries which did not join the combination with Alcoa.

As matter of fact, the evidence indicates strongly, and I am persuaded it is true, that the difficulties of the Michigan Aluminum Foundry Company came from an official of one of the banks which had got tired of carrying the Michigan account.

Likewise, the claim of maltreatment of the Fulton-Harwood Brass Works is completely disproved by the overwhelming weight of the testimony from a number of witnesses, some of whom are entirely disinterested.

I conclude, therefore, that the evidence does not substantiate any of the Government's charges as to castings.

### (6) Cooking Utensils

This brings us to the sixth monopolization charge. That relates to cooking utensils. The pleadings on the subject are very lengthy. They contain considerable repetition. They also contain much detail and many figures. The pertinent allegations in the bill are in five paragraphs. These are numbers 6, 51, 89, 93 and 102.

In paragraph 6 of the bill it is alleged that since 1909 Goods has been engaged in the manufacture and sale of aluminum cooking utensils and other fabricated aluminum products. In its answer Alcoa says that in 1909 Goods was engaged in the manufacture and sale of certain fabricated aluminum products, but denies that it was then or until several years later engaged in the manufacture or sale of cooking utensils.

In paragraph 51 of the bill Alcoa and its 100 per cent subsidiary (the Aluminum Cooking Utensil Company) are mentioned. In the discussion of aluminum cooking utensils that follows, for convenience, unless otherwise stated, both together or the subsidiary alone will be referred to as Alcoa.

In paragraph 51 it is alleged that Alcoa produces and sells approximately 50 per cent of the aluminum cooking utensils moving in interstate commerce of the United States; also that Alcoa owns 26 per cent of the capital stock and is represented on the directorate of Goods which, except for Alcoa, is the largest domestic manufacturer of aluminum cooking utensils. In its answer Alcoa denies knowledge of the percentage of such sales moving in interstate commerce that it produces or sells, but admits its ownership of stock and representation on the directorate of Goods, as alleged, and says that, with the exception of itself, Goods is the largest domestic manufacturer of aluminum cooking utensils.

In paragraph 89 it is alleged that in 1909 Alcoa acquired 26 per cent of Goods stock and has since retained it; also that in 1909 it acquired and has since retained representation on the Goods directorate. It is then alleged that in 1909 Goods was engaged in the manufacture of aluminum cooking utensils and other fabricated products and in selling them in interstate and foreign commerce in competition with Alcoa. In its answer Alcoa admits that in 1909 it acquired and has since retained 26 per cent of Goods stock. It says also that it has representation on the Goods directorate in the form of two directors out of six. It denies, however, that in 1909 Goods was engaged in the manufacture or sale of aluminum cooking utensils and says that Goods did not engage in that business until several years later. It admits that in 1909 Goods was engaged in the manufacture and sale in interstate commerce of certain fabricated aluminum products, but says that if in selling those fabricated products Goods then came into competition with Alcoa, such competition was negligible and Alcoa is without knowledge whether or not such competition existed in fact.

In paragraph 89 of the bill it is further alleged that the purpose of Alcoa's acquisition of Goods stock and representation on

the Goods board was to obtain for Alcoa influence over the policies of Goods and to restrain competition by Goods with Alcoa in cooking utensils as well as in other fabricated aluminum products. Again, it is alleged that Alcoa and its officers now own about 31 per cent of the Goods stock and that two of Alcoa's officers are directors of Goods. Next, it is alleged that in 1931 Aluminium caused a corporation (called Aluminum Goods, Limited) to be organized in Canada to engage in the manufacture of cooking utensils and other products and sold 49 per cent of the stock to Goods, the balance of the stock being retained by Aluminium. It is then alleged that the purpose and effect of the sale to Goods of the 49 per cent of the new corporation's stock were to give Alcoa, Aluminium and Goods "monopolistic control of the interstate and foreign trade and commerce in aluminum cooking utensils in the United States and Canada."

In its answer Alcoa denies that the purpose or effect of its acquisition of Goods stock was to obtain for Alcoa an important influence over the policies of Goods or to restrain competition. Alcoa admits that it and its officers now own about 31 per cent of the Goods stock and that among the directors of Goods are two of Alcoa's officers. It denies the remaining allegations of paragraph 89 and specifically denies that if any of the transactions mentioned occurred their effect was to give Alcoa monopolistic control of any trade or commerce.

In paragraph 93 of the bill it is alleged that in 1919 Goods purchased a sheet rolling mill at St. Louis, then owned and operated by the Bremer-Waltz Corporation, which was engaged in producing and selling in interstate commerce aluminum sheet in competition with Alcoa and was its only competitor therein. It is also alleged that the purpose and effect of that purchase were to eliminate the Bremer-Waltz Corporation competition.

In its answer Alcoa admits that in 1919 Goods purchased the rolling mill referred to, but alleges that the acquisition was contrary to the advice of Alcoa's two directors of Goods. It also alleges that the Bremer-Waltz concern was small and its competition negligible. It then denies that either the purpose or the effect of the purchase by Goods was to eliminate competition or that at the time Bremer-Waltz was its only competitor in producing and selling aluminum sheet. In addition, Alcoa alleges that when Goods determined, in 1919, to produce some or all of the aluminum sheet consumed by it in the manufacture of aluminum cooking utensils and other aluminum fabricated products, it bought the St. Louis plant of Bremer-Waltz Corporation and in 1923 erected a new aluminum sheet rolling mill at Manitowoc, Wisconsin, which has ever since been engaged in the manufacture of aluminum goods and in the production of sheet. It is then alleged that, after the erection and equipment of its rolling mill at Manitowoc, Goods discontinued rolling sheet in the St. Louis mill (because the new Manitowoc mill was more economical and efficient); also that in 1924 Goods dismantled the former Bremer-Waltz St. Louis mill and subsequently sold the property.

In paragraph 102 it is alleged, and in the answer thereto is denied, that by the means heretofore described Alcoa has suppressed competition in and excluded others from competition in or monopolized interstate and foreign commerce in fabricated aluminum products.

Out of the mass of allegations just summarized in regard to the relations between Alcoa and Goods in regard to Goods going into the cooking utensil business, and in regard to its conduct therein, there emerge several issues. Giving the charges made against Alcoa the most favorable interpretation toward the Government that the language permits, in substance the questions that arise are three in number. These are as follows:

(a) Was the purpose or effect of Alcoa acquiring Goods stock, through influence gained over the policies of Goods, to restrain competition in the manufacture or sale of cooking utensils?

(b) Did Alcoa, through domination of Goods, eliminate the Bremer-Waltz St. Louis sheet mill as a competitor?

(c) Was the purpose or effect of Alcoa's course in the transactions described to monopolize or to participate in the monopolization of the manufacture or sale of cooking utensils?

Before the evidence directly bearing on the charges stated can properly be appraised, it is necessary to have in mind the general facts which lie in the background. I believe those are without material dispute. At any rate, as I think, they are fully established by the evidence. This background is somewhat as follows:

The Aluminum Cooking Utensil Company (100 per cent subsidiary of Alcoa) was organized in 1901. About 1899 Alcoa had tried, but was unable, to induce others to go into the manufacture of cooking utensils (pp. 18658-66). This is precisely the kind of thing that, according to the testimony, carried Alcoa into fabrication of some of the other commodities which it put out on the market. That is to say, it endeavored to induce others to take up the fabrication end of the business, but being unsuccessful then itself took up the fabrication. In this instance, when it failed to induce others to take up manufacturing cooking utensils, it took upon itself such manufacture; but apparently it did not reach a substantial scale in the manufacture or sale until 1909 or 1910 (p. 21178). Even so, Alcoa entered the business ahead of Goods.

Goods was organized in 1909. It was not until several years afterwards, however, that it began making cooking utensils (pp. 21178-9) and the Goods production of cooking utensils was not of much consequence earlier than about 1914 (p. 21179).

Goods has its principal office at Manitowoc and has plants at Manitowoc and Two Rivers, Wisconsin. When it began operations in 1909 its chief products were aluminum novelties, including articles for decorations, and certain dining room personal conveniences. It did not then produce or sell cooking utensils. As heretofore said, it went into cooking utensils later. Apparently it did that about 1912, though the precise date has not been fixed with certainty (pp. 19091; 21567-8; 21961-70). As previously remarked, however, its production of cooking utensils was not of much account previous to 1914.

When Goods was organized in 1909 Alcoa participated and subscribed for stock (pp. 5330-1). The first block of stock was acquired in April, 1909. Other acquisitions brought the total up to 26-1/2 per cent (for convenience, herein called 26 per cent; Alcoa's answer to interrogatory 218). Alcoa paid for the stock partly in cash and partly in ingot (pp. 21102-7). Approximately 5 per cent of additional Goods stock was acquired and is now held by officers or others connected with Alcoa. This brought the total holdings of the Alcoa group up to about 31 per cent. The slight variance from 31 per cent in the aggregates shown as of September 20, 1937, by the answer of Goods to question 5 addressed to it by the Government is inconsequential and may be ignored.

Goods has six directors. Its by-laws provide for cumulative voting of the stock. It is important to bear this in mind. The cumulative voting feature is of genuine consequence. Because of it, the stock owned by Alcoa enables it as of right to elect two directors. From the beginning these directors have been officers of Alcoa (who, for the purpose of the present discussion, will be called Alcoa's directors). The remaining four directors have always been stockholders of Goods coming from the neighborhoods of Goods plants—that is, Manitowoc or Two Rivers (for convenience hereinafter referred to as the Wisconsin directors).

By the cumulative voting system Wisconsin stockholders now or formerly residing in the locality of the plants (and said to hold about 53 per cent of the stock) as matter of right are able to elect four of the directors. Apparently from the inception to date—the evidence indicates that from at least as early as 1914 (p. 17888) and certainly since 1926—the Wisconsin directors have consisted of two members of the Vits family, one member of the Hamilton family and one member of the Koenig family (pp. 21103-4; answer of Goods to question 8 addressed to it by the Government). In addition, the president of Goods since about 1910 has been a member of the Vits family.

There are two methods of producing aluminum cooking utensils. One is by casting; the other is by forming them from aluminum sheet. In producing cooking utensils it is possible to use either primary or secondary aluminum. In fact, for the purpose primary and secondary aluminum are interchangeable. Neither Goods nor any of Alcoa's competitors is dependent on Alcoa for materials. Though Goods has procured the greater part of its ingot from Alcoa, it has purchased from whom it pleased (pp. 19106; 21127-8). Moreover, for most of the time since Goods was organized, and at all times except during a war or a similar emergency, any producer of cooking utensils in the United States has been able to buy imported as well as domestic aluminum (pp. 28731-2; 29801-2; 30366-7; 31892-3; 31964; Exhibits 1463, 1505 and 1557).

The estimates of the comparative sales by Alcoa and Goods of cooking utensils on the witness stand by Mr. Davis and

Mr. Hunt, Alcoa's directors on the Goods board, that is of the relative amount of aluminum cooking utensils business done by Alcoa and Goods, were made without the use of documents and were rather indefinite (pp. 19093; 21179; 21967-8). However, if the problem is to be approached through inquiry, our initial concern is not to know the amount of such business done by Alcoa and Goods considered together. For the present purpose what we chiefly want to know, and for the moment all that we need to know in this connection, is the relative sizes of the business done by Alcoa separately and of that done by all other cooking utensils concerns in the country taken as a single group.

In its answer to paragraph 51 of the bill, Alcoa disclaimed knowledge of whether it produced and sold as much as approximately 50 per cent of all aluminum cooking utensils moving in interstate commerce and said that Goods stood next to Alcoa as a manufacturer of those articles in the United States. In consequence, without at the moment making a specific finding on the point, Alcoa will be taken as first and Goods as second in size as a producer and seller of aluminum cooking utensils in this country.

Quite a number of companies, approximately 30, are engaged in producing and selling aluminum cooking utensils in the United States. As to most of these the evidence does not show the quantity or value of their sales. We have figures for only five of the companies, including Alcoa and Goods, and these are merely in dollars, without giving either pounds or pieces.

The five companies are Alcoa and Goods, the two largest, and Enterprise, Aluminum Products and Leyse, which in contrast are small. These are taken from Alcoa's answer to interrogatory 11(z); answer of Goods to question 4; and Exhibits 637, 1551 and 1569.

Among the active competitors for which we lack sales figures are Club Aluminum, Century Metalcraft, West Bend Aluminum, Advance Aluminum Castings, Monarch Aluminum and Stewart Die Casting. These were highly successful concerns. Facts showing their gains will be brought up later.

In its original brief, at page 87, speaking of aluminum cooking utensils, the Government said that "in no year have the sales of the Goods Company even approached those of Alcoa." For support it cited Al-

coa's answer to interrogatory 11(z) and the answer of Goods to question 4.

The only cooking utensils sales figures of Alcoa in the record are for 1933 to 1937 and, except in 1921, of Goods for 1930 to 1937. The only years for which we have the figures for both companies are 1933 to 1937. If for any particular single year during the period 1933 to 1937 we set off against each other the sales of the two companies, those of Alcoa are greater than those of Goods. On the other hand, if we consider in their entirety the figures referred to by the Government in the statement above quoted from its brief, it appears that the sales of Goods for each of the years 1930, 1931, 1936 and 1937 were greater in money amount than the sales of Alcoa for 1933. So also the sales of Goods for 1930, out of more than $6,000,000, were but approximately $22,000 less than the sales of Alcoa for 1934. Again, during the ten months of 1921, Goods sales of cooking utensils were more than $7,000,000 (item 7 of Exhibit 969, a letter from Mr. Vits to Mr. Hunt, dated November 17, 1921). That is greater than Alcoa sold during any entire year preceding 1935 for which we have the figures. And if we assume that the sales of Goods for the remaining two months of 1921, for which we do not have the figures, kept up at the rate for which we have the ten months figures, then the sales of Goods for the whole year 1921 were larger than the sales of Alcoa were in 1935.

Mr. Davis and Mr. Hunt stated their impressions or understandings to be that at a time, or at some times, during the past the production and sales of Goods had exceeded those of Alcoa (pp. 19093; 21964-9; 22023).

While the proof is not conclusive, their views are rather strongly corroborated right on the face of the undisputed figures.

On page 25 of its reply brief, the Government has assembled the 1937 figures for the five companies previously mentioned— for which alone the record contains the sales figures. If the sources be examined, it will be seen, however, that the information furnished is quite incomplete. It is given in the sources for all the five companies for four years only, namely, 1934, 1935, 1936 and 1937. It is solely from this that we can make computations for comparison purposes. It would be fruitless to consider any other single year or any part of the years less than all.

It must be realized, of course, that figures arrived at by computation are not very satisfactory and are far less satisfactory than those coming directly from the account books of those concerned. Nevertheless, due to the condition in which the evidence introduced has left the matter, computation is the only device open to the Court for gathering essential facts needed for making the comparisons.

Table 6 indicates the 1934-7 figures for the five companies. It is as follows:

$6,580,744. The sales of the four companies therefore, for that year, were about $200,000 greater than the total sales of Alcoa. In 1935 the total sales of Alcoa were $8,415,327 and for the four other companies were $7,761,543. In 1936 for Alcoa the total sales were $10,240,901 and for the other four companies $8,601,735; and in 1937 for Alcoa $10,143,333 and for the other four companies $8,390,537.

Thus you will observe that for each of the years of 1935, 1936 and 1937 the total of

## TABLE 6

### Sales of Aluminum cooking utensils by five companies

| Companies | 1933 | 1934 | 1935 | 1936 | 1937 |
|---|---|---|---|---|---|
| Alcoa | $4,286,488 | $6,360,481 | $8,415,327 | $10,240,901 | $10,143,333 |
| Other Co.'s: | | | | | |
| 1. Goods | 3,452,933 | 3,712,030 | 4,420,385 | 5,192,753 | 5,060,271 |
| 2. Enterprise | (not shown) | 2,248,200 | 2,764,366 | 2,673,942 | 2,467,446 |
| 3. Products | (not shown) | 501,149 | 415,600 | 538,963 | 651,000 |
| 4. Leyse | 78,477 | 119,365 | 161,192 | 196,077 | 211,820 |
| Totals Nos. 1-4 | | $6,580,744 | $7,761,543 | $ 8,601,735 | $ 8,390,537 |

NOTE: Full names of companies are Aluminum Co. of America, Aluminum Goods Manufacturing Co., Enterprise Aluminum Co., Aluminum Products Co. and Leyse Aluminum Co. Sources of figures are Alcoa's answer to interrogatory 11(z); Goods answer to question 4; Ex. 637; Ex. 1551; Ex. 1569. The sources do not give the 1933 figures for Enterprise and Products.

The table undertakes to state the sales of aluminum cooking utensils by the five companies to which I have referred. These are Alcoa, Goods, Enterprise, Products and Leyse,—the same companies for which the Government furnished the figures on page 25 of its reply brief for the year 1937. The names of the companies are in the column of the table to the left; then there are separate columns for each of the years 1933, 1934, 1935, 1936 and 1937. The figures for each of those years (except 1933) are given for every company whose name appears in the column to the extreme left. The figures for Alcoa are set off separately. Then the figures are given for the other companies, four in number, which are Goods, Enterprise, Products and Leyse. The totals for those four companies are given at the bottom of each of the yearly columns for 1934-7.

As said in the note to table 6, in 1933 there are no figures available for Enterprise or Products. On that account, for the moment the figures during that year for other companies will be disregarded.

For 1934 the total for Alcoa is $6,360,481; of the other four companies it is

Alcoa was greater than the total of the other four companies.

The figures of Alcoa for 1935 are, in round numbers, $700,000 more for Alcoa; in 1936 $1,600,000 more for Alcoa; and in 1937 $1,700,000 more for Alcoa. However, you will recall my statement, which is thoroughly sustained by the evidence, that there are about thirty concerns engaged in the business of making and selling cooking utensils. We have the figures here for only five of those concerns. We have no figures for the other approximately 25 concerns. Nevertheless, it is so likely as to amount to a practical certainty, that, if we knew the sales of the remaining companies, —including the companies as to which we have no figures at all and mostly consisting of those,—the proportion for Alcoa as against all the others for all the years would be considerably less than half the whole for all the companies. That, however, is a mere guess.

A more striking elucidation of the situation, as it seems to me, may be brought out by an assumption and, insofar as I can see, it is about the only way by which we can make a computation.

Mr. Hunt (p. 21968) estimated that the average production of Alcoa and Goods combined would be under 50 per cent (but say full 50 per cent) of the total output of all manufacturers engaged in the business. If, momentarily, we accept this estimate as correct, then by deduction the precise total or the annual average contributions to the whole by the manufacturers for whom we have no figures can be ascertained.

For example, on the assumption stated, the results would be as follows: In 1937 the sales by Alcoa and Goods would be $15,203,604—half the total produced by all manufacturers, according to Mr. Hunt. The sales by the other three companies whose names have been given aggregated $3,330,266. The difference between the two sums is $11,873,388. If Mr. Hunt be right, that would, therefore, be the sales in 1937 by the companies for which no reports are in evidence.

Making the same assumption and same computation on the basis of all the figures in hand as to 1934 to 1937, would give resulting yearly averages for the period as follows: for Alcoa and Goods $13,386,370; for the three other companies whose sales are given $3,237,280; and for the companies not reported on $10,149,090.

Speaking in the present tense, without specifying any year or period, the Government itself alleges in the bill (paragraph 51) that the sales by Alcoa are about 50 per cent of the whole (though at the trial it undertook to prove by Mr. Hunt that the sales by Alcoa and Goods combined were 75 per cent, pp. 21966-70). Mr. Hunt's estimate was that the production of Alcoa and Goods together would average about 50 per cent (p. 21968).

By its pleading, therefore, the Government has limited Alcoa's share to about 50 per cent. Let us assume that it was that much. If so, as appears by a different method of analysis of the figures on which the Government relies in comparing the five companies, the unreported companies must have sold approximately 8-2/3 per cent of the whole. The addition of 8-2/3 per cent of the entire sales as the sales of the unreported companies in 1936 and 1937 (as will appear from the computation) would show that the sales by Alcoa were slightly under 50 per cent for each of those years. Of course, something approaching an approximation of this result of necessity follows from the assumption and it must be remembered that it rests only on an assumption.

In this connection it may be noted also that, in the absence of figures outside of those for 1934 to 1937, it seems not improbable that, in accordance with the recollection of Alcoa's directors, as they testified, there were years when the sales by Goods of aluminum cooking utensils were larger than the sales by Alcoa (pp. 19093; 21964). Likewise, when the available figures for the years 1934 to 1937 are considered, it seems most likely that in some of the years for which figures are absent, Alcoa's sales were, as Mr. Hunt testified, less than half of the whole.

However that may be, it seems clear that since Goods entered the field in no event has Alcoa sold more than approximately half of the aluminum cooking utensils produced in the United States.

Another strong indication that Alcoa has not suppressed competition in the aluminum cooking utensils business is the flourishing financial condition or striking success, I might call it, of seven of its smaller competitors as to which the facts have been put into the record. Four of those were principally and three were partially engaged in the aluminum cooking utensils manufacture and sale. The evidence on the subject is as follows:

1. West Bend Aluminum Company of West Bend, Wisconsin: Organized in 1911. It manufactured and sold aluminum cooking utensils; also it manufactured and sold some gift ware. Its original capital was $7,000. This was increased by $143,000, which stockholders paid in. The net worth of the company as of January 1, 1940, was $1,455,000. The cash dividends it had paid were $1,766,342.84. The dividends and increase in net worth (above the original $150,000 paid-in capital), totaling upwards of $3,000,000, came exclusively from earnings (pp. 21834-9; see also pages 31843-4; Exhibits 1546 and 1547).

2. The Enterprise Aluminum Company of Massillon, Ohio, and Eatonton, Georgia: This company was organized in 1914 with a capital of $50,000. Its present net worth is $962,000. It both manufactures and sells aluminum cooking utensils. The cash dividends it has paid aggregate $702,998. The dividends and increase in assets (aggregating $1,614,988) came exclusively from earnings out of the sale of aluminum cooking utensils (pp. 31957-9).

3. Club Aluminum Products Company of Chicago: It began business in 1932. Its capital then paid in was $12,000. It has

paid $210,000 in cash dividends and has borrowed no money. It does some manufacturing, but mostly merchandising. At the close of 1939 its net worth was $320,000. Both the dividends and the increase in the net worth (together totaling $518,000) came exclusively out of earnings; in part from manufacture, but chiefly from the sale, of aluminum cooking utensils (pp. 29876-80).

4. Century Metalcraft Corporation of Chicago or of Lake Forest, Illinois, I cannot tell which: This company began business in 1933 with $3,000, later increased by $23,000 and by $5,000 (total $31,000), all paid in for capital stock. In addition, capital stock of $98,000 was issued for contracts, trademarks, copyrights and the like, bringing the total investment up to $129,000. It manufactures and sells aluminum cooking utensils. At the beginning the company borrowed $27,000, which has been repaid. At the close of the fiscal year on March 31, 1939, the capital and surplus totaled $354,-354.55. By this time the company had paid out $499,157.50 in dividends,—making a total of capital, dividends and surplus of $853,512.05 or earnings of $724,512.05 above the capital investment of $129,000 (pp. 28416-22).

5. The Monarch Aluminum Manufacturing Company of Cleveland, Ohio: Its predecessor began business in 1913. It manufactures and sells cooking utensils; also castings. 80 per cent of its manufacturing operations in 1939 consisted of the manufacture of cooking utensils—apparently of aluminum (pp. 30364-7; 30381; 30400-1; 30404-5). It started in a building approximately 50 by 100 feet, or 5000 square feet, with between 15 and 20 employees. Today its plant occupies about 175,000 square feet and employs between 600 and 700 men (pp. 30359-60; 30367). The figures describing the financial history of the company are not given in the evidence in dollars.

6. Advance Aluminum Castings Corporation of Chicago and Rockford, Illinois: Its predecessor was organized in 1919. It manufactures and sells aluminum cooking utensils; also castings (pp. 28708; 28715). The total capital paid in by its stockholders or by stockholders of its predecessor corporation was $35,000 (pp. 28711-12). Its present worth is $1,068,-432.52. Out of earnings it has paid off and retired $20,000 of the stock, reducing the stock to $15,000, and has paid $1,042,-734.35 in dividends (pp. 28711-12). As

shown by Exhibit 1477, its sales of cooking utensils (apparently made of aluminum, pp. 28709; 28734; Exhibit 1473) increased from $345,904.79 in 1935 to $1,-152,122.13 in 1939 (see pp. 28724-7; 28733-4; Exhibits 1475-6).

7. Stewart Die Casting Corporation of Chicago: Exhibit 1584 shows that its sales of cook ware (apparently all made up from aluminum) increased from $8,-770.26 in 1929 to $55,025.43 in 1939, in the meantime rising in 1931 to $258,613.32 and in 1934 to $186,320.95 (pp. 33039-43; Exhibits 1533 and 1584).

The figures as to the Bohn Company, which was also a competitor of Alcoa and engaged in producing and selling cooking utensils, are not set out here, but they will be furnished later in connection with another phase of the case.

So also there may be occasion to refer in a different way to the figures which I have just given relating to several of the smaller cooking utensils concerns.

We come, therefore, to a discussion of the charges which were summarized near the beginning of the present subdivision on cooking utensils. As there stated, the inquiry on the charges is reduced to three questions.

The first and second questions concern the relations between Alcoa and Goods. The substance of the charges is that, first, through holding common stock in Goods, Alcoa has restrained competition and, second, through domination of Goods, Alcoa has eliminated competition by the Bremer-Waltz St. Louis mill. In one essential feature at least, without going into other phases, both charges turn on whether Alcoa has controlled Goods. The two charges, therefore, may be considered together.

It is without dispute that sometimes the Wisconsin directors did and sometimes they did not do what Alcoa's directors asked (pp. 21571-2); but that Alcoa never controlled Goods is sufficiently demonstrated by the outcome of contests between the two groups of directors. Without exception, so far as the evidence discloses, when there was disagreement, the Wisconsin directors have had their way. Six illustrations of this will be given and, perhaps, will be enough. These are as follows:

1. Subsequent to 1909, and apparently not before 1912 (probably about 1913 or

1914, pp. 9217; 9689; 9766; 21176-9), the Wisconsin directors favored and the Alcoa directors did not favor Goods going into the cooking utensils business. The Wisconsin directors prevailed (pp. 22021-4).

2. In 1916, apparently over the opposition of Alcoa's directors and on the vote of the Wisconsin directors, Goods bought the Standard Aluminum Company mill, a Bremer-Waltz enterprise at Two Rivers, Wisconsin (pp. 20862-3). Alcoa had nothing to do with the purchase (pp. 9225; 9228-31; 9699; 9764-73; 20864).

3. In 1917 Bremer-Waltz began to erect and thereafter (perhaps in 1918) completed an aluminum rolling mill at St. Louis (pp. 9232-5; 9687). In 1918, apparently, negotiations to sell the mill to Goods were opened and fell through (pp. 9596-8),—though the evidence leaves this a bit uncertain (pp. 9600-2). In early 1919 Mr. Waltz made attempts (or if he had conducted negotiations in 1918, he made further attempts) to sell the mill. One of these was to sell to Alcoa. Alcoa refused to buy. Another was to someone in St. Louis who is not clearly defined (pp. 9400; 9598; 9602; 9822-4; 9829; 21732-6; 22081-2). Later in 1919 the owner offered the mill to Goods (pp. 9594-5). The Wisconsin directors favored and Alcoa's directors opposed buying it. The Wisconsin directors prevailed (pp. 19094-6; 21060-63; 21571-2A; 21735; 21582-3; 22025; 22073-7A; 22081; 22086; Exhibit 474; Exhibit 961. See also pages 18703-12; 21027-43; 22080-96; 22421). Moreover, it affirmatively appears that Alcoa had nothing to do with the purchase, save only that out of the purchase money paid Alcoa collected $168,000 owing to it by Bremer-Waltz for supplies (pp. 9441-4; 9594-604; 9618-21; 9634; 9699; 9701-4; 9772-9; 9828; 9900-18; Exhibit 467; Exhibit 470; Exhibit 471; Exhibit 474. See also page 9393).

4. In 1921 the Wisconsin directors favored and Alcoa directors opposed Goods going into the further developing of the rolled molding business. The Wisconsin directors prevailed (pp. 19103-5; 21592-3; 21595-7; 22067-70; Exhibit 962). It does not appear that Alcoa had anything to do with the decision.

5. In 1922 the Wisconsin directors favored and, without notice to Alcoa directors or a board meeting, the Wisconsin directors ordered the erection of a new and larger mill by Goods. Alcoa's directors did not approve building a new mill at that time (pp. 22028-9), but what they complained of most was the irregular procedure of ignoring them. Nevertheless, the Wisconsin directors prevailed (pp. 19096-101; 21583-5; 22025-38; Exhibit 961). Again, so far as appears, Alcoa took no material part and the comment it made was merely incidental.

6. Apparently subsequent to 1922, though the dates are not specifically given, when there were differences of opinion as to whether dividends declared were not too large, the Wisconsin directors prevailed (pp. 22013-4).

The Wisconsin directors have always controlled Goods. The evidence justifies the belief that, with respect to matters of consequence in conducting the affairs of Goods, they always had their way (pp. 19115; 21961-3).

In support of its position, that Alcoa dominated Goods, the Government has advanced several arguments. Those which it seems worthwhile to discuss divide themselves substantially into nine points. These will be taken up in turn.

At the beginning it should be noted that in considerable part the Government relies on material not in evidence against Alcoa,—among which are the testimony of an investigator for the Federal Trade Commission (excluded at pp. 17873-5; 17883-4; 17951-5; 18001; 18115) and Exhibit 1803 (excluded at pp. 40667-9).

The Government also relies on material not in evidence against Goods. Included are items 1 and 2 of Exhibit 963; items 1, 3 and 4 of Exhibit 964; items 1 and 2 of Exhibit 966 and items 2 to 7 and 9 of Exhibit 967 (whose admission was limited to showing that the letters were written, but not in proof of their contents; pp. 17679; 17684; 17723; 17843). In the comments which follow, sometimes the excluded evidence may be disregarded.

First: It is said that the president of Goods wanted to go into the manufacture of extruded moldings. Alcoa's directors expressed the opinion that it would be bad business for Goods at that time, because it would probably prove too expensive. Goods accepted this view (pp. 19104-5; 21590-3; 21594-7; 22062-3; 22066-70; Exhibit 962).

In this connection it is to be recalled that, contrary to the judgment of Alcoa's

directors, Goods did go into the rolling mill business. Obviously, as it strikes me, the concurrence or even acquiescence or joining a single time in advice of Alcoa's directors would not overcome the probative effect of the numerous instances previously cited when the Wisconsin directors rejected the advice of Alcoa's directors.

Second: It is argued that Goods had as its secretary and treasurer two men who had previously been employed by Alcoa. It is to be noted, however, that these were chosen after Alcoa's directors had furnished their names when the Goods president asked for suggestions. One, who had been a bookkeeper for Alcoa, was with Goods from 1914 to 1933. The other, who had been an assistant sales office manager of Alcoa, has been with Goods ever since 1937 (pp. 13802; 17887-9; 17893-5; 21107-11).

That friendly relations between Alcoa and Goods have existed for over 30 years is undisputed. I fail to see, however, what bearing the fact of former service with Alcoa has on the issue as to domination of Goods or domination of the Wisconsin directors. The fact seems to me irrelevant to the issue.

Third: In 1918, in order that Goods might get the benefit of a trade discount, and pursuant to a request of the buyer, Alcoa purchased two electric motors for Goods under the contract of Alcoa with the General Electric Company (Exhibit 967, item 1). Apparently there was nothing unusual in this incident (pp. 22052-4); but whether so or not, it was doing a favor which cost Alcoa nothing and its action has no tendency to prove or to disprove the charge of domination made by the Government.

Fourth: In 1919 a non-exclusive license of a patent on duralumin (Exhibit 1107) was granted to Alcoa "its subsidiaries and affiliated companies." For the purpose of the license Alcoa, its subsidiaries and affiliated companies (whose names were not there given) were therein defined to constitute the "licensee," as that word was employed in the document. The "licensee" was required to make reports at short intervals of business done under the license and annually to pay a minimum royalty. Immediately following the execution of the license Mr. Davis (who had negotiated it with the licensor) sent letters to Goods and another company, telling them that the clauses as to output and paying royalties applied to the three (Alcoa and themselves) taken together (Exhibit 4). Whether Goods ever manufactured duralumin does not appear. However that may be, I think it clear that the interpretation put on the license was reasonable. It certainly, at least, was not unreasonable. Moreover, whether reasonable or not, I feel that the transaction about the patent has no bearing on the domination issue (pp. 20898; 20914-22; 22103-4).

Fifth: When Goods was making plans for the construction of the new rolling mill at Manitowoc, heretofore mentioned—which, contrary to the views expressed by Alcoa's directors, the Wisconsin directors had decided to build—Goods asked the professional advice of Alcoa's engineers on the foundation for the structure. They also requested suggestions about equipment and Alcoa obtained quotations on motors for use in the mill. Regardless of whether the Alcoa engineering staff rendered the services desired without cost (pp. 22035; 22043-51; Exhibit 967, item 3, though there is doubt whether this item is in evidence against Goods; Exhibit 1126), the assistance described shows nothing about domination. Moreover, the record is replete with instances where, without charge, Alcoa has done like favors for others (including those who indisputably were competitors) engaged in the industry.

Sixth: In or about 1922 Goods consented that employees of Alcoa might buy Goods stock on a deferred basis, partial payment plan. This was like, or at least somewhat similar to, the scheme that was open to employees of Goods (pp. 21116-18). Again, the fact does not even tend to support, much less does it justify, an inference of domination by Alcoa. As I see it, the chief feature, and perhaps the sole feature, was to provide a safe market for the inexpensive sale of Goods stock.

Seventh: The Government criticizes two groups of Alcoa transactions which occurred 19 or more years ago. These consisted of Alcoa calling the attention of Goods to business opportunities in 1919 and granting concessions to Goods on the price of aluminum purchased by it so as to enable Goods to obtain contracts from new customers for sale of fabricated articles (Exhibit 966, items 1 and 2; Exhibit 963, items 1 and 2, though there is doubt whether some of

the items are in evidence against Goods); also of allowing Goods, in 1922, to take over a portion of 150,000 tons of imported aluminum at the price of cost to Alcoa plus brokerage, and making an explanation to Goods in 1921 of what appears was a reason why two banks had refinanced Goods to an extent which (among other things) enabled Goods,—by whom upwards of $2,000,000 was then owing to Alcoa, partly on notes and partly on open account (Exhibit 968; item 1, Exhibit 1123), to discharge its indebtedness to Alcoa.

The 1919 events present a case of the kind of which the record contains many instances, of Alcoa helping those in the industry with whom it was on friendly terms, without it ever having been suggested or there ever being ground for believing that the recipients of the benefit were being dominated by Alcoa.

So far as concerns the 1921-22 events, the facts are not fully developed; but the impression made by the evidence is that Alcoa was chiefly serving itself by getting rid of an excess of aluminum on hand and collecting overdue bills.

What occurred in 1919 or in 1921 or in 1922 is quite remote from domination.

Eighth: A group of minor respects in which Goods has sought and received advice from Alcoa on principles of business practice in 1919, 1921 and 1922 are described. The Government charges that these constitute permitting scrutiny by Alcoa of confidential information pertaining to Goods. The evidence comes from a few scattered letters (Exhibit 964, items 1 to 7; Exhibit 969, items 1 to 7; Exhibit 1122).

It is probable that some of the letters are not in evidence for the purpose of proving facts, but if so that will be disregarded (e.g., item 4 of Exhibit 964). Practically the entire correspondence was between Mr. Hunt and Mr. George Vits. Of course, it would have been distasteful if the letters had become public. Nevertheless, as I conceive, there would have been little danger of substantial harm to Goods if they had been published in the newspapers. Certainly they contained nothing which should have been withheld from a director or from the president (Mr. George Vits at the time being the president of Goods).

The exceptional letter was from Mr. Hunt to the Goods treasurer. It is essentially an inquiry and is entirely appropriate for any director to address to his company treasurer. The form of the figures used suggests that the letter is a mere discussion of a Goods balance sheet which Mr. Hunt had examined. If so, of course, there was nothing secret about it. I do not believe that there is any fact mentioned in any paper to which attention has been called that, in its nature, was genuinely confidential.

Ninth: From 1909 to date there have been 163 meetings of the Goods board of directors. Mr. Davis was present at 38; Mr. Hunt at 71 (Exhibit 1019). Most of those attended by either were held in Pittsburgh or in New York City at the office of Alcoa (pp. 21112-3; 22001-2).

There are several reasons which I think might be assigned for not regarding the holding of directors' meetings at Alcoa's office as indicating that Alcoa's directors controlled Goods. I think one will afford a sufficient explanation. This rests on four statements by persons who have actively opposed Alcoa at the trial of this suit.

A Government witness, who exhibited marked hostility on the stand, said of Mr. Arthur V. Davis that he had regarded him as "one of the greatest industrial managers I [that is, the witness] had ever met" (p. 5936).

Another Government witness (when his testimony conflicted with that of Mr. Arthur V. Davis) said that he believed in the honesty and sincerity of Mr. Davis.

A Government accountant testified extensively. I think he must have impressed all who heard him as reliable as well as competent. He had investigated many of Alcoa's books and papers. He had frequently had access to them. He was being cross examined by counsel for one of the defendants other than Alcoa or a member of its group. The matter of discussion was a cost figure contained in Exhibit 409. The witness had prepared the exhibit and the figure he used came to him from Alcoa. He was asked if he would take the figure "as the last word on the subject." His reply was as follows (p. 8388):

"I have had a lot of dealings with Alcoa and its officials. They have never told me anything that was not true yet. * * * They gave me that figure, and I accepted it, absolutely."

Lastly, in its brief filed last December, the Government itself referred to Mr. Davis as "unquestionably the outstanding

personality of the world's aluminum industry" (p. 640).

If Goods shared the views I have quoted, would not that fact furnish adequate explanation of its willingness to meet the convenience of Mr. Davis and Mr. Hunt as to a place for occasional meetings in order to have the benefit of retaining them as members of its board of directors? Can it be safely inferred from the majority yielding at times to the wishes of their associates with respect to so insignificant a matter as arranging a convenient place of meeting that control of the board had passed to the minority? I think not.

Perhaps there are other criticisms by the Government of things which transpired between Alcoa and Goods. If so, however, and they have been overlooked, I believe it safe to say that they come within some of the types of occurrences on which I have already commented.

I am uncertain whether, in its discussion of the subject, the Government always intended to condemn purchases of Goods stock by Alcoa or by its officials or employes. If it did so intend, however, its position does not seem to me justified by the evidence.

So far as concerns purchase of Goods stock, not only have Alcoa's officers denied that there was intent to restrain competition by Goods with Alcoa in the production or sale of cooking utensils, but the facts strongly, if not conclusively, indicate that up to the date of the original purchase of stock (1909)—indeed for a substantial time thereafter—Goods confined its manufacture to aluminum novelties. I have discovered nothing which even tends to show that, preceding Alcoa becoming a Goods stockholder, Goods had ever even contemplated going into the manufacture or sale of aluminum cooking utensils. So far as appears, the question of whether to do so, actually to do so, first arose at least several years after Alcoa had become a stockholder of Goods.

Next, is there warrant for the Government's accusation that Alcoa monopolized or attempted to monopolize the manufacture, or sale of cooking utensils? This is the last of the three questions, previously stated, raised by the pleadings with respect to cooking utensils. As I see it, the answer turns largely on the evidence relating to the mills with which Mr. Waltz was connected that were taken over by Goods.

With respect to the Standard and the Bremer-Waltz St. Louis mills, it is plain that their owners sold both of their own initiative. There is testimony somewhat indicating that Messrs. Bremer and Waltz were not forced to sell the Standard mill when they did. It is clear, however, that sale of the St. Louis mill was rendered unavoidable and I am inclined to think the sale of the Standard mill was rendered advisable by the distressed financial condition of their owners. For the existence of the condition of either Alcoa has not been shown to have had the slightest responsibility nor does any blame for it attach to Alcoa (pp. 9270-8; 9372; 9390-1; 9393; 9396; 9401-5; 9594-601; 9634-7; 9688-92; 9695-724; 9769; 9773; 9781-9828; 19283-6; 21732-4; Exhibit 467; Exhibit 470). Indeed, the Government itself attributes the sale of the St. Louis mill to the "compelling necessity of selling" (reply brief, p. 204).

During the early stages of his testimony Mr. Waltz was rather insistent that the financial collapse of his company was caused by Alcoa unduly narrowing the spread between the sales prices of sheet and ingot. In connection with the contention he gave some figures (pp. 9244; 9252-3; 9380-1; 9392; 9594; 9598-9; 9625-6; 9634; 21054-60; 21732). Aside from other sufficient responses, however, it is enough to say (as Mr. Waltz himself conceded after the question came up directly, pp. 9245-50; 9274; as the Court pointed out during the taking of the testimony,—e.g., pp. 9272-4; 9378-9; 22187-8; and as the Government admitted at the oral argument in March, 1941, at least admitted as I understand the words used, pp. 40992-3) that when the witness gave single figures as constituting a spread, his failure to tell the gauge or otherwise to identify the grade or the kind or the quantity of ingot about which he was talking rendered wholly worthless his testimony in regard to any spread affecting cooking utensils (pp. 9245-50; 9274; 9624-31; 21060).

Much time also was consumed in taking testimony about various alleged grievances of the Bremer-Waltz Corporation. Apart from the fact that few if any of the complaints had any relevancy to the suit, it is sufficient to say that none of them was sustained by proof.

There is no occasion to discuss the charge that in 1931 Goods acquired 49 per cent of the Aluminum Goods Limited stock.

Among the reasons for which that is so is this: through the sale back to Aluminium of the stock in July, 1938, Goods terminated all its connection with Aluminum Goods Limited (pp. 14018-9; 14033-4).

The evidence does not disclose, and its officers deny, that Alcoa ever had any connection with the matter. There is at least serious doubt also, on the view of the facts most favorable to the Government, whether in the present suit this Court could properly exercise jurisdiction of the subject matter (see also pp. 14025-8; 22110-13).

October 3, 1941

In determining whether there has been competition between Alcoa and Goods, a definition suggested by the Government is that "two articles compete where there is rivalry to sell the same product to the same customer for the same use" (p. 40817). For the purpose of considering the charge of monopolization with respect to cooking utensils this definition will be accepted. Indeed, Alcoa apparently consents to it; at least it seems implied (original brief, p. 379) that there is competition between utensils when they "are used for the same purpose and compete for the consumer dollar." That is Alcoa's statement.

I think a single fact constitutes an adequate answer to the charge that Alcoa and Goods did not compete. This is that the proof overwhelmingly shows that vigorous competition between the manufacturers and sellers of aluminum cooking utensils now exists and has long existed. Much of the testimony to that effect is from entirely independent sources. What was said, for example, by the representatives of the department stores is quite impressive. Those stores handle cooking utensils which came from all the manufacturers. Their testimony is quite extensive and complete with regard to the competition in their stores, by the insistence of the manufacturers, between the cooking utensils produced by each of the manufacturers. That there has been such competition is true as to Alcoa and Goods and has been true as to them ever since Goods entered the field, in which Alcoa had previously been engaged (pp. 11901-5; 12194; 21567-70; 21969-75; 22650-3; 28151-97; 28417-18; 28656-706; 28756-9; 28813-826A; 29805-19; 29823-46; 29877; 30364-6; 30417-8; 30448-9; 30838-41; 31834-6; 31844-9; 31959-63; 31979-83; 33293-4; 40580-3). The same is also true as between them, Alcoa and Goods, and about thirty other concerns as well, some of which concerns run back for thirty years (e. g., pp. 11504; 18664) and seem generally to have prospered (pp. 11612-15; 11891-906; 12180-2; 12194-8; 18664-5; 21032; 21973; 28154; 28156; 28170-1; 28173-4; 28188; 28193-6; 28418-21A; 28668-9; 28672-3; 28684; 28695; 28698-9; 28704-6; 28713-4; 28820-22; 29799-805; 29812; 29823-46; 29876-8; 30364-6; 30380-5; 30838-41; 31834-9; 31844-9; 31883; 31958-64; 31975-85; 32019-22).

Two additional supplemental features are that the competition of Alcoa in aluminum cooking utensils has been fair (e. g., pp. 12048; 29803-5; 30371; 31964-5) and that those utensils compete in greater or less degree with cooking utensils made of enamel, copper, cast iron, stainless steel, tin, glass and other materials (pp. 22650; 28713-14; 29799-801; 29831; 30366; 30448-9; 30841; 31836; 31845; 31961; 31972-3).

I conclude, therefore, that the evidence does not sustain any of the charges against Alcoa as to cooking utensils.

(7) Pistons

The seventh monopolization charge relates to pistons.

Aluminum pistons are largely, if not wholly, produced by the permanent mold method. For that reason, save with respect to the patent question which will be discussed, perhaps what has been said heretofore about permanent mold castings might be taken as disposing of the controversy over pistons.

There are two types of patents relating to pistons which interest us at this stage. These are process patents and structure patents. Since in or prior to 1922 Alcoa has owned process patents which were regarded as essential in the manufacture of pistons and, indeed, were believed by Alcoa to carry with them control of the manufacture of aluminum pistons. In 1922 Alcoa and several others owned structure patents. There were disputes among the owners about those structure patents. There had been litigation between the owners. Further litigation was threatened or feared. In 1927 Bohn owned and still owns a patent (granted to Nelson) for making a strut or control type of piston.

In composure of the differences between the structure patent owners (not including Bohn) a so-called Piston Patent Estate was created in 1922. Pursuant thereto the structure patents (other than the Nelson) were transferred to a Cleveland, Ohio, trust company as trustee. Alcoa then obtained an exclusive license from the trustee on the structure patents, with the right to issue sub-licenses. Thereupon Alcoa issued to several piston manufacturing concerns sub-licenses under the structure patents and licenses under its own process patents. Bohn also obtained a sub-license under the structure patents and a license under the process patents. In exchange for this, Bohn granted to Alcoa a license under the Nelson patent.

Aside from the licensees and sub-licensees just referred to, there are in the United States other manufacturers of aluminum pistons (pp. 16866-7; 16967-8; 17276-9; 30320-1; 30330; 30352-4; 30356); but for present purposes those may be disregarded. Pistons were also made from other metals (pp. 17095-8; 17265-75); but likewise, for the moment, these too will be disregarded.

It is unnecessary to go into details of the patents involved or into the details of the Piston Patent Trust Estate (Exhibits 918 and 919). This is true because of the positions taken by Alcoa and the Government in their briefs.

In the original Alcoa brief, furnished last December (p. 346), it was said:

"It should be remembered that Alcoa then [that is, when the Piston Patent Trust was formed] had what it believed to be a legal monopoly in the aluminum piston industry by virtue of its ownership of the controlling process patents. The manufacture of piston castings by the sand casting method was satisfactory only for experimental purposes and where only small quantities were desired. The only commercial process for the manufacture of aluminum pistons was by permanent molds, and Alcoa did not know of any economical process which could be used in the manufacture of piston castings without infringing its mold or process patents."

In its reply brief, submitted in January, 1941 (p. 185), the Government said:

"On the basis of Alcoa's brief and Norton's testimony, it can be considered as established that virtually no aluminum pistons can be made without infringing the process patents owned by Alcoa and the structure patents owned by the Piston Trust Estate and under which Alcoa is an exclusive licensee."

The bill (paragraphs 52 and 95) contains two charges: (1) That Alcoa and its licensees manufacture and sell about 80 per cent of the aluminum pistons moving in interstate commerce. (2) That the purpose and effect of Alcoa procuring an exclusive license under the structure patents were to obtain "a monopoly in the production and sale of such pistons in interstate and foreign commerce", which Alcoa and its licensees still hold.

In its original brief Alcoa insisted that evidence is lacking to support the first charge. In neither its original nor its reply brief has the Government drawn any such evidence to my attention and I have discovered none.

On the face of the pleading, and for reasons previously given in discussing the Hall patents, it seems to me that no cause of action is stated with respect to pistons. Moreover, both at the trial and in its briefs the Government has made express admissions which, if accepted, apparently mean that its own view is that no cause of action is stated. In other words, the situation may be described to be that if there be a cause of action it has not been pleaded.

Though licensed at different dates, the original sub-licensees and licensees (other than Alcoa itself) were the Bohn Aluminum & Brass Corporation, the National Piston Company, the Walker M. Levett Company and the Kant-Skore Piston Company. The Packard Motor Car Company indirectly transferred some patents to the Piston Patent Estate and acquired an interest in the estate. Some time subsequent to the beginning of the Piston Estate, National and Levett were taken over by Bohn and Kant-Skore changed its name to Aluminum Industries, Inc. The United Engine & Machine Company had no license or sub-license and held no interest under the estate. However, it owned piston patents.

None of the companies just mentioned is or ever has been nor is the trustee nor has it ever been a party to the case at bar. In the situation described, the crucial issue is what was the consequence of the Piston Patent Estate and its incidents.

On May 16, 1939, the Court suggested that the absence of necessary parties to this suit might prevent an adjudication in the pending litigation of whether the Cleveland Piston Patent Estate is lawful. Time was given counsel to consider the matter (p. 17222). The next day the Government counsel said (p. 17374):

"* * * we are not attempting to dissolve the patent trust estate. Your Honor was perfectly correct in stating that the necessary parties have not been made parties to this suit and consequently we could not dissolve the estate if we wanted to. There may be a separate cause of action there, but we are not trying that cause of action in this case."

The view announced at the trial has been confirmed since by the Government. In its principal brief, filed subsequent to the close of taking testimony, it said (pp. 24; 485-6; 494):

"* * * we seek no relief in this case against its [Alcoa's] piston monopoly. * * *. It should be made clear * * * that we are not seeking any relief in this case against the piston monopoly as such. As the court properly pointed out, the necessary parties are not defendants. * * * we are not seeking any separate relief in this case in so far as Alcoa's piston monopoly is concerned."

What the Government now urges is that (1) Alcoa has used the piston patents which it owns or holds as licensee from the estate to further the sale of aluminum and (2) it was the intention of Alcoa to monopolize the production and sale of aluminum pistons. The two points will be considered separately.

The manufacture of aluminum itself has not been covered by a patent as you will recall, since 1909 and (without at the moment definitely so deciding) it will be assumed that the patent statute confers no right to employ a patent for the promotion of marketing an unpatented article. Our initial inquiry, therefore, is whether the proof shows that Alcoa has used the piston patents, or any of them, to enforce sales of aluminum. Otherwise stated, has Alcoa conditioned the grant of benefit of a piston patent license on its customers purchasing aluminum from it?

In support of its contention, the Government put on the stand representatives of Aluminum Industries, Packard Motor Car Company and United Engine & Machine Company.

The general manager of and lawyer for Aluminum Industries testified on direct examination as to five or six conversations with officials of Alcoa between 1923 and 1931. Aluminum Industries procured a license from Alcoa in 1924. From then on it was a frequent applicant for an increase in the number of pistons it should be entitled to make. On direct examination some of the statements by its representatives, standing alone and unexplained, perhaps might be construed as designed to convey the impression that the officials of Alcoa had indicated that the requests of Aluminum Industries might be granted if its purchases of aluminum from Alcoa were increased (pp. 16939-45; 17153-4; 17160-1; 17164-5; 17173-5; 17178-80; Exhibits 939 and 940). On cross examination, however, the Aluminum Industries statements were modified to such extent that the testimony of its representatives, as well as the testimony of representatives of Alcoa, persuade me that at no time did Alcoa condition the grant of a license or the increase of a quota on the applicant purchasing or agreeing to purchase aluminum from Alcoa (pp. 16982-3; 17009-11; 17024-7; 17186-7; 17192-8; 17201-12; 19238-67; 22639-47; 23100-12; 28845-54; 28923-44; 33267-9; 33274-6; 33283; 33348. See also pp. 16949-61).

The position taken by Mr. A. V. Davis was that all licensees should be treated alike; that, as he asserted, for building up its sales Aluminum Industries had relied more on taking away customers from its competitors than on building up the aluminum pistons business as an industry (e. g., pp. 17188-90; 19244; 19246-9). It is also true that when, in 1929 and later, Aluminum Industries had increased its sales by promoting the use generally of and developing new markets for aluminum pistons, its license quotas were proportionately increased (pp. 16984-93; 17025-8).

Upon reviewing all the evidence, as I see the matter, however, the Government has attempted to put the shoe on the wrong foot. Instead of Alcoa having sought the purchase of aluminum as its price of consent that Aluminum Industries might manufacture more pistons, Aluminum Industries used the suggestion that it had bought or would buy more aluminum if Alcoa would

182

give the consent. To this suggestion Alcoa never yielded.

The Packard lawyer had two conversations with Mr. Arthur V. Davis. One was in 1922 and the other was in 1933 (pp. 16827-38; 16856-9; 16864-6; 16880-97; 16905-8; Exhibit 921). In neither was purchase of aluminum from Alcoa more than casually mentioned. The only reference to the subject I discover in the evidence is that the Packard lawyer said he asked Mr. Davis to use his influence to procure licenses for two outside manufacturers (Ray Day and Sterling) and Mr. Davis replied that he considered it unreasonable to request that licenses be granted to piston manufacturers who were not buying aluminum from Alcoa but from foreign sources and thereby give them the result of all the research work of Alcoa (pp. 16832; 16866). In fact, the Packard Company apparently did not buy pistons from Alcoa, but procured them from Bohn and Aluminum Industries (p. 16867).

United Engine complained that Alcoa refused it a license to manufacture aluminum alloy pistons (pp. 17371; 28935; 30219; 30233). Even if so, however, that would have denied United Engine no right. On the contrary, it would have been merely the exercise by Alcoa of a right conferred on it by the patent law.

The testimony of the representative of United Engine was chiefly about Alcoa's claim against it of patent infringement and litigation over the matter. When on the stand, in substance that representative said that Alcoa's representatives had conceded that its purpose was to exclude United from manufacturing aluminum castings or aluminum pistons (p. 17371). This was denied by Alcoa witnesses (pp. 28831-2; 28842-4; 28893-4; 28941-4; 30216-23; 30234; 30276; 30298-319; 30326-29A; Exhibits 941-942 and 1502-4); but even the admission of the truth of the charge would not sustain the contention of the Government. If Alcoa did what United asserts, it would have amounted to no more than saying that Alcoa insisted the patents of itself and the Cleveland trust had priority over United patents and that United was infringing.

What the representatives of three concerns engaged in manufacturing aluminum pistons said was supplemented by the testimony of the chief engineer of the H. H. Franklin Manufacturing Company. In substance, he said that a representative of Aluminum Manufactures refused to sell metal with which Franklin could manufacture its own pistons (pp. 3206-7). This was denied (pp. 35546-7); but even if what the Franklin representative says took place, so far as affects the branch of the case now under consideration it would not have amounted to a violation of the Sherman Act by Alcoa, much less an offense alleged in the bill.

It may be noted that the expiration of many of the piston patents now held by the Cleveland trustee has been disregarded; also that no attention has been given to the problem of whether sufficient live patents are still held by the trustee or by Alcoa to enable them to interfere with the manufacture of aluminum pistons by unlicensed concerns.

If Alcoa employed patents of which it was the owner or exclusive licensee to effect a monopolization of the subject matter of the patents, precisely as pointed out in the discussion of the Hall patents, that (as I believe) would not entitle the Government to complain under the Sherman Act. Right to enjoy such a monopolization is one of the very things that the Congress itself expressly granted in 1790 and continuously since has granted by statute to patent holders. It would be wasteful of time, therefore, to go over all the evidence relied on by Alcoa to support its denial of any such intent as was alleged by the Government.

My conclusions, therefore, are as follows:

1. The percentage of aluminum pistons manufactured or sold by Alcoa and its licensees has not been proved.

2. It has not been shown that Alcoa employed a piston patent to further the sale of aluminum.

3. So long as the Piston Patent Estate is unassailed, and by virtue of exemption from attack must be treated for the purposes of this case as lawful, what Alcoa has done with respect to the production and sale of pistons must be deemed within the protection of patents of which it is owner or licensee.

I hold, therefore, that no violation of the Sherman Act growing out of anything relating to pistons has been established.

(8) Extrusions and Structural Shapes

We come now to the eighth monopolization charge. This concerns extrusions and structural shapes.

In paragraph 49 the bill charges that Alcoa produces and sells virtually 100 per cent of the extruded and structural shapes made of aluminum or aluminum alloys moving in interstate commerce.

The evidence shows that Alcoa produces all the large rolled structural shapes made in the United States out of aluminum or aluminum alloys. For this purpose it built a mill at Massena, New York, about 1930. That was done at a cost of $3,000,000. It is the only mill in the world used exclusively for that purpose. It was erected before any business was acquired for it and it has been a success. The large rolled shapes it produces are for use on bridges, railroad cars, street cars, trucks, buses and the like.

Outside of on those large rolled shapes (i.e., on smaller shapes made by extrusions) Alcoa has four competitors. These are the Bohn Aluminum & Brass Corporation, the Reynolds Metals Company, the Revere Brass & Copper Company and Extruded Metals, Inc. The competition is keen between the four named and Alcoa, and all the competitors are successful.

Structural shapes can be made from foreign or from domestic primary aluminum or from secondary aluminum or from aluminum scrap. They compete also with like products made from steel and from other metals. In addition, steel companies can roll aluminum shapes on their own structural mills (pp. 33524-5).

I have prepared table 7, which is as follows:

Bohn, Revere and Reynolds. The years in the first column to the left are 1934 to 1938, inclusive. There is a column for each of the four companies I have mentioned. There is then a total for each year of all four companies. In the final column to the right, column F, there is a computation of Alcoa's percentage of the total. This is obtained by dividing the total of Alcoa, column A, by the total of all the companies in column E. The result of the computation is that it is shown that in 1934 Alcoa's percentage of the total was 90.67 per cent and in 1938 that Alcoa's percentage of the total was 77.45 per cent.

You will notice that Extruded Metals is not included in the table. This is because that company started in 1939. When you examine the table you will see also that Alcoa's relative percentage was approximately the same in 1934 and 1935 and has declined each year since.

Reynolds has in process an increase of its capacity to two million pounds a year. The greatest quantity of production of Reynolds shown in this table was for 1938 and was 88,300 pounds. Extruded Metals, which began operations in March, 1939, for the year ending in February, 1940, fabricated over one million pounds of extrusions (pp. 17711-13; 28599-600; 28606). And you will recall that I stated heretofore that no figures are included in the table for Extruded Metals.

■ With respect to the matter of extrusions and structural shapes, therefore, I conclude this: Save with respect to what

TABLE 7

*Alcoa's share of sales (pounds) of extrusions by four companies, 1934-8*

| Year | A Alcoa | B Bohn | C Revere | D Reynolds | E Total (A + B + C + D) | F Alcoa's Percentage of Total (A ÷ E) |
|---|---|---|---|---|---|---|
| 1934 | 4,137,906 | 241,849 | 183,944 | | 4,563,699 | 90.67% |
| 1935 | 5,546,041 | 391,103 | 178,216 | | 6,115,360 | 90.69 |
| 1936 | 9,607,575 | 1,012,923 | 271,946 | | 10,892,444 | 88.20 |
| 1937 | 12,094,364 | 1,939,984 | 1,037,459 | 35,000 | 15,097,807 | 80.11 |
| 1938 | 6,962,648 | 1,636,699 | 302,161 | 88,300 | 8,989,808 | 77.45 |
| Total | 38,348,534 | 5,213,558 | 1,973,726 | 123,300 | 45,659,118 | 83.99 |

This table is a collection of statistics, with a computation, to show Alcoa's share of the sales (in pounds) of extrusions by four companies in 1934 to 1938.

The four companies are the ones to which I have previously referred, namely, Alcoa,

was said above about large structural shapes rolled at the Massena mill (pp. 33304-5; 33523-5), no allegation of the charge has been proved. Neither what was said about the large shapes produced at the Massena mill, nor anything else charged

or proved with respect to structural shapes made from aluminum, states or establishes an offense committed by Alcoa.

### (9) Foil

We come now to the ninth monopolization charge. This is as to foil.

Paragraph 50 of the bill (pp. 26829; 34965) alleges that Alcoa is the largest producer and seller of aluminum foil which moves in interstate commerce in this country. Even if that were so, however, for reasons previously assigned in the course of the discussion of virgin aluminum, what is alleged about foil, without more, would not state a violation of the Sherman Act; but the evidence does not show that the charge is true.

Alcoa, Reynolds Metals Company and Johnston Tin Foil & Metal Company produce and sell aluminum foil in the United States. Several other concerns sell aluminum foil in the United States—how many is not made clear, although apparently all of them import and it is uncertain if any of them manufacture (pp. 28314-6; 33291-2; 33641-4; 35827; 35834; 35840; 35843-5; 35849). The United States producers and the importers are in active competition with each other.

As noted at the foot of Exhibit 1627, the figures concerning production and sale of foil by Reynolds are incomplete. Yet, despite substantial omissions (pp. 34939-77), the Reynolds sales for 1935 to 1939 shown on the books totalled 27,859,642 pounds as against Alcoa's total sales for the same years of 26,663,218 pounds; and for the year 1939 alone the sales of Reynolds on the same basis exceeded those of Alcoa by approximately 800,000 pounds (Exhibit 1627; Alcoa's answer to interrogatory 11(r); Exhibit 1642, exhibit p. 6961). In its application to the Reconstruction Finance Corporation in 1940 for financial assistance, which was laid before this Court near the close of the taking of testimony, Reynolds described itself as "the largest and most dominant factor in the foil industry" (Exhibit 1800, exhibit p. 7442).

Certain of the Reynolds books (showing its sales) were lost by flood. If estimates of sales by Reynolds for those years were taken into account, it is pretty clear that there would be quite a substantial enhancement of the amount by which Reynolds has exceeded Alcoa in sales of foil for the past few years (pp. 34966; 34972-4).

In addition, in the period of 1930 to 1939 Johnston's aluminum foil production totalled nearly five million pounds. The growth of the company's annual production has been very considerable and for the major part the annual increase has been steady (Exhibit 1470; pp. 28268-9).

As between itself, Reynolds and Johnston, the percentage of aluminum foil produced by Alcoa fell from 62.39 per cent in 1933 to 44.3 per cent in 1939. In other words, while Reynolds and Johnston have gone up, Alcoa has gone down.

In direct and active competition with aluminum foil are two things: (1) Many articles manufactured in the United States from other metals and materials serve, and are sold for, some of the identical purposes for which aluminum foil is used. (2) Imported aluminum foil usually sells at a lower price than domestic foil (p. 22675).

The imports of foil from Switzerland are large and increasing. These have increased particularly since a reciprocal agreement was made between Switzerland and the United States in January, 1936. This agreement reduced the tariff rates on aluminum foil. The diversity and extent of the competition has been very great (pp. 12663-5; 22675-8; 28263-9; 28289-307; 28314-21; 28402-3; 33292-3; 35822-59; 40275-6; Exhibit 457, exhibit pp. 2749, 2753 and 2755. See also Exhibits 1791 and 1792 for identification, pp. 40275-8).

My conclusion is that not alone is the charge against Alcoa unproved, but that it is affirmatively and indisputably established that with respect to foil Alcoa has committed no violation of law.

### (10) Miscellaneous Fabricated Articles

This brings us to the tenth monopolization charge. That relates to miscellaneous fabricated articles. A number, which are minor, are mentioned in paragraphs 7, 9, 49, 50 and 53 of the bill. These are bronze powder, wire, rods, bars, tubing, nuts, bolts, bottle seals, caps and similar articles.

What is said in paragraphs 7 and 9 is merely descriptive. It charges no offense.

In paragraph 49 it is alleged that Alcoa produces and sells virtually 100 per cent of the wire, rods, bars and tubing made of aluminum which move in domestic interstate commerce. In paragraph 50 it is alleged that Alcoa is the largest domestic producer of bronze powder moving in

interstate commerce. In paragraph 53 the charge is that, by virtue of its 100 per cent monopoly of production and sale of alumina and virgin aluminum, Alcoa has acquired and has maintained monopolistic control of the production and sale of products manufactured therefrom.

The last mentioned charge is an illustration of what I called attention to yesterday; of the difficulty, arising from the form of pleading in this case, of knowing with accuracy what the Government's charge actually is. The very use of the expression "100 per cent monopoly," when whether any such exists is the subject of inquiry, conveys to me nothing and I do not know what the Government's position is.

It is obvious that, with respect to a great proportion of the articles under consideration, no cause of action is stated; also that there is doubt whether a cause of action is stated as to any of them. Even though, however, there be some charge which may be treated as good in law, it is not sustained by proof; nor is any one of the charges sustained by proof. Indeed, the evidence is silent as to a good many of the articles and, relatively, none is important or of any considerable volume.

In so far as my attention has been directed to or I have discovered evidence relating to these matters (whether specifically named or covered by general description), such evidence will be found in the record as follows: As to bronze powder, at pp. 12637-46; 26829; 33293; 34937-8; in Exhibit 704 and Exhibit 1626. As to wire, at pp. 23004; 23009; 23011; 33288; 34521. As to rods, at pp. 21187; 23004; 23010; 24643; 34509-12; 34527; and in Exhibit 1642. As to bars, at pp. 21187; 23004; 23010; and in Exhibit 1642. As to tubing, at pp. 32140-1; and in Exhibit 1642. As to screw machine products, at pp. 34520-3; 34527; and in Exhibit 1642. As to rivets, at p. 23011; and in Exhibit 1642. As to nuts, at p. 34520. As to forgings, at pp. 23004; 23011; 34509; 34511-13; 34520; and in Exhibit 1642.

▮▮▮ I think a cursory reading of the record at the pages I have mentioned, coupled with a reading of the exhibits I have mentioned, will demonstrate that Alcoa has committed no offense with respect to any of the matters which I have included under the heading of miscellaneous fabricated articles.

(11) Sheet

We come now to the eleventh monopolization charge. This concerns aluminum sheet.

Perhaps sheet has been more provocative of controversy at this trial than any other single subject. In order fairly to consider all the issues which have been raised in those controversies, I feel it is quite essential that I go into the evidence at length. On this account I anticipate that we shall probably be engaged for several days on the subject.

The bill makes five separate sets of charges about sheet. These are contained in paragraphs 47, 48, 53, 83, 92, 93, 98 and 99 of the bill.

The testimony about sheet is very extensive. A full discussion of it would require a great deal of time. By analysis, however, I think the issues can be brought within rather narrow compass; also that it will be necessary to comment on the relatively few of them which are crucial. As I have previously indicated, and I call it to your attention on account of the statement I have just made, in the findings I shall be prepared to deal with every pertinent question presented by the pleadings.

Ordinarily up to this point, in entering on the discussion of a new matter, or very soon after I had entered on the discussion, I have set out fully the substance of all the allegations of the bill containing the charges in respect to the subject. Here, however, I have concluded that it will be better to adopt, and perhaps helpful if I adopt, a different procedure. The plan I shall follow will be to take up a single charge at a time, recite the evidence bearing on it, and dispose of it before I go into another charge; and thus in time I shall discuss all the charges contained in the eight paragraphs of the bill of which I have given you the numbers.

In dealing with the controversy I must consider twelve companies. These are, or have been, engaged in rolling sheet. It is material to have, and to hold in mind, the dates when certain events affecting those companies occurred.

Alcoa began rolling aluminum sheet in 1895. It was the pioneer in this country. It sought first to induce others to take up that phase of the business, with the view to selling them ingot. This plan, however, failed. Having failed, in order to get a

market for its aluminum, or for products therefrom, Alcoa itself took up the rolling of sheet.

Aside from Alcoa, eleven other companies went into sheet rolling. The names of these, with the dates on which they began that business, were as follows: (1) Goods, in about 1914, with plants at Manitowoc and Two Rivers, Wisconsin. (2) Standard Aluminum Company, in 1913, which had a plant at Two Rivers, Wisconsin. (3) Cleveland Metal Products Company, in 1915, which had a plant at Cleveland, Ohio. (4) United Smelting & Aluminum Company, in 1917, which had a plant at New Haven, Connecticut. (5) Bremer-Waltz Corporation, in 1918, which had a plant at St. Louis, Missouri. (6) Baush Machine Tool Company, then and now chiefly engaged in the machine tool business, which in 1919 established and for a time had an aluminum sheet plant in, or on the edge of, Springfield, Massachusetts, part of the property being in Chicopee, immediately adjacent to Springfield. (7) Aluminum Products Company, in 1920, which has a plant at LaGrange, Illinois. (8) Sheet Aluminum Company, in 1926, which has a plant at Jackson, Michigan. (9) Fairmont Aluminum Company, in 1927, which has a plant at Fairmont, West Virginia. (10) Reynolds Metals Company, in 1931, which has plants at Louisville, Kentucky, Richmond, Virginia, and Farmingdale, Long Island, New York, and may have plants elsewhere,—established since the close of the taking of evidence in this case, but as to which I have no direct knowledge. (11) Scovill Manufacturing Company, in 1935, which has a plant at Waterbury, Connecticut.

The eleven companies just mentioned, other than Alcoa itself, are divided into three classes. The first consists of four companies which formerly manufactured and sold sheet, but are no longer in the business. The second consists of three companies which, ever since they were organized, have rolled and still roll sheet, but have themselves exclusively, or almost exclusively, used their own output and have not themselves sold sheet in substantial quantities to the public or to other companies generally. The third consists of four companies which since their organization, or at least for many years past, have rolled and sold, and still roll and sell, sheet to customers generally.

The companies of the first class, namely, those which are no longer in the sheet business for themselves, are (1) Standard Aluminum Company, which was sold in 1916 to Goods; (2) Bremer-Waltz Corporation, which was sold in 1919 to Goods; (3) Cleveland Metal Products Company (or Aluminum Rolling Mill Company, the two together for the purposes of discussion being treated as a single enterprise and for convenience being called in this discussion the Cleveland Company), which was sold in 1924 to Alcoa; and (4) the Baush Company, which quit manufacturing or selling sheet at some date between 1927 and 1931.

The companies of the second class, which produce but usually do not sell sheet, are (1) Goods; (2) Aluminum Products; and (3) Scovill.

The companies of the third class, which have heretofore produced and regularly sold and still produce and regularly sell sheet, are (1) United Smelting; (2) Sheet Aluminum; (3) Fairmont; and (4) Reynolds.

As I have already indicated, I shall take up the charges separately. I shall state one charge only and then follow with a discussion of the evidence bearing on the issue raised before going on to another charge.

There are two other charges which are general and in a sense may properly be characterized as preliminary. Those are contained in paragraphs 47 and 48 of the bill.

I shall begin with the charge in paragraph 47. It is there alleged that Alcoa produces and sells upwards of 90 per cent of aluminum sheet moving in interstate commerce of the United States. This charge is not sustained by the evidence.

2S and 3S aluminum sheet are referred to by some of, though not by all, the witnesses as aluminum sheet or pure aluminum sheet. For commercial purposes the two, that is, 2S and 3S, are practically identical.

Exhibit 1703 shows that in 1923 Alcoa furnished 95.8 per cent of the 2S and 3S aluminum sheet supplied to the public by sheet rollers in the United States who manufactured and sold such sheet to customers; also that thereafter the proportions furnished by Alcoa (as between itself and competitive sheet sellers) gradually,

but very nearly uniformly, decreased annually; and that in each of the years 1938 and 1939 this had fallen below 72 per cent.

It is to be observed, however, that the figures contained in Exhibit 1703 take no account of sheet produced by companies of the second class (which use their output for their own fabrication of articles from sheet). If they were considered, obviously the 72 per cent would be further reduced. It is clear, therefore, that the charge made by the Government in paragraph 47 of the bill has not been proved.

In paragraph 48 of the bill it is alleged that Alcoa produces and sells over 95 per cent of the alloys of aluminum moving in interstate commerce of the United States; also that this is commonly called duralumin.

In support of the charge the Government relies solely (original brief, p. 496) on Exhibit 1730. I think, however, that this exhibit does not support the allegation.

The charge in the pleading is as to the percentage of "alloys of aluminum" or "hard alloys" which Alcoa produces and sells. Exhibit 1730 gives statistics only as to "sheet" other than 2S and 3S. The commodity covered in the exhibit is specifically stated in the exhibit title to be "Aluminum Alloy Sheet." When so confined it, of course, excludes from the figures used in the exhibit both castings and forgings, as well as some other articles which are in fact "hard alloys" of aluminum. If this be true, then it follows that the exhibit does not embrace figures as to all alloys of aluminum, to which paragraph 48 by its express terms relates. Outside of Exhibit 1730 I discover nothing in the evidence which furnishes, nor does Exhibit 1729 furnish, the information called for by paragraph 48. In consequence, the charge as made is not sustained.

The difficulty, as I see it and repeat, is this: Paragraph 48 of the bill relates to "alloys of aluminum," commonly known as "hard alloys" or "duralumin." On the other hand, Exhibit 1730 deals with "aluminum alloy sheet other than 2S and 3S."

We are thus brought to the four companies constituting the first class, which formerly manufactured and sold sheet but are no longer in that business. They are Standard, Bremer-Waltz, the Cleveland Company (i. e., Cleveland Metal Products Company, as previously defined) and Baush. Each will be considered in turn.

Standard Aluminum Company is not mentioned in the bill. In paragraph 53, however, it is alleged that Alcoa employed its monopolistic control of the production and sale of aluminum sheet and of alloy sheet to exclude others from engaging in competition with it. It is also there alleged that the monopolistic control of Alcoa has had, and will continue to have, the effect of preventing substantial competition which would otherwise have arisen in the production and sale of products manufactured from aluminum. Possibly it was designed to include the Standard transaction in that wide sweeping charge, although it is not mentioned by name. Even though that were not the intention, however, Standard Aluminum Company will be so treated; that is to say, it will be treated as if this charge had been made in regard to the transaction which involves it.

The Standard mill was built in 1913. It was sold to Goods in 1916, three years later. At the time of the sale Mr. Arthur V. Davis and Mr. Roy Hunt, Alcoa officials, were on the board of directors of Goods. However, there is no evidence that Mr. Davis participated in the purchase. His recollection is that he opposed it (pp. 20862-3); and the evidence shows that Mr. Hunt was not active in the purchase or in the negotiations leading up to it (pp. 22113-5). Indeed, there is no evidence which indicates that either Mr. Davis or Mr. Hunt had any active share in the purchase and none whatsoever which connects Alcoa with the purchase.

The facts are that Standard was considerably in debt and was being pressed by its bank (pp. 9223; 9225; 9226; 9696; 9698; 19285-6). It seems obvious that it is those conditions which brought about the sale. Alcoa did not promote it. On the other hand, because of the financial distress of Standard, its owners induced Goods to take the property off of their hands (pp. 9229; 9771-2).

The next year, after the Standard sale, Messrs. Bremer and Waltz, owners of Standard, had the Bremer-Waltz Corporation, which they also owned, build a new aluminum sheet rolling mill at St. Louis (pp. 9232-5). Nothing in the Standard transaction stood in the way of their doing

188

this (pp. 9771-3). The new mill at St. Louis began operation in 1918, but it did not prosper (pp. 9382; 9384; 9387; 9390; 9393-4; 9396-7; 9599-9600; 9702-6; 9773; 9791-9804; 9898-9907; Exhibit 470). On account of its not prospering the owners offered the property to Alcoa, but Alcoa declined to buy it (pp. 9392-3; 9598; 21732-7; 22082). In February, 1919, the next attempt to sell the mill was made. This was to a group who are described by Mr. Waltz in the testimony as the St. Louis Board of Trade. That also failed (pp. 9821-4). Subsequently, in the latter part of 1919, having decided that it needed another mill, Goods bought the St. Louis mill (pp. 9400; 9403; 9595-9602; 9775; 9821-5; 22096; Exhibit 467; Exhibit 471).

Accordingly, on the evidence thus far without more, Alcoa would be entitled to a complete acquittal on the charges relating to the Standard and St. Louis Mills. But there is additional evidence on the subject.

In paragraphs 93 and 98 of the bill the allegations with respect to the St. Louis mill, in substance, are as follows: In 1919 Alcoa was a stockholder and was represented on the directorate of Goods. Alcoa shared responsibility for the policies and activities of Goods. The competition of Bremer-Waltz with Alcoa in producing and selling sheet terminated in 1919, when the Bremer-Waltz sheet rolling mill was acquired by Goods. The purpose and effect of the purchase were to eliminate competition with Alcoa.

Preliminarily it should be observed that here again the pleading consists in part of mere conclusions and so leaves the Court with a problem of trying to ascertain with accuracy what really is the position of the Government on the point.

What I have stated is the Government's accusation; but so far from Alcoa having influenced Goods to buy the St. Louis mill, the evidence satisfactorily establishes that Alcoa officials who were on the Goods board flatly opposed and advised against the purchase (pp. 19095-6; 21060-3; 21572-72A; 21583; 21735; 22073-7; Exhibit 474, item 5). In this instance, as in many other instances (pointed out elsewhere), the majority of the directors of Goods favored a course which the minority directors disapproved. Yet the majority prevailed and carried through the transaction (pp. 21571-2).

The negotiator of the sale in behalf of Bremer-Waltz testified unequivocally that Alcoa had nothing to do with it (pp. 9599-9600); also· that he personally assented to the sale in which Goods was the purchaser (pp. 9771-2; Exhibit 471). I am persuaded, therefore, that the charge as to the Bremer-Waltz mill is entirely unfounded.

Because it has been discussed, perhaps a bit of the subsequent history of the mill should be mentioned.

For a time Goods operated the property at St. Louis, but the results were financially unremunerative. Accordingly, the mill equipment was moved to the two Wisconsin plants of Goods and the St. Louis real estate was sold (p. 22096). None of these things was done on the request or at the suggestion of Alcoa or its officials. It and its officials were without responsibility for any of those things.

We come next to the Cleveland Metal Products Co. transaction.

In paragraphs 92 and 98 it is alleged that Cleveland Metal Products Company (called herein the Cleveland Company) was a competitor of Alcoa in the production and sale of aluminum sheet; that in March, 1918, the two companies entered into a contract, pursuant to which the Aluminum Rolling Mill Company (hereinafter called the Mill Company) was organized to purchase and operate the Cleveland Company's mill and that Alcoa purchased 60 per cent of the stock of the Mill Company and obtained control of its management; that the purpose and effect of the contract were to establish Alcoa's monopoly in the production and sale of aluminum sheet by the elimination of the Cleveland Company's competition; that in 1923, pursuant to court order, Alcoa sold to the Cleveland Company the 60 per cent of the Mill Company's stock it owned; that shortly thereafter Alcoa obtained a judgment against the Mill Company for indebtedness and acquired the mill at sheriff's sale; and that competition by the Cleveland Company terminated in 1918 when its mill came under the control of Alcoa.

Parenthetically it may be remarked that in their original briefs (Government, p. 503; Alcoa, p. 423) both sides said that the ratio of Mill stock taken was two-thirds by Alcoa and one-third by the Cleveland Company (instead of 60 per cent by one and 40 per cent by the other, as alleged in the bill). Though the variance is immaterial, the

evidence indicates that the actual proportion was two-thirds and one-third and that will be taken as true.

The Cleveland Company began operations in 1915. Its plant was good; but, because too small, neither when in the hands of the Cleveland Company nor when in the hands of the Mill Company was it ever able to operate profitably (pp. 19221; 19225; 22077A).

In 1918, during the first World War, the Government fixed the prices of sheet; or some say fixed the maximum, but it doesn't make any difference which. Thereupon, or shortly previously (in anticipation of the schedule going into effect), the Cleveland Company decided that it could not continue to operate under the newly prescribed scale of prices. Everybody apparently realized that whatever the scale was, whether it was a maximum or not, it would be adopted by all engaged in the industry. The Cleveland Company's president, Mr. Ramsey, so represented to Alcoa and appealed for help, Alcoa at that time being a creditor (pp. 19220-3; 20978; 20981; 21054; 21069; Exhibit 728; Exhibits 463-5 for identification, of which judicial notice is taken,—these being War Industries Board papers).

This led to the organization in 1918 of the Aluminum Rolling Mill Company to take over, and it did take over, the Cleveland Company's mill. The stock of the new company was distributed, as I have said, two-thirds to Alcoa and one-third to the Cleveland Company; and $600,000 of fresh money was put in (pp. 19223-5; 21065; 22078; Exhibit 727, item 2, exhibit p. 3558; Exhibit 729, exhibit p. 3574).

Promptly after the organization of the Mill Company, in the same or the next year, the Federal Trade Commission brought suit assailing the transaction and specifically seeking a court order compelling Alcoa to divest itself of the Mill Company stock (pp. 21065-7; 22079; Exhibit 727, item 1). This resulted in a decision by the Commission adverse to Alcoa, which directed it to abandon the enterprise. An appeal was taken. In 1922 the ruling below was sustained by the Third Circuit Court of Appeals (Aluminum Co. of America v. Federal Trade Comm., 284 F. 401).

In obedience to the court order which followed, the Mill Company plant was abandoned by Alcoa and it sold its Mill Company stock to the Cleveland Company (pp. 19225-6; 21067). In the meanwhile, the indebtedness to Alcoa for ingot had grown to about $600,000 (pp. 19225-6; 21067-8; 22079; 22082; Exhibit 727, item 2, exhibit pp. 3559-60),—a sum in excess of the worth of the entire Mill Company assets (Exhibits 737-8). Alcoa brought suit for the amount of its debt, obtained judgment, had execution levied on the property and, in 1924, bought it in at sheriff's sale (pp. 19225-7; 21065; 22082; Exhibits 738-9).

The Federal Trade Commission thereupon sought a court order to prevent Alcoa from holding the property which it had acquired under the execution sale, but this effort failed (299 F. 361; pp. 19227-8). After it had obtained the property in the way described, Alcoa discontinued operation of the mill and shortly afterwards, as a measure of economy, removed the equipment to some of its other plants (pp. 22079; 22096-7).

From the recitals it will be observed that the original plan, pursuant to which the Mill Company was created, was formulated by or at the insistence of the Cleveland Company when in a financially failing condition. This called for a division between Alcoa and the Cleveland Company of the benefits. The shares of these were to be measured by the stockholdings; that is, two-thirds to Alcoa and one-third to the Cleveland Company. When, after court proceedings, it had been determined that the plan was not lawful, Alcoa, strictly in pursuance of its legal rights, availed itself of the only remedy open to it, which was by suit to collect the money owing to it.

There is no evidence which would sustain a finding, or none in my opinion which would sustain a finding, that it was the purpose of Alcoa to drive the Cleveland Company out of business. Rather it appears that its purpose was to conserve its debtor, the Cleveland Company, and in doing so to treat it leniently and, so far as I can see, fairly. When this purpose had been frustrated by litigation, in order to exercise an indisputable right and, if possible, to collect something on a debt Alcoa was compelled to institute an action the consequence of which was its purchase of the property of its debtor at public sale.

There is failure to prove that the purpose of Alcoa was to limit or to destroy competition. Alcoa went no farther and its conduct carried it no farther than to avail of the provisions of law open to every creditor for the collection of what was justly owing to it.

Moreover, in a case arising under the Clayton Act, the Supreme Court has held that the purchase of a failing business is not unlawful, for the reason that it does not deprive anyone of the opportunity to compete (International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 301, 302, 50 S.Ct. 89, 74 L.Ed. 431). It would seem equally that in the case at bar, under the Sherman Act, the acquisition of the Cleveland Company or its property by Alcoa did not constitute a violation, because it did not lessen competition.

Paragraph 99 of the bill contains charges concerning Baush. These are confined to the period 1924 to 1931. They relate chiefly, if not wholly, to the spread between the prices of virgin aluminum ingot and the prices of aluminum alloy (duralumin) sheet. In substance, the allegations are as follows:

(1) At the time, as theretofore, Alcoa was and it still is the sole producer of virgin aluminum in the United States. It has fixed prices for the ingot moving in interstate commerce. Aluminum of that kind is indispensable in the manufacture of aluminum alloy sheet. Alcoa also manufactured such a large proportion of the total domestic output of aluminum alloys that it was able to and did establish the prices for all aluminum alloy sheet moving in interstate commerce.

(2) As Alcoa knew, Baush was then its only competitor in the field of aluminum alloys. Baush had been manufacturing aluminum alloy sheet since 1919 and selling it in interstate commerce. Knowing that any competitor therein would be required, because of Alcoa's control over prices, to purchase virgin aluminum and sell his sheet at prices established by it, Alcoa effected changes in the respective prices of virgin aluminum and of aluminum alloy sheet which so reduced the differentials between those prices that any competitor in the manufacture and sale of aluminum alloy sheet, even though he should roll efficiently and conduct his business efficiently, would be unable to carry on operations without incurring losses destructive of his business.

(3) The result (as Alcoa intended) was that Baush was obliged to conduct its sheet operations at losses, accumulated over the 1924-1931 period, until Baush was compelled virtually to suspend such production.

(4) The purpose and effect of the reduction in the differentials mentioned were to eliminate Baush competition and to maintain Alcoa's monopolistic control of said commerce.

As heretofore indicated, what has been said in the four last preceding subdivisions is a paraphrase of paragraph 99 of the bill. To put the matter still more briefly, however, the essence of the charge is that, by unduly narrowing the spread between the prices of ingot and the prices of duralumin sheet, Alcoa made business unprofitable for Baush and thereby drove Baush out of business.

It will be observed that the complaint with respect to Baush grows wholly out of what affected duralumin and that the sole alleged misconduct of Alcoa complained of in the bill as having affected duralumin was narrowing the spread between the prices of ingot and the prices of duralumin. Elsewhere that very charge, relating to the spread, will be taken up. In that discussion, where the charge as considered will be stated in a somewhat more comprehensive way, the effect on others, as well as the effect on Baush and other sheet mill owners, will be dealt with. So also the spread between the prices of ingot and the prices of all types of sheet (including 2S and 3S or so-called pure sheet, as well as all kinds of alloy sheet, whether duralumin or 17S or some other kind) will be taken up. In consequence, if at this stage we should treat only the phase of the spread issue that concerns Baush, we should be forced later to indulge in repetition. Accordingly, we might with considerable appropriateness, at the moment, postpone all comment on the charge made in paragraph 99 until we reach the subject of spread generally.

Nevertheless, there is evidence relating particularly to Baush, and in part wholly to Baush, with respect to the charge that, through unfair competition (apart from the spread), Alcoa drove Baush out of the aluminum business. So also discussion of that special unfair competition charge has been intermingled with discussion of the alleged spread controversy. On that account I deem it proper to take up the excluding charge now in advance of dealing with the general complaint about spread.

Moreover, there is evidence from which it might well be argued, even though there were an undue narrowing of the spread, that this is not what drove Baush out of the aluminum business (if it was driven out) and that it can be demonstrated by

such evidence that there was another identified independent cause which, in and of itself, was sufficient to bring about and did bring about the result and that for the result Alcoa has no responsibility whatever. If that argument can be maintained, then certainly it would be fitting to go into it ahead of consideration in a broad way of the spread question.

Let it be remembered that the pleading (paragraph 99 of the bill) relates exclusively to the period of 1924 to 1931. It appears, however, that the quantity of sheet rolled by Baush in 1930 and 1931 was quite small (Exhibits 1703, 1729 and 1730). It appears further that in 1928 Baush commenced suit against Alcoa to recover treble damages alleged to have been suffered by it as a result of Alcoa's violation of the Sherman Act; also, as is manifest from the evidence, that, after the beginning of the suit, Baush executive officials (who afterwards were witnesses) gave more real attention to accumulating evidence for use in the trial than to the operation of their company's aluminum mill.

Viewing the evidence as a whole, it is clear that in 1928 Baush had already become far from active in rolling sheet and that the poundage of its production of sheet in 1929 was small. Its maximum production shown by the exhibits referred to was in 1927. Then was the peak. It might with some reason, therefore, be urged that the effort of Baush to produce sheet after 1927 was too small to be regarded as affording any basis for charging responsibility for its diminishing business to Alcoa.

The contest between Baush and Alcoa was one of the important topics dealt with at the trial. The evidence about it was elaborate. I do not believe, however, that it would be fruitful to assemble or to talk about the whole of it. As I understand, the Government shares this view. I shall, therefore, select instances which seem to me perhaps the best for exploration and elucidation.

Furthermore, for a reason which will be gone into later, it would be of comparatively little consequence now to determine which participant is right in the controversy involving the conduct of Alcoa and Baush toward each other.

In its original brief (pp. 535-6) the Government's statement on the subject was as follows:

"The manner in which Alcoa took sales of both sheet and forgings away from Baush is shown in the following concrete illustrations. In all of them, Alcoa succeeded in taking the business solely by means of underbidding Baush, which is merely another way of saying that Alcoa reduced the spread between ingot and the finished product to such an extent that Baush could not afford to compete."

Omitting sheet and spread from present consideration, the substance of the Government's express contention is that, by underbidding, Alcoa took away business from Baush and, impliedly, that this misconduct of Alcoa drove or contributed to driving Baush out of the aluminum business.

I am not sure that underbidding is charged as being an offense or, if so charged, is sufficiently pleaded to state a cause of action; nor am I sure that it is connected with sheet in such a way as appropriately to be brought in for consideration at this point. Nevertheless, it does directly relate to Baush, particularly the Government's contention that Alcoa improperly drove Baush out of the aluminum field. For that reason, as I feel, the subject of underbidding should now be gone into.

The Government says it is unnecessary for the Court to make final rulings on the merits of the underbidding examples on which it relies. Yet it goes into them. So I think I should go into the same examples. Those described by the Government (original brief, pp. 536-547) are transactions with the Franklin Motor Car Company, the Stutz Motor Car Company, the Hupp Motor Company and the Eastman Kodak Company.

It is not disputed that Alcoa did compete with Baush, as it has generally competed with others, in the various lines of its business and that the competition was vigorous. The primary issues raised are (1) whether the competition was fair and (2), if not, whether unfairness forced Baush to give up the aluminum business.

The first batch of evidence the Government relies on relates to connecting rods for automobiles. In connection with those the three automobile companies, as to which evidence was given and which were discussed, are Franklin, Stutz and Hupp. All the charges concerned with connecting rods are of underbidding. On sheet there is no charge of underbidding. That we shall take up when we reach Eastman.

In 1920 and 1927 H. H. Franklin Manufacturing Company manufactured the Franklin automobile for the Franklin Motor Car Company. The Manufacturing Company (hereinafter called Franklin) purchased the connecting rods used in the automobiles. The Government claims that Alcoa undersold Baush when competing with it in selling these connecting rods to Franklin. Whether, if so, this would show or can show monopolization will not be discussed. Instead, the charge as made will be considered on its facts side alone.

There are a good many minor disputes between the witnesses as to what was said in conversations. These occurred between fifteen and twenty years ago, during the period that Mr. Stellman was chief engineer for Franklin. They relate to dealings of Baush and Alcoa with Franklin. We need not go into more than one of those, however, because only that one has any bearing on the underbidding issue. Indeed, the underbidding question turns wholly on a single transaction. On the facts in that transaction there is no substantial dispute. As indicated, there is no occasion to discuss any other transaction.

In December, 1926, Alcoa made a written bid (Exhibit 111) to Franklin of 81-1/2 cents per piece (that is, per rod) on 6600 pieces of connecting rods (having an estimated weight of 8250 pounds). Baush made a bid of 86 cents per piece on the same rods (pp. 3263; 3272; 3276-7). The evidence as to the latter bid is entirely oral. No writing concerning it was produced from the Baush files. This is probably because the papers of Baush relating to the aluminum branch of its business were misplaced, lost or destroyed some time after the second trial of its suit against Alcoa. Neither was any writing relating to the bid produced from the files of Franklin. Apparently this was because its papers disappeared after it quit business in 1932 or 1933 and their present whereabouts are not known (pp. 3198; 3214; 3286). Nevertheless, the oral testimony indisputably establishes that the Baush bid was 86 cents per piece.

Each bid was for the whole of the connecting rods. The prices in both bids were per piece. Inasmuch, however, as we have the total number of pieces and the total weight of the rods, it is easy to translate the per piece prices into per pound prices. By computation it is shown that Alcoa's bid of 81-1/2 cents per piece is equivalent to 65.2 cents per pound and Baush's bid of 86 cents per piece is equivalent to 68.8 cents per pound. In other words, the bid of Alcoa was 3.6 cents per pound under the bid of Baush. But so far as concerns the charge of underbidding, there is not a scintilla of evidence establishing or even suggesting or furnishing basis for an inference that in bidding Alcoa went below its own cost of production plus a reasonable profit. However, if we go somewhat into details, it will be even clearer that the evidence affords no foundation for criticizing the conduct of Alcoa.

Exhibit 1423 contains a long list of the principal aluminum alloys which Alcoa produces and sells or has heretofore produced and sold, with the names of commodities in which the several alloys are commercially available. The list is divided into groups. One of those is group 2. That consists of forged products (all made from aluminum alloys). Included in group 2 are 17S forgings and 25S forgings (Exhibit 1423, exhibit pp. 6477-8). Connecting rods are made from 17S or 25S alloy by forging.

As far back as 1919, or a bit later, when Baush began production of duralumin (which is a hard alloy of aluminum) and continuing until it quit the aluminum business, 17S corresponded to and was known and accepted in the trade as the commercial equivalent and a competitor of duralumin. Sometime preceding December, 1926, Alcoa established an alloy called 25S (pp. 29550; 29707). This had never been in production of Franklin connecting rods before 1926 and it went on the market that year (pp. 3272; 3440; 3442; 33254; 33257-8). The bid Alcoa submitted to Franklin under date of December 22, 1926, was for connecting rods forged from 25S alloy (p. 3272; Exhibit 111).

There is no evidence from which it can be determined whether a connecting rod could be forged cheaper from 17S or from 25S. At least there is no evidence on the subject so far as I can discover or has been called to my attention. Moreover, 25S being new at the time, conceivably there may then have been warrant for selling an article made from it cheap, by way of advertisement, or even for selling it at a price below cost, so as to introduce it to the trade and regardless of whether the cost of producing the 25S may have been as much as or more than the cost of producing 17S (pp. 22516-7;

22671-3). However that may be, in the absence of any showing on the point, certainly, as it seems to me, the evidence would not justify a finding that Alcoa sold the 25S connecting rods too low.

In Exhibit 1423 the chemical composition of every alloy it mentions is stated. A comparison of what is said in the exhibit concerning 17S and 25S will indicate how unlikely it is that the costs of producing these two alloys were the same.

The percentages of the elements entering into the two are set out in table 8, which is as follows:

TABLE 8

| | 17S | 25S |
|---|---|---|
| Copper | 4.0% | 4.5% |
| Silicon | — | 0.8% |
| Manganese | 0.5% | 0.8% |
| Magnesium | 0.5% | — |
| Iron plus silicon plus minor impurities | 0.9% | — |
| Iron plus minor impurities | — | 0.6% |
| Aluminum | 94.1% | 93.3% |
| | 100.0% | 100.0% |

Table 8 is made up in this way: Out to the left is a list of several metals, the bottom one being aluminum. In the second column, under 17S, there are percentages stated,—these being for the metals named out at the left. To the right is a column under the heading 25S. There also the percentages are stated for the metals out at the left.

The metals out at the left are copper, silicon, manganese, magnesium, iron plus silicon plus minor impurities, iron plus minor impurities and aluminum. For copper, under 17S, the percentage is 4%; for 25S 4.5%; for silicon the percentage under 17S is 0 and under 25S it is .8%; for manganese the percentage under 17S is .5% and for 25S it is .8%; for magnesium the percentage under 17S is .5% and under 25S it is 0; for iron plus silicon plus minor impurities under 17S the percentage is .9% and under 25S it is 0; for iron plus minor impurities under 17S the percentage is 0 and under 25S it is .6%; for aluminum, under 17S it is 94.1% and under 25S it is 93.3%; in each instance making the entire total 100% of the composition.

It will be noted that some of the elements in the alloys are different and that the percentages are different for each one of the elements of which the two sets of alloys are composed. There is no single element the percentages of which are the same for both of the commodities, 17S and 25S. These circumstances emphasize the insufficiency of the evidence to uphold the Government's contention.

The two bidders were on an equal footing. Each bid, without embarrassment or limitation, was on the precise terms specified by Franklin in the invitation to bid. So far as appears, neither bid was for all-or-none (pp. 3264-5; 3292-5).

Some former officials of Baush say that if it had gone lower in its bid, it would have lost money; also that in order to make a profit, it would have had to get for its duralumin from 7 to 10 cents per pound more (pp. 3128-30; 3268-71; 3277). If that be true, then three comments seem pertinent:

1. It was a piece of good fortune for Franklin and other customers wishing to purchase connecting rods to have Alcoa to hold down the price by competing with Baush.

2. Baush bought practically all its raw aluminum from foreigners. The purchases were almost uniformly at prices below the prices prevailing in the United States for aluminum produced in the United States. From aluminum produced nearly altogether in Europe and imported into the United States from there, Baush manufactured in its own plant the duralumin it used in fabricating the articles (such as connecting rods) which it sold. The fact that the cost of its duralumin was so great that it would have been necessary to sell it from 7 to 10 cents higher than it was sold, in order to earn a profit from sales in competition with Alcoa, strongly corroborates the contention of Alcoa that the cause of the failure of Baush to survive was its relative inefficiency.

3. New articles (such as connecting rods forged from 25S) frequently could first be sold only in competition with, as well as in displacement of, articles made from other materials (as was true of products from 25S). So also, as previously stated, in the beginning, when necessary in order to introduce them, it was justifiable to sell such articles at prices below cost of production (pp. 22516-7; 22671-3).

There is no occasion to pursue the matter further. Shortly after December,

1926 (though precisely how long after is not clear), Franklin abandoned aluminum connecting rods and shifted to rods made of steel, which was a competitor of aluminum (pp. 3206; 3215; 3441-3; 22672).

I think the Government's claim of fault on the part of Alcoa, with respect to the sale of connecting rods to Franklin, has no foundation in the evidence. We, therefore, go on to the facts relating to Stutz connecting rods.

Preceding the 1926 model Stutz car going on the market, the connecting rods used by Stutz were steel (p. 34562). For the 1926 and 1927 models, more generally called the 1926 and 1927 cars, the connecting rods were of hard aluminum alloy. The controversy in regard to the Stutz Motor Company is about the rods in those cars. Alcoa furnished them for both years, 1926 and 1927.

Baush and Alcoa made their rods from aluminum alloy; not from sheet. The process was forging. They competed for the Stutz order each year. The negotiations on behalf of Stutz were conducted by its selling agent (Kelly). He testified that the sole reason for the business going to Alcoa was that in both years its prices were lower (p. 34606). The negotiations for Alcoa were carried on by its Indianapolis sales manager (O'Connor) and for Baush mostly by its engineer or sales manager (Calkins), though in September, 1926, its president (Mr. Haskell) was active (pp. 2543-9; 34571-2; 34611).

The customary procedure among automobile manufacturers in obtaining material for constructing cars, during the period when the connecting rods under consideration were sold by Baush and Alcoa, was substantially as follows: Within the year preceding the date of the model, and usually some months in advance of the articles being needed (the length of time varying with circumstances), purchase inquiries (constituting invitations of quotations) were sent out by the manufacturer. Generally (one witness said nine times out of ten, p. 34621) those desiring to bid sent written replies containing their quotations. Frequently, however, there were also oral negotiations between the parties. Later, when the manufacturer reached a decision, usually it was followed by a formal or informal written contract setting out the terms of the order.

The practice described was followed in the present instance with respect to rods for the 1926 and the 1927 cars. It will be well to discuss the facts relating to rods for the Stutz 1926 car separately from what I shall say in regard to rods for the Stutz 1927 car.

For rods to go into the 1926 car, so far as the evidence shows, each bidder submitted but a single quotation. Certainly there was no more than one written bid by either. There were some oral negotiations, but what (if any) quotations were orally discussed does not appear (pp. 34633-6).

The documentary evidence shows indisputably that the first bid was by Alcoa. On May 27, 1925 (Exhibit 1617), Stutz and on May 29, 1925 (Exhibit 1618), Alcoa confirmed in writing an oral quotation by Alcoa made May 26, 1925, of 98 cents per rod (pp. 34598-602; 34622-3). There is no evidence that Baush made any oral quotation and it was not until August 10, 1925, approximately two and a half months subsequent to the Alcoa quotation, that Baush sent a letter to Stutz containing a quotation. This was $1.06 per rod (Exhibit 68, item 1; pp. 34567; 34623). The quotation of Alcoa therefore was 8 cents lower than that of Baush. It was accepted by contract dated September 28, 1925 (Exhibit 1619).

So far as disclosed by the evidence, the transaction was merely an ordinary instance of competitive bidding where the low bidder won. There is no evidence from which it can be determined that either quotation was below cost of production, plus a reasonable profit, on the part of the bidder who made it. Nor have I found anything which would justify even a suspicion that either quotation was so low that, if accepted, it would have caused the bidder to lose money; nor does the evidence afford any indication of an attempt or purpose on the part of Alcoa to put Baush out of business; nor have I discovered anything for which the conduct of either party properly could be criticized.

In its original brief (p. 540), speaking of rods for the 1926 car, the Government says that Alcoa took the business "upon the condition that all of the Stutz business for the 1926 model car be given to Alcoa." Is that charge proved? If so, what is the consequence? Before these questions can be answered it is essential that we have the exact facts in mind.

In its letter of May 27, 1925, concerning receipt in a conversation the previous day of a quotation by Alcoa of 98 cents per rod for the 1926 model rods, Stutz described the quotation as "on 40,000 rods to be supplied to us [Stutz] over a period of 12 months" (Exhibit 1617; pp. 34567-8). In the contract of September 28, 1925, between Stutz and Alcoa, covering rods for the 1926 car, it was provided that "Seller [Alcoa] agrees to furnish and buyer [Stutz] agrees to purchase one year's requirements" and in a covering letter dated October 2, 1925, transmitting to Alcoa a signed copy of the contract, Stutz referred to "our year's requirements" as "40,000 connecting rod aluminum-alloy forgings" (Exhibit 1619; p. 34568). It is, therefore, clear that the contract was for 40,000 rods to be used in the 1926 cars, then believed by the parties to be all Stutz would need in that model.

Yet it does not follow from the writings, nor so far as I have discovered is there elsewhere in the evidence anything to show, that it was Alcoa who determined that the price quoted by Alcoa should apply to the whole of the connecting rods desired for the year. Much less is there in the extracts quoted, or so far as I have discovered anywhere in the evidence, a showing that Alcoa insisted on or even initiated the suggestion of having all the business; nor is there any foundation whatever for finding, so far as I have discovered, that Alcoa ever indicated that it would refuse to furnish a part unless it got the right to furnish all.

In addition, even if the negotiation had included an all-or-none feature, manifestly, unless the evidence pins on Alcoa responsibility for introducing it, blame therefor does not rest on its shoulders. Certainly the manufacturer was free—if it chose, and particularly, with respect to connecting rods, since, as he said, the Stutz purchasing agent preferred (pp. 34623-6; 34636)—to buy the total requirements of any year from a single supplier. The Sherman Act has interposed no objection. If the manufacturer were free to buy, then surely the Sherman Act did not forbid the supplier to sell.

The very limit of an inference which could be drawn from the evidence on the point under consideration is that, when asked by Stutz, Alcoa consented to furnish all. Moreover, the preference of the purchasing agent to have all rods for a particular year come from one supplier was based on his view that thereby money was saved for his employer; for example, when there were two sources of supply, it was necessary to furnish each a separate set of dies, handling expense was doubled and there were other duplications of or increases in cost items, as the agent thought and stated (pp. 3295-7; 3445; 34623-5; 34636; Exhibit 68, items, 1, 2 and 4; Exhibit 1617; and Exhibit 1619).

Is it not probable, therefore, that the purchasing agent himself was responsible for not dividing the order for the 1926 cars?

Next, the Government says (original brief, p. 540) that "Baush submitted its bids on the basis of receiving a part only of the total Stutz requirements" for the 1926 car. Because I discover nothing else possibly affording support to the argument, I assume that the contention of the Government is based on the use by Baush of the words "quantities of not less than 10,000" (Exhibit 68, item 1) in its letter dated August 10, 1925, making a quotation of $1.06 a rod. If so, the foundation for the contention strikes me as very frail and the language seems to me insufficient to convey to Stutz any indication of a wish by Baush to get an order for part of the year's supply. Outside of the words just quoted, there is no showing whatever that Baush desired, or even was willing to take, much less that it made an effort to secure, an order for a portion only of the rods for the 1926 car.

As will be pointed out later, despite the Stutz purchasing agent's preference to have all rods for a single season from a single supplier, when he was negotiating for the 1927 model rods and Baush expressed a definite desire to have half, the Stutz representative readily yielded, although he yielded only on an express condition. He said that Baush could have part of the 1927 order, provided the price was not in excess of the price Stutz would have to pay for the other half. Perhaps if Baush had conducted its negotiations for the 1926 rods in the same way as was done with respect to the rods for the 1927 car, an order for some of the 1926 rods would have resulted.

The only other argument by the Government regarding the price of rods preceding July, 1926, grows out of occurrences in which Baush and Stutz were concerned that took place in December, 1925.

On December 29, 1925, Baush sent a letter to Stutz (Exhibit 68, item 2). This followed a call on the Stutz purchasing agent by the chief engineer or sales manager of Baush, whose name, you will recall, was Calkins (pp. 34568-9). Mr. Calkins said that he could give Stutz lower prices. Mr. Kelly told him "go ahead and submit me [Kelly] a quotation, although at the time we [Stutz] were not able to place any business." The price mentioned in the letter was $1.02 (which was 4 cents lower than Baush had quoted in the previous August for the 1926 rods). The parties disagree as to whether the December, 1925, price was a quotation for the 1926 or for the 1927 models.

I think the dispute is academic. Yet, in view of the discussion of counsel, I feel that I should comment on the matter.

The December, 1925, communication preceded by more than six months Stutz sending out purchase inquiries for quotations on rods for the 1927 car (Exhibit 68, item 3; Exhibit 1619; pp. 2793-6; 34567-71; 34582) and was later by three months than the signing of the contract between Stutz and Alcoa for the 1926 car rods.

The between-season date of the letter may engender some doubt as to which model Baush had in mind, but there is no supplementary evidence which affords an accurate or certain answer. If forced to make a determination, I should lean to the 1926 car. This because of the unlikelihood that as long as six months in advance of the announcement of specifications for the 1927 model any supplier would have attempted to frame a bid in a vacuum. But, as I see it, what is more important, and renders it wasteful to attempt to reach a conclusion, is that the thing referred to as a price in reality was not a quotation at all.

In the first place, the writer of the letter says that "you [Stutz] may consider the prices which we [Baush] are quoting below [i. e., later in the letter] as tentative" (Exhibit 68, item 2). If tentative, they were no quotation at all; they were useless; nobody could act on them. As I feel, that is tantamount to saying that no price whatever was stated. Indeed, I think the entire letter was utterly without significance, beyond being an effort by a manufacturer to keep in contact with a prospective customer.

In the second place, the letter includes a request that "when you [Stutz] are actually ready to purchase, you give us [Baush] a regular inquiry for a specified number of forgings with definite dates of delivery." Baush, of course, was familiar with the practice by automobile manufacturers to distribute purchase inquiries near the middle of the year preceding the model year (p. 34569). Specifying, even though under the guise of a request, that before relying on the figure stated, Stutz make further inquiry of Baush, necessarily rendered conditional what is referred to as a price. When made conditional, necessarily it ceased to be a quotation.

It seems clear in regard to the 1926 model rods, therefore, that there is no warrant for criticizing Alcoa in any of the respects urged by the Government.

Disregarding Baush's December, 1925, letter to Stutz, as a preliminary to taking up the subject of rods for the 1927 model it should be noted that the first communication next after December, 1925, which so far as the evidence, discloses passed between Stutz and Baush, was dated July 2, 1926; that is, over six months later. This July, 1926, letter was a purchase inquiry. In it Stutz requested from Baush a quotation on rods for the 1927 car (Exhibit 68, item 3) and included a clause as follows:

"In quoting us [Stutz], kindly base your [Baush's] quotation on from 40,000 to 50,-000 pieces, which is estimated as our next year's requirements."

It is incontrovertible, therefore, that at the inception Stutz made it clear that what was called for was a quotation on its entire requirements for the 1927 car. Stutz, not Alcoa, injected into the negotiation the specification that the quotation be on all (instead of a part only) of the 1927 requirements.

The purchase inquiry of July 2, 1926, was sent to Baush at Springfield, Massachusetts (Exhibit 68, items 3 and 4). The Stutz purchasing agent made a like inquiry of Alcoa at or about the same time, though he is not sure, he says, whether it was written or oral (pp. 34570-1; 34582). The explanation of his uncertainty seems to be that his office was in Indianapolis, where Alcoa's sales agent for that territory (Mr. O'Connor) was also located, and that the two frequently saw each other (p. 34571).

On July 8, 1926, Baush responded to the July 2nd inquiry. In the Baush July 8th letter a quotation of 98 cents was made, without any indication that the quantity to

which the quotation applied was less than the entire requirements of Stutz for the year (pp. 2796; 34569-70; Exhibit 68, item 4; Exhibit 89).

From July 8, 1926, onward, through his pressure on Baush and Alcoa, the Stutz purchasing agent played them off against each other. There was nothing new or unusual about using the method employed (pp. 34584-9). By means of it a series of reductions in the quotations by each bidder in turn was obtained (pp. 34582-9; 34609; 34611; Exhibit 68, items 5 and 9; Exhibits 89-94. See also pp. 2787-8).

As the outcome of the bidding, Baush went to 87 cents (Exhibit 68, item 7; Exhibit 94) or, as the purchasing agent understood but Baush denies, as low as 85 cents per rod (Exhibit 68, items 6 and 8; Exhibit 90) and Alcoa as low as 84 cents per rod (pp. 2542-6; 2553; 34572-7; 34579; 34582-9; 34602; 34607; 34614-6).

In other words, the final Alcoa quotation was 3 cents, or (as the Stutz purchasing agent thought) 1 cent, below the lowest quotation of Baush. Consequently, the business went to Alcoa as the low bidder.

In the period from July 8 to August 27, 1926, so far as the evidence discloses, no written communication passed between Baush and Stutz,—although the inference is plain that there were verbal negotiations during the interim.

At the beginning of negotiations (on July 2, 1926) for the 1927 car rods the quotation requested by Stutz was for its "next year's requirements" (Exhibit 68, item 3). In the Baush reply, dated July 8, 1926, quoting 98 cents per rod, the inquiry of six days earlier was mentioned. It was also said that the rods would be supplied "in lots of not less than 20,000" (Exhibit 68, item 4); but in a letter to Stutz dated August 27, 1926, Baush made it plain, as I think, that its previous 98 cents quotation had been on all of Stutz's supply of 1927 rods. This letter included a paragraph as follows (Exhibit 68, item 5):

"We [Baush] understand that your yearly requirements are about 48,000 rods and that these would undoubtedly be released periodically."

In addition it should be observed that the word that was used by Baush in the July 8 letter (item 4) was "lots" and not "lot." The expression Baush quoted was that rods were to be supplied "in lots" of not less than 20,000. You could not have many lots of 20,000 each in 40,000. It is plain that the minimum on which Baush quoted was 40,000.

It is important to observe that the August 27th letter of Baush to Stutz was sent from Springfield, Massachusetts. It is difficult to construe its language as meaning other than that the 94 cents quotation therein was for Stutz's total 1927 supply. If that be true, there was never a later quotation which was exclusively for less than the whole; although, as elsewhere pointed out, Baush furnished a quotation for a part which was identical with the quotation for the whole; or, as it can otherwise be put, a time was reached when the Baush quotation was applicable either to the whole or to the half of the 1927 rods.

The failure of the August 27th letter to express a desire by Baush to bid for less than all the year's requirements is the more significant because it constitutes the second instance in which, without complaint or suggestion with respect to quantity or proportion, Baush had made a written quotation for the whole or apparently for the whole (one of 98 cents and the other of 94 cents) that was not accompanied by a quotation for a part.

On the very day (August 27, 1926) of Baush sending the 94 cents quotation from Springfield, the Stutz purchasing agent wrote a letter at Indianapolis which was addressed to Baush at Springfield (Exhibit 89). In this letter the writer referred to a recent conversation in his office (that is, at Indianapolis) regarding Baush's 98 cents quotation for rods. The writer also expressed the belief that the Baush representative had "further stated that you [Baush] would meet the price of the Aluminum Company of America, in order to obtain at least 50% of this business."

I discover in the evidence no dispute about the date of the conversation referred to in the August 27th letter to Baush. I think it may be taken as true, therefore, that the first mention by Baush of a wish for half the 1927 business was oral and that it was not made until shortly preceding August 27, 1926. The identity of the representative of Baush who participated in the Indianapolis conversation has not been definitely shown; nor is it of consequence to know who he was. Nevertheless, the inference is clear that it was Mr. Calkins (who was the chief engineer or sales manager of Baush, p. 34568). He did some traveling out of Springfield for Baush and customarily called on the Stutz

198

purchasing agent at Indianapolis several times a year (pp. 34571; 34609; 34611).

The last paragraph of the August 27th letter from Stutz to Baush (Exhibit 89) is as follows:

"We [Stutz] certainly would be glad to enter into negotiations with your company regarding 50% of our business on this part [connecting rod forgings], and would suggest that you write us in detail, at the earliest possible date, regarding this matter."

From August 27, 1926, when the Stutz letter was sent, down to September 29, 1926, when Alcoa finally accepted the order for the 1927 rods, so far as I can discover Stutz never varied from or did anything inconsistent with the position taken in its August 27th letter. As late as September 13, 1926 (Exhibit 68, item 9), the Baush president showed in his letter of that day to Stutz that he perfectly understood the position of the Stutz selling agent. The September 13th letter says that in a telephone conversation of September 3, 1926, with the Stutz purchasing agent, Baush's president (Mr. Haskell) stated that "we [Baush] would like half the business at the price of our competitor [Alcoa];" but the fact is that Baush never lived up to the condition to which its president had assented. The condition plainly was that for half of the rods furnished by it, Baush would accept the same price as Alcoa; and that was 84 cents. Yet, Baush insisted on having half the order at its own price of 87 cents (Exhibit 68, items 8 and 9; Exhibits 92 and 94).

At the risk of some repetition, by way of explanation or emphasis I call attention to the three features of the August 27th letter from Stutz to Baush (Exhibit 89), which I think should be clearly understood:

1. The "part" mentioned in the last paragraph is the rod of Stutz for 1927. Elsewhere it is identified as being in compliance with drawing or blueprint No. 24012 and it is spoken of as No. 24012 (Exhibit 68, item 10, exhibit p. 298).

2. The Stutz purchasing agent's understanding was, and the letters specifically stated that he understood, that, if Baush obtained half the order, it "would meet the price of the Aluminum Company of America."

3. The Stutz agent also suggested that Baush write in detail regarding the matter "at the earliest possible date." The evidence, however, discloses no written communication thereafter passing between Baush and Stutz earlier than September 3, 1926 (Exhibit 68, item 6; Exhibit 90). Moreover, the record does not contain, or show that there was ever made, any written answer by Baush to the Stutz letter of August 27, 1926.

In the correspondence following August 27, 1926, the proposed sale by Baush of half the rods was mentioned a number of times, down to and including September 13, 1926 (Exhibit 68, items 6, 7, 8 and 9; Exhibit 90; Exhibit 93). Although Baush knew that Stutz stood ready to give it (Baush) an order for half the 1927 rods at the same price at which the balance would go to Alcoa, Baush did not accept. On the contrary, on September 4, 1926 (Exhibit 92 coupled with Exhibit 68, items 6, 8 and 9), and again on September 7, 1926 (Exhibit 68, item 7; Exhibit 94), eleven days after Stutz stated its position in the August 27, 1926 letter (Exhibit 89), Baush unequivocally refused to submit a bid for half the rods at a price as low as the quotation of Alcoa (namely 84 cents) or, indeed, lower than 87 cents.

The matter remained open, pending further negotiations between Stutz and Baush, for about two weeks longer; and not until September 29, 1926, a month after the August 27th letter of Stutz to Baush, was a contract with Alcoa signed by both parties thereto for the whole of the 1927 supply (Exhibits 1620-21).

The contract between Stutz and Alcoa for the 1927 rods is evidenced by two papers. This is in accord with the method which Alcoa customarily, or at least generally, employed in making its contracts for the sale of commodities.

A letter dated at Indianapolis September 23, 1926 (Exhibit 1620), was signed by the purchasing agent of Stutz (Kelly) and addressed to Alcoa at the office of its selling agent (O'Connor) in Indianapolis. This purported to set out the terms of the contract between Stutz and Alcoa for the 1927 rods and asked confirmation of the writer's understanding. As the evidence abundantly shows, a field agent like Mr. O'Connor was without authority to close a contract of this kind. His duty was to refer it to Pittsburgh. The authority as to whether to close on behalf of Alcoa was vested exclusively in the Pittsburgh office (pp. 35951-2). Accordingly, Mr. O'Connor sent the Kelly September 23rd letter to Pittsburgh.

The sales manager of Alcoa received the letter in Pittsburgh on September 29, 1926. On the same day he sent a letter (addressed to Stutz at Indianapolis) in which he qualified the terms of the contract as recited in the Stutz September 23 letter (Exhibit 1620). In substance, the change consisted of releasing Stutz from the portion of its letter which, in the language of the reply letter, "lays upon you [Stutz] the obligation to give us [Alcoa] your entire requirements" (Exhibit 1621). With that exception, the contract, as set out in Exhibit 1620, was accepted by Alcoa.

The evidence makes it clear that there was active competition between Baush and Alcoa for the 1927 Stutz business. The struggle was continuous through July and August and nearly through September, 1926,—more than two and one-half months. I am impressed that during the whole of the period the Stutz purchasing agent exercised skill in stimulating competitive bidding. My impression is also that he was impartial as between Baush and Alcoa; that his sole concern was to serve what he regarded as the business interests of Stutz, his own company. It was by means of excitation of the bidding that he obtained a price which was fourteen cents lower than the opening quotation of 98 cents.

On the other hand, I have found nothing, and my attention has been directed to nothing, in the evidence about the 1927 rods which points to any effort by Alcoa to drive Baush out of business or which points to anything done by either of them except to carry on a clean contest to get the Stutz order.

In the correspondence with Stutz, Baush stated that its cost of production was more than 87 cents per rod, the lowest price which it conceded it had quoted (Exhibit 68, item 7; Exhibit 94; pp. 2546; 2553A; 34608-9; 34616). On the other hand, the Stutz purchasing agent said that it was familiar experience with him to have sellers make similar claims as a part of their efforts to bolster up their quotations (p. 34628).

However that may be, there is no actual evidence in the record of what it cost Baush to produce its rods. Likewise, there is no evidence whatever that the 84 cents price at which the contract went to Alcoa was below its cost of production plus a reasonable profit.

As already indicated, the Stutz purchasing agent and Baush disagreed as to whether Baush ever gave Stutz a quotation as low as 85 cents. As I see it, however, there is no occasion to resolve the controversy. The only feature of the matter worthy of attention is the probability, which suggests itself, that the Stutz agent used what he declared to be Baush's 85 cents bid to drive Alcoa down to an 84 cents bid.

Different from the situation with respect to the rods for the 1926 car, Baush (shortly previous to August 27, 1926) specifically asked that an order be placed with it for half the rod requirements for the 1927 car (Exhibit 89).

At some time,—it does not appear when, —the Stutz president told the Baush president that "he would be glad to see Baush get some of the business" and told the Stutz purchasing agent that, on account of his personal friendship with the Baush president, he would like the business placed with Baush, "everything being equal" (pp. 2542-3; 2549-51; 34614; 34627-8. See also Exhibit 68, items 12 and 13).

Whether the intervention of the Stutz president had any influence on the 1927 outcome is not shown. Nevertheless, it is established that the Stutz agent on August 27, 1926, definitely offered to place half the 1927 order with Baush on the single condition that the price be as low as the quotation of its competitor. Inasmuch as Alcoa went down to 84 cents as its last quotation, it would follow that if Baush had accepted the proposition embodied in the Stutz letter of August 27, 1926, Baush would have taken half the business and Alcoa would have taken the remainder for 1927,—both alike, at the price of 84 cents per rod. But, as we have seen, Baush refused to take half the 1927 order on the condition prescribed by Stutz.

Even if, preceding the modification and the acceptance, the terms of Exhibit 1620 (when assented to by both parties) would have been in violation of law, it seems to me plain that when (promptly after being informed of the proposed inclusion in the contract of an obligation on Stutz to take all the 1927 rods from Alcoa) the sales manager of Alcoa deleted it, that action by him would have saved Alcoa from guilt of the charge now made by the Government so far as concerns the 1927 rods. But I think the position of Alcoa is even

stronger and can be sustained on three grounds:

1. In the circumstances described, the documents do not show, nor have I discovered evidence elsewhere in the record which would support an inference, that Alcoa conditioned its quotation on getting an order for all the rods.

2. Preceding the signing of the agreement by either Stutz or Alcoa, Baush had unequivocally refused to furnish any part of the rods at the low quotation (made by Alcoa). Even if the agreement had remained in the form in which it stood when signed by Kelly, it would not have deprived Baush of anything. For that reason no blame can attach to Alcoa for Baush not getting a part of the order.

3. If Stutz throughout had steadily refused to divide the 1927 order, or if after expressing its willingness to divide the order it had determined to place the whole with one supplier, in the absence (as here) of evidence showing or even tending to show that the price of Alcoa (84 cents) was less than its cost of production plus a reasonable profit or that Alcoa's purpose was to put Baush out of business, there would have been no violation of the Sherman Act.

Two classes of cases on the subject are pertinent; one class in general terms, the other specific.

I think that in Federal Trade Commission v. Sinclair Company, 261 U.S. 463, 475, 476, 43 S.Ct. 450, 454, 67 L.Ed. 746, the Supreme Court has laid down the principle I invoke. It was there speaking of the powers of the Federal Trade Commission under the Clayton Act 15 U.S.C.A. § 12 et seq. and the Federal Trade Commission Act 15 U.S.C.A. § 41 et seq.; but what was said seems to me equally applicable to the powers of this Court under the Sherman Act. Of the Commission it was said:

"It has no general authority to compel competitors to a common level, to interfere with ordinary business methods or to prescribe arbitrary standards for those engaged in the conflict for advantage called competition. The great purpose of both statutes was to advance the public interest by securing fair opportunity for the play of the contending forces ordinarily engendered by an honest desire for gain. And to this end it is essential that those who adventure their time, skill, and capital should have large freedom of action in the conduct of their own affairs."

So in Federal Trade Commission v. Curtis Co., 260 U.S. 568, 582, 43 S.Ct. 210, 213, 67 L.Ed. 408, it was said:

"Effective competition requires that traders have large freedom of action when conducting their own affairs. Success alone does not show reprehensible methods, although it may increase or render insuperable the difficulties which rivals must face."

Likewise, in Locker v. American Tobacco Co., 2 Cir., 218 F. 447, 450, a case under the Sherman Act, the Court said:

"The laws of trade are not wholly altruistic, they may often be hard and selfish, but it is no part of the duty of courts to attempt to enforce the precepts of the decalogue. In the struggles engendered by fierce competition, losses must occur and injustice may be done, but this is frequently inevitable and cannot be prevented so long as the parties keep within the law."

The second group of decisions comes from the lower courts. They deal more particularly with the phase of the law which concerns us at the moment.

One is United States v. Great Western Sugar Co., D.C.Neb., 39 F.2d 149, 151. There Judge Munger said:

"It would be going far"—and I inject my own statement, that I think it would be going too far—"to say that a dealer may not buy or sell at a uniform price that yields him a profit if the only objection is that he has the intention to obtain customers, who would otherwise deal, in interstate commerce, with competitors at a different price."

Another is American Steel Co. v. American Steel & Wire Co., D.C.Mass., 244 F. 300, 302, dealing with the charge of monopolization under the Sherman Act. I think there Judge Morton stated the line of demarcation correctly and with perfect clarity. He said:

"The thing forbidden by the statute, * * * is monopolizing or attempting to monopolize. These would usually involve —and are here alleged to have involved —many separate acts, each of which, so far as it was part of the monopolizing, or attempt to monopolize, would be forbidden, * * *. The defendant had a perfect right, for instance, so far as the Sherman Act goes, to undersell the plaintiff in ordi-

nary business competition, or for the purpose of putting the plaintiff out of business. It had no right to do so as part of a plan to drive everybody out of the trade in order to obtain a monopoly for itself, * * *."

On the basis of the opinions from which I have quoted, I think it plain that the facts in the Stutz case show no exclusion of or attempt to exclude Baush from the business in which it was competing with Alcoa nor any wrong to it of any kind done by Alcoa.

At the trial (pp. 2551-3; 2788-9; 34590-97) the Government argued that, in connection with the 1927 contract, Alcoa was guilty of giving a rebate. In the Government briefs, filed since the trial closed, the claim has not been repeated. I assume, therefore, that the intention was to withdraw the charge. Nevertheless, it has not been expressly disavowed. For this reason I think I should comment on it.

The facts are that the 1926 contract was for "approximately 40,000 connecting rod aluminum-alloy forgings," spoken of between the parties as 40,000 rods (Exhibit 1619, exhibit p. 6924), and that the 1927 contract included a clause which, in substance, provided that the 84 cents price, that is the 1927 contract price for 1927 rods, should apply to rods for use in the 1926 car in excess of the 40,000 (Exhibit 1620).

The clause on the subject of such excess (consisting of the next to the last paragraph of Exhibit 1620) reads as follows:

"It is further understood that all rods manufactured for us [Stutz] by your company [Alcoa], over and above the original 40,000 rod contract [Exhibit 1619], which was entered into last Fall [September 28, 1925], the new price of 84¢ will exist in place of the 98¢ price now being paid."

The difference between the 98 cents price for 1926 and the 84 cents price for 1927 only affected the excess (apparently 4,862 rods, Exhibit 68, item 11) above the maximum of 40,000 rods to which the 1926 price applied. Until the 1927 contract was made, no price had been fixed for such excess. It was the 1927 contract which first named a price therefor and that price is what Alcoa charged (Exhibit 68, items 10 and 11). As I feel, it is obvious, therefore, that this did not constitute a rebate.

Accordingly, I conclude that none of the Government charges with respect to Stutz has been proved.

As to the Hupp Motor Company transaction the evidence is indefinite and sparse.

For a time,—apparently from about 1919 to about 1926 or 1927,—Baush sold duralumin connecting rods to Hupp; sometimes all and sometimes half the requirements (pp. 3297-8; 3301; 3446-7). For the year following 1926 and 1927 the order went to Alcoa. This was due to the fact that Alcoa's bid was lower (pp. 3301; 3303-4; 3447).

In the contest, when it lost the order, the bid of Baush was 88 cents (p. 3304). Alcoa's bid is not shown nor have we been told what alloy it used (whether 17S or 25S or some other). Likewise, there is no showing of what was the production cost of either bidder. The only statement relating to the subject was made by an officer of Baush. He said his company believed that the business would not have been satisfactory at a.price lower than its bid (p. 3304).

It follows, for the reasons assigned in discussing Franklin and Stutz, that no violation of law by Alcoa concerning the Hupp business has been shown.

Three comments, though not requisite, are permissible. They are pertinent, especially because they bring out the looseness of the evidence on the Hupp branch of the controversy:

1. The weight, shape and size of rods vary from year to year. Changes in any of those respects necessarily affect costs (p. 3443). In 1926 Franklin had a rod weighing 1-1/3 pounds. Baush's bid on it that year was 86 cents (pp. 3262-3; 3272). We have no information about the dimensions or other characteristics of Hupp's 1927 rod, except that it was patented (p. 3449). Consequently, we cannot compare the Hupp and Franklin prices nor can we even guess what price would have been necessary in order to be compensatory to the supplier of the Hupp rod.

2. Baush, which made its rods under a hammer, could produce only one at a time (p. 3450). Alcoa could produce two and sometimes four at a time (p. 40585). Whether, however, Alcoa had that particular advantage in costs as far back as when Baush lost the bid is not clear.

3. The treasurer of Baush said that he thought the president of the company was mistaken if he (the president) had testified before the Federal Trade Commission that, following loss of its bid by Baush, Hupp shifted to steel as the material for its rods (pp. 3448-9). We are, therefore, uncertain whether Alcoa furnished rods to Hupp longer than a single year.

A lot of testimony has been taken about a controversy as to whether, in getting an order from the Eastman Kodak Company, Alcoa was trying to put Baush out of business. Much is rather vague and much is irrelevant. Nevertheless, the issue turns on a single transaction and I believe a decision can be reached which will be based on a few credible and well established facts; but before the problem can be fully comprehended, it is essential that we have as a background an account of the branch of the aluminum business that is involved,—though it may prove a bit tedious to go over it.

There are two ways of cold-rolling sheet. One is called the coil method and the other the flat method. It is of considerable consequence which is used. Generally which is used is determined in a particular instance by what qualities the manufacturer is looking for. In the evidence the story of this phase of the matter was best told by Mr. Nagel (pp. 24434-9).

Coiled sheet rolling is resorted to when a relatively long, narrow piece is desired. The sheet is handled in the form of a coil as soon as it can be coiled (pp. 24435; 24437). On the contrary, flat sheet rolling is resorted to if the manufacturer wants a short wide piece. Such sheet is produced flat in the beginning of the operation and continues flat from start to finish (p. 24435).

What I have described is the state of the art up to date. Efforts are in progress to improve it.

When the coiled sheet method is employed, greater reduction per pass is obtained by using, and the only way heretofore or now known to get the advantage of coiled sheet rolling is by using an apparatus which causes what is called back-tension (sometimes spoken of as back-pulling). The advantage of coiled rolling comes from the application of back-tension. The apparatus uncoils the already coiled sheet as it enters the roll and then rerolls it as it comes out of the rolls on the other side

(pp. 24437-8). The tension apparatus is not used at all in flat sheet rolling (p. 24438). This is because flat rolled sheet, as manufacturers have heretofore been able to manufacture it, is too short to permit back-pulling (pp. 11919-21; 24438).

By the coiled sheet method the sheet easily may be, and apparently usually is, stretched to between 200 and 600 feet in length; and one instance is mentioned in the evidence where a single piece was drawn out to 1200 feet. On the other hand, by the flat sheet method the average length usually attained in Alcoa's plants is about 15 feet,—although (when a customer wants it) a considerably greater length can be produced (pp. 24435-6).

Baush never commercially succeeded in rolling flat sheet of a width greater than 18 inches (pp. 2759-60; 3401-3); but Alcoa has done much better. The limit to 18 inches by Baush is due to the fact that, with the kind of mill and appurtenances Baush had, it could not economically do commercial rolling at a greater width than the 18 inches (p. 3404).

In the period of 1922 to 1931, with the common alloys, Alcoa produced coiled sheet to approximately 36 inches wide (pp. 24481-3), duralumin coiled sheet to about 20 inches wide (p. 24482), duralumin flat sheet 60 inches wide (p. 24483) and flat sheet of common alloys (2S, 3S, 4S and 52S) over 100 inches wide (pp. 24483-4). Since 1931 the length of all the kinds mentioned, except duralumin coiled sheet, has been further increased by Alcoa (pp. 24482; 24484).

Another characteristic difference is that a coiled sheet mill operates at considerably greater speed than a flat sheet mill (pp. 11040; 24438-9). While variations in finish and other differences exist, there is no occasion to go into them.

Normally the making of coiled sheet is cheaper than the making of flat sheet and the coiled sells at a less price (pp. 3357; 11040-1; 11051; 24438; 35516). The cheaper production of coiled sheet occurs where a separate coiled sheet device is used. Baush, however, had no coiled sheet rolls; all its sheet was made, from the beginning stage and throughout the time it was in the aluminum business, on flat sheet rolls. When it desired coiled sheet it took the already manufactured flat sheet and, by using what is known as a coiler, converted it into coiled sheet. But both its coiled

sheet and flat sheet were made on the same set of rolls (pp. 2781; 3357; 3478).

Necessarily, therefore, production of coiled sheet by Baush was more expensive; after using its only equipment to make the more expensive article (normally a flat sheet) it then had to add the expense of converting it into coiled sheet,—thus further increasing its total expense of production. Manifestly, it follows from its exclusive reliance on a less efficient method that it was handicapped in competing with Alcoa in the sale of coiled sheet.

So much by way of introduction to the consideration of the controversy over the Eastman business.

Preceding the transaction in which Eastman gave an order for coiled sheet to Alcoa and none to Baush, both had been included generally among the suppliers patronized by Eastman. Purchases from Alcoa went back to 1913 or earlier (pp. 35503-6; 35956); from Baush back to 1920 (pp. 2557-60) or possibly (as Baush officials remember) to 1919 (pp. 2554; 3227; 3230-1; 3436-7).

There was a time when Eastman preferred to use flat sheet. So long as that condition existed, some, though the evidence does not disclose what proportion, of the Eastman purchases of flat sheet were made from Baush.

In June, 1925, however, in a letter to Baush, in substance Eastman stated that it was considering procuring coiled sheet for additional parts; that if it did so, its requirements for flat sheet would be considerably reduced and its requirements for flat sheet would be placed with Baush (p. 3506).

The evidence does not make certain the year of the occurrence of the transaction around which the controversy under consideration hinges; whether in 1925, 1926 or 1927. The dispute relates to 3S sheet. From the quantity of sales of that kind of sheet by Baush to Eastman in 1925 and its great relative fall-off in 1926 (pp. 2555-7; 2560), I infer that the event was in 1926,—perhaps pursuant to Eastman's announcement of the new plan in the 1925 letter (pp. 3505-6). But, it is unimportant whether the date was 1925, 1926 or 1927. This is so because the facts are undisputed that, when Eastman changed from 2S and 3S flat sheet to 2S and 3S coiled sheet (which was some time subsequent to 1923, p. 35507) the price Alcoa charged for coiled sheet on the order

it got was, according to the recollection of its sales agent, about 5 cents a pound below the price then prevailing for flat sheet (p. 35515). At any rate, the price at which the sale was made to Eastman was the same as that at which Alcoa made sales at the time to its customers generally (pp. 35517-9). The Baush treasurer testified that his company would have lost money if it had met Alcoa's price (pp. 3240-2).

However, other than the testimony of Alcoa's sales agent just referred to, there is no evidence of what Alcoa's price was; nor is there any showing of what had been Baush's cost of producing coiled sheet; nor is there the slightest basis in the evidence for a finding that Alcoa ever cut prices to Eastman in order to take business from Baush (see p. 35528) or was ever unfair in its competition or made an effort, or had an intention, in connection with any of its Eastman dealings, to put Baush out of business.

As earlier stated, the question of spread is reserved for later consideration. The Government's argument about spread in connection with the Eastman business has, therefore, been disregarded for the moment.

The conclusion seems to me inescapable, therefore, that Alcoa must be declared not guilty of underbidding to Eastman.

October 4, 1941

When I adopted the program of endeavoring to present the questions in this case by subjects, I realized that it had defects. One obvious fault is that if followed, necessarily it will involve repetition. When I take up one subject and in the course of it discuss certain phases of the evidence, that is not enough. When I reach another subject, it frequently happens that the same evidence must be considered in passing on the other subject. Despite its imperfections, however, I have adhered to the plan because it seemed to me more likely that by it I could make a clearer presentation than by some alternative method.

\* \* \* \* \*

Evidence has been taken as to numerous other individual instances in which the Government claims that Alcoa endeavored to exclude Baush from the aluminum business. Many of those instances are not included in what I have already said. In the interest of saving time, however, I shall content myself with treating the additions

in groups, without going into details about each.

I think it is true that some of the evidence (if accepted as correct) is capable of being interpreted as at least creating a suspicion of Alcoa,—though I believe that general matters of that type relate to a rather distant past. Of course, however, suspicion is not enough. Likewise also, in the state of the evidence, in some respects the conduct of Alcoa may have left it open to criticism. Yet such occasions (if any), when after full review of the evidence suspicion remains unremoved or criticisms remain unanswered, at best are merely spasmodic and, even when taken together, do not make out maltreatment of Baush by Alcoa. In none do I regard it as satisfactorily shown by credible evidence that Alcoa has therein been guilty of unfair competition with the purpose of putting or of ever engaging in a contest to put Baush out of the aluminum business.

Where the law requires or even encourages competition, the line between what is permitted and what is prohibited is extremely difficult to draw with accuracy. It must be borne in mind that in many instances, under the law, a business man is as much blamed, or deemed open to blame, for under-competing as for over-competing. Nevertheless, if the public is to enjoy, as it is entitled to enjoy, the benefits of competition, then some leeway must be allowed to those actively engaged in opposition to each other before malevolent motives may properly be attributed to them. Compare, for example, Federal Trade Commission v. Sinclair Co., 261 U.S. 463, 474-476, 43 S.Ct. 450, 67 L.Ed. 746.

As already indicated, so far as concerns individual cases brought into the evidence, I do not think it has been shown that Alcoa crossed the line to the wrong side.

So also I feel that the reasons I have given justify me in refraining from multiplying instances or extending discussion of particular individual charges against Alcoa of under-selling or of other forms of misconduct affecting Baush. I shall now turn rather to the somewhat more general phases of the issue.

Alcoa urges that Baush's misfortunes arose largely out of inadequacy in equipment. Baush claims that its plant was well equipped. This raises a question which can be answered only after patient examination of the evidence on the subject.

In 1919 Baush hired a brass mill and a grey iron foundry. These were located at Chicopee, which is adjacent to and I believe now is a part of Springfield, Massachusetts. The mill and the foundry combined came to be called the metals division and were so referred to at the trial. It will be convenient to continue the use of the name. About half a mile from the metals division and located in the city of Springfield was a machine tools establishment, referred to at the trial as the machine tools division (or the tools division), which Baush was conducting and had conducted since about 1896.

Before Baush became owner of the mill (that is, the brass mill coupled with which was the grey iron foundry), steps were taken toward converting the mill into a place for carrying on aluminum sheet manufacturing. The plant was substantially completed for the duralumin business about 1923 (p. 2856). From 1919 on, for about two to four years, Baush conducted experiments there. In addition, preceding October, 1921, preparation was in progress to manufacture, and apparently to some extent there was actual manufacture of, duralumin sheet in this plant (pp. 2153-6; 2185-6; 2195-6; 2204-7; 2755-6; 3224; 3226).

In October, 1921, Baush purchased the metals division plant. This included the machinery and equipment already there (pp. 2752; 2755-7). In the meanwhile the grey iron foundry equipment had been or then was scrapped (p. 2758).

The plant was acquired by Baush primarily for the purpose of rolling aluminum sheet. While Baush was occupying the metals division premises as a tenant (1919 to 1921), it expended $18,000 (in round figures) on improvements (pp. 2733-4; 2738; 2759-68). Saving that expenditure and the widening of the rolls so that they could commercially roll sheet 18 inches wide, so far as I can discover, up to 1922 there were no substantial improvements over the condition of the mill and equipment as they existed in 1919 (pp. 2759-60) and the value of the total equipment when the mill was acquired (including the improvements from the $18,000 expenditure, but exclusive of the land and the buildings housing the equipment), was $550,000 (p. 2758).

While the pleading is confined to the years 1924 to 1931, the evidence relating to the mill and changes in it made by Baush,

after becoming the owner, begins with a time two years earlier. I shall therefore treat the matter back to 1922.

During the period 1922 to 1931 the limit of the expenditures by Baush for improvements in its mill, for the manufacture of flat or coiled sheet, was $15,000 and for rim rolls (which are used to shape sheet to a particular form) was $27,000. The total expenditure for such improvements did not exceed $42,000 (pp. 2736-40; 2760-8).

So far as appears, there were no other improvements for sheet production during the period. There was testimony that the $42,000 expenditure over ten years was inadequate to keep the mill efficient (pp. 18970-1; 21603-9; 24508-27; 40588. See also p. 22140). This evidence does not seem to me unreasonable. On the other hand, during approximately the same period Alcoa's expenditures for improvements in sheet production aggregated $7,500,000 (pp. 18971; 20959-61). At the time, and as time went on, the trade demand for better kinds and greater sizes of sheet constantly grew (pp. 2821; 2856-7; 3403-6; 3451-6; 18970-1).

The very disparity in the figures, standing alone, would lead one to expect that the sheet business of Baush would suffer from failure to better the facilities for conducting manufacture of the sheet. The figures are the more impressive because, as brought out by the Government, Baush lost money in its metals division every year the division was in existence (pp. 2598-9; 2606-8; 2826-35; 2837-8; 2880; 2883; 3129-30; 3460-7; 23403-4; Exhibit 73, items 1 and 2).

Again, it is significant that the Baush president conceded that the competition of Alcoa had been fair and clean. What he said is that his complaint in essence was that Alcoa undersold him when he was endeavoring to introduce a new product to the trade. He also said, however, that it is a reasonable anticipation that a manufacturer with superior equipment, through incidental resulting decreased cost of production, will win a competitive test for the sale of his products (pp. 2726-33). I have already called attention to the court decisions which seem to me to hold that a fair competitor having such an advantage as that I have just described is entitled by law to avail himself of it.

In reply, the Government makes two contentions: (1) that the improvements of the Baush plant cost $143,000 and (2) that, if this amount be not taken as the total in contrast to what Alcoa spent for improving its sheet producing facilities, at least the $18,000 spent by Baush in improving the plant preceding 1922 should be added to the $42,000,—thus bringing the value of the aggregate improvements Baush made up to $60,000. Even to these contentions, however, I think there are adequate answers.

The $143,000 is made up by adding together the $18,000 spent on improvements by Baush previous to buying the plant and $125,000 it spent on improvements after it became owner (pp. 2736-9). But the $18,000 had already been included in fixing the value of the equipment in the plant at the time it was acquired; and the $125,000 covers Baush's expenditures for all improvement purposes—for fabrication facilities as well as for sheet manufacturing facilities—in the period of 1922 to 1931. In making the comparison of what Baush and Alcoa spent on improving their relative sheet producing capacities, we are only concerned with that period and with what went to improving the facilities for manufacturing (not for fabricating from) sheet. Indeed, I incline to think that the $27,000 spent for rim rolls should be classed as going into the improvement of fabrication facilities. If that be true, then the gross expenditure of Baush during the years 1922 to 1931 for increasing its sheet producing facilities was no more than $15,000.

For the reason that the $18,000 was expended preceding 1922 it has already been included in the $550,000 valuation of equipment at the time Baush became owner of the plant. It may be noted also that the evidence does not show the items of which the $18,000 was composed. I think it clear that this sum should not be credited to Baush in making the comparison with which we are concerned. However, if that feature be waived and the figure be included, the $42,000 allocated to improvements for manufacturing sheet would be increased to but $60,000. I think if we should treat the entire $60,000 as expended on Baush improvements, the change would not be sufficient materially to impair the weight I have given heretofore to $42,000 when contrasted with $7,500,000.

Again, as a second ground for contrasting the sheet producing facilities of Baush and Alcoa during the same period, let us

examine what the evidence shows about the methods employed by them in cold-rolling sheet.

For the entire time (1922-1931) Baush used exclusively cast iron (sometimes spoken of as chilled) rolls. In producing sheet (chiefly duralumin) Baush never used forged steel rolls in its mill (pp. 2211-12; 2619-20; 2755-6; 2758-9). On the other hand, through the greater part of the period Alcoa used forged steel rolls in manufacturing sheet. Beginning about 1925 a large proportion (apparently upwards of two-thirds) of the rolls employed by Alcoa in rolling sheet were forged steel and the balance were chilled alloy iron rolls (pp. 24423-4).

It is true that, preceding 1922, temporarily Alcoa largely used cast iron rolls; but about 1920 it added cast iron alloy rolls, which are different things from cast iron rolls (pp. 24429-30). Subsequently Alcoa completely discarded cast iron rolls; that is, cast iron rolls in the sense of the rolls under that name used by Baush (pp. 18972; 19019-20; 24426), and for rolling hard alloys, corresponding to duralumin, since abandoning cast iron rolls Alcoa has used steel rolls exclusively (pp. 19020; 21005).

For manufacturing sheet, steel rolls are vastly superior to any other kind of rolls. They are much more efficient and their use effects a good deal of saving in the cost of producing sheet (pp. 18972; 19020; 21003-5; 24424-35).

Baush did not refrain from making added improvements because it lacked money. The evidence shows that Baush had the money with which to supply its plants with steel rolls, but that it preferred not to spend it for this purpose (pp. 2620; 2845; 3401). In other words, Baush deliberately elected to continue a method of production which was less economical.

As pointed out in the discussion of the Eastman matter, Baush could only make flat sheet and then, through use of a coiler, convert the flat sheet into coiled sheet. It made both kinds of sheet on the same set of rolls (pp. 2781; 3355-7; 3477-9). On the other hand, Alcoa had separate machinery for taking the two kinds of sheet. In consequence, Baush was at a disadvantage. Not only was its production of coiled sheet by comparison more costly, but, because it employed the substitute or roundabout method in producing coiled

sheet, it could not fill orders at all for greater widths than the 18 inches which was the maximum width of its flat sheet.

Baush's restriction to 18 inches as the width of the sheet it could manufacture was a serious handicap. For this reason it deserves further comment.

Illustrations of Baush being hampered by narrow width capacity are in the Eastman case and, at another time, in the matter which has been referred to as the Harrison Radiator case. The former has been explained already; the latter has not yet been explained and will be taken up now.

It was part of the business of the Harrison Radiator Corporation to procure radiator shells for Chevrolet automobiles. In 1924 Baush, when afforded the opportunity, was unable to accept an order for these aluminum radiator shells because Chevrolet wanted them made of 30 inch sheet. Baush did not have equipment capable of rolling sheet of that width, or beyond 18 inches wide, and was unwilling to buy it (pp. 2686-9; 2805-21; 2887-95; 3387-3406; 3411-4; Exhibit 87; Exhibits 95, 97 to 103).

In 1924 Baush quoted its duralumin sheet at 52 cents a pound (provided Harrison took 5 tons) and Alcoa quoted 46 cents a pound (pp. 2889-91; Exhibit 87, exhibit p. 380). The next year, according to Harrison, Alcoa made a so-called "tentative" quotation of 47 cents, with an intimation that if the order was large and it proved practical to roll, there might be a substantial reduction. Mr. Harrison believed that 37 cents and 40 cents per pound were mentioned. So far as I have discovered, however, Baush submitted no quotation in 1925.

The facts are somewhat indefinite. Nevertheless, if it can be said that Alcoa underbid Baush either year in connection with radiator shells, it would be purely academic. That is true because Baush did not have, and declined to supply itself with, the equipment necessary to enable it to produce what its prospective customer wanted. Moreover, Baush said the competition it could not meet in 1924 was a radiator shell made of "steel" and "nickelplated" which Chevrolet was then using (Exhibit 98, exhibit p. 393); not one made of aluminum at all.

So also for flat sheet Baush could furnish only a dull finish, while Alcoa could furnish bright flat sheet. The bright flat·

sheet is much preferred by many customers (pp. 3478; 24441-3; 24480-1). Inability to supply a bright finish is one reason among the several reasons why Baush lost the Eastman business already discussed.

Another Baush deficiency was that it had inadequate forging equipment (pp. 2821-3; 3481-91; 3499-3504; 29571-3). One result of this was that it was necessary for it to hire much of its forging done by outsiders. This was an uneconomical, and apparently a dilatory, method for supplying forgings. It vitally affected propellers for airplanes and connecting rods for automobiles. It was also unsatisfactory to customers (pp. 3295-7; 3450; 3486-91; 3504-5; 24506-8; 29541-73; 29609-11; 29617-9; 29662; 29722-3). At the time Alcoa was able, in its own plants, to produce both articles satisfactorily (pp. 24505-6; 29574-8; 40585).

Many examples could be given of the consequences to Baush of the comparative inferiority (except for a very restricted range of purposes) of the equipment in its mill. Perhaps the most striking single illustration is the one already partially dealt with, concerning the narrowness of the sheets produced. Its importance is so great, however, that, even at the expense of some repetition, I think it deserves amplification. I think also that it is typical and, if a bit amplified, will be enough to say about the width aspect.

In the period under consideration Baush produced 2S and 3S sheet (p. 3335). It was never able commercially to roll sheet of any kind (either flat or coiled) of a width greater than 18 inches (pp. 2625; 2760; 3401-3; 18972-3; 32434). Meanwhile, Alcoa had increased the width of various types of its rolled sheet to much over 18 inches. Since 1916 Alcoa has been producing 17S sheet (from 1919 a direct competitor of duralumin; pp. 2526; 2599; 2727-8; 3314; 23398-9; 32050-65) and later produced 25S, 51S and other hard alloys which also competed with duralumin (pp. 2525-6; 24172; Exhibit 1423). As early as 1922 Alcoa rolled and sold flat duralumin (or 17S) sheet as wide as about 36 inches and 2S and 3S to nearly 100 inches in width (p. 24330); as early as 1923 it rolled flat duralumin sheet up to 40 inches (pp. 24330A-31); in 1925 or 1926 it rolled flat duralumin sheet of 50 inches and by 1928 of 60 inches (pp. 24332-3); in 1931 it rolled flat duralumin

sheet of 60 inches (pp. 24483-5) and thereafter of 100 inches; and throughout the period (pp. 2620; 18973-4; 24330-6; 24481-4; 32434-5) it rolled coiled duralumin sheet 20 inches wide (p. 24482) and coiled aluminum sheet of 36 inches (pp. 24481-2) and common alloy flat aluminum sheet of 100 inches in width (pp. 24483-4).

The evidence further shows that since Baush quit the aluminum business Alcoa has rolled sheet reaching to a width of about 144 inches. Increasing width of both coiled and flat sheet is, and for some years has been, one of Alcoa's liveliest problems.

Such tremendous increases in width as those already accomplished by Alcoa not only met new trade demands, but resulted in large savings in the manufacturing cost of sheet (pp. 18972-7; 21601-3; 32435-9; 34688-91; 35374-83; 40585-7). Moreover, it is obvious that the inferiority in equipment, which relatively incapacitated Baush, was capable of having caused, wholly or in part, and, as I cannot fail to believe, was a chief if not the chief cause of, the failure of Baush to survive competition with Alcoa.

Even if the equipment of Baush had been adequate, however, I think it plain that the Baush selling force was quite insufficient to meet competition in introducing its new products to the trade. Outside of three officials, who gave only part of their time to selling, at various times Baush had only one or two or three salesmen. Both the officials and the salesmen divided their energies between the metals division and the tools division, and for several years preceding 1931 the metals division had only one salesman (pp. 2741-4; 2804-5; 2842-5; 3137-41; 3456-8; 3507-10; 21609-14; 22121-2). On the other hand, apart from a well organized sales department maintained at Pittsburgh, and apart from the fact that a good many of its principal officials were engaged in selling, especially in making sales of large lots, Alcoa had an extensive organization of sales offices and salesmen stationed at strategic points throughout a good portion, and especially plentiful in the eastern half, of the United States. While the precise number Alcoa employed in selling has not been shown, it does appear that it ran into hundreds.

I may sum up by saying that, when considered in its entirety, the evidence convinces me that, among the causes for the failure of Baush to survive the competition

it encountered, for which it must bear sole responsibility, were its own errors of judgment. I think these led to inadequate and in some respects inferior equipment, employment of insufficient capital, unwillingness to spend money to keep abreast in improvements, limitation of production to a restricted line of commodities, high cost of production in its plant as conducted and inadequate sales effort. But even if I be mistaken in my particularization, at least it seems to me certain that fair appraisal of the evidence now before this Court compels the finding that it has not been shown that unfair competition or misconduct by Alcoa forced, or materially contributed to forcing, Baush to quit the aluminum business.

It would take a long time to summarize all the evidence which I regard as supporting the view I have stated. Much has already been stated and need not be repeated. Perhaps, standing alone, what I have already cited is enough. In any event, I think the great weight of the evidence shows that the causes I have listed were responsible, rather than that any misbehavior of Alcoa was responsible, for Baush's failure to continue. In addition to the parts of the record previously referred to in discussing Baush, among other things, I rely on the following (pp. 2574; 2620; 2727-9; 2732-3; 2737; 2748; 2752-68; 2773-80; 2805-20; 2855-7; 3128-30; 3326-35; 3341-3; 3387-3419; 3451-70; 11039-40; 18575-7; 18970-7; 20950; 21601-9; 22140; 22671-3; 24330-505; 24526-7; 29216-18; 29293-331; 29513-33; 29561-78; 29691-704; 32037-173; 32434-9; 34688-91; 35374-7; 40583-8).

Moreover, if one doubt that the deficiencies in equipment which existed at the Baush plant were, of themselves, a sufficient cause, I suggest that he begin his study of the matter by reading the testimony of Mr. Nagel explaining the unavoidable effect of such deficiencies on the cost of production.

Aside from urging the sufficiency of various evidence (already considered) to refute the conclusions I have reached, the Government has advanced four special arguments. These will now be taken up:

1. It is urged that Mr. Hunt (president of Alcoa) in 1929 admitted that his company had followed a plan of trying to wear down Baush by a policy of attrition.

In my judgment, however, the evidence to the contrary greatly preponderates and I think indeed is convincing (pp. 2999-3000; 3025-7; 3031-2; 21629; 21641-4; 22131-40; 22131-63; 22620-33; 23062-8; 27644-50; 27686-93; 27749-64; 33313; 33467-8; Exhibit 108).

2. It is next claimed that Baush's duralumin was superior to Alcoa's corresponding sheet (17S) and that, because of this, Baush should have prevailed in competition.

It is undisputed that Baush's flat duralumin was good and, particularly in the early stages (say between 1919 and 1923), that it was regarded by some (though not by all) as better in quality than Alcoa's 17S, which was then Alcoa's competing article (pp. 3165-6; 3184; 6525-6; 32128-31; 32133A; 32136; 32138-40; 32145; 32150. See also pp. 3178-80; 3203-4; 32122-3). In fact, Alcoa itself concedes (original brief, p. 537; reply brief, p. 327) the good quality of its competitor's duralumin flat sheet; and Alcoa has never disparaged it nor, indeed, disparaged to the trade any of Baush's products (p. 2727).

On the other hand, so far as appears, complaint of Alcoa's duralumin occurred only during the period of experimentation. Thereafter the defect was remedied by Alcoa. Since then the quality of Alcoa's duralumin sheet has been satisfactory (pp. 3616-26; 6525-6). Moreover, better quality of a single article would not be enough to assure financial success of the Baush plant as a whole, when the range of articles which duralumin met in the market was great and many of them were of indisputable excellence.

Another thing Alcoa has urged is that the line of Baush's articles was too restricted. I think that position is well taken (pp. 2619; 2729; 3184-5; 32140-1; 32145-7; 32150-3; 32156-9).

3. Baush claims that the test of efficiency in rolling sheet is the quantity of resulting process scrap; also that its plant threw off a smaller proportion of such scrap than any Alcoa plant.

Though the Baush officials are not unanimous, the contention is that the less the scrap the greater the efficiency of the rolling and that in some years Baush rolling produced less scrap (pp. 3311-5; 3409-11; 3423-33; Exhibits 113-14); but I do not accept this view and in making reply we shall not have to go into the question of whether, in fact, Baush's process scrap was less than Alcoa's. I think it plain that relative scrap losses is not a test and that

the evidence on the point is quite convincing to that effect (pp. 18976-76A; 21602-3; 24527-39; 40589-90).

I am particularly impressed by the statement of Mr. Nagel. He is a highly qualified expert of experience. He says, as it seems to me necessarily must be true, that the quantity of process scrap depends primarily on the shape of the articles cut from the sheet and to some extent on the thinness of the sheet (pp. 24527-32). No evidence is required to show that if circles be cut from sheet, the resulting scrap will be more than it would be if the cutting were of rectangles or otherwise on straight or nearly straight lines. I think that fact alone is a complete answer to the Baush contention.

Again, it is established that where sheet is wide (as in the case of Alcoa sheet), the saving by cutting on straight lines will be much greater.

4. As I understand the position of the Government it insists, and certainly by implication at least it urges, that the Circuit Court of Appeals for this Circuit has decided, as shown by its opinions reported at 72 F.2d 236 and 79 F.2d 217 in the suit of Baush against Alcoa, that Alcoa violated the Sherman Act in its dealings with Baush and, hence, that I should so hold.

Of course, I recognize my duty to follow rulings on the law by the courts to which I am directly subordinate. Nevertheless, I do not interpret the 72 F.2d or the 79 F.2d opinion referred to, or any other Circuit Court of Appeals opinion in the Baush-Alcoa suit, as containing a ruling of the kind which counsel invokes for my obedience. One of the several grounds for my view on the subject is that what counsel relies on is certain statements of fact included in the opinions. But these do not bind me. One reason why this is true is that the evidence in the case at bar affecting the relations of Baush and Alcoa is much more extensive than, and in many respects vastly different from, the evidence at either trial of the treble damage suit of Baush against Alcoa. I am not conscious of failure to accept any ruling by the Circuit Court of Appeals of this Circuit in the treble damage suit on a question of law.

Accordingly, I conclude that none of the charges against Alcoa of unfair competition with Baush or of excluding or trying to exclude Baush from the aluminum business is sustained by the evidence.

We come now to a question relating particularly to the Sheet Aluminum and the Fairmont companies.

Paragraph 98 of the bill relates to these two companies, the one located in Jackson, Michigan, and the other at Fairmont, West Virginia. The allegations naturally fall into three subdivisions, as follows:

(1) In 1927 both of those companies were producing and selling aluminum sheet. Between August 1, and October 20 of that year there were changes in the prices at which they bought virgin aluminum (i. e., ingot) and sold aluminum sheet they produced. The changes so reduced the differentials between the prices of ingot and sheet that, though he rolled efficiently and conducted his business with thrift, skill and good judgment, a sheet manufacturer competing with Alcoa could not continue his operations without incurring losses destructive of his business.

(2) In consequence, Sheet Aluminum was obliged virtually to suspend operations and Fairmont to suffer serious losses, curtail operations and establish an interlocking interest with a foreign aluminum producer in order to remain in business.

(3) Alcoa reduced the spread, its purpose was to eliminate the competition of the two companies named and the practical effect was virtually elimination of Sheet Aluminum competition and contraction of Fairmont competition.

As previously said, I shall not take up the subject of spread generally until I have reached the matter as it affects all engaged in or desiring to engage in sheet production. Accordingly, at the moment I shall go no further than to make some preliminary comments and then to discuss the charges specifically made in which Sheet Aluminum and Fairmont are specially concerned.

In advance of the coming in of evidence taken from the account books of Alcoa, several witnesses gave testimony about spread charges against Alcoa. Usually this was entirely devoid of details. Almost none included statements which gave the impression of accuracy. Some even seemed reckless and there was little, if any, substantiation. On this account I felt it incumbent on me to give warning that such testimony might prove worthless. The reason I so regarded it, as I explained in substance at the time (e. g., pp. 9258-84; 9363-79; 22186-7; 40992-3), is that the prices of

aluminum sheet shift with variances in gauge, in width, in finish or in other characteristics; and yet, in the testimony there was no discrimination on account of those variances. They were either not touched on at all or information about many was omitted. In consequence, it is impossible from such evidence to make reliable comparisons.

If we disregard (as I feel we must substantially disregard) the vague testimony I have spoken of and postpone considering the figures from Alcoa's books until the general spread question is reached, the only possible remaining evidence in the record, with respect to the 1927 spread charges affecting Sheet Aluminum and Fairmont, is contained in Exhibit 112.

There are a number of reasons why Exhibit 112 is not acceptable as proof. Among those relating to sheet are: (1) The exhibit is confined to 30,000 pound lots and we are not informed whether either of the two companies mentioned made sales in lots of that poundage. (2) The prices set out in the exhibit are list prices of Alcoa, not its actual prices. (3) The price changes in the exhibit are for numerous gauges and vary, as appears in the exhibit, with the gauges, though how much as between gauges cannot be ascertained with precision. (4) There is no evidence of what it cost either of the companies mentioned to manufacture and market sheet. (5) The exhibit, consisting of eight tables, gives prices diverging with gauges for 17S, 25S and 51S coiled and flat sheet and for 2S and 3S coiled and flat sheet, but not for other kinds of sheet.

It is plain on the face of the document, therefore, that from Exhibit 112 it is impossible to ascertain with certainty what was the spread between prices at which aluminum was purchased and prices at which various types of sheet produced therefrom were sold.

Another fatal defect, or missing link, is the complete lack of showing that the changes in prices, if they followed the prices appearing in the tables, affected actual transactions of Sheet Aluminum or Fairmont so as to cause material loss or to inflict material injuries to either.

The explanation at the trial of the difference between taking prices from lists issued by Alcoa and using actual prices at which sales were made by Alcoa, as recorded in Alcoa's books, was in substance as follows: Lists are for the use of salesmen. For one thing, they are exhibited to prospective customers or are otherwise resorted to while soliciting orders. Upon authorization by officials, however, such prices may, and frequently are, departed from in actual sales, especially if of large volume. It was the habit of Alcoa also to exercise much caution in changing list prices, even though it made many changes in actual prices. One important reason for that habit was that not infrequently customers used warehouse receipts for sheet (as well as for other aluminum products) as collateral at banks. If list prices were carelessly or suddenly changed, there was danger of upsetting credit arrangements of Alcoa's customers with their banks.

In the oral testimony there was a good deal of complaint of what was claimed to be undue narrowing of the spread preceding the year 1933. This criticism was especially and chiefly aimed at the period 1927 to 1932. These dates have some significance. That will not be gone into now; but it will be pointed out hereafter.

I do not doubt the good faith of some of the competitors and customers of Alcoa who took the position that what occurred preceding 1933 constituted an undue or unfair narrowing of the spread. Plainly evidence contains enough at least to engender suspicion or discontent, even though it be not sufficient predicate for relief by a court,—which, of course, must have legal proof as a basis of action. But, as already indicated, and is known to all, suspicion is not enough.

What I have said about the oral testimony relating to the spread and about Exhibit 112, of course, applies to the cases of the Sheet Aluminum and Fairmont companies. Yet I cannot too strongly emphasize this: an essential feature of establishing the spread charge is a showing that Alcoa sold sheet at prices materially below the prices at which its competitors sold it. Because of deficiencies in the evidence I have referred to, I am unable to tell therefrom whether the things contrasted are comparable; that is to say, whether the prices at which Alcoa sold and at which the other two companies sold are comparable. For example, there is a difference in terminology arising from Sheet Aluminum employing the phrase pure sheet in giving its figures (without, so far as I have discovered, furnishing a precise definition of the sense in which it is used but certainly including 2S and probably 3S). Also, both

Sheet Aluminum and Fairmont failed to specify the gauges in which they dealt. Illustrations could be multiplied. It is for reasons like those given that I feel compelled to hold that the Sheet Aluminum and Fairmont charges are not established by the evidence.

By tables setting off against each other, as nearly as can be, the prices of Alcoa and the prices of the other two companies referred to, I think the inference is inescapable that the evidence does not show oppression by Alcoa of, or an intent by it to oppress, either of these two sheet competitors. I have made up two of those tables, but overnight I determined to omit them because they are not necessary and are rather complicated; also because it would require considerable time to make them clear.

Assume, however, that in the mass of evidence on the subject I have overlooked something pertinent, or that I am in error in the view that there is not a sufficient number of instances of undue narrowing of the spread to warrant award of relief against Alcoa. Nevertheless, for reasons which will specifically be brought out later and which I have heretofore a bit referred to, if I have made a mistake on this point as a practical matter it will do the Government no harm.

There is much evidence on the present branch of the case which I have not mentioned. I content myself, however, with pointing out that what I have already referred to, among other things, is supplemented by other testimony supporting the proposition that the competition between sheet rollers has been active (pp. 10881-3; 12649-83; 20868-71; 29156-7; 29801-5; 31094-8; 31135-6; 31964; 33284-5; 34528-38; 34545-6; 34548; 34553-4; 35034-5; 35579; 35798-822; 40416-40).

██ With reservation of the general spread question, my conclusions as to the claim by the Government that Alcoa excluded or endeavored to exclude or otherwise maltreated its sheet competitors are as follows:

(1) The evidence does not establish that Standard or Bremer-Waltz or Cleveland Metals Products or Baush was driven out of business or injured by Alcoa or that Alcoa attempted to drive out of business or to injure any of them.

(2) It is established (a) that, aside from Alcoa, seven sheet rolling companies are and for some years past have been actively engaged in rolling sheet; (b) that four of these (United, Sheet Aluminum, Fairmont and Reynolds Metals) now sell, and for varying numbers of years past have sold, sheet they themselves rolled in active competition with Alcoa; and (c) that three of the companies (Goods, Aluminum Products and Scovill) now are equipped and since their respective entries on the production of sheet for varying years in the past have been equipped so that, if heretofore they had desired, they could have engaged, and if in future they should desire they can engage, in the production of sheet in competition with Alcoa.

(3) The sheet monopolization charges against Alcoa have not been proved.

That brings us to a highly controversial question. About it a great deal of testimony has been taken. This question is as to the so-called sheet spread.

Before adjournment I cannot today get very far into a discussion of the matter. Nevertheless, I consider it better to proceed today and get into the record as much as is reasonably practicable on the subject.

In amended paragraph 83 of the bill it is alleged that the defendants "have fixed and maintained price differentials between virgin aluminum and fabricated aluminum products at such levels as to suppress, prevent and eliminate competition from independent fabricators."

So far as concerns the present branch of the case, these allegations are the equivalent of charging that Alcoa has kept the spread between the prices of ingot and sheet so low that independent sheet rollers were prevented from competing with it. Practically the accusation is aimed exclusively at Alcoa because, as is obvious and I believe is not disputed, there has been no evidence to establish the offense against anybody other than Alcoa and those subordinate to Alcoa. As heretofore indicated, the articles involved are ingot and sheet.

I have already pointed out that in paragraph 98 it is alleged that the reduction of the differentials (or narrowing of the spread) in 1927 virtually prevented Sheet Aluminum Company from continuing in business, as well as caused the Fairmont Company to contract its business; also in paragraph 99, that between 1924 and 1931 the narrowing of the spread compelled

Baush virtually to suspend the production of duralumin.

The charges in paragraphs 98 and 99 (save to the extent, if any, that they are affected by the general spread evidence) have already been disposed of. Likewise, it has been shown, or at least I think it has been shown, that neither the oral testimony about what the spread was nor Exhibit 112 is sufficiently reliable to help the Government. We are, therefore, now faced with a single issue as it concerns all sheet producers, as well as all ingot producers.

At the beginning it must be determined what evidence should be considered in order to reach a decision.

It is plain, and I believe is not denied, that the issue about spread, as raised in the pleadings, was much reduced and clarified at the trial. The evidence made two things clear. These are (1) that narrow sheet differentials have not existed since 1932 and (2) that the extent, if any, to which they existed previous to 1933, if at all, is determinable only from Alcoa's books of account. If either of these propositions were contested, I think both would be sustained. In my view both are incontrovertibly established by the proof. Indeed, as I understand the position of Government counsel, announced at the trial as well as in argument since the close of the trial, they are expressly conceded.

What does the record show in regard to the matter?

In its opening on June 3, 1938, the Government said (pp. 1780-1):

"During the period from about 1926 to about 1931 the Aluminum Company of America subjected these independent sheet rollers to a price squeeze, * * *. To-day, * * * the independent sheet rollers who survived are prosperous, because the Aluminum Company has seen fit to widen the margin—and they are making money today, and temporarily they are satisfied with the situation."

Again, at the final oral argument on March 4, 1941, this colloquy occurred between Government counsel and the Court (pp. 40992-3):

"The Court: The widening of the spread substantially began in 1933, didn't it?

"Mr. Rice: Yes, sir.

"The Court: And it has continued since then up to the time of these figures [embodied in chart] you present, hasn't it?

"Mr. Rice: There was a further widening of the spread in 1934, and I think a further widening in 1937. I will get to those figures in a few minutes, * * *.

"The Court: Well, now, isn't it true that so far as this evidence about spread is concerned, prior to your taking the facts from the books of Alcoa itself, that the testimony of the witnesses was so indefinite that it is almost impossible to draw any safe conclusion from them? Isn't that true?

"Mr. Rice: Yes, * * *. A great deal of the testimony, for example, of Mr. Waltz regarding the spread is very vague and indefinite.

"The Court: Oh, I know what it is. It doesn't amount to anything. I told you time and again it did not, because it was so indefinite. And in your brief you do not seem to rely upon any of that.

"Mr. Rice: No. * * *.

"The Court: All right. Then we get right down to the exhibits here that you are taking from the books of the company.

"Mr. Rice: Yes, sir, because those figures are definite and concrete."

The statements in the Government's original brief as to widening of the spread were substantially to the same effect. Thus, speaking of the spread charge, it was said in that brief (pp. 612, 626):

"While losses occurred in all gauges of 2S and 3S sheet before 1933, when Alcoa was endeavoring to squeeze out the independent rollers, the reversal of Alcoa's spread policy in 1933 converted losses into profits in every gauge. * * *.

"Alcoa cannot say that it did not know that competitors were being injured by the narrow spread from 1926 to 1933. * * *. But in spite of their pleas for Alcoa to relieve the pressure, it did nothing about it until at least by 1931, by Davis' own admission, and the exhibits show that it was not until 1933 that Alcoa relaxed the spread by reducing its ingot prices."

Then at page 628 of the Government's original brief there is an italicized subheading to a section of the argument, entitled, *"Pressure upon Alcoa forced it to relax the spread in 1933."* In what fol-

lows on the same page there are two statements as follows:

"It [Alcoa] argues that it narrowed the spread in 1927 and 1928 because of its [Alcoa's] increasing efficiency.

\* \* \* \* \*

"An inspection of both Alcoa's Spread Exhibit 1748 and the Government's Spread Exhibit 1753 shows that in every gauge, without exception, Alcoa's *costs were lower in 1933* than in 1932."

There are numerous voluminous tabulations bearing on the spread question which are based on Alcoa's books. Among them two are especially important. These are Exhibit 1748 and Exhibit 1753. I believe they are typical.

Exhibit 1748 was made in conformity with the theory of and under the supervision of Alcoa. Exhibit 1753 was made up in conformity with the theory of and under the supervision of the Government. Accordingly, in ascertaining what the books show, attention will first be given to those exhibits.

Before going into the figures, however, note should be taken of an introductory fact that was brought out in the evidence. This relates to a dilemma in which Alcoa was placed by conflicting demands made on it by its competitors and customers. Apparently these separated into groups. Each adopted a separate view. The two views were squarely opposed. Alcoa had to consider both.

What is spoken of as the "spread" (also called the "differential" or the "margin") means the difference between the price at which ingot could be purchased and the price at which sheet was sold. Some wanted the difference narrow or small. Others wanted it wide or large. Apparently the positions taken by the groups vary to a great extent, if not wholly, with their normal self-interests. If one was a seller of ingot, he wanted the price high. If he was a buyer, he wanted it low. So if he was a manufacturer and seller of sheet, he wanted its price high. If not, he wanted it low.

It cannot properly be said, however, that the positions of everybody involved adhered rigidly or uniformly to lines so simple as those just stated. For example, Alcoa itself was a producer and seller of both ingot and sheet. In this way it came to have competitors and customers who pressed on it divergent arguments and

thereby created or contributed to its dilemma.

In speaking of the dilemma in the way I have done, it should be understood that I am not exonerating Alcoa from bringing it about. Whether it was to blame and, if so, to what extent the blame went are among the problems to be solved. But, nevertheless, the position of Alcoa growing out of the cross-fire to which it was subjected by its competitors and customers, together with the accompanying factor that the cross-fire was the consequence of its being engaged in producing and selling the two articles (ingot and sheet),—between the prices of which the spread prevailed (and, of necessity, as I see it, a spread always will prevail),—must be taken into account.

What were the positions of the two groups of Alcoa's competitors and customers themselves can perhaps be better and more nearly precisely ascertained by referring to actual testimony by members of the groups who took the stand at the trial. Examples of such testimony will be given.

The West Bend Aluminum Company is a manufacturer of cooking utensils. It has no sheet mill. It wanted the spread between ingot and sheet narrowed. The reason assigned was that if this were done it would assist one having no sheet mill (like itself) in competing with those who had mills. As a witness, one of its officials said that he had asked Alcoa to narrow the spread; that he had told Alcoa that "the differential was too great between ingot and sheet." When asked why that was important, his response was as follows (pp. 31849-51):

"Well, we have one of our competitors, the Aluminum Goods Manufacturing Company, that have a rolling mill, and we have always felt that that was an advantage which they had over us.

"Q. Is that the only cooking utensil company that has a rolling mill? A. No, Aluminum Products Company has one also.

"Q. How often have you made such requests of the Aluminum Company of America? A. Very often, during the past 25 or 26 years. \* \* \*.

"Q. Will you explain just why the fact that certain of these cooking utensil companies have rolling mills, causes you to have an interest in these differences between the prices at which you buy your sheet and the price of ingot? A. The

Aluminum Goods Manufacturing Company of Manitowoc, are one of our principal competitors. They are able to sell certain lines for less money than we do, and on the aggregate they make more money than we do and we believe we are as efficient a manufacturer as they are, and we have always felt that the reason they could make more money than we, was because they had an advantage in rolling their own sheet.

"Q. Was that because you believed they were making a profit on the rolling of the sheet as well as fabricating the sheet into cooking utensils? A. Yes, sir."

On the other hand, the Aluminum Products Company rolled (though it did not sell) sheet. It also manufactured cooking utensils. It took an opposing position to that taken by the West Bend Company. It wanted the spread widened. One of its officials, Mr. Hastings (whom you all remember and who certainly made on me a strong impression of fairmindedness and I think must have made a like impression on everybody) gave this explanation (pp. 11515-6; 11527; 11552-3):

"A. The spread between sheet and ingot began to narrow. When we operated the mill for the first year, as I recall, the spread was 11 cents per pound, * * *. * * * when the spread dropped to 6 cents or thereabout we were unable to continue a profitable operation in the mill as we had operated for the first few years. * * *.

"Q. * * * did you make complaints to the Aluminum Company of America after the spread narrowed as you have testified? A. I believe I did. * * *.

"Q. What was it that led you to make your complaint to the Aluminum Company of America? A. My intention and object in making that complaint was to obtain relief from a diminishing spread and I made my complaint to the Aluminum Company of America because I was buying metal from them."

Numerous other illustrations could be given of how competitors · or customers with divergent interests (one being and the other not being a sheet roller) pressed their requests on Alcoa.

Representatives of Alcoa also testified about the opposing interests of its two groups of customers and as to how each group urged its claim. What was testified by Mr. Gibbons, one of Alcoa's vice-presidents, was summarized by the Court, at

the oral argument last March, in a statement with which the Government agreed. This appears at pages 41031-2. Quoting it, without going back to the rather lengthy testimony, will be enough. It is as follows:

"The Court: * * * My recollection is that he [Mr. Gibbons] said that they [Alcoa] had two groups of customers, one group insisting on one thing and the other on the absolute opposite of that, and the suggestion was that so far as concerned the relations with their customers they were between the devil and the deep sea. * * *.

"Mr. Rice: Your Honor's recollection is right."

It is because of the agreement between Government counsel and myself that I deem it enough, in stating Alcoa's position, to rely on what I have just read.

What was said by additional witnesses on the phase of the matter under consideration at the moment is hardly more than repetition of what·was brought out by the testimony quoted from two competitors, one of whom had and one of whom did not have a sheet mill. Essentially it is that a fabricator who had no ˙sheet mill and bought his sheet wanted the spread as narrow as possible, while the owner of a mill wanted it as wide as possible. The position of Alcoa was different from either, because it produced both the articles between which the spread in controversy existed.

I shall go to a different phase of the matter just at this point.

October 6, 1941

* * * * * *

Another preliminary matter˙ should be discussed before we reach the question of what the figures from Alcoa's books show with respect to the spread. This is whether, on certain indisputable facts, in any event there is· warrant for an injunction. As to the matter there are several pertinent considerations. Among them are the following:

It is shown without material controversy, and is clearly established, that the spread between the prices of ingot and sheet has not been unduly narrow since 1932. Moreover, as already demonstrated, the Government itself, in effect, has abandoned the sweeping charge on the subject made in the bill. Expressly or impliedly, the Government now admits that the spread widened in 1933 and that ever since it has

continued sufficiently wide. The result of this admission is, in substance, to say that the evils complained of have been corrected; that the spread from 1932 to date is not and cannot justly be criticized; and that, with respect to the width of the spread, Alcoa has obeyed the law for nine years.

I am persuaded by the evidence also that there is little or no likelihood of Alcoa hereafter unduly narrowing the spread.

Moreover, a strong argument can be made in support of the proposition that the decree of July 7, 1912, in the Pittsburgh case (Exhibit 1009, exhibit pp. 4926-37) contains injunctive provisions forbidding narrowing the spread to the extent or for the purpose of reducing it (in the sense of the differential between the price paid for ingot and the price received for sheet) below the cost of producing sheet (consisting of mill cost of rolling the sheet plus administrative and selling expenses).

█ It is fundamental that an injunction cannot properly issue as punishment for a past violation of the Sherman Act or of any other act of Congress. If punishment be sought, it can come only through application of the criminal provisions of the appropriate statute. These have not been invoked here and, of course, proceedings under them could not even be initiated except through indictment.

█ The sole function of an injunction is preventive. Prevention applies to the future. An injunction may forbid continuance of a present practice or of an existing condition. So also if the practice or condition has been abandoned, the Court is authorized to forbid its renewal if there be sufficient ground for apprehension that it will be renewed in the absence of a prohibition. But lawfully an injunction cannot go further. I understand that the Supreme Court has sustained the view of the law I have just expressed.

█ Where it appears that an alleged evil under the Sherman Act exists no longer and danger of its renewal or occurrence hereafter has not been shown, or cannot properly be inferred, it has been squarely held that there is no justification for the issuance of an injunction. United States v. United States Steel Corp., 251 U.S. 417, 445, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; Industrial Association v. United States, 268 U.S. 64, 84, 45 S.Ct. 403, 69 L.Ed. 849. The Supreme Court has explained that this is because an injunction relates only to the future. Furthermore, it has been specifically held that an injunction cannot be used to punish for what is past and out of existence. Standard Oil Co. v. United States, 283 U.S. 163, 181, 182, 51 S.Ct. 421, 75 L.Ed. 926.

█ In this connection I may add that in Sherman Act cases, as is true in other cases generally, the Court has also said that an injunction is not properly grantable unless the ground for it has been definitely and satisfactorily proved. Ibid., page 179 of 283 U.S., 51 S.Ct. 421, 75 L.Ed. 926; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 377, 53 S.Ct. 471, 77 L.Ed. 825.

█ If the conditions be as I have summarized them, therefore, then because for nine years Alcoa has lived in harmony with the law in regard to the spread and danger of renewal of an unduly narrow spread has not been shown and does not appear, it follows that no ground exists for an injunction now to issue with respect to the spread. If I be correct in that conclusion, perhaps there is no occasion to go further into the figures from the books. However, I deem it appropriate at least to discuss Exhibit 1748 and Exhibit 1753.

Nobody doubts the correctness of the figures taken from the books. It is from them that the exhibits were made up. The only controversy is as to whether they have been rightly used in compiling the exhibits.

The general plans of the tabulations (Exhibits 1748 and 1753) are substantially identical. They cover the years 1925 to 1937. Each tabulation contains figures bearing on certain kinds and gauges of sheet. The two cover the same kinds and gauges of 2S and 3S sheet; but Exhibit 1748 contains figures as to five sets of gauges of 17S flat sheet, while Exhibit 1753 contains nothing about 17S sheet.

Both tabulations I have mentioned set out what purport to be annual average prices received for sheet sold. Exhibit 1748 sets out the annual average price received for ingot and Exhibit 1753, the annual average price paid by Alcoa's customers for the same grade of ingot. Each then, in a separate column, gives the result of subtracting one price (for ingot) from the other price (for sheet). Thereby the

difference or spread between the two prices is obtained.

Lastly, in three columns, each exhibit contains what purport to be the several items of cost of producing and selling the particular class of sheet to which the figures relate (hereinafter, for convenience, called the production cost).

The consequence involved in making a choice between the two exhibits is great. What is involved in making the choice must therefore be described.

If Alcoa's tabulation (Exhibit 1748) were accepted, then the showing would be as follows: It deals with 14 kinds of sheet. The figures are given as to each kind for 13 years (1925-37). In other words, the figures cover 182 items. Out of those items the instances in which, during the years 1925 to 1932, inclusive, the table, if accepted, discloses that the production costs of the sheet were greater than the spread are these:

(1) For 2S and 3S coiled sheet, as follows: one for 12-17 gauge; none for 18-22 gauge; four for 23-24 gauge; none for 25-26 or 27-28 gauge;—a total of five instances for all gauges of 2S and 3S coiled sheet which occurred in years from 1927 to 1930, inclusive, when production cost of sheet was above the spread.

(2) For 2S and 3S bright flat sheet, as follows: 13-14 gauge, none; 15-16 gauge, three; 20 gauge, three; 21-2 gauge, none, —a total of six in years from 1928 to 1932, inclusive, for all grades of 2S and 3S bright flat sheet, when the same was true.

(3) For 17S flat sheet, as follows: one for 13-15 gauge; none for 16-17 gauge; two for 18-20 gauge; two for 21-23 gauge; four for 24 gauge,—a total of nine during the years 1925 to 1931, inclusive, for all gauges of 17S flat sheet, when the spread was less than the production cost of sheet.

This makes a gross total of twenty instances in which (according to Exhibit 1748) production cost exceeded the spread, where the total items were 182.

The selection of Exhibit 1753 (the Government's tabulation) would paint a very different picture. It consists of 117 items. Of those the instances in which, if we accept the table, during the years 1925 to 1932, inclusive, the production cost was greater than the spread are these:

(1) For 2S and 3S coiled sheet, as follows: six for 12-17 gauge; five for 18-22 gauge; six for 23-24 gauge; three for 25-26 gauge; and one for 27-28 gauge,— a total of twenty-one for the years 1927 to 1932, inclusive, for all gauges of 2S and 3S coiled sheet.

(2) For 2S and 3S bright flat sheet, as follows: four of 13-14 gauge; seven of 15-16 gauge; six of 20 gauge; five of 21-22 gauge,—a total of twenty-two for all gauges of 2S and 3S bright flat sheet.

This makes a gross total of forty-three instances in which, according to Exhibit 1753, production cost was greater than spread from 1925 to 1932, inclusive, out of 117 items.

It will be noted (as heretofore stated) that Exhibit 1753 is confined to 2S and 3S sheet and, of that sheet, to coiled and bright flat. In other words, as will appear by inspection, while Exhibit 1748 contains the figures as to various gauges of 17S flat sheet, that sheet is ignored in Exhibit 1753.

I am not satisfied, however, with either of the exhibits. I cannot but feel that the theory on which each is framed leads to results which are partial or are erroneous (in the sense of being inaccurate or incomplete). A single respect in which plainly each is not both accurate and complete will be given by way of illustration.

On sheet sales covered by Exhibit 1748 Alcoa made a transportation allowance to customers. On the average the allowance amounted to approximately one-half cent a pound (pp. 38742-4, the answers there given being directed to Exhibit 1651 but relating to the same sheet prices as are set out in column B of Exhibit 1748). In Exhibit 1748, as made up, the half cent transportation allowance is not included. If that half cent per pound were deducted from the prices in column B which Alcoa received for sheet during the years 1925-1932, the number of instances in which the production cost exceeded the spread would be increased by three. That is, the total number would be carried to 23.

It is true that the resulting change, as applied here, is small in its effect. In one of the additions the excess is only 25/100ths, in another 26/100ths and in the third only 28/100ths of a cent a pound. Nevertheless, I think accuracy demands that the change be made. In addition, there may be other situations in which the change is of greater significance.

Alcoa argues that the transportation allowance should not be deducted from the prices set out in column B of Exhibit 1748. The reason assigned is that in making up the table the effort was not to ascertain profits.

It is true that we are not trying to get the amount of the profits. Nevertheless, it strikes me that the conclusion sought to be drawn from that is a non sequitur. It seems to me obvious that if Alcoa bore the transportation allowance, then its net return from sheet sold (in the sense of the price received) was less by the amount of the allowance than the price stated in column B.

Turning now to Exhibit 1753, its column E is entitled total mill cost of rolling sheet. In making up that mill cost, however, unabsorbed burden was included as one of the component elements.

Unabsorbed burden is an item much used by accountants. It represents fixed charges applicable to idle or unused facilities, or as sometimes put, the expense of such facilities during the idle period. There seems to be no doubt that it is proper to employ the item in ascertaining the profit from the operation of a factory as a whole; but also it would seem inherently improper, and even impracticable, to use it in ascertaining the cost of producing in that factory a single pound of a particular gauge of a particular type of sheet.

In reaching the conclusion just stated I do not rest exclusively on my own view. There are others who support it. For example, two experts testified at the trial on the subject. Both said the use in Exhibit 1753 of unabsorbed burden, in the way explained above, was erroneous (pp. 39565-74; 39620-1; 39667-70; 39735-43). There was no testimony to the contrary. Explanations by the experts of the bases for their opinions on this point appeal to me as sound. Accordingly, I adopt their views on the point.

In column E of Exhibits 1723 and 1726, which were introduced in evidence by the Government, the amounts of unabsorbed burden that are claimed to have been included in making up mill costs for the years 1929 to 1937 are stated. So also, while unabsorbed burden was claimed to have been included in mill costs for the years preceding 1929, the record does not disclose what the amounts were for those years.

At the oral argument of March 12, 1941, there was much colloquy with respect to unabsorbed burden. The specific problem discussed was whether the item should be eliminated from Exhibit 1753 (pp. 41026-8; 41670-82; 41698; 41700-1).

The Government submitted a brief, dated April 9, 1941, dealing with the subject. At pages 22-26 of the brief there is a complete recomputation of all matters covered by the exhibit. In the recomputation, according to its claim, the Government omitted unabsorbed burden from cost of production whenever it considered that the element should not be retained. As a consequence, it is now contended that for the years 1926 to 1932, inclusive, there were 30 so-called "red figures;" meaning, as is argued, that, after eliminating unabsorbed burden as a production expense during those years, there remained 30 instances in which annual production cost was larger than spread. I think, however, the evidence establishes that there were only 20 such instances.

The difference of 10 between the 30 and the 20 grows out of a single set of facts. These are as follows:

In its revised table the Government sets out 10 items, purporting to depend in part on unabsorbed burden, which relate to years preceding 1929. It relies exclusively on Exhibits 1723 and 1726 for the amounts of such unabsorbed burden during the respective years involved. But, as matter of fact, neither of those exhibits contains information as to what was Alcoa's unabsorbed burden for any year earlier than 1929. Indeed, under the heading to column D of Exhibit 1726 it is definitely said that, for those years, unabsorbed burden had been included in mill cost as stated in column B; and, as appears from inspection, what is true on the point as to Exhibit 1726 is true also of Exhibit 1723.

In consequence, instead of removing unabsorbed burden as a portion of production cost down to and including 1928, Government has retained it in each of the 10 instances mentioned. It is clear that this was error. Deducting the 10 from the 30, there remain only 20 cases on which the Government can rest its contention that during the years 1929 to 1932 production cost exceeded spread.

For 1929-1932 there are but two variances between the recomputation by the Government and the computation I made.

218

Both agree, however, in the result that, with the elimination of unabsorbed burden, the number of times when annual production cost was greater than spread during those years was 20. The variances are, therefore, immaterial.

If unabsorbed burden ought to be (as I think it should be) ignored, then obviously its elimination would reduce the instances (heretofore tabulated as to Exhibit 1753) in which production cost appeared greater than the spread. Instead of such instances being 43, as appears on the face of the exhibit, it is clear that they should be reduced to 20. There is no support in the evidence for anything in excess of that number.

Upon directing attention merely to a single aspect of each of the two exhibits just reviewed, it seems to me to have been satisfactorily demonstrated that they have the faults which the Court has ascribed to them. I refrain, however, from going further with other aspects.

I am impressed that, in fact, there are respects, additional to those already mentioned, in which both Exhibits 1748 and 1753 are made up along erroneous lines; but I feel also that it would be useless to pursue the inquiry. I say this because, as I feel, it is possible to base an answer to the question with which we are concerned on definite facts of which we are sure; on facts which are not obscure or difficult to state with exactness.

Among facts of the kind just described are the following:

(1) On the face of the exhibits (1748 and 1753) it is manifest that the method adopted by Alcoa, for widening the spread for each of the years from 1933 to 1937, inclusive—so as no longer to be subject to criticism for overnarrowness—was by reducing the price of ingot. This lends strong color to the Government's contention that during the preceding period (1925-1932, inclusive) there were instances, and probably a substantial number of instances, with respect to the various types of sheet covered by the exhibits, in which the spread was too narrow; also that it was rendered too narrow by Alcoa holding up (that is, holding high) the price of ingot. If so, then, inasmuch as all the facts appeared on Alcoa's books, it would seem to me that it must be taken as true that Alcoa was conscious of the situation or, what in law is the same thing in effect, was obligated to know the situation.

(2) The next thing to be borne in mind is that, though the proportion be small, Exhibit 1748 (Alcoa's own tabulation) shows a substantial number of instances in which production costs were greater than the spread during the 1925-1932 period.

(3) Another thing is that, while proof is lacking as to years preceding 1925, because of the worthlessness of the evidence offered as to those years, the complaints in evidence as to the then conditions on the subject render it at least not unlikely that, at the time of or at some of the times covered by those complaints, the spread in fact was unduly narrow.

On the authority of the court decisions heretofore cited, in connection with my discussion of the Stutz Motor Car Co. matter, I think it clear that sales of an article at a loss may persist so long, and be of such nature and volume, that they will afford basis for an inference that the purpose of carrying on the business at the loss was to drive competitors out of it. As I conceive, it is because of these circumstances that the issues first, as to whether Alcoa's sheet production cost was greater than the spread and, secondly, if so how long that condition continued, are important. The facts brought out in those connections have a vital bearing on whether Alcoa was guilty of monopolization.

I do not think, however, that we need go through the wearisome task of analyzing or discussing the entire multitude of exhibits introduced by both sides containing tabulations of figures relating to the spread; nor need we give attention to the sundry charts and schedules submitted at the oral argument in March, 1941, or attached to briefs filed since, dealing with this issue.

So also I feel that there is no occasion to add to the previous discussion of the separate claims as to how Sheet Aluminum, Fairmont and Baush were affected. Outside of what has been heretofore said about them, I think nothing has been developed which differentiates the question as to the three companies named from the question as to other sheet rollers.

I believe that, so far as figures are concerned, there are quite enough in Exhibits 1748 and 1753 to enable us to pass on the controlling features of the spread inquiry.

This brings us, therefore, to the problem of what should be done In endeavoring to find an answer unavoidably some repetition must be indulged in. Perhaps we have here

another illustration of where the situation will be made clearer if first approached by consideration on a hypothetical basis.

Suppose the Court, as in substance desired by the Government, should make the following findings and adopt the following conclusions (a total of five) in regard to the spread:

(1) Preceding 1933 there were several years during the period beginning with 1925 when it was the practice of Alcoa to narrow the spread between its sales prices of sheet and ingot. This existed to such a degree that at times during that period Alcoa sold at a loss some of its sheet output of certain types and grades; that is, sold those articles at a loss, provided we take the market price of ingot as its cost. The suffering of loss to that extent and of that character occurred with sufficient frequency, and complaints to Alcoa of the practice were made by competitors or customers with sufficient frequency (see pp. 10961-2), to put Alcoa on notice of them.

(2) Knowledge of the spread and failure to correct it were the equivalent in law of intentionally bringing about the loss, unless the price which Alcoa took as the cost of ingot used in the production of the sheet was a reasonable price not in excess of the actual cost of producing the ingot plus a reasonable profit thereon; but, if it had examined them, Alcoa could not have escaped learning from its own books of account that such cost figure for ingot was more than its actual expense of producing the ingot plus a reasonable profit thereon.

(3) The facts with respect to what such cost was lay peculiarly within the knowledge of Alcoa. Yet, save that it very fully exhibited its books to, and facilitated their examination by, the Government, Alcoa did not bring these facts before the Court at the trial. The circumstance that Alcoa went into the manufacture of sheet or the fabrication of other products of aluminum because, after effort, it had been unable to induce anyone else to undertake it or to manufacture a satisfactory article (see pp. 18647; 18664-6), cannot alter the measure of its duty, prescribed by law for it as well as for all others who engage in manufacturing or selling such an article as sheet.

(4) It was lawful for Alcoa concurrently to produce sheet and ingot. Indeed, on the whole the industry has benefited from Alcoa engaging in the manufacture of both, though at the same time. Yet Alcoa's joinder of the two carried with it a responsibility which it cannot avoid. Moreover, if production of the two caused continuous loss therefrom over any considerable period, in fairness to its competitors and customers Alcoa was put under a duty to adopt corrective measures.

(5) The facts that for several years preceding 1933 no change was made and that when the spread was widened in 1933, as well as in later years, one of the factors employed was reduction of, and apparently the only thing of consequence done was to reduce, the ingot price strongly corroborate the Government's claim that Alcoa had knowledge theretofore that maintenance of the price of the ingot sold at a figure higher than its actual cost plus a reasonable profit thereon was the cause or one of the causes of Alcoa's continuous annual book loss on sheet through the production cost of sheet exceeding the spread in many instances.

For the moment, for what I deem good reasons, I do not make any definite findings, or state definite conclusions, to the effect set out in subdivisions (1) to (5) above or otherwise. You will recall that I stated the five sets of facts as describing an assumed situation.

In the first place, I refrain because, temporarily at least, it is unnecessary to reach findings or conclusions on the issues which would be covered thereby if made. Nevertheless, if hereafter, before final decree, it be shown that they are required, to the extent possible they will be supplied.

Secondly, I refrain because the burden was on the Government, and it did not discharge the burden, to introduce in evidence the facts showing the cost of producing ingot and what would have been a reasonable profit thereon. The books of Alcoa were in New York and were accessible to the Government. There has been no suggestion that they did not contain the requisite information. Alcoa went further. It offered, at its own expense, to supply experts from its staff who would make up from the books tabulations on any theory desired by the Government. According to the terms of the offer, such tabulations were subject to verification by the Government if it desired and the books were submitted to the jurisdiction of the Court, so that the Government's right to verify the figures could have been enforced if not readily accorded to it. Yet, as I have

said, the Government did not produce the facts in question from Alcoa's books.

Thirdly, I think there are grounds on which, so far as concerns the present suit, I can probably dispose of the matter without having before me the additional facts referred to.

The use of the narrow spread was abandoned by Alcoa in 1932. It has not been resumed since. For nine years past Alcoa has kept the spread widened. The result is that during those years—as I understand the Government agrees, but whether or not it agrees is true—there has been no complaint or basis for complaint with respect to the spread by either competitors or customers of Alcoa.

So also it seems to me that, if we assume that the spread has been improperly used in the past by Alcoa, the evidence does not warrant me in saying that, unless a preventive presently be applied, there is danger of its renewal.

In these circumstances I feel that the matter can be handled, without violation of the rights of either side, in a way that will safeguard the public interest as nearly as it can be safeguarded.

■ I think that if jurisdiction were reserved in this cause for some period (say five years) to hear and determine complaints by the Government (if any there be) of future undue narrowing of the spread between the prices of sheet and ingot during that future period, the procedure should afford opportunity hereafter fully to protect against the practice. I am persuaded that the Court has power to make such a reservation of jurisdiction and that, although (if an offense has been committed) the fault for lack of evidence to show that rests on the Government, the power mentioned, if invoked, should now be used by the Court on the terms herein prescribed.

The loss to its competitors from Alcoa unduly narrowing the spread hereafter, if that should occur, would be so serious in nature and effect that, so far as within its power, I think this Court should adopt some measure to prevent its prevalence in the future (unless it appears that, by reason of the 1912 decree in the Pittsburgh case, there is no need for action by the Court on the subject).

The Pittsburgh decree contains an injunction in broad terms. It has been argued that it prohibits every kind of well pleaded offense ·the bill charges against

Alcoa in the case at bar. In connection with the settlement of findings in the present case, if they wish, counsel may be heard by memoranda on that question (that is, the question as to whether the Pittsburgh decree already covers this matter). I feel warranted in saying now, however, that it strikes me as manifest that if the spread be already enjoined, it would be superfluous to enjoin it again.

. In so far as the Sherman Act deals with remedies, where no dissolution and no injunction or other form of prohibition has been granted, Section 4, 15 U.S.C.A. § 4, impliedly confers on the Court authority by its final decree to reserve jurisdiction to make further orders or decrees. I think that, in principle at least, the Supreme Court has approved keeping jurisdiction alive after final decree when it appears that supervision is probably the only adequate means, or even when it is the most efficient means, to compel future lawful behavior by a litigant. United States v. United States Steel Corporation, D.C.N.J., 223 F. 55, 178, 179, affirmed 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121; Appalachian Coals, Inc. v. United States, 288 U.S. 344, 378, 53 S.Ct. 471, 77 L.Ed. 825. See also Sugar Institute v. United States, 297 U.S. 553, 605, 56 S.Ct. 629, 80 L.Ed. 859.

With respect to a matter such as is involved in the case at bar, where a condemned practice is not enjoined on the ground that (as I feel here) the proof of the practice is not wholly satisfactory, and where (as I feel here) if it heretofore existed it has been abandoned, it would be a misfortune for both sides if its occurrence or recurrence, within a specified period, could not then be stopped and thenceforth enjoined, without an additional plenary trial or the institution of an entirely new suit. Later proceedings of that kind in substance would be merely, and would be no more than, ancillary or supplementary in nature.

If no injunction of the spread be already outstanding in the Pittsburgh case, then, if the Government so desire, there may be reservation for a period to be specified (say five years) of jurisdiction on the lines above indicated.

(12) Cable

We come now to the twelfth monopolization charge, which is as to cable. This is the last of the twelve subjects into which, for convenience, I have divided my

discussion of the issue of monopolization in this case.

It is alleged in the bill (paragraph 49), and admitted in the answer, that Alcoa produces and sells virtually 100 per cent of the aluminum cable for electrical transmission moving in interstate commerce in the United States.

The commercial article is aluminum cable steel reinforced, commercially called A. C. S. R. (pp. 22661-2; 22670-1). Some phases of the problem presented are very complicated. Some of the relevant facts are highly technical. I think it would be helpful, and perhaps it is necessary for its understanding, to examine the engineering features involved before going into the problem. These have been described by Mr. Snider and Mr. Eales, who testified in this case (pp. 28971-29135; 33046-233). They are outside engineers. They are wholly disinterested and are highly competent. What they said would be too long to set out now. I feel, however, that it would be advantageous for anyone who did not hear their testimony to read what they said before taking up the question with which we are now called on to deal.

For reasons heretofore given, I do not think that what is conceded by Alcoa in its answer constituted a so-called monopolization per se and that, in order to establish the offense charged, the element of exclusion or attempt or intention to exclude must be proved.

The contentions of the Government are predicated on Exhibits 887 and 888. For convenience table 9 has been made up from those exhibits. This is as follows:

### TABLE 9

*Comparison of what the Government claims were (1) spread in excess of prices of aluminum cable above prices of ingot and (2) cost of fabricating and profit on fabrication of aluminum cable (per pound), 1930–1937.*

| | Spread | | Cost of Fabricating Cable | Profit on Fabrication of Cable |
|---|---|---|---|---|
| | A | | B | C |
| 1930 | 5.615¢ | | 6.840¢ | 1.225¢ (Red) |
| 1931 | 1.698 | | 6.910 | 5.212 (Red) |
| 1932 | 0.664 | (Red) | 7.552 | 8.216 (Red) |
| 1933 | 0.346 | | 7.810 | 7.464 (Red) |
| 1934 | 2.653 | | 6.645 | 3.992 (Red) |
| 1935 | 5.685 | | 7.883 | 2.198 (Red) |
| 1936 | 5.146 | | 7.414 | 2.268 (Red) |
| 1937 | 8.272 | | 8.181 | 0.091 |

NOTE: Column A above is from column C of Ex. 887; column B above, from column B of Ex. 888; and column C above, from column E of Ex. 888.

This table is a comparison of what the Government claims were (1) the spread in excess of the price of aluminum cable above the price of ingot and (2) the cost of fabricating aluminum cable (per pound) for the years from 1930 to 1937, inclusive.

The years are stated to the left. To the right are three columns: the first, A, is headed "Spread"; the middle column B is headed "Cost of Fabricating Cable"; and the third column C to the extreme right is headed "Profit on Fabrication of Cable."

The profit in column C for each year is computed by subtracting cost of fabricating cable from spread, or rather vice versa in most instances; where cost of fabricating the cable is greater than the spread, then in column C the figure is entered in red,—showing that there was a loss instead of a profit.

The table runs through the period 1930-1937, showing for each year from 1930 to 1936 a loss and for 1937 a small profit.

Substantially all of the Government's argument consists of the contention that during each of the years 1930 to 1936 the cost per pound of fabricating cable was greater than the spread between Alcoa's selling price of aluminum cable and the selling price of aluminum ingot from which the cable was produced (the production cost being the larger). The table represents, as I have explained, the outcome of computations by the Government showing, as it claims, how the spread compared with the cost of fabricating cable annually during the 1930-37 period.

First, I wish to mention a matter which I regard as unimportant.

I think Alcoa is right in its criticisms of the figures (contained in the table) on which the Government predicates its argument. As I see them, the primary faults of those figures are as follows: (a) The prices of aluminum ingot, as given in column B of Exhibit 887 and column A of Exhibit 888, on the basis of which the Government has computed the spread (constituting column A of the table), do not correspond with the prices of aluminum ingot in Exhibit 1701 or Exhibit 1753; and Exhibit 1701 is correct. (b) Column B of the table is from

column B of Exhibit 888 and that, in turn, was taken from Exhibit 719. I think Exhibit 719 is incomplete. Nevertheless, the variances in the table from figures which I regard as right are not great. I shall, therefore, discuss the controversy on the basis of the table as if it were exactly right.

There are several comments on the subject, however, which I deem of significance. These rest on what either was undisputed or is indisputedly shown:

(1) In dealing heretofore with the same issue in regard to the prices of sheet and ingot, as I understood the Government conceded and certainly the Court concluded, that a spread not much larger than that in table 9 for the years 1930, 1935 and 1936, and much smaller than that for 1937, was sufficient in size to rebut the charge that it was unduly narrow. No reason has been given, nor have I discovered any reason, why the same measure of ascertaining whether the spread here is free from objection should not be adopted. If that view be right, then the only years when the spread is shown to have been quite substantially less than the cost of production are 1931 to 1934, inclusive. The last of these years was seven years ago.

(2) The prices at which Alcoa has sold aluminum cable have been called by the Government itself "relatively low," though it expressly disclaims charging that they are "too low" (original brief, pp. 635; 638).

(3) There is, and continuously since Alcoa entered the cable field there has been, active competition between aluminum cable and copper cable. The Government itself says that the two are "highly competitive" (original brief, p. 635) and the evidence abundantly establishes that this is true (pp. 18656-8; 22183; 22288-8A; 22653-8; 25681-3; 29026; 29030-1; 29043).

In consequence, the substance of the position the Government is necessarily forced to support is that it should have relief, although as to aluminum cable, if all it says be true, it has not been shown that there is any substantial actual evil to complain of. It follows that, if the Government be sustained, it must be solely on the academic proposition that for the years 1931-34 the spread was small and, as the Government would urge, was too small.

I think it is obvious, however, that the size of the spread, standing alone, is not enough to entitle the Government to recover; also that in order to appraise the significance of the size of the spread, the surroundings must be considered. What were these? The Court judicially knows some at least. Among them were the following:

(1) In 1929 there occurred a great crash in the business of this country. Indeed, it was the greatest business crash of recent years. Certainly it was the initial financial event or one of the earliest financial events from which the country, in varying degrees, has suffered ever since.

(2) The depression reached its depth in 1932 (pp. 10967; 19208-9; 26973-4). Inasmuch as, during the depression period, it has been the practice of Alcoa to keep up, and in the interest of its customers it has felt bound to adhere to the practice of keeping up, its prices (or in any event its list prices), may not the narrowness of the spread shown in table 9 for 1931-4 be a mere incident of the depression period, rather than an indication of a conscious effort by Alcoa to keep competition out of aluminum cable production or sale?

The Government suggests, though it seems fair to say that it does not press the suggestion, that excessive prices of ingot deter Sheet Aluminum Company and General Cable Company from engaging in the production of aluminum cable. I do not think, however, that the evidence would support the charge, if directly made, that either of those concerns or any other identified concern or person has been kept out of aluminum cable manufacture by the price of ingot (pp. 5160-64; 10883-7; 11041; 18647-58; 29068-70; 29088; 29126-31; 34854-6; 34906-7; 40590).

Next, the Government, in essence, urges that the existence of copper cable competition would not exempt Alcoa from blame for keeping others from producing aluminum cable. With the statement of the proposition in that unqualified form I agree. But, as I conceive, the adoption of the proposition would not help the Government. I deem this to be so because, in order to show that Alcoa has been guilty of excluding competition from the aluminum cable field in the situation here presented, it would at least be necessary to establish two things: (1) that for a long period (without at the moment specifying

its length) Alcoa has carried on the manufacture and sale of aluminum cable when the production cost thereof exceeded the spread between the sales prices of cable and ingot; (2) that, without necessarily having any particular one in mind, this was done for the purpose on the part of Alcoa, and had the effect, of keeping others generally from engaging in such manufacture or sale.

Plainly, proof to the effect stated has not been adduced nor is there sufficient evidence to warrant drawing an inference to that effect.

I take it that all would agree that competition with copper cable is one of the facts of which account must be taken in reaching a conclusion as to the effect of the spread between the prices of aluminum cable and aluminum ingot. If that competition were in existence, then obviously two separate forces were operating at the same time in the same economic area. It would not be easy to segregate them or to make certain which would bring about an identified specific result or whether both would contribute or, if both did contribute, what share of responsibility should be assigned to each.

Indeed, I feel that the topic has not been sufficiently developed in the evidence to enable me to come to a firm decision on the aspect of the controversy presently under consideration. On account of this deficiency in the evidence, I think the Government's charge ought not to be upheld.

Alcoa argues that the depression going so low in 1932 was responsible for the fabricating costs of aluminum cable being greater then, as well as in immediately preceding and succeeding years. This may be true or be true to a large degree; but whether so or not, the evidence does not warrant me in saying definitely. My feeling is that, on the evidence as it stands in the record, a statement of what was the effect unavoidably would be merely speculative.

Alcoa also urges that copper cable competition furnishes an adequate stop-gap to excesses of fabricating cost over spread being a deterrent to newcomers coming into aluminum cable production. Undoubtedly that competition is to some extent a safeguard and must always be taken into account. But, as already indicated, standing alone it does not seem to me to afford assurance of normal operation of competition in a broad field. I think that those in the aluminum industry are entitled to that kind of competition (if anyone be willing and able to furnish it) with respect to cable, precisely as with respect to other articles fabricated from aluminum.

Moreover, while Alcoa makes no unambiguous admission on the point, I think it may fairly be implied from one of its own briefs (original, pp. 296-7; 305-6) that Alcoa does not deny that for 1930 to 1936 its cable costs did annually exceed its spread. If so, then I think that possibly the continuance of production cost above spread from 1930 to 1936, inclusive, may have been (though I cannot say on the evidence that it was) sufficient ground for the inference that, if others desired to go, it was enough to repel and possibly to exclude them from going, into the manufacture of cable; also that the facts, being on its books, must be taken to have been known to Alcoa.

On the other hand, after reviewing all the evidence and weighing the matter as best I can, I am impressed that, if Alcoa were prohibited from conducting its cable production and sale along the lines it has heretofore pursued, there would be genuine danger that no one else would take up the business and that, in consequence, the public would lose the benefit that it now enjoys from the competition which indisputably prevails between copper and aluminum cable.

If I be right in what I have stated, what action, if any, should the Court take with respect to the aluminum cable question?

These things seem clear: (1) Copper cable competition has the capacity to keep, and possibly has kept or contributed to keeping, the aluminum cable spread at least within rather narrow limits. (2) In 1937 already the ratio during the depression period has so improved that the spread has risen above production costs and there was a profit in fabricating cable. (3) It is quite uncertain how an injunction could be framed, and it would be very difficult to frame one, that would not do more harm than good to the industry as it stands today.

On account of the facts recited, my present feelings are: (a) that the evidence leaves me doubtful whether the case has been established in regard to cable and (b) that supervision under reservation of jurisdiction might be the more appropriate, as well as more effective, method for ac-

complishing the desired result. Accordingly, without yet determining that question and subject to hearing counsel by memoranda on the point in connection with settlement of the findings, I think the plan of handling the cable matter so far as concerns future conduct of Alcoa for a period to be fixed (say of five years), possibly had best follow substantially the same lines as have been prescribed as to the sheet spread.

I have now completed consideration, as planned, of the twelve subjects into which, for purposes of discussion, I divided the monopolization charges against Alcoa. With respect to certain aspects relating to sheet and cable, already specifically stated and not necessary to repeat, I have expressed a willingness or possible willingness to reserve jurisdiction if the Government so desire. Apart from that, my conclusions are (1) that none of the monopolization charges has been satisfactorily proved and (2) that in regard to them the Government has not shown that it is entitled to any relief.

## II. CONSPIRACY

This brings us to the second major branch of the case. That deals with the question of conspiracy.

Section 1 of the Sherman Act, 15 U.S.C. A., § 1, see also 26 Stat. 209, c. 647, and 50 Stat. 693, c. 690, provides as follows:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: * * *. Every person who shall make any contract or engage in any combination or conspiracy declared by sections 1–7 of this title to be illegal shall be deemed guilty of a misdemeanor, * * *."

You will observe that there are three things each of which is made an offense. The first is a contract of a described nature, the second is a combination of a certain type and the third is a conspiracy. Any one of these is a crime, provided it restrain trade or commerce among the several States or with foreign nations.

While the Act speaks of contract, combination and conspiracy, for convenience I shall include all of them under the word "conspiracy." It will, therefore, be understood that in discussing conspiracy in this branch of the case there is included also

the kind of contract and the kind of combination that is prohibited by Section 1.

In the beginning I think I should resort again to what was said in the Socony-Vacuum Oil Company case, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. There attention was drawn to the line of demarcation between monopolization and conspiracy.

In note 59 to the case, at pages 225 and 226 of 310 U.S., at page 845 of 60 S.Ct., 84 L.Ed. 1129, the Court definitely pointed out the essential difference between Section 1 and Section 2 of the Sherman Act. That is to say, it drew the distinction between monopolization and conspiracy in the sense in which I have defined those two words for purposes of discussion in the consideration of the case at bar.

In the note 59 the statement was as follows:

"It is the 'contract, combination * * * or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other. See United States v. Trenton Potteries Co., 273 U.S. 392, 402, 47 S.Ct. 377, 381, 71 L.Ed. 700, 50 A.L.R. 989. Cf. Retail Lumber Dealers' Ass'n v. State, 95 Miss. 337, 48 So. 1021, 35 L.R.A., N.S., 1054. And the amount of interstate or foreign trade involved is not material (Montague & Co. v. Lowry, 193 U.S. 38, 24 S.Ct. 307, 48 L.Ed. 608), since § 1 of the Act brands as illegal the character of the restraint not the amount of commerce affected. Steers v. United States, 6 Cir., 192 F. 1, 5; Patterson v. United States, 6 Cir., 222 F. 599, 618, 619. * * * But the crime under § 1 is legally distinct from that under § 2 (United States v. Mac-Andrews & Forbes Co., C.C., 149 F. 836; United States v. Buchalter, 2 Cir., 88 F.2d 625) though the two sections overlap in the sense that a monopoly under § 2 is a species of restraint of trade under § 1. Standard Oil Co. v. United States, 221 U.S. 1, 59–61, 31 S.Ct. 502, 515, 516, 55 L.Ed. 619, 34 L.R. A.,N.S., 834, Ann.Cas.1912D, 734; Patterson v. United States, supra, 222 F. page 620."

In an opinion in the case at bar, published in D.C., 1 F.R.D. 1, and also set out in the minutes at pages 21455–73, I dealt briefly with the subject of conspiracy. I also there referred to discussions of the subject elsewhere in the record of the present case. For these reasons I see no occa-

sion now for going further into the law phase of the matter.

The charges in the bill, in brief, are as follows: that there was a conspiracy between Alcoa and the major foreign aluminum companies between sometime in 1902 and June 4, 1928; also that from the latter date to the present there has been a conspiracy between Alcoa and Aluminium or between Alcoa or. both Alcoa and Aluminium on the one hand and the foreigners on the other.

In the course of the trial, in substance, the Government has also charged orally that there has been one continuous conspiracy from 1896 to date and that Alcoa has been the nucleus of that conspiracy throughout.

What the conspiracy consisted of has been rather vaguely stated both in the bill and in oral discussion. So also it has been difficult, if not impossible, at times to determine who, according to the Government's contention, were the parties to the conspiracy.

The Government says, or has stated in the course of the trial (for example, at p. 5250), that conspiracy constitutes only about 5 per cent of this case. I have made an estimate, however, of approximately what I anticipated would be the time that I should have to devote to a discussion of the conspiracy issue. According to this estimate, conspiracy will require about three-fourths the length of time that has been required in discussing the entire topic of monopolization.

Treatment of the conspiracy question is one of the things of which I gave warning this morning that it will be tedious. There is no proper way to escape going into the matter extensively.

The charges cover many paragraphs of the bill. Among those which are devoted wholly or almost exclusively to the subject of conspiracy are paragraphs 54 to 80.

In paragraph 54 the allegations are, in substance, as follows:

There was a conspiracy between Alcoa and the foreigners to limit production, fix prices and allocate sales, with the intent to restrain and with the effect of restraining imports of aluminum into the United States and thus to free Alcoa from the competition of those articles in the United States. To this end Alcoa purchased interests in foreign companies and foreign properties connected with the aluminum industry. These foreign companies and foreign properties were used by Alcoa to intimidate foreign aluminum producers into suppressing shipments to the United States of aluminum and aluminum products for sale in competition with Alcoa and thereby to maintain Alcoa's monopolistic control in the United States.

In furtherance of or as parts of the conspiracy, three things are alleged to have occurred:

(1) In paragraphs 55 to 57, that Alcoa (directly or through a subsidiary or subsidiaries) joined cartels with aluminum producers in 1902, 1908 and 1912.

(2) In paragraphs 58 to 71, that Alcoa purchased (1916 to 1928) properties in foreign countries or stock in foreign corporations engaged or to engage in the aluminum industry.

(3) In paragraphs 72 to 80, that, pursuant to or as parts of the conspiracy from 1928 to date, Aluminium was organized in 1928, various foreign interests were then transferred to Aluminium by Alcoa; that sundry misconduct by those two companies occurred; and that sundry relations of one or both of those companies have existed with the foreign companies, including relations with the Alliance (also called a cartel).

Further descriptions of the three groups mentioned will be added when those matters are specifically taken up for consideration.

Otherwise put, the pleading in effect amounts to this: there was a general conspiracy between Alcoa and foreign companies. Pursuant thereto (1) cartels were formed (1902 to 1912) between Alcoa and the foreigners; (2) Alcoa acquired (in 1916 to 1928) sundry foreign interests; (3) Alcoa (1928) formed Aluminium, with which it has since been in conspiracy (1928 to date) and through the Alliance (formed in 1931 and called a cartel, as I have said) both Alcoa and Aluminium have been in conspiracy with European producers of aluminum.

The discussion, therefore, will cover three periods: (1) 1888, the date of organization of the Pittsburgh Reduction Company, to 1915; (2) 1916 to 1928 (June 4); and (3) 1928 (June 4) to date.

There are two of these periods, as you will observe, namely, the period from 1888 to 1915 and the period from 1916 to 1928,— the latter of which ran only to June 4, 1928 (that being the date on which Alumi-

nium was organized). It follows that, being prior to Aluminium's coming into existence, if the conspiracy charged up to June 4, 1928, ever existed, it was only between Alcoa and the foreign companies. On the other hand, since June 4, 1928, the conspiracy as charged concerns the relations between Alcoa and Aluminium or the relations between Alcoa and foreign producers or the relations between Alcoa, Aluminium and the foreign producers.

Heretofore I have referred briefly to the organization of Aluminium and the transfer of properties to it by Alcoa. In order, however, with accuracy to comprehend the part played in this lawsuit by Aluminium, it is necessary to go into details with regard to that company.

As I have said, the transfer took place on June 4, 1928. Preceding that event Alcoa had acquired and on that date owned interests in 34 foreign companies or properties. It now retains but two. The balance went to Aluminium. On June 4, 1928, Alcoa transferred 29 of these companies or properties to Aluminium. Pursuant to understandings reached at or about June 4, 1928 (as parts of the same transaction), Alcoa has since transferred to Aluminium three of these companies or properties. The 29 and the three make up the 32 companies or properties which formerly belonged to Alcoa and now belong to or are connected with or are subsidiaries of or the proceeds of which have gone to Aluminium. The additional two of the total of 34 formerly owned by Alcoa, as I have stated, still belong to Alcoa.

The two companies or properties retained by Alcoa are Cedars Rapids Transmission Company and the Surinaamsche Bauxite Company. The Cedars Rapids Company has a line through or over which power was and is brought from Canada to Alcoa's plant at Massena, New York. The Surinaamsche Company holds bauxite deposits in Dutch Guiana.

Save that some slight acquaintanceship must be made with the Cedars Rapids and Surinaamsche companies,—that by this means we shall the better understand some of the evidence and, indeed, that we need the information in order to comprehend the whole picture,—these two companies cut little if any figure in the conspiracy controversy. For practical purposes we can pretty nearly forget those two companies.

There is one difference in the facts as to the acquisition of the two groups of foreign interests by Aluminium which it is important to have in mind. The 29 companies transferred on June 4, 1928, were paid for by the issuance of Aluminium's common stock. That stock was distributed ratably to the holders of Alcoa's common stock. The additional three companies, transferred to Aluminium later, were separately paid for by Aluminium otherwise than with stock. The consideration for those three companies was cash or its equivalent which went directly to Alcoa, but of course inured indirectly to the benefit of Alcoa's stockholders.

The foreign interests held by Alcoa up to 1928 were acquired by it between 1920 and 1928,—the last of them in fact having been acquired by Alcoa on the 31st of May, 1928, only four days preceding the transfer of 29 of the properties to Aluminium.

As I have already stated, the transfers of the three companies or properties to Aluminium, additional to the 29 transferred to Aluminium on June 4, 1928, were made in general accordance with the understanding reached contemporaneously, or almost contemporaneously, with the transfer of the 29 properties. The transfer of one of the three was carried out in October, 1928. The understanding as to the transfer of the other two of the three was confirmed in writing in July, 1930 (Exhibit 386, items 3 and 4). The dates of actual transfers of the three, and the prices in round figures (equal to cost in the case of the last two), were as follows:

(a) Laatefos, having water rights in Norway, was transferred to Aluminium in October, 1928, for $95,000 cash, which was paid at or about that time by Aluminium to Alcoa.

(b) Stock of Prodotti Chimici Napoli, owner of leucite deposits in Italy, was transferred at cost to Aluminium in 1931. As I have said, this stock was agreed to be transferred substantially contemporaneously with the transfer of the 29 properties. For that, including the expenses of operation of the property by Alcoa from 1928 to 1931, Aluminium paid $1,558,000.

(c) The assets of the Alcoa Power Company, consisting of the Lower Development site on the Saguenay River, acquired by Alcoa from Mr. Duke in 1925, plus the dam, power house and power generating equipment which had subsequently been erected on the site by Alcoa (Exhibit 381; Exhibit 447), were trans-

ferred (at cost) to Aluminium in 1938 for $35,000,000.

So much I have stated merely by way of a general introduction to the conspiracy branch of the inquiry. That is all I have undertaken thus far to furnish. I shall now take up specifically the various aspects of the controversy.

### (1) 1888-1915

The first charge is that within the period of 1888 to 1915 there were five cartels. These are alleged to have been parts or in furtherance of a conspiracy between Alcoa and foreign producers of aluminum. None of the cartels is alleged to have preceded 1895. According to the Government's claim, all five of the cartels were between 1895 and 1915. In other words, there is no claim that between 1888 and 1895 there were any cartels. These cartels, according to the Government's contention, were in effect for only parts of the time and none were for long periods.

As to the five the Government's claim is that (1) the 1895 cartel is set out in Exhibit 478, (2) the 1901 cartel is set out in Exhibit 268, (3) the 1906 cartel is set out in Exhibit 308, (4) the 1908 cartel is set out in Exhibit 343 and (5) the 1912 alleged cartel is set out in Exhibit 143.

Only one of the cartels was signed by Alcoa. That is the first, the one back in 1895,—although sometimes in the evidence referred to as the 1896 cartel. The others were signed by Canadian subsidiaries of Alcoa. The latest of the five, as you will observe, was dated in 1912.

Outside of the Canadian subsidiaries of Alcoa, the foreign members of the cartels, according to the Government, were as follows: (1) the 1895 and 1908 cartels were with the Swiss company; (2) the 1901 and 1906 cartels were with the Swiss, the British and two French companies; (3) the 1912 cartel was with the British, the Swiss, the French and two small companies,—one Norwegian and the other Italian.

The 1895 cartel provided that Alcoa was not to sell aluminum or aluminum products in four specified European countries and that the Swiss company, which was the other party, was not to sell in America.

The 1901, 1906 and 1908 cartels provided for allocation of certain markets or the fixing of prices or both.

The 1912 cartel on its face applied only to sales outside the United States. It pro-

vided that quantities of sales and prices be fixed by a committee. The Government claims that in actual operation this cartel applied to sales in the United States.

The 1895 (or as it is sometimes called the 1896) cartel and the 1901 (sometimes referred to as the 1902) cartel and the 1906 cartel were plainly violations of the Sherman Act. There is no dispute about it. The 1908 cartel was adjudicated in the Pittsburgh case by the decree of June 7, 1912, to be in violation of the Sherman Act. This also was without dispute, the decree itself being by consent. For the moment I shall not try to determine or even discuss whether the 1912 cartel was a violation of the Sherman Act. For present purposes I shall assume that it was a violation. Before going into these cartels— and it is of the greatest importance—we should ascertain, and we should keep in mind, the dates of their termination.

The 1895 cartel ended in July, 1896, 45 years ago. The 1901 cartel expired by its terms (Article 13) in 1906, 35 years ago. The 1906 cartel was dissolved by consent October 1, 1908, 33 years ago. The 1908 cartel was terminated in two ways; first, by consent of the members on February 17, 1912, and, second, by cancellation through decree in the Pittsburgh case on June 7, 1912—29 years ago. Lastly, the 1912 cartel became moribund in August, 1914, through the outbreak of the World War and, in the words of paragraph 57 of the bill, it was "cancelled by the parties January 23, 1915" —that precise language being taken from paragraph 57 of the bill—that is, 26 years ago.

In other words, of the five cartels of the earliest period, which constitute the principal basis for the charge by the bill of conspiracy during the first period, that is, down to 1915, the oldest of the cartels was terminated 45 years ago and the youngest of them 26 years ago.

The present suit was begun April 23, 1937. If we take that as the date as of which to make estimates, then all five of the cartels ended various periods of time from 22 to 41 years preceding the commencement of this suit.

 Now what are the consequences in the case at bar of the termination of these cartels under the circumstances which have been described? They are several. It will be sufficient to mention one. This is, that the Court has no power whatever to

enjoin Alcoa with respect to the 1895-1912 cartels. Before this suit was begun, all of them were dead and gone—dead and gone years ago—and there is not the slightest danger of the revival or renewal of any of them.

As I called to your attention in discussing the sheet problem, the sole purpose of an injunction is preventive; there cannot be an injunction for the purpose of punishment. These cartels having passed out of existence, there can be no injunction. As I understand, the Government does not contest that proposition; its claim as to the cartels is that they may be considered as a part of the conduct of Alcoa and may be employed by the Court in connection with all the other facts of the case in determining the intent on the part of Alcoa in doing some act.

There are three rather parenthetical remarks I should make now and perhaps ought to have made earlier:

1. Alcoa stoutly denies that the 1912 cartel was a violation of the Sherman Act. I said this morning that for the present I should assume that it was a violation. This, however, does not mean I have determined that it was. On the contrary, if necessary, the question will be determined later. My present impression is that, in and of itself, it does not make any difference whether it was a violation or not. So that in saying that I assume it was a violation, my statement is entirely without prejudice to Alcoa or to later passing on the issue, if it be material to do so, in the findings or otherwise.

2. The Government does not suggest that the cartel of 1895, or 1896, whichever it may be, or the cartel of 1901, or 1902 as it is sometimes called, or the 1906 cartel, is any part of a cause of action in this suit. The limit to which the Government goes, as I understand its position with regard to any of those cartels, or as to the 1908 cartel or the 1912 cartel, is that they may be taken into account for their bearing, along with the other facts, upon the issue of intent on the part of Alcoa.

3. At the moment we are not directly concerned, but nevertheless we shall be concerned later, with the fact that,—outside of the group of cartels of which I have spoken, the last of which according to the bill of complaint expired 26 years ago,—there were other cartels of which Alcoa was never a member. Two of these are identified by dates, or at least counsel

on both sides have referred to them as being of specified years, and the evidence indicates that the years counsel gave are substantially correct. One of those is the cartel of 1923 and the other is the cartel of 1928, of which, as I have said, Alcoa was never a member (pp. 5185; 16199-200; 16302-3; 21301-7).

Perhaps there were other cartels; but, if so, outside of the alliance of 1931 or subsequently, hereafter discussed, none of them was identified in the evidence.

Bear in mind that as to these other cartels preceding 1931—that is, the 1923, 1928 or later ones—Alcoa was not a member. In saying this I do not at the moment definitely deal with, though I shall later squarely pass on, the controversy as to whether Alcoa had any interest in or instigated Aluminium to join the 1931 cartel or any cartel thereafter. That I put aside temporarily. It is, however, important to remember that during this period which ran back of 1923, and possibly to as early as 1920 and up to 1928, and running certainly for two or three or four years after that, there were cartels in Europe; also that the European aluminum producers were members of those cartels. Why it is of consequence to remember all this will appear later.

Alcoa contends that the cartels of the so-called earlier group, which I have referred to as between 1895 and 1915, have no real bearing on intent or that, if they have any bearing, at least there are other counter facts which should be taken into account in determining the extent, if any, to which they have a bearing on intent. For its position Alcoa assigns a number of reasons. These will be discussed in turn:

1. During the period of 1895-1915 the Sherman Act had a very unsettled meaning. According to the Apex Hosiery case, it still has an unsettled meaning; but it was much more unsettled in the years between 1895 and 1915. As the Supreme Court has said, it has gradually been clarified and is in process of being clarified, but its meaning can be determined now only by taking up and dealing with individual cases on their own peculiar and specific facts in each instance.

2. Alcoa calls attention to the fact that it is substantially inconceivable that Alcoa had any intent of violating the Sherman Act, or that it ever occurred to

Alcoa that it was violating the Sherman Act, in attaching itself to the 1895 cartel. Alcoa says this is shown to be true by its publishing the fact of its membership in the 1895 cartel in its 1896 annual report.

3. At the time of the 1901, 1906 and 1908 cartels, of which the Canadian subsidiaries were members but of which Alcoa itself as a principal was not a member, it was believed by Alcoa and believed by its lawyers that participation by a Canadian subsidiary in a cartel was lawful.

I am merely touching on these points; there is no use spending a great deal of time on or going into an extensive discussion of them.

4. As the Government expressly concedes (reply brief, p. 252), the parties to the 1908 cartel themselves clearly understood that it was a mere temporary arrangement.

5. In the latter part of 1911 and the early part of 1912 Alcoa gave advance information direct to the Department of Justice that it was negotiating the 1912 cartel (pp. 18735-71; 18889-929; 18940-52; 19676-90; 19749-51; 19754-79; Exhibit 1013; Exhibit 1015).

You may recall the testimony by Mr. Arthur V. Davis, as well as some of the correspondence, indicating that in the course of the negotiations with the Department of Justice, both on the part of Mr. Davis and on the part of Mr. Gordon, the attorney for Alcoa in the Pittsburgh case, and quite some time in advance of the signing of the first form of the 1912 cartel, Mr. Davis went abroad and negotiated with respect to that cartel.

You may recall also that the proof sheet of a draft of the decree put in evidence (Exhibit 1014) shows the insertion, as there appears in the decree itself now, of a clause which in the language of the cartel provided that it should apply only to trade other than that in the United States.

In the bill criticism is made of the fact that the 1912 cartel, as we have it in evidence here in its final form, is dated June 10, 1912, whereas the decree in the Pittsburgh case is dated June 7, 1912. In the bill this is referred to as if three days after the decree was signed Alcoa had proceeded with the kind of misconduct which was condemned by the decree and had done it secretly from the Department of Justice. Is that a fair statement or is that borne out by the evidence?

The statement of the bill, as so interpreted, is wholly without warrant and is not sustained by the evidence. The 1912 cartel was signed in its first form on the 28th day of April, 1912, weeks in advance of the signing of the decree of June 7, 1912. It turned out, however, that Giulini Bros., a European concern which had expected to join and be a member of the 1912 cartel, had decided to withdraw and not become a member. It was on this account and solely on this account that it became necessary to change the form of the cartel by the elimination of Giulini Bros. as a party and the consequent relative rearrangement of the sizes of participation of the other members.

It is perfectly clear on the proof that the June 10, 1912, form of the 1912 cartel differed from the April 28, 1912, form of cartel only by embodying in the later form the changes which were required as the result of Giulini Bros. withdrawing after the April 28th or earlier cartel had been signed by a number of the other members. So also it is clear from the proof that the purpose of Alcoa, through Mr. Davis and through Mr. Gordon, negotiating with a representative of the Department of Justice,—either Mr. Fowler or his assistant, —as to the form of the 1912 decree was to embody in the decree a provision so that there could be no doubt on the part of Mr. Davis and Mr. Gordon that the decree was not intended to interfere with or prohibit Alcoa through its subsidiary from joining in the 1912 agreement.

6. Alcoa furnished to the Department of Justice a copy of the cartel on November 25, 1912 (Exhibit 1021; minutes, pages 19757-8). That was nearly 29 years ago and the first complaint that has been heard of it, so far as appears in the proof, is in the present suit.

7. Alcoa urges that the subsidiary of Alcoa joined in signing the 1912 cartel on the advice of counsel that it was lawful to do so (Exhibit 141; pp. 18947; 19762; 19768-70).

On the other hand, what does the Government say with regard to these same matters?

In the first place, the Government contends that there was insufficient revelation of the 1912 cartel to the Department of Justice and that intentional violation of the Sherman Act by Alcoa is shown by the following: (a) There was a large increase of importations into the United

States in 1910 over the importations of 1908. This was attributable, according to the argument, to the British and French companies ceasing in 1908 their membership in the 1906 cartel and in 1910 not being members of the 1908 cartel (Exhibit 453). (b) There was an increase of nearly 7 cents per pound in the United States market quotation between April, 1912, when the first form of the 1912 cartel was signed, and the end of that year, while aluminum sold in 1911 at 16-1/2 to 17 cents per pound (pp. 19806; 21190; Exhibit 77).

Assume that the facts relied on by the Government are accurately stated and that the Government is right on what are the facts as to the prices. How does that establish that there was an agreement between Alcoa and the members who had quit the cartel? So far as I can see, it has no bearing whatever,—not even on the question of whether there was an agreement,—and without an agreement there was no conspiracy.

However, at this stage it is inappropriate to attempt to make any final decision on the intent with which Alcoa did various of the many acts that occurred subsequently; and all that we can do is to bear in mind the conduct of Alcoa during the period up to 1915 as having a bearing, when coupled with various other facts, on the intent with which Alcoa did the acts, outside of joining the cartels, that are complained of as constituting a violation of the Sherman Act.

Moreover, as it seems to me, substantially we may disregard all the cartels we have been talking about, save to the limited extent that I have indicated, down to January 23, 1915, when paragraph 57 of the bill says specifically that the so-called 1912 cartel was "cancelled." Certainly it is true that the cartels spoken of back in that period cut very little if any figure at all in this case; and I repeat, by way of emphasis, that the latest of those cartels, even if it be conceded for the sake of the argument that the 1912 cartel was a violation of the Sherman Act, terminated 26 years ago.

(2) 1915-1928

That brings us to the second period. This is from 1915 to 1928.

The Government says (original brief p. 641) that the conspiracy was "inert" from 1915 to 1919. If it was not inert in the sense that it did not exist at all, what does the Government mean by describing it as "inert"? So far as I can see, there is no proof of any existence whatsoever of a cartel of which Alcoa was a member between 1915 and 1919. That appears to me to be the fact and in that sense the cartel was inert. As I view the matter, it is certain that a finding that during the 1915-19 period there was conspiracy would not be supported by any evidence that has been introduced in this case.

If the conclusion just stated be accepted, then the period of 1915 to 1928 will be shortened to 1919 to 1928 and the inquiry will become whether there was a conspiracy during the latter period.

As to the years 1919-1928 the Government says that there was a "tacit" understanding. What does that mean? I think it necessarily means that there is no evidentiary support of the existence of a conspiracy during the 1919-1928 period unless it can be implied or inferred from circumstances. If it were tacit, it was not explicit or outright agreed on. The resort of the Government, therefore, for support of its contention is to circumstantial evidence.

Before taking up the problem as to whether it may be inferred that there was conspiracy during the period last mentioned, it is important to note two facts:

1. The first fact is one to which I drew your attention earlier, without indicating its significance. This is that in the period of 1919 to 1928 from time to time there were cartels between European producers. The chief of these referred to in the evidence or by counsel are one of 1923 and one of 1928.

The evidence, however, indicates very strongly and I feel shows that during that period there were cartels additional to those of 1923 and 1928. The dates as to the latter class of cartels are not precisely stated. As I have previously remarked, the evidence indicates that they ran from time to time between 1920 and June 4, 1928. The evidence also indicates that they existed after June 4, 1928; but, if so, we are not interested in the fact at the moment.

2. Apparently in 1923 there was, and at the trial counsel for the Government and Alcoa assumed that there was, a cartel between Europeans as to aluminum. We are the more certain of this being true because Mr. Arthur v. Davis testified that he was asked to join it and that he declined. The

terms, as I have said, were not definitely stated (pp. 5184-6).

In 1927 or in 1928, or apparently in both (seemingly within the period running from January, 1927, to January, 1928), Mr. Marlio, head of the French Aluminum Company, and Mr. Morrison, head of the British Aluminium Company, besought Mr. Arthur V. Davis to have Alcoa join the cartel to limit imports into the United States. Mr. Davis testified that he flatly refused (pp. 21361-71; Exhibit 892, at exhibit pp. 4139-40; 4177). There is no testimony whatever to the contrary. That would be enough to reject the contention that Alcoa joined the cartel. But the case is stronger. In its original brief, pages 642-3, the Government says that it believes the statement of Mr. Davis that "he refused to comply with this demand." I believe him also.

Mr. Davis flatly denies, and there is no evidence to justify a finding, that Alcoa or any subsidiary of Alcoa was a member of any cartel during the period 1919 to 1928.

In support of its claim that there was a tacit understanding during the 1919-1928 period between Alcoa and the foreign aluminum producers, the Government makes four arguments:

(a) The prices of aluminum in Europe and in the United States during that period were uniform.

(b) There were statements by representatives of the foreign aluminum producing companies to American business men which showed that there was such an understanding.

(c) There is testimony that representatives of Alcoa admitted its membership.

(d) Acquisitions of property from and of stock in companies located in Europe engaged in the aluminum business point to confederation or conspiracy between themselves and Alcoa.

Each of the contentions will now be discussed.

The first ground on which the Government relies is that there were uniform prices between Alcoa and the European producers.

There is some testimony that there were quotations of Alcoa and foreign producers which were practically the same at various times between 1919 and 1928. There is other testimony to the contrary.

Assuming, however, the existence of uniformity in prices claimed by the Government, yet that standing alone does not establish the existence of an agreement on the subject between Alcoa and the foreigners. It was so held in United States v. International Harvester Co., 274 U.S. 693, 708, 709, 47 S.Ct. 748, 754, 71 L.Ed. 1302. There the Court said:

" * * * the fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition or show any sinister domination."

Other evidence is required. In connection with the other evidence, if any, the trier of the facts, whether a jury or a judge, may consider, for what weight it or he sees fit to give to it, the fact that the prices were the same.

As I have indicated to you heretofore, however, and as I shall bring out later, the truth is that the prices were not uniform.

The second ground of the Government is that, as it says, statements that an agreement existed between Alcoa and the foreigners were made by representatives of the European companies to American business men.

In support of this contention the Government offers testimony as to twelve conversations. Nine occurred prior to 1928. Three occurred after 1928.

I have several times spoken of having to go into the recitation of evidence which is tedious. If I had to make a choice of what is the most tedious, my selection would probably be these twelve conversations.

I have gathered together the full testimony of the witnesses as to the twelve conversations. I have considered bringing the whole of that before you. It is difficult to condense. Nevertheless, I have decided not to lay all of it before you, but to endeavor to put it into shorter form. I think, however, that, if one wish to get the full force of that testimony and thoroughly to understand it, it would be better to read the full testimony in which the conversations are described in their entirety.

The first set of conversations occurred in the period from 1919 to 1927. The European companies concerned were the British, the French, the Swiss and the German. The four American business men who took the stand and recited those

conversations were Mr. Haskell and Mr. Babson of the Baush Company, Mr. Waltz (who was an aluminum broker and formerly had been connected with the Bremer-Waltz Company) and Mr. Harwood of the Fulton-Harwood Brass Works of South Bend, Indiana.

The Government also relies on testimony that did not come from the foreigners. One of the witnesses in that class is Mr. Main of the Cadillac Motor Company and the other is Mr. Bohn of the Bohn Aluminum & Brass Corporation. The testimony of Mr. Main and Mr. Bohn will be taken up later and not intermingled with the testimony concerning statements by the European aluminum producers or their representatives.

I have indicated that some interviews by American business men with the foreigners occurred subsequent to the transfer of foreign properties to Aluminium on June 4, 1928. Possibly I should not take those up at this stage in connection with the other conversations that clearly occurred preceding June 4, 1928. However, I have concluded that it will be better to take up all those conversations as one group, partly because the dates of some of the conversations are rather uncertain and it is just as well to have all of them brought in now.

Before taking up any of the twelve conversations, I should call attention to a piece of testimony by Mr. Harwood not related to the conversations with the Europeans. He said that before 1922 there was real competition in the aluminum business in the United States between Alcoa and the foreigners (pp. 4614-5). If we accept that statement and I understand its meaning correctly, and I think I do, then the effect of it is to advance the beginning date of the inquiry from 1919 to 1922. You will recall that, on the Government's concession, it was moved up from 1915 to 1919. Now if we rely on this particular testimony of Mr. Harwood,—and I see no reason for doubting its accuracy,—such beginning date goes forward again and this time to 1922. If the starting point was in 1922, then in effect the charge of the Government is that the conspiracy complained of prevailed between 1922 and 1928.

The testimony with regard to the conversations with the representatives of the foreign aluminum companies, condensed as best I can, is as follows:

First. Mr. Waltz testified that in 1920 he had a conversation with Mr. Tait of the British Company. Mr. Waltz said that he tried to buy 500 tons of aluminum, that Mr. Tait would only sell him 300 tons, that he asked Mr. Tait for a price reduction and Mr. Tait then stated that he could sell me (Waltz) more and reduce the price but that there was an agreement he thought it best to live up to because he did not want to step on Mr. A. V. Davis's toes. The type of agreement, the witness says, was not discussed. Mr. Waltz added that the reason the foreigners preferred to sell others ahead of him (that is, ahead of Mr. Waltz) was that the others had money to pay and he did not (pp. 9460-4; 9718-9; 9737-8; 9762-3; 9868-70).

The second conversation was by Mr. Waltz in 1920 also. He says this was with Mr. Cohen of the French Company and occurred in New York. Mr. Cohen, he says, was not an agent of the French Company in the United States. Previously, he says, Mr. Cohen had sold him (Waltz) loose lots of aluminum in Paris. In 1920, when Mr. Waltz sought to buy from Mr. Cohen in New York, Mr. Cohen replied that it was impossible through him to get the aluminum into the United States. He said, according to Mr. Waltz, that the French Company had joined an association or was working under a cartel. He said the Europeans had adopted a suggestion of Mr. Arthur V. Davis that it was better to restrict production and sell at a higher price than to go full capacity and sell lower. He further stated that Mr. Cohen said that he (Cohen) could deliver to me (Waltz) in Mexico; but when I sought that, the freight precluded (pp. 9475-82; 9487-90; 9738-43).

The third conversation was in 1922. This was between Mr. Harwood and Mr. Morrison of the British Company. Mr. Harwood says that when he sought to buy, Mr. Morrison said that other arrangements had been made as to selling us. In future, Mr. Harwood reports Mr. Morrison as saying, we (that is, the Americans) should buy from Alcoa. He said that the British Company would distribute in other fields. Mr. Harwood further testified that he did not recall that Mr. Morrison discussed the character of the new arrangements to which he referred. Mr. Harwood said that he and Mr. Morrison discussed the anticipated new United States tariff, a bill being then pending in Congress for a new tariff.

Mr. Harwood said further that Mr. Morrison remarked that there would be no more such severe competition after the tariff was enacted as there had been in the past. Mr. Harwood also stated that Mr. Morrison said that he estimated that the price advance on account of the new tariff would be more than three cents a pound; perhaps five cents and possibly ten cents. Mr. Harwood added that Mr. Suhr of the French Company and Mr. Kaufman of the Swiss Company had also mentioned the new tariff in about the same terms that Mr. Morrison did (pp. 4433-44; 4623-7).

The fourth conversation was in 1922. It was between Mr. Harwood and Mr. Suhr. According to Mr. Harwood, Mr. Suhr said that the reason he would not continue to sell Mr. Harwood was because other arrangements had been made for distribution and sale of their (that is, the French Company's) product. He (Mr. Harwood) represented that Mr. Suhr also said that they would sell elsewhere and that there would be a reallocation of distribution. He said that Mr. Suhr did not say in words that Alcoa was a member of the arrangement. He stated further that thereafter he (that is, Harwood) was not solicited by foreign aluminum representatives (pp. 4445-53; 4623-4). He further testified that Mr. Suhr could have been telling about an arrangement among the foreigners, not including Alcoa. He added, however, that "I don't believe it was" (pp. 4653-8).

Fifth, in 1922, Mr. Harwood says he had an interview with Mr. Kaufman of the Swiss Company. Mr. Harwood testified that Mr. Kaufman said that he would sell no more in the United States direct to consumers (Mr. Harwood adding "I being a consumer"). He says that Mr. Kaufman stated that a cartel arrangement had been made of world distribution of aluminum; that further Mr. Kaufman stated that certain territory had been allotted to each company and that the American market had been allotted to Alcoa. He testified further that Mr. Kaufman stated that there would be no competition under the new plan. He added that Mr. Kaufman said that if I wanted Swiss metal I should get it through Alcoa. He added that, according to Mr. Kaufman, the American market would be occupied by Alcoa after the passage of the tariff bill; that there would then (that is, after the passage of the tariff bill) be no competition. He said that this

was because each would have his field, similar to the European cartel plan. He said he was not sure that Mr. Kaufman said anything about an agreement in that connection. He said that Mr. Kaufman stated that general plans had been entered into, that distribution of aluminum would be allocated all over the consuming world; also that Alcoa would get the American market. He said, according to Mr. Harwood, that foreign companies would not be concerned with sales in the United States; further, that Mr. Kaufman stated that reallocation of distribution had been agreed on. He said that he did not remember that Mr. Kaufman said anything about sales by Alcoa outside of the United States. He said that he (that is, Mr. Harwood) did not think that there was an arrangement among foreign producers without including Alcoa. He said his (that is, Harwood's) opinion was that Mr. Kaufman meant to convey that Alcoa was a member. He said "possibly this was inference on my part" (pp. 4453-63; 4523-7; 4550-2; 4608; 4610-3; 4618-27).

The sixth conversation was in 1924. This was between Mr. Haskell and Mr. Marlio of the French Company. Mr. Haskell testified that when he asked for a price Mr. Marlio said that he had an agency in New York and referred me (that is, Mr. Haskell) there; that Mr. Marlio said that the price would be the same as charged by Alcoa or there might be a small concession. Mr. Haskell said that Mr. Marlio referred to agreements between the foreigners with each other. Mr. Haskell also said that he was not sure that Mr. Marlio said anything about an arrangement with Alcoa, but he added "I inferred it." Mr. Haskell further testified that it was not his recollection that Mr. Marlio said that he had an agreement with Alcoa. In substance, Mr. Marlio stated that the French Company had been able to sell all the aluminum they produced at prices set by Alcoa. He said further (p. 2312) "My recollection is that reference was made to meetings of the producers of aluminum" (pp. 2304-13; 2335-9; 2869).

The seventh conversation was between Mr. Waltz and Mr. Bernstorff who at the time was the agent of the German Company in New York. This was in 1925. Mr. Waltz said that he had arranged with Mr. Bernstorff to sell VAW (that is, the German Company) aluminum on commission. He said that the market price at the time was 27 cents. Mr. Waltz said further that

he himself sold at 26 cents. He said that the market price then rose to 28 cents and that he (Waltz) continued to take orders at 26 cents (that is, 2 cents below the market). He further testified that Mr. Bernstorff refused to fill orders from him of that kind and that he (Waltz) then cancelled the orders. He further said that when the market price went to 28 cents the New York agent of the British Company asked if he (that is, Waltz) was going to raise the price of German aluminum from 26 cents to 27 cents, saying (that is, the British Company agent saying) that all other importers and Alcoa had raised their prices; that the British agent said that he thought that Mr. Waltz should raise his price, but that he (Mr. Waltz) refused (pp. 9490-9544; 9577-83).

The eighth conversation was in 1927. This was between Mr. Haskell and Mr. Von der Porten of the German Company. Mr. Haskell said that when he asked for a price on aluminum Mr. Von der Porten told him to get it through his (that is, Von der Porten's) New York agency. Mr. Haskell says he then requested Mr. Von der Porten to cut the price. He says Mr. Von der Porten refused and said his (Von der Porten's) price would be the same as Alcoa's. Mr. Haskell then added that he asked Mr. Von der Porten to quote him below the market price and that Mr. Von der Porten refused. Mr. Haskell further testified that the foreigners were already quoting lower prices and did that nearly all the time. Mr. Haskell said that he did not remember Mr. Von der Porten saying anything as to the policy of breaking the price in the United States. He testified further that Mr. Von der Porten said he had accumulated a surplus of ingot and that he contemplated selling it in America by lowering the price and selling it as distressed aluminum. He further said that Mr. A. V. Davis bought that distressed aluminum at a price which netted him (that is, Von der Porten) his regular price as if he had sold it in Amercia. Mr. Haskell further testified that the price, with freight and duty, was substantially equal to or only slightly less than the prices being charged in the United States by Alcoa and the foreign producers, including the German Company.

Mr. Haskell said finally that he thought that dominance in the market by Mr. Davis was discussed; also that there was discussion of what would happen in the German market if the Germans dumped a lot of aluminum in the United States. He said that he (Mr. Von der Porten) said he feared what Mr. Davis would do, but that he (Mr. Haskell) did not remember whether he (that is, Von der Porten) said what Mr. Davis had threatened to do (pp. 2313-7; 2707-8; 2713-5).

The ninth conversation occurred in 1927. It was the last of the series which preceded 1928. It was between Mr. Waltz and Mr. Seligman, an agent in New York of the British Company. Mr. Waltz said that he told the British agent that he (that is, Waltz) had heard that the customers in the United States had been allocated to different foreign agencies and that he (that is, Waltz) had been allocated to the British Company and that he (Waltz) thought that the British agent should have sold him aluminum. He said the British agent said that the companies had been allocated and he could not sell Waltz because there was a deal among importers not to sell to dealers; that if he (that is, Waltz) sold to a manufacturer, the British Company would fill the sale direct. Mr. Waltz said that he did not recall anything else said on the subject (pp. 9583-7).

I have related to you nine conversations about which there was testimony given by American business men. None of the foreigners and none of the agents of the foreigners took the stand except Mr. Bernstorff, who did not testify about the conversations. In other words, in the nine conversations I have referred to we have only the testimony of American business men as to what was told them by the foreigners or their representatives.

As I have previously stated, there is testimony of three conversations which occurred subsequent to the transfer in 1928 of certain of its foreign properties by Alcoa to Aluminium.

One of the conversations occurred in 1929. The second and third occurred in 1930. I shall have occasion in another connection, as I have indicated heretofore, at a later stage to discuss the three conversations I am now going to relate to you. Mr. Babson of the Baush Company participated in one of them. He had taken no part in any of the nine conversations which occurred before 1928.

As I have said, the first of the additional conversations was in 1929. It was by Mr. Babson with Mr. Kaufman of the Swiss Company. Mr. Babson said that he asked a

quotation for use in the United States. He says that Mr. Kaufman replied that the price would be substantially the same as Alcoa's. Mr. Babson added that he thought that Mr. Kaufman said the price was fixed; by which he understood that it would be the same, irrespective of where I (that is, Babson) got the metal.

Mr. Babson further testified (and this is one of the instances to which I referred heretofore where the date is very uncertain) that during the period from 1920 to 1930, from time to time, he (that is, Babson) tried to get price quotations from import agents of the four major European producers in the United States. He said that he got none lower than Alcoa's prices. He said also that the price was always the same as the price of Alcoa (pp. 3056-63A; 3095-3128; 3150-1). Mr. Babson is the witness who testified to the identity of prices previously mentioned.

The second of the post-1928 conversations was in 1930. It was between Mr. Haskell and Mr. Kaufman of the Swiss Company. Mr. Haskell testified that he asked Mr. Kaufman for a price of aluminum for use in the United States and that Mr. Kaufman referred him to his (Kaufman's) New York agent and said that the price would be the same as Alcoa's. Mr. Haskell says that he does not remember Kaufman saying anything about breaking the cartel price, but that at a previous meeting or meetings between 1924 and 1930 Mr. Kaufman had refused to break the cartel price. He testified further that Mr. Kaufman referred to contracts abroad. Mr. Haskell added that he (Haskell) inferred that the reason Mr. Kaufman would not break the price in the United States was that there had been an agreement; but that this was inference on his (Haskell's) part. He said that he was unable to get a material concession in the price of ingot (pp. 2317-29).

The third conversation was also in 1930. It was between Mr. Haskell and Mr. Morrison of the British Company. Mr. Haskell testified that when he asked the price of aluminum for use in the United States Mr. Morrison referred him to his (Morrison's) New York agent. Mr. Haskell added that he thought Mr. Morrison said that the price would be the price of Alcoa. He added further that this was what he (Haskell) was generally told by foreign producers between 1919 or 1924 and 1930 (pp. 2327; 2331).

Mr. Haskell said further that he did not remember Mr. Morrison saying anything about an arrangement that he (Mr. Morrison) had with Mr. Davis. He also said that he did not remember Mr. Morrison saying that an arrangement he had related to the United States, but Mr. Haskell says (p. 2335; see also pp. 2325-6; 2696), "I did infer it."

Mr. Haskell testified also that he did not ask a quotation on a particular amount nor discuss deliveries. He said that no doubt he (that is, Haskell) had in mind his treble damage suit then pending against Alcoa and that he (Haskell) was seeking information he thought would be helpful in that suit. Mr. Haskell said further that the foreigners might have assumed from the nature of the conversations that he (Haskell) was not seeking actual purchases of aluminum. He said finally that he (Haskell) was unable to distinguish between his recollection and his inferences (pp. 2329-35; 2691-6).

This completes the summary of the testimony of the four American business men about their conversations with the Europeans between 1920 and 1930. As I have said heretofore, none of the Europeans took the stand, nor did any of the agents of the Europeans take the stand except Mr. Bernstorff, who gave no testimony about these matters.

Later attention will be called to contradictions by other witnesses of the testimony I have summarized. Even if, however, that testimony were not disputed, I feel that on its face it is insufficient to establish conspiracy.

There are three observations I desire to make concerning the twelve conversations as a group. After those observations I shall discuss the individual conversations.

■ (1) The first observation is in regard to the attitude of the courts toward testimony such as that embodied in the twelve conversations. It is a perfect example of hearsay. The conversations occurred years ago. Such testimony stands rather low in the scale applied for measuring the weight of testimony. Dalton v. United States, 22 How. 436, 442, 16 L.Ed. 395. There the Court said this:

"In all cases, the testimony of admissions or loose conversations should be cautiously received, * * * They are incapable of contradiction. They are seldom anything more than the vague impressions of a wit-

236

ness of what he thinks he has heard another say—stated in his own language, without the qualifications or restrictions, the tone, manner, or circumstances, which attended their original expression."

Next in Chaffee & Co. v. United States, 18 Wall. 516, 541, 21 L.Ed. 908, the Court said:

"The testimony of living witnesses personally cognizant of the facts of which they speak, given under the sanction of an oath in open court, where they may be subjected to cross-examination, affords the greatest security for truth."

Also in Beckwith v. Bean, 98 U.S. 266, 280, 25 L.Ed. 124, the Court said:

"Verbal confessions or admissions, made in the presence of the witness alone, constitute, it is true, very unsatisfactory evidence, partly because of the facility with which they may be fabricated. It is, therefore, to be received with great caution; * * *."

Lastly in Tousey v. Hastings, 194 N.Y. 79, 80, 81, 86 N.E. 831, 832, it was said:

"We have frequently held, but it does not seem to be well understood, that there may be a question of fact when all the witnesses are worthy of belief and no witness contradicts another. Diverse inferences may be drawn from the narrative of a truthful witness; and when the narration is of oral admissions, made some time before, and, although the precise words are important there is no circumstance to impress them particularly on the memory, it is seldom that a question of fact is not presented as to whether the essential fact is fully proved. Aside from the danger of fabrication, verbal admissions are regarded as unreliable evidence, because experience shows that they are frequently misunderstood, imperfectly remembered, and inadvertently made."

(2) What in these twelve conversations related to cartels, of which there is no evidence that Alcoa was a member and of which there is evidence that Alcoa was not a member, are mere inferences of witnesses and not evidence on the issue as to whether Alcoa was in conspiracy.

(3) Of the four American business men who were witnesses and who related the twelve conversations, two undertook to state conversations they had had while in search of evidence for use in a treble damage suit under the Sherman Act against Alcoa; as witnesses in the trial

of that case they committed themselves adversely to Alcoa before testifying in this case; and I think I may recall to you that to some extent it seemed necessary to lead those witnesses in order to get out the conversations. The other two witnesses on the stand displayed, and conceded, strong hostility to Alcoa (pp. 4542-9; 9648-9721; 9729-36) and, as I think, both of them were of the type who,—though perhaps unconsciously,—influenced by that bias, would perhaps unconsciously shade their testimony adversely.

Next, what did the witnesses who talked of conversations with foreigners or the representatives of foreigners say about there being or having been an agreement between producers of aluminum? That is what we are concerned with. The testimony we are now considering may contain all sorts of things of academic interest, but unless it bear on whether or not there was some form of concert or confederation between Alcoa and the European aluminum producers, we have no interest in it at this stage.

In reviewing the portion of the testimony which, as I see it, comes nearest to having a bearing on whether there was an agreement, I have selected four examples, —and I think four examples of what, included in all the testimony of those twelve conversations, is the most favorable to the Government.

You may recall there were four witnesses who testified on the branch of the case at the moment being considered. They interviewed the representatives of four foreign companies. Their talk was about things that ran along from 1920 to 1930. Of the twelve conversations let me remind you also that nine occurred before and three occurred after June 4, 1928. The nine which occurred before 1928 were between 1920 and 1927; the three which occurred after 1928 were one in 1929 and two in 1930.

Of the four examples selected for comment, the first is a conversation in 1920 of Mr. Waltz with Mr. Tait of the British company. Mr. Waltz said that Mr. Tait stated that there was an agreement he thought it best to live up to so as not to step on the toes of Mr. A. V. Davis. The second is a conversation of Mr. Harwood in 1922 with Mr. Morrison of the British company. You may remember that, according to Mr. Harwood, Mr. Morrison

said that other arrangements had been made for selling in the United States and that in future Americans should buy from Alcoa. The third is the testimony of Mr. Harwood as to his conversation in 1922 with Mr. Kaufman of the Swiss company. He said that Mr. Kaufman stated that an arrangement had been made for world distribution; that the American market had been allotted to Alcoa; also that, after passage of the tariff bill of 1922 by Congress in this country, there would be no competition. The fourth is the testimony of Mr. Babson about his talk in 1929 with Mr. Kaufman of the Swiss company. According to Mr. Babson, Mr. Kaufman stated that the price in the United States would be substantially the same as Alcoa's. Then he added that he thought Mr. Kaufman stated that the price had been "fixed."

On analysis it seems to me that the conversations are without any great probative weight in determining the relevant issues. Among the reasons for this view are the following:

First, each of the examples I have given is capable of an interpretation to mean only that the Europeans themselves were in a cartel or that in their sales in the United States they would closely follow Alcoa's prices or that they would substantially leave the United States market to Alcoa.

Second, no unambiguous statement, even second-hand, is shown to have been made by any European producer that Alcoa had joined in any agreement on prices or on other terms of selling aluminum in or importing aluminum into or keeping foreign aluminum out of the United States.

Thirdly, according to the statements made by the witnesses themselves, what they say rested largely on their own inferences.

Fourthly, accepting the evidence on its face, the evidence is vague and unsatisfying. Without more it strikes me that it is wholly insufficient to discharge the burden of proof which rests on the Government.

In the nature of things Alcoa officials have no personal knowledge of what was said out of their presence by European aluminum producers or by agents of those producers. Alcoa cannot directly contradict the testimony of the four American business men that the producers or their representatives made the statements which those American business men witnesses have attributed to them. If the producers made the statements and these be interpreted to mean that the producers charge Alcoa with having confederated or agreed or conspired, during the period of 1919 to 1928, to suppress or join in suppression of the importation of aluminum into the United States or otherwise to participate in the restraint of trade of aluminum, in their testimony the principal officials of Alcoa have made complete and unequivocal denials of knowledge that any such thing ever happened (pp. 5184; 5192-3; 5195-5200; 5222-5; 18389-91A; 18511-44; 18552-6; 18562-7; 19274-5; 19282-3; 19347-50; 20504-7; 20577-88; 21482-3; 21486; 22538-41; 22545-53; 33240-43; 33245-6; 40353-4; 40358-9).

As I conceive, as a practical matter the accusations could not be true and Alcoa's officials be ignorant of them. As I conceive also, if the accusations be untrue, there is no way to meet them except in the one way which the Alcoa officials have adopted. I believe their denials.

The next group of testimony on which the Government relies in connection with the matter now being discussed is some incidents, not previously described, which, it is contended, occurred between American business men and representatives of foreign aluminum companies.

(1) The Government claims that in 1919 the New York sales agent of the British Aluminium Company informed the Director of Purchases of the Cadillac Company, or the Cadillac Division of the General Motors Company, that the British company had set aside a quota of British aluminum to come to the United States for the Cadillac concern that year; also, that in 1920 the Cadillac purchasing agent had asked the British company's New York sales agent if there was an agreement with Alcoa as to limiting importation of foreign aluminum into the United States and that the sales agent did not affirm or deny it but "just smiled it off" (p. 4318).

Manifestly, as I conceive, if either incident occurred as insisted by the Government, it would prove nothing affecting the present controversy. For one thing, this is true because it is not even asserted by the Government, much less shown by evidence, that Alcoa had any share whatever in what was done by the British company with respect to a quota.

238

Apart from all this, however, the memory of the Cadillac agent, as all who heard him must recall, was so poor that no one can be sure what he intended to represent as being the facts. In saying that I do not mean in the slightest to criticize him (pp. 4311-3; 4315-8; 4341-7; 4372-4400). Curiously also, although present at one of the interviews and much interested (pp. 4316; 4373-4; 4381-2; 4395), Mr. Bohn when on the stand as a Government witness was not asked what was his recollection.

The evidence, therefore, seems to me wholly insufficient to establish anything wrong, much less to show the commission of an offense.

(2) This brings us to the Bohn Company matter. This has been previously mentioned, but has not yet been set out.

The Government claims: (a) that in 1922 Alcoa discriminated against the Bohn Company, and in favor of the International Motor Company, in prices of aluminum; and (b) that in 1923 several European producers of aluminum, without explanation, refused to sell the Bohn Company all the aluminum ingot it needed.

It might be enough to point out that if what is complained of occurred, it would fall far short of supporting a conspiracy charge against Alcoa. If Alcoa preferred another customer over Bohn or, without disclosure of a reason, foreign aluminum companies failed to supply all the ingot Bohn wanted, each may be subject to criticism; but it seems plain that, on the evidence, what was done is not shown to have been an agreement or confederation or conspiracy or any other violation of the law whatever.

I feel strongly that the facts fully sustain the view just expressed. These divide themselves, however, into two quite distinct branches—one dealing with each charge—and I shall take those up.

Certain sales referred to by the Government took place in 1922—partly in January and partly in August. It is around these that the first Bohn charge hinges. The other Bohn matter occurred in 1923.

It is not alleged, nor has it been proved, that Alcoa made no sales to Bohn during 1922. On the contrary, Mr. Bohn says he thinks that during the year his company did purchase aluminum from Alcoa (pp. 13323-5). What is alleged is

that, as the Government says, in 1922 there was aluminum Bohn wanted which Alcoa refused to sell when concurrently it sold to others.

In January, 1922, Alcoa sold some re-run No. 12 alloy to the Clark Metal Last Co. at 15 cents a pound (Exhibit 753). Though apparently a bit uncertain, Mr. Bohn said he thought that he asked Alcoa for a quotation on the same alloy about the time there was a sale to Clark; but he says, "As far as I can remember" I got none (p. 13348). He said also the Bohn Company asked the Clark Company to obtain for it such an alloy; and the Clark Company sold the Bohn Company a carload of this metal about that time, but he does not remember the price (pp. 13343-65). Mr. Bohn said further that he did not think his company ever bought any re-run metal from Alcoa (p. 13359). He did recall that his company had bought a carload of metal from Clark (p. 13361) which his company had tried to buy from Alcoa; but, he added, "they did not have any available, so we bought it from Clark" (p. 13364).

Mr. Bohn indicated that the Clark re-melt metal matter had been handled by his associate, Mr. Markey (p. 13355). When Mr. Markey later took the stand, he said he recalled that his company had been unable to obtain No. 12 remelt from Alcoa; that he then asked Clark to purchase the same metal from Alcoa; that Clark got the metal, turned it over to Bohn and Bohn reimbursed Clark for it (pp. 24684-5).

As I see it, there are two difficulties in the evidence about the Clark matter. The first is that it does not appear that there was any conspiracy to treat Bohn differently from any other customer; and when there is no conspiracy to treat them differently the law does not require that all customers be treated alike. The second is that the facts with respect to the sale to Clark and the failure to sell Bohn are not brought out with sufficient detail to enable one to say that there was no material difference in the terms on which Clark bought and on which Bohn asked Alcoa to sell.

Alcoa says, in substance, that the Peninsula division or subsidiary of Bohn was speculating in metal in 1922; that this division or subsidiary was the one which actually sought to buy the remelt No. 12

metal from Alcoa; and that these facts justified Alcoa's refusal to sell. In support of its argument Alcoa relies on the testimony of Mr. Markey (pp. 24916-7). I do not believe, however, that the evidence is sufficient to support Alcoa's contention. A missing link is that it does not appear that Alcoa knew at the time of the intention by Bohn's division subsidiary to speculate with the No. 12 if acquired by Bohn.

There were also some occurrences later in 1922 which should be discussed.

Exhibit 751 contains correspondence in August between Alcoa and Bohn. In response to inquiries for quotations on two described kinds of aluminum for later shipment, Alcoa (through a salesman named Foote) gave 19 cents as its price on one lot and 21 cents as its price on the other lot (items 2 and 3 of Exhibit 751). On October 4 following Mr. Bohn wrote a letter to Mr. A. V. Davis about these quotations. He complained that at dates near the dates of those quotations Alcoa had sold to International Motors Co. at 18 cents and to Wilson Foundry & Machine Co. at 21 cents (item 5).

The evidence does not give details about the sale to Wilson; but Exhibit 752 shows that, through an agent named Brown, a sale was made to International at 18 cents, as asserted by Mr. Bohn in his October 4th letter to Mr. Davis. On October 11th Mr. Davis sent a reply (item 6 of Exhibit 751). In substance two things were there stated: (1) that the price given International was a mistake, committed by a subordinate while his superiors were absent from home (for which Mr. Davis was apologetic); (2) that Mr. Bohn was misinformed about the sale to Wilson Co. to which the price had been exactly the price to the Bohn Company.

There is nothing in the evidence to contradict or impair the account of the transaction given by Mr. Davis (pp. 13324-43). Moreover, what Mr. Davis said was introduced in evidence by the Government. Under the circumstances, I think it must be accepted. If taken as true, the criticism of the conduct of Alcoa in regard to the August sales vanishes. It is left wholly devoid of foundation.

The Government relies on Exhibit 749 to sustain the second or 1923 Bohn charge. This consists of communications which passed between Bohn and several foreign companies in that year.

The first group contains letters in which Bohn asked for prices, with deliveries during the last half of 1923; the second group contains a telegram (item 9) in which he asked for prices, with deliveries in the first half of 1924. The producing companies sent polite replies. These were in varying forms. Some explained, and some did not explain, why the orders were not accepted. For example, in item 2 the Swiss company said it did not then have tonnage free for delivery at the date desired; in item 3 a French company pleaded prior commitments and said its failure to offer tonnage was only temporary.

There is complete lack of evidence to impeach the genuineness of, or otherwise to support criticisms of, any of the refusals (pp. 13272-321); nor is there any evidence to pin responsibility on Alcoa. It follows that the charge must fall, because not sustained by proof.

Lastly, it should be emphasized that the matters covered by the first Bohn charge occurred in January and August, 1922, while those covered by the second Bohn charge occurred in May, June and November, 1923. The mere separation by such a long period, standing alone, prevents the coupling together of the conduct of Alcoa complained of in one charge with the conduct of the foreign aluminum companies complained of in the other in order to support a theory of conspiracy between Alcoa and the foreigners.

In connection with the conspiracy charges several miscellaneous other matters have been discussed by the Government. Inasmuch as these are not closely related to the aspects now under consideration, they will not be taken up at present. However, they will be dealt with later.

The third argument of the Government, as I have recited what its group of arguments now being considered consisted of, is that, as the Government claims, certain admissions of conspiracy were made by Alcoa officials; one by Mr. Arthur V. Davis and one by Mr. Edward K. Davis.

In March, 1919, and June, 1924, Mr. Haskell and Mr. Arthur V. Davis had conversations about purchases by Baush of aluminum from Alcoa. At the former date Mr. Haskell bought 20,000 pounds. At the latter date Mr. Haskell asked a price cut on 5 million pounds.

The request for a cut was refused and the sale was not made. Save with respect to whether there was concert between Alcoa or Mr. Davis and the foreigners, it is not necessary to go into the details of the testimony on the subject. This testimony is set out at pages 2168-84; 2275-94; 2633-48; 2677-82; 2860-5; 5196-5200; 5270-1; 18508-44; 18564-71.

Mr. Haskell does not definitely or certainly remember what Mr. Davis stated on either occasion. He merely inferred or got the impression at both meetings that there was agreement between Alcoa or Mr. Davis and the foreign aluminum producers on prices and on limiting importations of aluminum into the United States (pp. 2176-77; 2180-1; 2282-91; 2294; 2635-9; 2644-8; 2864-5). Mr. Davis squarely denies that there ever was, or that he told Mr. Haskell there ever had been, any such agreement (pp. 5196-5200; 5224-5; 18515; 18519-20; 18538-9; 18542A-44).

Counsel for the Government and counsel for Alcoa declared that they regarded Mr. Haskell as honest. I do not mean to criticize him. Nevertheless, even taken at its face, I think his testimony is too vague and uncertain on which to rely for finding the existence of the agreement or conspiracy charged in the bill. Except very generally he does not give the terms of or parties to any agreement. He disclaims a definite recollection and relies, mostly if not exclusively, on inferences. On the other hand, during his several weeks on the stand Mr. Arthur V. Davis did not impress me as boastful, nor as one likely to confess, much less to initiate the suggestion, and much less to tell a stranger or a competitor, that he was guilty of a crime.

If we interpret Mr. Haskell's statement as directly saying that Mr. Davis stated that an agreement of that kind was made between Alcoa or himself and the foreigners, on review of all the circumstances in evidence I feel impelled to accept the denial of Mr. Davis.

There is some testimony that in 1923 Mr. E. K. Davis (then sales manager of Alcoa) told Mr. Main (the General Motors director of purchases): (1) that Alcoa never interfered with the sales of aluminum, or tonnage or prices on sales of aluminum, by the British Aluminium Company to any of its old established customers, of which the Cadillac Division was one (pp. 4314-5); (2) that a quota had been made to take care of the customers of foreign aluminum (p. 4315); (3) that the foreign companies had agreed with Alcoa not to "dump" aluminum in the United States if Alcoa would not "dump" in their countries (p. 4315).

If all this occurred, it was not a violation of law because: (1) the law does not compel competition (United States v. United States Steel Corp., 251 U.S. 417, 451, 40 S.Ct. 293, 64 L.Ed. 343, 8 A.L.R. 1121) and the business policy described is permissible under the law in the absence, as here, of an agreement; (2) if there was a quota, it was fixed by the foreign companies as between themselves and Alcoa had no part in it; (3) it was lawful for Alcoa to agree with the foreign companies that if they (the foreign companies) refrained from violating the Anti-Dumping Law of the United States (39 Stat. 798, c. 463, section 801, 15 U.S.C.A. § 72), Alcoa would not be guilty of the same misconduct in their countries.

October 7, 1941

As I indicated yesterday, the fourth argument advanced by the Government, in support of its contention that in 1919–1928 Alcoa and European aluminum producers were in conspiracy to restrain imports into the United States, is that the foreign acquisitions by Alcoa themselves constitute a basis from which to imply the existence of such a conspiracy.

In substance, the bill alleges that the purpose and effect of the foreign acquisitions by Alcoa were to restrict importation of aluminum and aluminum products into the United States and to suppress competition in those commodities by the major European aluminum producers through three specified means: (1) intimidation of, (2) association with and (3) agreement with those producers by Alcoa. It is alleged also that it was the motive of Alcoa in acquiring these foreign properties to protect its monopolistic control of aluminum in the United States (paragraphs 54, 60–71 and 82).

For example, it is specifically alleged (paragraph 54) that Alcoa made agreements "with the major aluminum companies of foreign countries * * *, with the intent and effect of restraining importations of aluminum into the United States"; also that Alcoa acquired "interests in foreign aluminum producing and fabricating companies, water power sites, power plants, bauxite de-

posits, and leucite deposits (substitutes for bauxite deposits), and have thereby intimidated foreign producers * * * with the intent and effect of suppressing shipments of aluminum and aluminum products to the United States for sale in competition with Aluminum Company, * * *."

As all agree, the reference to foreign companies is alone to those in Europe. It does not include Canadian companies. It is conceded by Alcoa that it bought interests in European companies during the period 1920 to 1927. So the questions are:

(1) Did the actions of Alcoa restrain imports into the United States?

(2) Did those actions intimidate Europeans from shipping aluminum or aluminum products to the United States for sale in competition with Alcoa? Or, more accurately, was there agreement between Alcoa and the foreigners for either purpose?

At the beginning, it is worth noting that the Government charges appear to be inconsistent. There can be no conspiracy without concert between two or more. On the one hand, the Government alleges that there was agreement to restrict imports,—obviously meaning that an agreement existed between Alcoa and the European producers to restrict imports into the United States. On the other hand, the Government alleges that Alcoa was seeking to intimidate the foreigners. But surely it is not intended, nor could it be maintained, that Alcoa agreed with the foreigners to intimidate them. Yet unless there was agreement, there was no conspiracy.

However, we need not rest on the inconsistency. Answers to the controlling questions can be derived from more important sources. There are several of these. Among them I think the most convincing are some tables. Those of consequence are tables 10 and 11.

For counsel to follow the tables without having before them copies, which I am now unable to supply, would be difficult. Nevertheless, with the minutes of my statement transcribed, containing the tables, before you, later by using items (instead of a lot of confusing foreign names) I hope the matter will be clear.

The first table is as follows:

TABLE 10

*European companies in which Alcoa acquired interests that it transferred to Aluminium.*

| A | B | C | D | E | F |
|---|---|---|---|---|---|
| Item No. | Paragraph Bill | Name | Acquired | Location | Business |
| 1 | — | Northern Aluminium | 1909 | England | Selling |
| 2 | 70 | Bauxites du Midi | 1912 | France | Bauxite lands |
| 3 | 60 | Jadranski Bauxit | 1921 | Jugo Slavia | Bauxite lands |
| 4 | 61 | Norsk Aluminium | 1922 | Norway | Aluminum production |
| 5 | 62 | Det Norske Nitrid | 1922 | Norway | Aluminum production |
| 6 | 63 | Carrieres de l'Arboussas | 1923 | France | Bauxite lands |
| 7 | — | Birmingham Aluminium Castings | 1923 | England | Foundry |
| 8 | 65 | Laate-Foss | 1924 | Norway | Water power rights |
| 9 | 64 | Fonderie de Precision | 1924 | France | Foundry |
| 10 | 65 | Det Norske Aktieselskab | 1924 | Norway | Water powers and patents |
| 11 | 65 | Kinservik | 1924 | Norway | Water power rights |
| 12 | 66 | Mineraria Triestina | 1924 | Italy | Bauxite lands |
| 13 | — | Aluminum Die Casting | 1924 | Germany | Foundry |
| 14 | 69 | Primorski Bauxit | 1925 | Jugo Slavia | Bauxite lands |
| 15 | 67 | Societa dell'Alluminio Italiano | 1925 | Italy | Aluminum production |
| 16 | 68 | Aluminio Espagnol | 1925 | Spain | Aluminum production |
| 17 | — | Bauxites Francaises | 1926 | France | Bauxite |
| 18 | — | Alcoa de France | 1926 | France | Holding |
| 19 | 70 | Forces Motrices du Bearn | 1926 | France | Water power rights |
| 20 | — | L'Aluminium Cable | 1927 | France | Cable |
| 21 | 71 | Prodotti Chimici Napoli | 1928 | Italy | Leucite |

NOTE: Item no. 8 transferred in October, 1928; no. 21 in June, 1931; and all others on June 4, 1928. Nos. 1, 7, 13, 17, 18 and 20 are not mentioned in the bill.

This table lists, by name, 21 companies. Two of these were acquired by Alcoa preceding 1919. They are of little or no importance here. Indeed, substantially, they may be ignored. Of the 19 remaining names on the table, all had to do with properties or interests in properties situated in Europe which Alcoa acquired between 1919 and 1928, inclusive. The table consists of the names of all the European companies transferred, or interests in which were transferred, by Alcoa to Aluminium in 1928 plus one more. The additional one is Prodotti, item 21. Alcoa agreed in 1928 to transfer that company, but actually did not transfer it until 1931.

The second table is as follows:

TABLE 11

*Comparisons (in pounds) bearing on significance of Alcoa's acquisitions of Norwegian aluminum imported to U. S. 1919–1928.*

Section 1. Comparisons of (a) total European production, (b) total imports from Europe to U. S., (c) total imports from Norway to U. S. and (d) total Alcoa acquisitions of (c).

| | A | B | C | D |
|---|---|---|---|---|
| | European production | Imported from Europe | Imported from Norway | Total of C acquired by Alcoa |
| 1919 | 130,953,240 | 5,257,600 | 223,995 | (See note) |
| 1920 | 115,741,500 | 27,689,847 | 6,592,890 | 00 |
| 1921 | 92,813,660 | 27,253,655 | 10,326,458 | 00 |
| 1922 | 106,261,720 | 32,181,233 | 6,884,925 | 343,047 |
| 1923 | 155,644,760 | 31,982,169 | 15,681,132 | 4,602,042 |
| 1924 | 195,768,480 | 23,441,999 | 16,868,983 | 9,335,490 |
| 1925 | 229,498,860 | 30,724,487 | 14,126,742 | 8,667,649 |
| 1926 | 246,274,280 | 55,117,087 | 19,868,944 | 15,197,185 |
| 1927 | 239,712,772 | 29,738,364 | 8,272,973 | 7,403,200 |
| 1928 | 265,590,366 | 14,456,202 | 3,809,720 | 9,327,056 |

Section 2. Analysis of Alcoa's acquisitions of Norwegian aluminum 1919–1928 (column D).

| | E | F | G | H |
|---|---|---|---|---|
| | Norsk exported | D. N. N. exported | Exporter not stated | Column B less column D |
| 1919 | (See note) | (See note) | (See note) | (See note) |
| 1920 | 00 | 00 | 00 | 27,689,847 |
| 1921 | 00 | 00 | 00 | 27,253,655 |
| 1922 | 00 | 00 | 343,047 | 31,838,186 |
| 1923 | 2,518,283 | 1,346,666 | 737,093 | 27,380,127 |
| 1924 | 1,506,148 | 7,829,342 | 00 | 14,106,509 |
| 1925 | 782,849 | 7,884,800 | 00 | 22,056,838 |
| 1926 | 4,691,586 | 10,505,599 | 00 | 39,919,902 |
| 1927 | 33,600 | 7,369,600 | 00 | 22,335,164 |
| 1928 | 816 | 9,326,240 | 00 | 5,129,146 |

Section 3. Imports of aluminum to U. S. from countries of Europe (other than Norway) 1919 to 1928.

(a) From all (except Norway) for entire period.

| | |
|---|---|
| United Kingdom | 56,731,918 |
| France | 21,170,750 |
| Switzerland | 54,292,997 |
| Germany | 36,307,617 |
| Total (four countries) | 168,503,282 |
| Spain | 00 |
| Austria | 4,053,650 |
| Italy | 819,065 |
| Netherlands | 1,809,884 |
| Total all Europe (except Norway) | 175,185,881 |

(b) From four major exporting countries by years.

| | United Kingdom | France | Switzerland | Germany | Totals |
|---|---|---|---|---|---|
| 1919 | 2,864,642 | 2,168,963 | 00 | 00 | 5,033,605 |
| 1920 | 14,117,937 | 4,703,628 | 00 | 1,919,590 | 20,741,155 |
| 1921 | 6,653,600 | 814,621 | 5,410,448 | 3,701,052 | 16,579,721 |
| 1922 | 9,813,155 | 7,000,955 | 7,115,767 | 124,073 | 24,053,950 |
| 1923 | 6,880,939 | 1,785,733 | 6,393,760 | 1,240,605 | 16,301,037 |
| 1924 | 1,207,920 | 00 | 5,140,602 | 224,494 | 6,573,016 |
| 1925 | 2,888,898 | 224,000 | 8,553,818 | 4,481,057 | 16,147,773 |
| 1926 | 3,712,047 | 220,471 | 8,134,844 | 18,894,327 | 30,961,689 |
| 1927 | 5,429,281 | 4,252,246 | 6,623,406 | 5,159,921 | 21,464,854 |
| 1928 | 3,163,499 | 133 | 6,920,352 | 562,498 | 10,646,482 |

(c) From four minor exporting countries by years.

| | Spain | Austria | Italy | Netherlands | Totals |
|---|---|---|---|---|---|
| 1919 | 00 | 00 | 00 | 00 | 00 |
| 1920 | 00 | 00 | 342,195 | 13,607 | 355,802 |
| 1921 | 00 | 00 | 291,477 | 55,999 | 347,476 |
| 1922 | 00 | 551,147 | 184,856 | 506,355 | 1,242,358 |
| 1923 | 00 | 00 | 00 | 00 | 00 |
| 1924 | 00 | 00 | 00 | 00 | 00 |
| 1925 | 00 | 00 | 00 | 449,972 | 449,972 |
| 1926 | 00 | 3,502,503 | 00 | 783,951 | 4,286,454 |
| 1927 | 00 | 00 | 537 | 00 | 537 |
| 1928 | 00 | 00 | 00 | 00 | 00 |

NOTE: Column A from Ex. 985; columns B and C and section 3 from Ex. 458; columns E, F and G for 1920 to 1928 from Alcoa's answers to interrogatories 16 and 17, as amended (no figures there given for 1919); column D by adding figures for respective years in columns E, F and G; column H by subtracting figures in column D from those for corresponding years in column B.

Table 11 is in three sections. It contains a variety of statistics with respect to European producing companies and shipments of their products to the United States during the years 1919 to 1928, inclusive.

I believe that it will be helpful if, at the moment, I give some preliminary explanation of table 11,—though I shall not complete my discussion of it in those pre-

liminaries. I shall take up the table for further discussion later.

Table 11 is a comparison (in pounds) bearing on the significance of Alcoa's acquisitions of Norwegian aluminum imported into the United States in the period 1919-1928. There are three sections. In the third section there are three subdivisions.

Section 1 compares these items: (a) the total European production of aluminum by years for the entire period 1919 to 1928, which is set out in column A; (b) the total imports of aluminum from Europe into the United States for each of the same years, which are set out in column B; (c) the total imports of aluminum from Norway to the United States by years for the same period, set out in column C; and (d) the total Alcoa acquisitions of all the aluminum imported into the United States by years during the same period from Norway, set out in column D.

Section 2 is an analysis of Alcoa's acquisitions of Norwegian aluminum for the entire period, as set out in column D. In column E of section 2 Norsk aluminum imported into the United States is set out by years; in column F., D. N. N. aluminum imported into the United States from Norway is also set out; and in column G, the exportation of other aluminum from Norway during that period, the names of the exporters of which are not shown in the evidence. In section 2 there is a final column headed H. In that column there are set out the differences by years of aluminum imports into the United States, derived by substracting D (which is the total of aluminum imported from Norway that was acquired by Alcoa) from the total of aluminum imported during the period from Europe.

In section 3 there are set out, by countries, the imports of aluminum to the United States from countries of Europe (other than Norway) during the period from 1919 to 1928.

In subdivision (a) the imports from all European countries except Norway are given for the entire period. In subdivision (b) there are given the figures for the importations by years from the four major European exporting countries,—these being the United Kingdom, France, Switzerland and Germany. In subdivision (c) there are given the figures showing importations from the four minor exporting European countries,—these being Spain, Austria, Italy and the Netherlands.

Coming back to section 1 of table 11, I call your attention to a fact which should be borne in mind. You will remember that I said yesterday that, previous to Alcoa acquiring interests in the Norwegian companies, it made express provision in the contract for the acquisition of the Norsk interests of a clause which exempted it from going forward with the contract until after the proper Government authorities in this country had passed on the matter. You will recall also that I said that, pursuant to and in execution of that clause of the contract for acquiring that company, application was made to the United States District Court at Pittsburgh for a modification of the consent decree of June 7, 1912, in the Pittsburgh case. The essence of the modification was a declaration by the Court in a supplemental decree that such acquisition of Norsk and D. N. N. would not be a violation of any prohibition contained in the 1912 decree.

The clause to which I call your attention is contained in the modifying decree of October 25, 1922 (Exhibit 1009, exhibit p. 4944).

In the supplemental decree it is provided that the so-called consent decree of 1912, which was rendered June 7, 1912, "* * * shall be and the same is hereby modified so that nothing therein contained shall be considered or construed to enjoin or restrain the defendant, the Aluminum Company of America or any company or companies subsidiary to or affiliated with it from, at once or from time to time, acquiring, holding, exercising all rights of ownership in, and disposing of, any interest or interests, either controlling or otherwise, in the capital stock or securities of the companies mentioned in the 5th paragraph of this petition, * * *."

The companies mentioned in the fifth paragraph of the petition are the Norwegian companies which are now under consideration.

The modification decree, as I have said, was rendered on October 25, 1922. Until it had been obtained, Alcoa was not in position to close its arrangement with either of the Norwegian companies. The arrangement was closed with the Norsk Company in time after October 25, 1922, to enable Alcoa to import some of the Norsk aluminum into the United States during the remaining part of the year 1922. On the other hand, as to Det Norske Nitrid (or D. N. N. as it is commonly called)

the arrangement, on some account, was not closed in time to permit any of the D. N. N. aluminum to be imported either during 1922 or sufficiently early in the year 1923 to give us figures of their importation of D. N. N. aluminum for the entire year 1923. In consequence, the first year as to which we have complete figures for D. N. N. aluminum being imported is 1924.

With the explanation given, I wish now to call your attention to some of the figures in table 11. In doing that I shall use generally round figures rather than all the details.

In 1923 the total European production of aluminum was 155 million pounds. Of that there was imported into the United States that year a total of 32 million pounds. For the same year (1923) of the 32 million pounds imported into the United States from Europe, 15,700,000 pounds came from Norway. Similar figures continue for each of the years. For the entire period from 1919 to 1928 the total imported from Europe was 278 million pounds. Of those importations approximately 103 million pounds came from Norway. You can get from this table the number of pounds for each of the years and draw your own deductions with respect to the importations as to each year.

In the same period, from 1919 to 1928, out of the total of aluminum imported from Norway approximately 55 millions came to Alcoa. In other words, a little in excess of half of all the aluminum imported from Norway during that period was imported by Alcoa.

In section 2 the figures of importations by Alcoa of Norwegian aluminum by years are broken down; and note that in 1919, in 1920, in 1921 and in 1922 no aluminum came either from Norsk or from D. N. N. to Alcoa. During the period 1919-1922 the only Norway aluminum that came to Alcoa was from an exporter whose name is not shown in the evidence. The importation from this third person other than Norsk or D. N. N. was in 1922 and its total was only 343,047 pounds.

Turning now to the years 1923 to 1928, dealing with the portion of all the aluminum that came from Norway to Alcoa for that period, that which came from Norsk was 9,533,282 pounds and that which came from D. N. N. was 44,262,247 pounds; or if we wish a comparison for the years as to which we have complete figures for both companies, towit, for the year 1924 and down to and including the year or rather the fraction of the year 1928, the total of importations from Norsk was 7,014,999 pounds and from D. N. N. was 42,915,581 pounds, an approximate total for both companies of 50 million pounds.

In this connection, that you may have it in mind when you read the table, it is to be remembered, as I have said, that these figures are not for the complete year 1928, because the companies or the properties of Alcoa in foreign countries, including those in Norway, were transferred to Aluminium on the 4th of June, 1928. We have, therefore, less than half a year in 1928 during which Alcoa had any concern under the contracts that were theretofore in existence with the Norwegian companies.

Another fact which must be borne in mind, as you will see on examining the table, is that the figures given for 1928 seem out of balance. The explanation of that, as I conceive and as I understand from the evidence, is that there were outstanding on June 4, 1928, some contracts that were not then completely fulfilled and that were later fulfilled; and thereby additional importations by Alcoa from Norway came into the figures which are included in the table for 1928. That and that alone, as I believe, is the explanation of the lack of precise balance of the figures of the imports from Norway for the year 1928.

As I have told you, in column D of section 1 of table 11, there are given the total importations of Norwegian aluminum by Alcoa for each of the years. We, of course, are concerned at the moment only with the years 1923 to 1928.

Perhaps I should call your attention further to the fact that, as will appear by column D, there were no importations of Norwegian aluminum to Alcoa for the years preceding 1923 save the single item of 343,047 pounds which came to Alcoa from an exporter whose name is unknown.

In column H, as I have also heretofore explained, it should be observed that there are set out by years the totals of the importations for the several years by persons in the United States less Alcoa's Norwegian importations. It is matter of interest to compare what those were. In other words, by combining column D and column H for consideration, we can get a comparison of the importations from Norway for

these several years by Alcoa and by others than Alcoa in the United States.

In 1923, still using round figures, the figures for Alcoa were 4,600,000 and for others 27,400,000; in 1924, for Alcoa 9,-300,000 while for others than Alcoa 14,-100,000; in 1925, for Alcoa 8,700,000 and for others 22,000,000; in 1926, for Alcoa 15,200,000 and for others 39,900,000; in 1927, 7,400,000 by Alcoa and 22,300,000 by others; in 1928 (and here you will see an illustration of where you must reconcile figures and I think they are reconcilable along the line I have heretofore explained) by Alcoa 9,300,000 and by others 5,100,000.

In subdivision (a) of section 3 there is included a statement of the importations from all European countries except Norway for the entire period. The total importations from the four principal countries was 168,500,000, which, when we add the importations from the four smaller countries, carries the total for all of Europe except Norway to 175,000,000. Remember that those are the figures for the total importations from all European countries except Norway, whereas, on the other hand, the total of the importations from Norway for the same years was 102,700,-000 pounds.

In subdivision (b) of section 3 you will find the figures of the importations for the same period by years from the four major European exporting companies. In subdivision (c) you will find the figures for the importations from the four minor European countries. I shall have occasion later to call attention in some detail to the importations from the latter.

I have said that, after completing some preliminaries with respect to tables 10 and 11, I should then add some comment. An inevitable consequence (or perhaps I should say one of the defects) of employing my methods is that, having taken very few notes of different parts of what in advance I contemplate saying, when I proceed beyond what is covered by the notes, not infrequently there occurs some repetition. In what I am about to say now there probably will be repetition of some things I have said already. However, no harm will result.

In its reply brief, page 267, the Government says that, except in the case of the Norsk Company (a part of whose stock, of course, Alcoa bought), it "does not consider it necessary to take up in detail each individual acquisition or proposed acquisition of foreign properties during the period in question." Its contention is that "all followed essentially the same pattern."

I agree that, outside of Norsk and Det Norske Nitrid (commonly called D. N. N.) as I have said, the two Norwegian aluminum producing companies, items 4 and 5 of table 10, there is no occasion to go into the details of any item in the table.

Nevertheless, we do need a background in order fully to comprehend the significance of the table. Such a background should furnish some history of Alcoa's acquisition of the companies transferred by it to Aluminium; also something of the history of a part of the companies which, as you will see when I give you the history, were not included in the transfer, because Alcoa no longer owned them.

In 1891 or 1892 Alcoa built a plant at Saint Michel in France. There it began the manufacture of aluminum. How long the plant continued does not appear. Alcoa sold the property many years ago; precisely when is not stated (pp. 5275-8; 5297). The sale was far in advance of the time with which we are presently dealing. It is on this account that the Saint Michel company is not included in table 10. It does not now concern us.

Four companies which were included in the table can be or may be entirely disregarded. These are items 1, 2, 18 and 21.

Two (items 1 and 2) were organized or acquired by Alcoa preceding the first World War. One of those was a mere sales agency. No. 18 was a holding company. No. 21 (Prodotti Chimici Napoli) was purchased (that is, its stock was purchased) by Alcoa on May 31, 1928,—only four days before the general transfer of 29 companies to Aluminium on June 4, 1928. In addition, the sole activity of Prodotti was experimenting with leucite to ascertain if that ore could be used as a substitute for bauxite. Moreover, none of the four companies referred to (items 1, 2, 18 and 21) relates to any alleged misconduct complained of as having occurred in the period (1919-1928) under consideration.

There remain 17 of the 21 companies. These 17 are Nos. 3 to 17, 19 and 20 of table 10. The dates they were organized or acquired, according to the bill, ran from 1921 to 1927. Several of the dates alleged differ from those established by the proof, but the variances are immaterial and will be ignored.

Of the 17 companies five were located in Norway and 12 were located outside of Norway. All were located in Europe. The five in Norway were Nos. 4, 5, 8, 10 and 11. For convenience, they will be called the major group—that is, inside of Norway. They will be discussed hereafter.

The 12 companies, located outside of Norway, will be called the minor group. They will now be treated briefly.

Of the minor group (that is, outside of Norway), items 3, 6, 12, 14 and 17 were concerned exclusively with bauxite lands; items 7, 9 and 13 with foundries; items 15 and 16 with aluminum production; item 19 with water power rights; item 20 with cable.

Items 15 and 16 are the only companies of the minor group that produced aluminum. They are, therefore, really the only ones in that group in which we have any genuine interest at the moment. Item 16 was situated in Spain and item 15 in Italy. Part of the stock in each was bought by Alcoa in 1925.

As I have heretofore explained, Exhibit 458, summarized in section 3 of table 11, gives the facts as to shipments of aluminum by European countries to the United States from 1919 to 1928. Spain, as shown by subdivision (c) of section 3 of table 11, shipped none to the United States either before or after the 1925 purchase of stock in the Spanish company by Alcoa. The Italian company in which Alcoa took stock was Alluminio Italiano. Alcoa is not shown to have received any aluminum produced by that company either before or after the stock was purchased in 1925. Italy as a whole shipped to the United States only small amounts preceding 1923; none in 1919, none in 1923 and none in 1924. All those years were before Alcoa bought stock in the company. Only 537 pounds were shipped from Italy in the three years after stock was bought by Alcoa and there is no basis in the evidence for inferring that Alcoa influenced the Italian company not to ship.

It seems to me manifest from the statistics to which I have called attention that no foundation has been shown for any of the charges against Alcoa with respect either to the Spanish or to the Italian company.

But there is other evidence which supports the conclusion I have reached, resting on statistics, as to the Spanish and Italian companies.

In the first place, both were very small. Operations were carried on behind high tariff walls. Preceding as well as following Alcoa's buying stock in them, the sales of their products were wholly or almost wholly confined within the countries where they respectively were located.

Again, as shown without dispute, nothing Alcoa did had any observable effect, nor is there evidence that it had any effect, on the commerce of the United States (pp. 4862-7; 4873-80; 4884; 14280; 20631-34A). As elsewhere pointed out, and as I believe counsel agree, where there is no such effect the transactions do not come within the influence of the Sherman Act. For that reason alone, in passing on the issue now before us, we need give no further attention to the Spanish and Italian companies.

▬ The line of cases holding that what does not directly and materially affect the commerce of the United States is excluded from regulation by the Sherman Act perhaps is most helpfully elucidated—not originally laid down, but elucidated—in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S. Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. See also United States v. Gold, 2 Cir., 115 F.2d 236.

Outside of the Spanish and Italian companies there are ten other companies in the minor group. In their nature the matters heretofore described in which these remaining ten companies (outside of Norway) were engaged likewise could not directly or materially affect the commerce of the United States; nor does the evidence establish that, after Alcoa acquired interests therein, so far as affects United States commerce, there was material alteration in their practices in regard to those matters.

As to the entire 12 items constituting the minor group, the evidence is somewhat sparse; but, as I feel, the proof is plainly insufficient to support a finding that the interests of Alcoa in them were employed, either wholly or partly, to restrain the commerce of the United States.

Thus we are brought to consider the Norwegian companies, heretofore called the major group. This consists, as I have said, of five companies. Of those, only items 4 and 5 of table 10 could really present any matter for consideration in the present connection. Those items are Norsk Aluminium and Det Norske Nitrid (D. N. N.). They produced and sold aluminum. That is the reason we now have an interest in them.

Aside from Norsk and D. N. N., three companies, described in table 10, should now be recited. These are Nos. 8, 10 and 11.

They held water power rights. Their property consisted wholly or mostly of such rights. No. 10 also held electrode process patents.

Of all the water power rights companies, we may say, as has heretofore been said of items in the minor group, the proof does not warrant finding that Alcoa's interests therein were employed in restraining, nor did they directly or materially affect, the commerce of the United States. Indeed, it is difficult to conceive how any such companies could be used so as directly or materially to restrain the commerce of the United States.

Eliminating the three companies mentioned, our inquiry is reduced to two remaining members of the major group. As I have heretofore said, these are the Norsk and D. N. N. companies.

For the purpose of refuting charges that Alcoa's interests in Norsk and D. N. N. were used to cut down imports into the United States, or to intimidate the major European aluminum companies from competing with Alcoa in the United States, it would be enough to call attention to table 11 which I have previously discussed rather fully. In it there are compiled figures which are relevant to the subject. There already has been comment on the statistics. Now I am going a bit more into details.

It will be helpful to a comprehension of the full meaning of the table, however, to get in mind some of the pertinent surrounding facts. These are as follows:

Representatives of both Norsk and D. N. N. took the initiative in efforts to induce Alcoa to become interested in their enterprises. The Norsk negotiations started in June, 1920; the D. N. N. negotiations about July, 1921.

At the time the negotiations began both companies were and long previously had been financially embarrassed; also the plants of D. N. N. actually had been closed.

Different schemes, particularly as to Norsk, were discussed before one acceptable to both sides was found.

The final arrangements as to the two companies were as follows: (1) In 1922 that Alcoa should take one-half the Norsk stock. (2) In 1923 that Alcoa should take one-third of the D. N. N. stock and by virtue of that stock be entitled to get and sell for its own account one-third of the output of the D. N. N. plants, for the production of which one-third Alcoa should furnish the requisite raw materials. The Norsk plan, however, did not get into operation until, in accordance with the understanding between the parties (Exhibit 22; Exhibit 162, exhibit p. 898), both proposed purchases had been submitted to the Department of Justice (Exhibits 23, 24 and 25). As a result of the submission, as I have heretofore said, a supplemental decree was obtained in the Pittsburgh case to the effect that the acquisitions did not come within the prohibitions of the 1912 consent decree. That, as I have said, was not made until October, 1922 (Exhibit 1009, exhibit pp. 4938-45). I have previously read from that decree.

It is for this reason, as I believe I have previously said, that the first statistics for a full year's operation are as to Norsk for 1923 and as to D. N. N. for 1924.

Preceding 1922 the total imports into the United States of aluminum produced by Norsk, since its organization in 1915, had been less than one million pounds (Exhibit 892, exhibit pp. 4138-9; 4151. See also Exhibit 21, exhibit p. 73).

At the time of the Norsk negotiations the Norwegian currency was depreciated. The effect of this was recognized by Norsk's director who conducted the negotiations. He said, as is obvious, "when the Dollar exchange grows more normal the production cost in *cents* will increase" (pp. 2231-2; Exhibit 12, exhibit p. 53). The return to normal of the currency did not occur until 1927. It was accompanied by increase in taxes and rise in manufacturing costs. The consequence was that in 1927 Norsk lost money from its operations (Exhibit 892, exhibit pp. 4136-7).

On June 4, 1928, the day of the transfer by Alcoa to Aluminium of numerous properties and as a consequence of the transfer, Alcoa ceased to have any interest whatever in either Norwegian company (except, perhaps, as I have pointed out heretofore, the completion of fulfillment of shipments under a contract already then in existence and not yet completely fulfilled); but the evidence does not furnish the means for separating into parts the 1928 figures in table 11 as of that precise date (June 4, 1928).

Turning again to table 11 it is clear on its face, from casual inspection, that (1) from 1921 to 1928, inclusive, there was a steady annual increase in aluminum production by the European companies as a whole; (2) in 1920 to 1926, inclusive, with slight variations, there was substantially continuous growth in the size of the total annual im-

248

ports of aluminum into the United States from Europe; (3) the imports of aluminum into the United States from Norway (column C) grew, with only slight variations, with approximate steadiness each year from 1923 to 1926.

I feel that the variations which appear in the table, instead of being a weakness, are a strengthening factor. To my mind they indicate that the influence of competition was at work.

It must also be remembered that from 1915 to 1922 the total importation into the United States of Norsk aluminum was, as previously stated, less than one million pounds. Comparison of columns E and F makes clear that beginning with 1924, when the arrangement with D. N. N. to turn over one-third of its stock to Alcoa went into effect, and continuing to 1928, the receipt by Alcoa of an increased amount of aluminum (shown in column D) was largely attributable to this identical arrangement. The figures in regard to that are for Norsk 7,014,999 pounds and for D. N. N. 42,915,581 pounds,—a total of approximately 50 million pounds.

When these figures are taken into account, the increases of gross quantities of aluminum produced in Norway, which were acquired by Alcoa, are shown to be not materially disproportionate from the increases in size of either total European production or total imports from Norway.

As I see it, the facts demonstrate that competition in the United States by European aluminum producing companies was not diminished as a result of Alcoa acquiring interests in the Norwegian companies; also that the European companies were not deterred at all, much less by intimidation, from shipping aluminum to the United States for sale in competition with Alcoa.

It is true that what Alcoa received from the Norwegian companies and sold in the United States doubtless was commingled with what Alcoa itself produced in the United States. Nevertheless, if diminution or elimination of any competition occurred, it does not follow that intimidation either of Norwegian or of other European companies was the cause of it; nor, if it was the bona fide purpose of Alcoa to supply the needs of its own customers which it was unable to meet out of production at its own United States plants, would diminution of competition (if any occurred).

have constituted violation of the Sherman Act.

That Alcoa correctly forecast the future course of its own business and prudently adopted the measures it took in 1923 and 1924 with respect to equipping itself to provide against shortages in its own United States production,—which began in 1925 and continued for three years (pp. 5071-2; 5403),—is brought out by a summary showing pounds of aluminum (in round figures) of Alcoa's production of ingot and sales of commodities, in the form of ingot or other articles fabricated at its United States plants, as follows:

In the year 1925 the sales were 195,000,-000 pounds; the production was 140,000,000 pounds,—resulting in a shortage for that year of 55,000,000 pounds.

In 1926 the sales were 189,000,000 pounds; the production was 147,000,000 pounds,—leaving a shortage of 42,000,000 pounds.

In 1927 the sales were 185,500,000 pounds; the production was 163,500,000 pounds,—leaving a shortage of 22,000,000 pounds.

Alcoa's intent not to violate the law in the Norwegian companies transaction is further substantiated by its submission of the matters, before finally going into them, both to the Attorney General of the United States and to the United States District Court at Pittsburgh.

I am persuaded by the evidence that, as he declared to the Attorney General in May, 1922 (Exhibit 25, exhibit p. 83; p. 4902), the dominant motive of Mr. A. V. Davis, in acquiring interests in European properties and companies, was to meet the necessity, which he conceived confronted Alcoa, "of providing for future expansion, presumptively outside of the United States" (pp. 4903; 4909; 5342; 5402-3; 18387-98; 18444-7; 19200-4; 19274-5; 19282-3; 20661; 21244-5; 21487-8; 22548-53; 33246-7) for anticipated later, as well as immediate nearby, growth of Alcoa.

Even though, however, I be mistaken with respect to some of the conclusions heretofore stated relating to the interests in European companies and properties acquired by Alcoa, as I conceive there are three separate reasons why the Government is not entitled to prevail against Alcoa in regard to those matters. These are as follows:

(1) The Government has failed to show that foreign acquisitions by Alcoa, or Alcoa's behavior in connection therewith, either directly or materially affected the commerce of the United States. Cf. United States v. Hamburg, etc., C.C.S.D.N.Y., 200 F. 806, 807; Schechter Poultry Corp. v. United States, 295 U.S. 495, 547, 548 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947. See also Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. In the Hamburg case [200 F. 807], cited by both sides, the test is pithily stated in these words: "The vital question in all cases is the same: Is the combination to so operate in this country as to directly and materially affect our foreign commerce?" I think it manifest that, on the evidence, this test has not been met by the Government in the case at bar.

(2) In 1928 the parties agreed that Prodotti company (No. 21 of table 10) would be sold, and in 1931 it was actually turned over, to Aluminium. As shown by the bill (paragraphs 60 to 71) and the evidence (p. 16474; Alcoa's answers to interrogatories 2, 535 and 536; Exhibit 386, items 3 and 4. See also pp. 1877; 14148-9; 16474), Alcoa completely disposed of all the remaining properties now involved. The evidence discloses no danger of Alcoa again becoming the owner of any of those foreign properties. Therefore, it would not be proper for the Court to award an injunction concerning them.

(3) Moreover, the evidence does not warrant a finding that the properties under discussion constitute, or that any of them ever was, a material element in building up or in the success of Alcoa. In consequence, a dissolution of Alcoa, on account of the acquisition of those properties, would be wholly without justification. Yet dissolution is the only possible form of civil punishment open under the law, if Alcoa has violated it, in regard to the acquisition of those European properties,—of which it got rid 13 years ago. The only other means for seeking punishment is by criminal indictment.

This brings me to the discussion of a matter which has previously been referred to, but only briefly. This is the subject of prices.

It has heretofore been pointed out that if the foreigners and Alcoa sell aluminum in the United States at uniform prices, that does not necessarily indicate absence of competition or agreement not to compete. If prices have been uniform, that is only one fact which may be considered along with other facts in order to determine the significance of the whole set of facts. Also, as previously stated, prices at which sales of aluminum were actually made are of much more significance than list prices or quotations.

In addition, I have previously stated that I would assemble some facts indicating that prices were not really uniform during the period under consideration.

Some of the witnesses testified rather generally that in 1919 to 1928 (or part of that period) foreign "quotations" were not "substantially lower" than or were "practically the same" as prices "quoted" by Alcoa; or that foreign producers sold in the United States at "practically the same" prices as Alcoa's prices (pp. 2274; 3061; 3063; 9456-7).

It is notable—at least so far as I have observed—that in every instance cited the questions—apparently with scrupulous care—were framed so as to draw out information relating to quotations and to avoid inquiry as to prices which prevailed in trading transactions that actually occurred. This is the testimony on which the Government chiefly relies for support of its contention that, in effect, foreigners and Alcoa sold at what, as talked about, were identical prices.

Some of the Government's witnesses also undertook to give exact figures, or ranges of figures, at which foreign producers have sold in the United States. When these are examined, however, it will be seen that generally, and I believe without exception, they were lower than Alcoa's prices. Furthermore, whether the differences in specific figures are so small that they are not "substantially" or "practically" variant from Alcoa's prices manifestly rests on the opinions of the witnesses then testifying to the point. Those opinions are worthless unless substantiated by fact testimony. Perhaps the best test to apply is that which the Government itself has employed as its definition of competition. In essence it is this: Where rivals offer to sell the same prospective customer, how much difference in price is required to induce acceptance of the lower figure?

As will be seen and must always be true, one price by foreigners may be so much less than the price of Alcoa for alum-

inum of the same grade and quantity that no one could reasonably deny that the foreigners' price was "substantially" or "practically" lower. The problem is to ascertain the line of demarcation. The evidence on this branch of the inquiry is not very full or detailed; but, so far as I can discover, what is definite is without serious dispute and in all instances, or at any rate in nearly every instance, where the facts are brought out and the foreigners got the business, they put their prices below those of Alcoa. Clearly those instances are important. The testimony relating to them, therefore, will be assembled.

Though not of direct bearing, it may be worthwhile also to have in mind some of the circumstances existing during the 1919-1928 period affecting sales of aluminum in the United States by European producers.

In the first place, the cost of producing aluminum is and, save when conditions have been abnormal or very unusual, long has been less in Europe than in the United States. In the second place, European manufacturers are and long have been accustomed to join and to deal under cartels among themselves. Certainly as far back as 1923, and from then through 1928, there was a cartel or there were cartels, as between themselves, among all or some of the European aluminum producers. Apparently also a cartel continued to 1931, although when it began is not shown. At the trial counsel referred to two of which the evidence furnishes the dates as the 1923 cartel and the 1928 cartel. In the third place, the testimony is undisputed that members of the cartel or cartels acted together in making sales of aluminum in the United States. In the words of one of the witnesses, in their selling in the United States customarily the cartels competed as a "unit" (pp. 21713; 21861-5. See also p. 22700). In the fourth place, frequently, as heretofore noted, sales of aluminum have been made at actual prices quite different from, and when different generally below, list or quoted prices.

I shall not undertake here to recite all the evidence on the question of prices. There is quite a lot of evidence on the issue. Some of it consists of and its purport can be gathered by my setting out fourteen items. These are as follows:

(1) Mr. Haskell, the president of Baush, a vigorous competitor of Alcoa, said that in 1919 to 1932 his company bought aluminum from the British, French, Swiss, German and Norsk companies (pp. 2262-74; Exhibit 26; Exhibit 140). He also said that the "quotations" of the foreigners were "a little lower, a fraction of a cent," and in one instance his company "bought" at a cent, lower than the quotations of Alcoa (p. 2274).

From the list of Baush purchases (Exhibit 26) we must exclude sales by the General Aluminum & Brass, an American company, because the origin of the aluminum there mentioned is not shown and is unknown. I shall omit also deliveries or purchases from a foreign seller made in 1929 under a contract of January 25, 1928.

After eliminating the items just specified, Exhibit 26 shows that under contracts dated between May 22, 1919, and January 25, 1928, and by December 19, 1928, the deliveries to the Baush Company were 5,336,014 pounds from European countries and 510,044 pounds from Alcoa; in other words, ten for one. The witness further said that "usually" the foreigners sold at from one-quarter to one-half cent a pound lower than Alcoa, though sometimes his company could break the price of the foreigners one cent; that the maximum concession to him by the foreigners was one cent below Alcoa, but that was for a comparatively short time (pp. 2315; 2336-8). Again, he testified that sometimes he bought aluminum from foreigners and paid them for aluminum of 98-99 grade, but required and tested for, and would not use unless it tested, 99 per cent grade (pp. 2160-1; 3459-60). 99 per cent, of course, was of higher grade than 98-99 per cent.

(2) Mr. Babson and Mr. Daniels, other officers of the Baush Company, testified that from 1920 to 1930, substantially, the price quoted by the four European companies was "always" the same as Alcoa's quoted price (pp. 3060-3); but that, during practically the entire period of the operations of the metals division of the Baush Company (which covers all the time it was concerned with aluminum), Baush purchased 98-99 per cent aluminum from the foreigners who "always" delivered 99 per cent (the higher grade) or better at from 4/10ths of a cent to one cent a pound less than Alcoa's price for 99 per cent grade (pp. 3459-60). Mr. Daniels said specifically that when his company bought metal as of 98-99 per cent grade from the foreigners, he analyzed it and "always" found the grade to be 99 per cent or better (p. 3460).

(3) In 1926 the Baush Company, three of whose officials just mentioned were witnesses for the Government, made a contract with the Swiss Company to purchase 600,000 pounds of 99 per cent or better ingot, for delivery in 1927, at 26 cents a pound. There was, however, a supplemental letter agreement that if, during the period of the contract, Alcoa should reduce its then current price of 27 cents for the same grade of aluminum, the Swiss Company would reduce its price by an amount equal to the reduction, applicable to the undelivered portion of the contract as of the date of the reduction (pp. 2338-41; Exhibit 26, contract No. 169, October 20, 1926, exhibit p. 94; Exhibits 34 and 88).

(4) It is undenied that from its inception until it quit the aluminum business, the Baush Company bought nearly all its aluminum from the foreign aluminum producing companies and that when the sales agent of Alcoa sought orders from it (at least from 1925 onward) Baush (without inquiring Alcoa's price) refused to buy and said that it had an adequate supply from other sources (pp. 35079; 35090; 35099; 35105-7). The latest date shown in writing (Exhibit 26) on which Baush purchased any aluminum from Alcoa was July, 1923.

(5) Mr. Main, the purchasing agent for an automobile company, testified that his company bought a "lot" of aluminum from the British Company at a price lower than he could get it from Alcoa. He said that the British price was "always" one-eighth to one-quarter of a cent lower than Alcoa's price (pp. 4314; 4324).

(6) Mr. Harwood, of the Fulton-Harwood foundry at South Bend, Indiana, testified that in 1921 his company bought 600,000 pounds of aluminum from the French Company at one cent to 1-1/2 cents a pound lower than Alcoa's price (pp. 4427; 4471). Prior to 1922 the South Bend company bought from foreigners at from 1/8-cent to 1-1/2 cents a pound below what the witness said his company paid Alcoa. He also said that on an average his company paid three-quarters of a cent per pound less than the price from Alcoa (p. 4471); and that in 1922 his company bought from Norsk at "a little less than we could buy aluminum for in America" (p. 4432).

(7) Mr. Waltz testified that the foreigners sold him and he paid for 98-99 per cent aluminum; but that 99 per cent or over was delivered (p. 9458). He further said that Alcoa charged him 1/5th of a cent additional for 99 per cent aluminum (p. 9458). The same witness stated that in 1925, when acting as a broker for the German Aluminum Company, on its instructions he sold between 3000 and 4000 tons of aluminum, part of it at 26 cents a pound when the market price was 27 cents a pound and part of it at 26 cents a pound when the market price was 28 cents a pound (pp. 9494-7; 9583); that is, from 1 cent to 2 cents below the United States market price.

(8) Mr. Hunt, the president of Alcoa, who from 1919 to 1928 was concerned with the sales for his company, testified that the foreign companies competed with his company and quoted ingot for sale in the United States at from 1/2 cent to 1 cent, and sometimes even at 2 cents, below Alcoa's price (pp. 21682; 21685); that the foreign companies frequently delivered a higher grade than they quoted, charging for the lower grade, e. g., they would quote and ship 99 per cent when they billed it as and charged the price of 98 per cent grade (pp. 21685; 21687-8); that in many instances the foreign companies undercut Alcoa's price and seemed to do so regularly on sales in the United States (p. 21861).

(9) Mr. Gibbons, one of the vice-presidents of Alcoa, said that "as a rule" the foreigners quoted prices from 1/2 cent to 2 cents below the current prices offered by Alcoa (p. 22690).

(10) Mr. Simmons, the assistant general sales manager of Alcoa, who in 1923 to 1928 was a sales agent of Alcoa, gave a full account of his experience with five named United States buyers of aluminum (Precision, Buffalo Bronze, Anstice, Northwest Foundries and Oberdorfer Brass) located in his territory at the time, whom he solicited and to whom he made few and to some no sales for the reason, assigned by his potential customers, that the foreigners gave lower prices (pp. 35568-72; 35760-66; 35775-82; 35791-4).

(11) Mr. Hellings, a former assistant sales manager of a castings corporation for a part and its sales manager for the remainder of the 1919-1928 period, then a competitor of Alcoa (pp. 30738-9), testified. He said, and the documents (Exhibits 1531, 1532) he produced showed, that in 1926 the Swiss Company sold his company 500,000 pounds of aluminum at 26 cents a pound for delivery in installments during 1927 when Alcoa's published price

was 27 cents a pound and made a side agreement that if, during the life of the contract, Alcoa lowered its price below 27 cents, the Swiss Company would correspondingly reduce the price on the undelivered portion of the contract; e. g., if Alcoa reduced its price to 26 cents, as it actually did before any delivery was made, the Swiss price would go down to 25 cents, so that the price at which the castings corporation got the entire 500,000 pounds was 25 cents (pp. 30771-2; 30773-4; 30849-55). Apparently this is a transaction similar to that about which another witness testified to the same effect.

(12) In 1927 the British company sold the same castings company from 800,000 to 1,200,000 pounds of aluminum (with buyer's option to take either) at 26 cents under a similar arrangement; and when Alcoa's price went down 1 cent, the price to the castings company (which had contracted with the British company) went down 1 cent also, that is to 25 cents a pound (pp. 30772-4; 30855-6; Exhibit 1524).

(13) The witness also said that he later bought on the same terms, though the arrangement was not put in writing, from the Swiss and British companies (pp. 30773-4; 30851-3). Exhibit 1533 shows that from 1919 to 1928 the castings company bought 5,700,000 pounds of aluminum from those companies.

(14) Exhibit 26 shows that many purchases of aluminum by Baush were made from the European producers and Alcoa in 1919 to 1928; Exhibit 575, by Sheet Aluminum Corporation from foreign and American companies in 1925-1928 (p. 108-66); and Exhibit 634, by Aluminum Products Company from European producing companies and Alcoa (pp. 11678-80). Analysis of these indicates that they contain numerous illustrations of rather wide variations between the prices of foreign companies and the prices of Alcoa. If the prices there set out apply to aluminum of the same respective grades of about the same dates, there were many instances during the period now under consideration when the prices of the foreigners (f. o. b. destination in U. S. and duty paid—the customary terms of such sales in this country) were higher and a number when they were lower than those at which Alcoa was selling in the United States.

I cannot be sure whether the last group of comparisons I have made are accurate.

This is due to the lack of explanatory details in the testimony. From my examination of the documents, however, I am confident, according to my interpretation of them, that they contain nothing pointing toward identity of prices at the same time in Europe and the United States.

After weighing all the testimony my conclusions are these:

1. There is nothing in the evidence by which with certainty I can determine—or even can say there is great probability of —how great must be the difference in a lower price from a higher price to cause a customer to shift from one seller to another. The Government disposes of the matter by a mere assertion. It says, in substance, that the differentials shown are too small to disclose a competitive market (original brief, pp. 676-7; 678-9; reply brief, pp. 30-1). Save by its assertion the Government does not attempt to sustain its position. In view of the facts assembled from the record, however, I am impressed that many of the differences were in fact entirely sufficient,—in the absence of some special reason to the contrary in individual exceptional cases,—to draw the average customer to buy from the one offering his goods at the lower price.

2. I have discovered in the record only two definite examples bearing on the size of the difference in prices that may win a customer seeking to buy aluminum. Both occurred after 1928. In the first Alcoa asked Baush 19 cents a pound f. o. b. shipping point. The German company offered to sell Baush at 18-3/4 cents delivered in New York. The British and the Swiss each asked 22.9 cents. The German company got the business (pp. 3458; 3539-43). In the second case the French company got an order from Reynolds Metals Company where its price was 17.1 cents and Alcoa's price was 19 cents (p. 21866).

It must be recognized that those two instances are not conclusive. Yet if the 1/4 of a cent or 1.9 cents be a fair criterion, then the evidence certainly establishes at least that when competing with Alcoa the foreigners have offered to sell and have sold at prices below Alcoa's price at the time by much more than 1/4 of a cent or even 1.9 cents a pound.

I feel that the evidence as to actual prices supports Alcoa's claim, and, along with other evidence heretofore assembled, demonstrates that during the period of

1919 to 1928 Alcoa and the foreigners were not in conspiracy to commit any of the offenses charged in the bill.

I have now completed discussion of the four arguments I mentioned yesterday, which, as I understood, the Government advanced in support of its contention that for the period immediately preceding June 4, 1928,—whether we call it 1916 to 1928 or 1919 to 1928 or 1922 to 1928,—there was a "tacit" understanding or conspiracy between Alcoa and the European companies of the kind charged by the Government or of any kind. As already indicated, I think that none of the charges can properly be sustained.

### (3) 1928-1940.

We come now to the period subsequent to June 4, 1928, and running from then down to date.

The Government charges that there were two separate conspiracies existing after June 4, 1928, to which Alcoa is alleged to have been a party: (1) a conspiracy with Aluminium and (2) a conspiracy with foreign aluminum producers. That it is correct to interpret the bill as charging a conspiracy between Alcoa and Aluminium, regardless of the foreigners, is indicated by the Government's original brief. At page 690 of the brief it was said of this period that the proof demonstrates that "Alcoa and Aluminium Limited, as between themselves, and irrespective of relations with the foreigners, conspired to restrain the trade and commerce of the United States." Again, at page 783 of the brief, it was said:

"The Government maintains that irrespective of the foreign producers, Alcoa and Aluminium Limited conspired to fix prices and restrain imports into the United States."

Before taking up the inquiry whether the evidence shows guilt, it would be well to recall the situation in which, following Aluminium's organization, Alcoa and Aluminium found themselves. It is particularly important to have in mind what were the problems of Aluminium and what was the plan by which it undertook to solve them. The facts are without substantial dispute.

As heretofore stated, in its inception Aluminium was composed of or held stocks or other interests in 29 foreign companies or properties (both, for convenience, hereinafter sometimes referred to, as they were referred to in the trial, as the foreign companies). These were transferred to Aluminium by Alcoa on June 4, 1928. The consideration for them received by Alcoa was all of Aluminium's common stock. At about the same time it was agreed that Alcoa would later transfer to Aluminium three additional foreign companies. For these three companies Aluminium would pay cash. Thus the arrangement was for the transfer by Alcoa to Aluminium of 32 foreign companies. It was of these that Aluminium was to be composed.

With a few exceptions, previously noted, Alcoa had acquired the 32 companies (or the properties out of which they grew) in the years 1920 to 1927, inclusive. When it began their assembly, and for a considerable time thereafter, Alcoa believed that use of the companies as a supplement to its United States properties, and for its own further expansion, would be a good scheme. Gradually it changed this view. By 1928 it had reached the conclusion that the preceding plan was a mistake; also that a better plan would be, with a few exceptions, to transfer all its foreign companies to a Canadian corporation.

The grounds for the 1928 opinion may be described, in substance, as follows:

The old plan of Alcoa had failed in an important respect. The causes of its failure were (1) inability of Alcoa to give needed attention to the foreign business and (2) the inherent difficulty of its efficiently running both the domestic and the foreign properties as a single enterprise. There were both chief reasons and subordinate reasons for adopting the new plan.

Perhaps the most important reason was the conviction that the foreign companies were more likely to develop properly if segregated into a separate group and an organization provided to concentrate on their management. Another major reason was the fact that in countries where the properties were located, particularly in the British Empire, there had grown up a strong feeling that producing and selling manufactured commodities generally should be in the hands of localized organizations. For example, in the British Empire the campaign to "Buy British" had attained great popularity. This means that throughout the British Empire it was widely urged that preference be given to goods which came from part of it (that is, were produced in the Empire). Gradually the opinion was formed that a positive business advantage

could be gained by catering to this feeling which (as was believed) then prevailed and to an increasing extent had already pervaded not only the British Empire but also all or most of the other countries where Alcoa had interests outside of the United States.

The Alcoa officials thought also that Canada was especially well fitted, and probably was better fitted than any other country, to be the home of a new corporate owner of the foreign companies. This was partly because the largest and most valuable of those to be turned over by Alcoa to Aluminium were in Canada and partly because, with its principal plants located in Canada, the British Empire would afford more advantages than any other country for success under the new program.

There were two lesser grounds for favoring the transfer to a new corporation,— though I am not certain what influence either of those grounds had. The first of these was that it would solve a personnel difficulty which had grown to be of concern to Mr. A. V. Davis. The second was that it would enable him individually to prepare for eventual retirement from headship of the whole Alcoa enterprise as it then existed.

The personnel problem concerned two officials who had been with Alcoa for 25 years. These were Mr. Roy Hunt, son of Alcoa's first president, and Mr. Edward K. Davis, younger brother of Mr. A. V. Davis. They had entered Alcoa's service in 1903. One had risen to be vice-president in charge of manufacturing; the other to be vice-president in charge of sales. Each had done well. Mr. A. V. Davis felt that both deserved and were well fitted for promotion. He also had the notion that if Alcoa were separated into two distinct parts and one of the vice-presidents were made the independent head of the domestic (United States) business and the other of the foreign business, discrimination between the two would be happily avoided.

Mr. Haskell, when on the stand, said that in 1924 Mr. Arthur V. Davis had indicated to him that he (Mr. Davis) was looking forward to retirement. This idea was not new in 1928. Mr. Davis then thought that if he could be relieved of active executive duties, by passing them into competent hands, he might appropriately become chairman of Alcoa's board.

Mr. A. V. Davis was the author of the idea out of which grew the plan of Mr. E. K. Davis assuming the practical details of the foreign business. As Mr. A. V. Davis felt, the primary reason for parting with all but a few of the foreign holdings was, in his words, as follows (pp. 19039-40):

"We were not giving sufficient attention to business outside of the United States, and what attention we were giving to that business was necessarily unsatisfactory in character, and the motives in forming Aluminium Limited were to have an organization which would devote itself exclusively to the foreign business, I mean foreign business outside of the United States, and to the building up of an organization whose work would be of a character which would be satisfactory. That was the main motive. It could perhaps be equally well expressed by saying that inasmuch as we were not satisfied with the growth and size of our foreign business, we felt we ought to do it better and make more of that business and make it bigger. But in order to do that we had to have as we conceived it or I conceived it, an organization such as we eventually set up and cut loose from Alcoa."

So much by way of introduction. What then was the alleged conspiracy between Alcoa and Aluminium?

What is claimed to have been the conspiracy is variously described by the Government in paragraphs 72 to 76 of the bill. It is well summarized at page 783 of the Government's original brief. There the statement about the two companies during the period following June 4, 1928, was as follows:

"There are three phases of the relations between Alcoa and Aluminium Limited which have been declared by the courts to be strong evidence of conspiracy: (1) The close personal and commercial relationships between them; (2) The element of common stock ownership; and (3) The failure to compete."

The Government has assigned no other reason for its insistence that it has proved there was the conspiracy at the stage presently under consideration. Apparently the contention rests, and I believe rests entirely, on what the Government claims to be the evidence supporting the three aspects mentioned in the last quotation from its brief. All of these will be taken

up, but not in the same order stated. Unless out of the evidence bearing on them the charge of a conspiracy at the time between Alcoa and Aluminium (apart from the foreign producers) be established, the Government must fail on this branch of the case.

The first of the grounds to be considered is what has been called, and during the trial frequently called, the small group of stockholders' control. Probably this ground is more urged than is any other of the three relied on.

Although my statements involve some repetition, let us have clearly in mind at this stage that Aluminium, as it came finally to exist, was composed of 32 companies, or the properties connected with those companies, that it acquired from Alcoa. 29 of the companies (or the properties underlying them) were acquired on June 4, 1928, and were acquired in exchange for all the common stock of Aluminium. The other three going along with the 29, to make up the 32 companies, were transferred, or the property underlying them transferred, to Aluminium by Alcoa for cash.

Before taking up the distribution of the Aluminium stock among Alcoa's stockholders,—on which rests the first main contention of the Government that the conspiracy is established by the existence of what is referred to as the small group of stockholders' control,—let us briefly consider the situation growing out of a single fact and consider it as of the precise moment when that fact came into existence.

The single fact to which I have referred is that on June 4, 1928, the entire Aluminium stock passed into a single hand; that is, into the hand of Alcoa. Did that, in and of itself, constitute or establish a conspiracy such as is denounced by the Sherman Act? For example, suppose at that moment, with the conditions I have described, the Government had instituted an action, such as that now on trial, under the Sherman Act. In that action, so brought on those facts, would the Government have been entitled to succeed?

In order to bring out with clarity—I hope with clarity—the point I am about to present for consideration, I shall employ a rather extreme illustration.

Suppose ten persons had joined in an enterprise. One of the purposes of the ten was to organize a corporation to engage in the production and sale of steel ingot.

Suppose the same stockholders at the same time also organized a corporation to engage in the production and sale of corn flakes. Could it be maintained that the facts that the stockholders in those two corporations were identical and that they joined together to create the two corporations, each individually to share alike in the stock of both corporations, would render them guilty of conspiracy?

 I think obviously the answer must be in the negative. If so, then it follows that mere identity of the stockholders in two corporations does not establish either restraint of trade or attempt to restrain trade or confederation to restrain trade.

Let us put the case a bit differently. Let us change the picture slightly.

Suppose the steel ingot corporation was in existence with the same ten persons as its stockholders. Suppose that thereupon they withdrew from the steel ingot corporation funds with which they organized and paid for the stock issued by the corn flakes corporation; or suppose they withdrew from the steel ingot corporation properties which they transferred to the corn flakes corporation, which they then organized. Suppose also that in this instance, as in the first situation described in this paragraph, there were the same ten stockholders each owning in the cereal corporation the identical number of shares and the identical proportion of shares that he owned in the steel corporation. On those facts could it be said that thereby there was committed the offense of conspiracy as defined in the Sherman Act?

I take it that no one for a moment would undertake to sustain the proposition that in either of the two situations I have last described there would be a conspiracy.

The steel ingot and the corn flakes companies were entirely separate corporations. Nevertheless, they had the same stockholders. Every stockholder held absolutely and relatively the same number of shares in each of the corporations. Are the facts as I have outlined them in any of the supposed groups of circumstances different in essence from the situation that existed on June 4, 1928, as between Aluminium and Alcoa, at the moment when, on that day, Alcoa placed in the hands of Aluminium the 29 companies or the properties underlying them, which it had withdrawn from its own assets, and Aluminium delivered all its stock to Alcoa?

If none of the sets of transactions I have supposed constituted a conspiracy, why is that so? Why was it not a violation of the Sherman Act? It seems to me clear that one reason is this: The Sherman Act is composed solely of prohibitions. It contains no prohibition of common ownership by the same group, and in the same relative proportions, of the stock of two companies; there is no prohibition of that condition any more in the case where the condition has come into being through transfer from one corporation to another of part of the transferor corporation or part of its assets, in exchange for stock of the transferee corporation, than there would be if ten persons were to do precisely as I have supposed in the illustration of the steel ingot company and the corn flakes company—organize two separate corporations, each consisting of stockholders whose absolute and relative participations in the stocks of the two companies were identical. In other words, the facts (1) that the stockholders of two corporations are identical and (2) that each stockholder owns the same number of shares in the one corporation as in the other corporation do not, in and of themselves, establish that the Sherman Act has been infringed.

The rule is universal,—approved by the Supreme Court and denied by nobody,—that there is no violation of the Sherman Act unless what is done be prohibited by that statute.

The Government has made an argument which, as I have been led to believe, it considers to be an adequate response. A number of times the Government has put its response in the form of a question. This is that if what was in the mind of Mr. Arthur V. Davis, and what was in the minds of the people who joined in the enterprise, in substance, was to carry out the intention professed by Mr. Davis (namely, to segregate all or most of the foreign companies or properties belonging to Alcoa into a separate organization), why was not the purpose accomplished by Alcoa transferring to one of its subsidiaries,—whether one of its then existing Canadian subsidiaries or a subsidiary that it might then have organized for the purpose under the laws of Canada,—the identical stock or properties with which Alcoa purchased from Aluminium all of Aluminium's common stock?

To the argument of the Government Alcoa has answered that if the plan now proposed by the Government had been followed, Alcoa would not have been able thereby to accomplish the purpose, and certainly not one of the main purposes, which most induced it to go into the new plan it had formed. Alcoa says that if it had undertaken to employ a subsidiary to effect or to provide the machinery for the plan, for the very reason that it was a subsidiary of a corporation existing under the laws of the United States it would not have had, and could not have obtained, the benefits which constituted one of the chief moving reasons for organizing the new transferee corporation under the laws of Canada.

Alcoa goes further. It says that if it be mistaken with respect to that view on its part, then at least great doubt would have been cast on the new corporation getting or entitling itself to get the benefits of the widely disseminated feeling in the British Empire that manufacturing enterprises in any part of the Empire, corporations organized under the laws of any subdivision of the Empire, should enjoy the special benefits that went along with the sentiment that was manifested in the slogan of "Buy British."

Alcoa, however, does not stop with this answer as constituting its entire refutation of the suggestion by the Government that transfer to a subsidiary might or could have been adopted and, if Alcoa's plan actually were what it professed, ought to have been adopted. An additional answer on which Alcoa relies is that it had the right to do what it did and that no law stood in the way; that the Sherman law did not stand in the way nor did any other provision of law, either in or out of the Sherman law, stand in the way. In other words, what Alcoa says is that the plan it pursued was not prohibited nor was it unlawful.

As I see it, the position of the Government that a subsidiary ought to have been employed cannot properly be sustained. As I see it also, the legal position of Alcoa is sustained by the authorities, including the decisions of the Supreme Court of the United States. If this be true, then we must inquire into the facts; for it is from the facts, and the evidence as to the facts, that a determination must come as to whether or not there was a conspiracy.

I shall, therefore, turn now to the situation resulting from the distribution of

Aluminium stock. It is on such distribution that the Government predicates its contention. Indeed, without distribution of the stock to the stockholders of Alcoa, the situation on which the Government relies would never have arisen; the sole basis for the argument that the transaction constituted a conspiracy is that out of it came into being the small group control of both companies.

Upon the distribution of the Aluminium stock ratably to the stockholders of Alcoa it turned out that there were three stockholders of Alcoa who together owned 51.3 per cent of the common stock, which was the only stock, of Aluminium. They also retained the same percentage of Alcoa common stock. In time I shall go into this phase of the matter at some length and recite the facts. The facts which I have just stated, standing alone, however, should be noted and kept in mind; namely, that at the inception three Alcoa stockholders owned 51.3 per cent of the common stock of Alcoa and the same percentage of the common stock of Aluminium. The Government lays great stress on those facts. Obviously they are of great importance in considering the problem which is presented.

I have prepared two tables relating to stockholdings in the two companies on different dates. One is table 12; the other is table 13. At the moment I shall not go into the details of what is included in the tables; but I hand them to the reporter for insertion at this stage in the minutes.

The tables are as follows:

TABLE 13

*Sundry percentage comparisons by dates of holdings of common stock in Alcoa and Aluminium.*

Section 1. June 4, 1928: Same in both companies; 3 stockholders held 51.3% in each company. By September 20, 1937, the sole survivor of the three (A. V. Davis, p. 5353) held under 12% of the stock of each company.

Section 2. January 2, 1939: 11 Aluminium stockholders held a majority of its stock.

Section 3. Shares of identical stockholders holding some stock in both companies, though in all except a negligible number of instances holding different percentages of stock in each of the two companies on September 20, 1937:

| | June 4, 1928 | September 20, 1937 | |
|---|---|---|---|
| | Alcoa and Aluminium | Alcoa | Aluminium |
| Total percentages | 100% | 81.53% | 83.93% |
| Held by brokers | 0 | 3.65% | 5.88% |
| Net | 100% | 77.88% | 78.05% |

Section 4. Holdings of stock in both companies by Alcoa officers and directors and their immediate families and the immediate families of A. W. and R. B. Mellon:

| | September 20, 1937 | | January 2, 1939 | |
|---|---|---|---|---|
| | Alcoa | Aluminium | Alcoa | Aluminium |
| Shares | 773,250 | 365,984 | 824,675 | 348,904 |
| Percentages | 52.51% | 54.08% | 56% | 51.56% |
| Deducting shares held in trust will leave: | | | | |
| Shares | | | 746,079 | 344,609 |
| Percentages | | | 50.66% | 50.92% |

NOTE: Section 1 from minutes, pages 13871-4; section 2 from table 12; section 3 from Exhibits 402, 421 and 774; and section 4 from Exhibit 774.

TABLE 12

*Number of shares of Aluminium and Alcoa common stock held by holders of majority of Aluminium common stock January 2, 1939, showing their holdings in (a) Aluminium January 2, 1939; (b) Alcoa same date; (c) Aluminium September 20, 1937; and (d) Alcoa same date.*

| | | January 2, 1939 | | September 20, 1937 | |
|---|---|---|---|---|---|
| A | B | C | D | E |
| Stockholders' names | Held in Aluminium | Held in Alcoa | Held in Aluminium | Held in Alcoa |
| 1. A. V. Davis | 74,299 | 168,049 | 75,378 | 169,249 |
| 2. R. K. Mellon | 56,388 | 128,685½ | 113 | 140 |
| 3. Sarah M. Scaife | 56,275 | 128,545½ | 00 | 00 |
| 4. Ailsa M. Bruce | 52,275 | 60,000 | 2,000 | 00 |
| 5. Paul Mellon | 50,000 | 102,500 | 00 | 55,000 |
| 6. R. A. Hunt | 20,798 | 55,306 | 21,848 | 55,306 |
| 7. Maria T. Hunt | 12,633 | 16,000 | 12,633 | 16,000 |
| 8. E. K. Davis | 8,498 | 14,689 | 9,231 | 14,889 |
| 9. G. R. Gibbons | 4,026 | 14,394 | 4,277 | 14,394 |
| 10. G. H. Clapp | 2,214 | 37,700 | 3,414 | 37,700 |
| 11. Trustees for Issue of Ailsa M. Bruce | 1,860 | 59,900 | 1,035 | 22,400 |
| Totals | 339,266 | 785,769 | 129,929 | 385,078 |

NOTE: Column A from schedule B of Ex. 774; columns B and C from schedule B of Ex. 774; columns D and E from schedule A of Ex. 774.

258

By 1939 there had been considerable change in the personnel of the stockholders of Alcoa, as well as in the numbers of shares that many of Alcoa's stockholders then held in Aluminium. By 1939, instead of three stockholders of Alcoa owning and holding a majority of the common stock of Aluminium as was true in 1928, it required eleven of the largest stockholders of Alcoa to hold a majority,—and they held only a bare majority,—of the stock of Aluminium. In other words, in the intervening eleven years the number of stockholders of Alcoa required in order to constitute their holdings of Aluminium stock a majority had risen from three to eleven.

It should be noted that the statement just made ignores four holding companies named in Exhibit 774. In 1937 they were record stockholders of both Alcoa and Aluminium. In 1938 they were dissolved. They will be referred to hereafter; but, in connection with the phase of the matter now under consideration, I think they cut no figure.

Of the eleven 1939 stockholders of Aluminium these things may be said:

(1) It does not appear how many as of the 1939 date got their Aluminium stock in 1928 or in what amounts though it does appear from table 12 itself that of the eleven largest 1939 stockholders four acquired all or substantially all of their stock in Alcoa and Aluminium subsequent to September 20, 1937.

(2) Only one of the eleven together holding the majority of Aluminium stock had in 1939 the same number of Aluminium shares as he or she had in 1937 (that is, but two years previously) and in the two years 1937 to 1939 five had increased and five had decreased the number of 1937 holdings of Aluminium stock.

(3) In 1939 four had the same number of Alcoa shares as in 1937, while five had increased and two had decreased the number of 1937 holdings of stock in Alcoa.

It is not only indisputable, but it is undisputed, that the majority stockholders of Aluminium possessed the power to control the company. The question, however, as to whether or not they violated or participated in the violation of the statute turns on whether they combined to exert that power by having Aluminium join Alcoa to restrain trade or to restrict imports or joined in a combination to do either. How then shall that be determined?

Where the question was whether a corporation, which acted through subsidiaries, was engaged in interstate commerce, in Electric Bond Co. v. Securities and Exchange Commission, 303 U.S. 419, 440, 58 S.Ct. 678, 686, 82 L.Ed. 936, 115 A.L.R. 105 the Supreme Court said, and as I conceive we can say here, "It is the substance of what they do, and not the form in which they clothe their transactions, which must afford the test." So in United States v. United States Steel Corp., 251 U.S. 417, page 451, 40 S.Ct. 293, 299, 64 L.Ed. 343, 8 A.L.R. 1121, as I have noted previously, the Court said that the Sherman Act does not make "the existence of unexerted power an offense. It, * * * requires overt acts, and trusts to its prohibition of them and its power to repress or punish them. It does not compel competition, nor require all that is possible."

Later to some extent I shall review the testimony; but I say now that clearly the Government has failed to show such overt acts and, hence, it has failed to establish a conspiracy between the stockholders themselves. We are, therefore, driven to inquire whether, apart from mere stockholdings, there is evidence as to the conduct of Alcoa and Aluminium which establishes the existence of a conspiracy between them. That conduct will now be discussed.

The first phase of it to which the Government calls attention is the failure of Alcoa and Aluminium to compete in each other's markets.

The charge that Alcoa and Aluminium did not compete in each other's markets is made in several forms; but nowhere more definitely than in paragraph 74 of the bill. There the statement of paragraph 72 was repeated, that failure to compete resulted from common control of the corporations by a small group of identical stockholders. In paragraph 74 it was alleged that this resulted from agreement among the corporations.

Paragraph 74 had best be read in full. It is as follows:

"Defendant Aluminium Limited produces large quantities of aluminum at low cost in Canada and Norway, and has shipped occasional quantities of aluminum to the United States for sale to Aluminum

Company, but it does not export any aluminum to the United States for sale in interstate trade and commerce in competition with Aluminum Company although the United States is a logical market for products of Aluminium Limited; and Aluminum Company does not export any aluminum, or any products fabricated therefrom, for sale abroad in competition with defendant Aluminium Limited which directs its own operations so as to aid and supplement the operations of Aluminum Company and other corporate defendants. The failure of Aluminum Company and defendant Aluminium Limited to compete with each other is the result of the common control of said corporations by a small group of stockholders and of agreements and understandings between said corporations."

At the beginning let it be emphasized that, as the Supreme Court has said, the Sherman Act does not require persons to compete. It is, of course, unlawful for them to agree not to compete; but in order to establish a violation of Section 1, it is essential to show concert between at least two persons,—that is, agreement to refrain from competing.

It is not suggested that in the case at bar there is direct evidence of agreement between Alcoa and Aluminium not to compete. The Government's sole contention is that from the evidence it may be, and that it should be, inferred that there was such an agreement. Does the evidence warrant this inference? The defendants involved say that Aluminium had a free hand and that, without pressure from and without agreement with Alcoa, Aluminium adopted the course it pursued.

October 8, 1941

I should like to make some additions to my statements of yesterday as to how tables 12 and 13 were made up.

I turn first to table 12.

The total of the common stock of Alcoa was 1,472,625 shares. Half of that is 736,312½ shares. A majority, therefore, is something above the figure last given. The total of common shares of Aluminium was 676,737. Half of that would be 338,368½. A majority, therefore, would be anything which is more than the latter figure.

I have already brought out that on January 2, 1939, it required eleven of the Aluminium stockholders to hold a majority control of the stock of the company. The eleven then having the greatest number of shares each together had a total of 339,266—which is a little less than 900 in excess of a bare majority.

Of the shares of Aluminium owned by Alcoa's stockholders on September 20, 1937 (table 13, section 3), 83.93 per cent of the Aluminium stock was held by holders of 81.53 per cent of Alcoa stock. However, a substantial quantity of the stock of each of the companies stood in the names of brokers. Of course, nobody would know without considerable inquiry, and probably nobody could find with certainty, who were the owners of the stock standing in the names of the brokers. Particularly is this true in large commercial centers. Deducting the stock standing in the names of brokers, then on September 20, 1937, 78.05 per cent of Aluminium stock was held by the holders of 77.88 per cent of Alcoa stock.

You will further observe from table 12 that, whereas on January 2, 1939, it required the holdings of the eleven largest Aluminium stockholders to make a majority (and they held 339,266 shares) of Aluminium common stock, on September 20, 1937 (less than a year and a half earlier), those identical eleven stockholders of Aluminium on the latter date held in Aluminium only 129,929 shares,—although it will be noted that table 12 disregards the beneficial interests of stockholders of Alcoa and Aluminium held by holding corporations in 1937 as well as the effect of the dissolution of those holding corporations in December, 1938. This aspect of the matter has not been disregarded and will be gone into later.

If table 12 be correct and what I have said about it be accepted, then its significance is that it constitutes a demonstration that usually time does away, or can and is almost sure to do away, with control of a corporation by any small group of stockholders. Of necessity the result follows from voluntary sales by, or from insolvencies of, or from deaths among, the general mass of stockholders or from a combination of those causes or possibly from other causes.

With the explanations given, I believe it will be easy to understand the plan on which table 12 has been made up.

Table 13 contains merely summaries of what has been established by table 12. It can be verified by anybody. I think there is no occasion for additional comment on it.

That, under normal conditions, the ratios between the quantums of stock in the two companies (Alcoa and Aluminium) held by any single group of individuals would not remain stationary was to be anticipated. Again, it is plain that, unless changes in the holding of stock in one company were permissible without an accompanying requirement that like comparable changes be made in the holding by the same individual of stock in the other company, as a practical matter ordinarily the general market for the stock of both companies would be destroyed.

Perhaps enough has been said on the subject. Nevertheless, it may avoid misunderstanding, and certainly may assist in clearness, to inject two further statements (even though that be at the expense of some repetition).

(1) On June 4, 1928, the proportion of stock in Alcoa and in Aluminium held by each stockholder was the same. In the course of the years, however, save in exceptional cases continuance unchanged of any such proportion could not reasonably have been expected; and the record shows numerous individual instances in which the proportions have shifted widely. Illustrations appear on the face of table 12.

It would require extensive investigation to ascertain with precision the many variances which have occurred from time to time in the proportions. Moreover, I do not believe it is essential or would even be helpful to determine definitely what have been all the proportions or their variances.

(2) The part played with respect to the lodging of Alcoa and Aluminium stock with holding corporations, insofar as disclosed by the evidence, will next be described.

There were four such holding corporations. Their names were Aloxite, Ricsar, Coalesced and Ascalot. On September 20, 1937, three of these held Alcoa and Aluminium common stock. The fourth (Ricsar) held none (Exhibit 774, exhibit p. 3722). As previously remarked, all were dissolved,—in fact fully liquidated,—in December, 1938 (exhibit p. 3720).

Numbers 2 and 3 of the list of stockholders in table 12 (column A) were children of Richard B. Mellon and numbers 4 and 5, of Andrew W. Mellon (exhibit p. 3729). The fathers named were the two associates of Arthur V. Davis when on June 4, 1928, the holdings of these three stockholders when combined made a majority of the common stock in each company.

Apparently it has been assumed (and perhaps it is true) that stockholders numbered 2, 3, 4 and 5 acquired all or most of their 1937 stock from their fathers,—though that has not been proved nor does it appear when the holding corporations acquired the stock they held for the children.

Apparently it has also been assumed that from the holdings by the children of common stock of the holding corporations (exhibit p. 3728) the relative shares of the beneficial interests of the children in Alcoa and Aluminium stock in the hands of the holding corporations can be determined. For example, since the two children of Richard B. Mellon each held an equal number of shares of the common stock of Aloxite (exhibit p. 3728), it seems to have been assumed that each likewise was entitled to one half the common stock of Alcoa and of Aluminium shown by schedule A of Exhibit 774 (exhibit p. 3722) which Aloxite held on September 20, 1937. The same method has been applied to determine the beneficial interests of the children in Alcoa and Aluminium stock held by the other holding corporations at that time.

If what results from a computation on the basis just outlined be added to what has already been included in table 12 as having stood in the names of the children in 1937, we get the respective total holdings of Alcoa and Aluminium stock which they personally held or beneficially owned September 20, 1937.

In conformity with the method explained, I have prepared table 12A. As indicated, it is designed to show what the holdings of the Mellon children would have been on September 20, 1937, if by then the holding corporations had already delivered to them

the Alcoa and Aluminium stock held for them and is as follows:

## TABLE 12A

*Revision of columns D and E of table 12 to show in columns F and G below the total numbers of shares of Aluminium and Alcoa common stock that would have been held on September 20, 1937, by stockholders numbered 2, 3, 4 and 5 in list of stockholders' names, column A of table 12, if (1) the numbers shown in columns D and E of table 12 and (2) the numbers computed from the evidence, on assumptions stated in the note below, to have been held at that time by holding companies for those numbered stockholders, were added together.*

| A | F | G |
|---|---|---|
| Stockholders' names | Held in Aluminium | Held in Alcoa |
| 2. R. K. Mellon | 56,363 | 128,123 |
| 3. Sarah M. Scaife | 56,250 | 127,983 |
| 4. Ailsa M. Bruce | 59,375½ | 97,500 |
| 5. Paul Mellon | 56,275½ | 102,500 |

NOTE: Numbers of Aluminium and Alcoa common shares held by holding corporations for stockholders numbers 2, 3, 4 and 5 above on September 20, 1937, but not included in columns D and E of table 12, were estimated by (1) taking Aluminium and Alcoa common shares held by holding corporations (Aloxite, Ricsar, Coalesced and Ascalot) from schedule A to Exhibit 774 (exhibit p. 3722) and (2) assuming (exhibit p. 3728) that (a) Aloxite held one half of such stock in its hands each for stockholders numbers 2 and 3 above, (b) Ricsar held no Aluminium or Alcoa common stock, (c) Coalesced held one half of such common stock in its hands each for stockholders numbers 4 and 5 above and (d) Ascalot held all Aluminium and Alcoa common stock in its hands for stockholder number 5.

By comparing tables 12 and 12A it will be observed that the inclusion in table 12A of the beneficially owned Alcoa and Aluminium common stock in the hands of the holding corporations with what had already been incorporated in table 12 does not alter the result already stated in regard to the effect of time on the shifting of stock control of a corporation. On the contrary, it emphasizes and further illustrates that result. The primary purpose of table 12A is to safeguard against confusion or misapprehension.

Nevertheless, it is worthwhile to note the result of substituting table 12A for the 1937 figures in table 12. Thereby we can see with precision the number of holders of Aluminium common stock that would have been necessary on September 20, 1937, in order for their holdings then to constitute a majority if preceding that day the holding corporations had distributed to the Mellon children such of the common stock as was held for them.

It will be recalled that upwards of 338,368½ shares of Aluminium common stock are required to constitute a majority. If tables 12 and 12A were combined in the way I have suggested, the minimum number of the holders of Aluminium common stock to make up a majority would have been eight (being the first eight named in column A of table 12). The total of their holdings would have been 347,354 shares.

There are two features of the situation, however, that should not be overlooked. These are that (1) on September 20, 1937, the eight Aluminium stockholders referred to held 711,550 shares of Alcoa common stock (nearly 25,000 less than a majority) and (2) on January 2, 1939, the eight held only 331,166 shares of Aluminium common stock (more than 7,000 less than a majority).

On the assumption as to 1937 mentioned, a recapitulation shows that the number of holders of Aluminium common stock needed to make a majority was 3 in 1928, 8 in 1937 and 11 in 1939. There is nothing in the evidence to suggest that this number will not steadily increase in size with the passage of time.

Accordingly, on review of all the evidence, I think that it would not support a finding of conspiracy between the stockholders of Alcoa and Aluminium or between either a large or a small group of those stockholders; nor would the evidence warrant a finding in regard to the conduct of the stockholders other than that they left officials of Aluminium a completely free hand in running the business of the company.

If in shaping the transfer of the foreign properties the purpose of Alcoa had been to retain control, then an easy way would have been to adopt the scheme suggested by the Government at the argument. Merely by turning over those properties to an Alcoa subsidiary, the control of all the properties would have remained complete and absolute in the hands of Alcoa.

As one ground for their attempted refutation—as they insist, standing alone, constituting a complete refutation—of the proposition of the Government, Alcoa and Aluminium rely on facts which will be presented in the form of several tables.

The first, table 14, is as follows:

### TABLE 14

*Aluminium's and Alcoa's mill costs (in cents per pound) of producing aluminum pig, 1928–1937, computed on two plans.*

*Section 1.* With profits of subsidiaries included:

| | A | B | C |
|---|---|---|---|
| Year | Aluminium | Alcoa | Excess of A over B |
| 1928 | 11.41¢ | 10.64¢ | .77¢ |
| 1929 | 11.35 | 10.06 | 1.29 |
| 1930 | 10.80 | 9.63 | 1.17 |
| 1931 | 11.00 | 9.21 | 1.79 |
| 1932 | 13.07 | 10.01 | 3.06 |
| 1933 | 12.55 | 10.43 | 2.12 |
| 1934 | 12.44 | 11.40 | 1.04 |
| 1935 | 10.86 | 10.23 | .63 |
| 1936 | 10.11 | 9.32 | .79 |
| 1937 | 9.19 | 9.15 | .04 |

*Section 2.* With profits of subsidiaries omitted:

| | D | E | F |
|---|---|---|---|
| Year | Aluminium | Alcoa | Excess of D over E |
| 1928 | 11.11¢ | 9.81¢ | 1.30¢ |
| 1929 | 10.93 | 9.41 | 1.52 |
| 1930 | 10.51 | 8.60 | 1.91 |
| 1931 | 10.75 | 8.51 | 2.24 |
| 1932 | 12.08 | 9.56 | 2.52 |
| 1933 | 12.09 | 10.30 | 1.79 |
| 1934 | 11.34 | 11.17 | .17 |
| 1935 | 9.68 | 9.40 | .28 |
| 1936 | 8.57 | 8.09 | .48 |
| 1937 | 7.22 | 7.94 | .72 (Less) |

This table compares Alcoa's and Aluminium's mill costs of producing aluminum pig from 1928 to 1937. There is some controversy between Alcoa and the Government as to what such costs of Alcoa were. I have, therefore, taken the costs from the Government exhibits and that was acquiesced in by Aluminium. In so far as concerns the figures in the table relating to both Alcoa and Aluminium, counsel do not question their mathematical correctness for use in passing on the issue now under consideration. Their disagreement is only as to the effect to be given to the figures. Details of table 14 will be brought out hereafter.

The second table is 15. This is as follows:

### TABLE 15

*United States taxes on imports of aluminum ingot and fabricated articles 1890–1939.*

| Years | Ingot | Sheet | Foil | Utensils | Other Manufactures |
|---|---|---|---|---|---|
| (Cents per pound and per cent ad valorem) | | | | | |
| 1890–1894 | 15¢ | | | | . |
| 1894–1897 | 10 | * | * | 35% | 35% |
| 1897–1909 | 8 | 13¢ | * | 45% | 45% |
| 1909–1913 | 7 | 11 | * | 45% | 45% |
| 1913–1922 | 2 | 3½ | * | 25% | 20% |
| 1922–1930 | 5 | 9 | 35% | 11¢ + 55% | 40% |
| 1930–1939 | 4 | 7 | 40% | 8½¢ + 40% | 45% |

* No separate classification of these items in the years indicated.

(26 Stat. 567; 28 Stat. 509; 30 Stat. 151; 36 Stat. 11; 38 Stat. 114; 42 Stat. 858; 46 Stat. 590, 19 U.S.C.A. § 1001 et seq.)

NOTE: Certain of the foregoing general rates have been modified in recent years by trade agreements. For example, the rate on ingot of Canadian origin was reduced to 3¢ in November, 1938 (U. S. Executive Agreements Series, No. 149), and the rate on foil of Swiss origin was changed in 1936 to 11¢ per pound, but not less than 20% nor more than 40% ad valorem (49 Stat., Part 2, 3917).

Table 15 sets out the tariff rates which for many years preceding January 1, 1939, applied to importations into the United States of aluminum and the products therefrom. There is no dispute about the figures. What the table shows is the tariff rates under the customs laws prescribed by the United States for various years from 1890 down to and including 1939.

The rates are in cents per pound or in percentages ad valorem. The table gives the rates in one form or another of the tariff tax on ingot sheet, foil, utensils and other manufactures. We are not much interested in any of the figures except those in the last two lines of the table. The next to the last line shows that from 1922 to 1930—and we are interested during that period only with the rates from 1928 to 1930—the tax on the importation of ingot was 5 cents a pound and the last line shows that for the period of 1930 to 1939 the rate was 4 cents a pound. I shall not go into the rates set out in the table for the other aluminum commodities which are given. As I have said, these are sheet, foil, utensils and other manufactures.

Apparently on their face—and I think the inference is well-nigh inescapable—the

rates, whether in cents per pound or in percentages ad valorem, were higher on every other type of aluminum importation than on ingot. For example, on sheet they were, as against 5 cents on ingot, 9 cents on sheet and, as against 4 cents on ingot later, they were 7 cents on sheet and so on. The facts in table 15 will be referred to again later.

The third table is 16. It is as follows:

3. Foreign markets having a domestic producer or domestic producers.

As to whether that grouping is correct I shall say nothing at this time. Later the matter will be discussed fully.

You may note, however, that the results arrived at from table 16 as to the averages of Aluminium's sales from 1931 to 1937 were as follows:

## TABLE 16

*Aluminium's sales of ingot to customers in different countries, 1928–1937.*

| | 1928 | 1929 | 1930 | 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Group 1:* | | | | | | | | | | |
| British Empire ...... | 25.0% | 15.8% | 5.4% | 16.9% | 24.6% | 38.2% | 41.5% | 35.4% | 39.7% | 40.6% |
| Italy ................ | 14.0 | 5.1 | 11.2 | 26.5 | 11.6 | 21.3 | 17.7 | 13.9 | 11.0 | 5.1 |
| Total ............ | 39.0% | 20.9% | 16.6% | 43.4% | 36.2% | 59.5% | 59.2% | 49.3% | 50.7% | 45.7% |
| *Group 2:#* | | | | | | | | | | |
| China ................ | .0% | .0% | .0% | .0% | 2.2% | 4.4% | .9% | .7% | .6% | .5% |
| Japan ................ | 10.7 | 5.6 | 7.6 | 45.3* | 37.9* | 29.9* | 31.0* | 26.3* | 41.4* | 42.1* |
| Russia ................ | 1.4 | 2.5 | 19.4 | .3 | 18.2 | 1.6 | .0 | .0 | .0 | .3 |
| South and Central America .......... | 1.5 | .7 | .6 | 1.7 | 2.2 | 3.3 | 6.8 | 3.3 | 2.0 | 1.9 |
| All others ........... | 7.0 | 4.8 | 2.3 | 8.0 | 3.2 | .8 | 2.0 | 2.1 | 4.3 | 5.0 |
| Total ............ | 20.6% | 13.6% | 29.9% | 55.3% | 63.7% | 40.0% | 40.7% | 32.4% | 48.3% | 49.8% |
| *Group 3:* | | | | | | | | | | |
| France ................ | .0% | .0% | 1.3% | .6% | .0% | .0% | .0% | .0% | 1.0% | .0% |
| Germany ............ | .5 | .2 | .3 | .1 | .0 | .0 | .0 | 10.9 | .0 | 1.5 |
| Switzerland .......... | 1.6 | 4.5 | 4.1 | .0 | .0 | .0 | .0 | 7.3 | .0 | .0 |
| United States ....... | 38.3 | 60.8 | 47.8 | .6 | .1 | .5 | .1 | .1 | .0 | 3.0 |
| Total ............ | 40.4% | 65.5% | 53.5% | 1.3% | .1% | .5% | .1% | 18.3% | 1.0% | 4.5% |

\# Aluminum was produced to some extent in Japan commencing in 1934 and in Russia commencing in 1931 (Ex. 985).

\* The indicated sales includes sales made for the account of the other parties to the Zurich Agreement; the elimination of sales for the account of others would result in a corresponding increase in the percentage of sales in all other markets (Aluminium interrogatory 166).

This table is a little bit more difficult to understand or to follow than either table 14 or table 15. It is of considerable importance. It gives Aluminium's sales of ingot to its customers in various countries from 1928 to 1937, inclusive. I have divided the countries in which the sales were made by Aluminium into three groups. I designate these as group 1, group 2 and group 3. There is controversy about the grouping; whether it is correct. The contention of Aluminium, which in its brief furnished an arrangement of the figures corresponding very nearly to the arrangement of them in table 16, took the position that the three groups should be these:

1. What it called domestic markets.

2. What it called foreign markets with no domestic producer.

(1) The sales into group 1 countries, to which Aluminium referred as domestic markets, were 49.1%;

(2) The like sales into group 2 countries, to which Aluminium referred as foreign markets with no domestic producer, were 47.2%;

(3) The sales into group 3 countries, to which Aluminium referred as foreign markets having a domestic producer or domestic producers, were 3.7%.

The last three figures, of course, make 100 per cent.

I think the bearing of the tables on the controversy here is clear. Nevertheless, I believe their significance can be better appreciated if, before going into details, there be further amplification of the facts show-

ing the positions of Alcoa and Aluminium. Moreover, while there is little or no difference between counsel as to the arithmetical correctness of the figures that are used in the tables, there is vigorous dispute as to whether the computations are made up on correct theories. Because of this difference between the parties it seems to me better to deal with evidence not involving figures before taking up the tables further.

What the accused defendants say, in support of their denial of guilt of the charge with respect to not competing, has been partly set out heretofore; but if my presentation now is to be clear, I must indulge in some repetition. A summary of the statements of Alcoa and Aluminium, in essence, is as follows:

(1) The properties which Aluminium took over on June 4, 1928,—especially when supplemented, as was then contemplated, by the later additions,—in and of themselves were very valuable. If properly handled they were capable of development into a unified whole of very much greater value. Neverthelesss, they were heterogeneous, incomplete and lacking in many respects. Out of the deficiencies there grew numerous problems.

(2) The largest and by far the most valuable properties were in Canada. Those properties included an alumina plant and two aluminum producing plants; but there were no adequate fabricating plants (pp. 16158-9; 21494-5; 22566-8; 22570; 40365-6). The alumina plant was positively inefficient. One of the aluminum producing plants was at Shawinigan Falls; the other at Arvida. It is important to remember that there were no adequate fabricating plants. That was an obvious handicap to Aluminium of large consequence.

(3) At the time of its organization Aluminium was supplied with sufficient bauxite deposits (located in British Guiana), but for making alumina therefrom it was solely dependent on a so-called dry process plant at Arvida. That was still then in the experimental stage. Ultimately (about 1930) it had to be abandoned and a Bayer process plant was constructed in its stead, —which was completed in 1936. The dry process plant had proved to be too costly in its production. In addition, it would not eliminate titanium, which was a very objectionable element (pp. 13986-8; 16100-2; 16245-7).

Because it had no satisfactory alumina plant in Canada, from June 4, 1928, onward for several years Aluminium had to procure alumina from elsewhere. Some was made in the United States by Alcoa, by the Bayer process, at Alcoa's East St. Louis plant. The bauxite from which alumina was manufactured for it at East St. Louis was supplied by Aluminium. Some of the alumina that came to Aluminium was procured from Europe.

So also the absence of adequate fabricating facilities of its own in Canada for some years following 1928, before it completed its Bayer process plant, imposed on Aluminium the necessity of procuring much toll rolling. This was done by Alcoa in the United States of aluminum furnished by Aluminium.

(4) In June, 1928, Alcoa turned over to Aluminium very little cash. Aluminium began its career with quite a small working capital. Not only was there absence of cash, but the constituent companies of Aluminium also owed substantial current debts. Among those debts were considerable sums due by the subsidiaries to Alcoa. Again, Aluminium had to look forward to the necessity of meeting what it had engaged to pay for the three companies to be acquired, and agreed to be acquired, from Alcoa which had not been purchased for stock. The total of the payments was large. In round figures the amounts turned out to be: $95,000 for Laate-Foss, a small water power site in Norway; $1,558,000 (which was cost) for Prodotti, where an experiment with leucite to develop from it alumina as a by-product of potash was in progress; and $35,000,000 (that also being cost) for the assets of Alcoa Power Company. The last named sum was for two items: (a) the site at the Lower Development on the Saguenay River, acquired by Alcoa from Mr. Duke in 1925 at a valuation of $17,-000,000, and (b) improvements installed on that site by Alcoa, composed of a dam, a power house and power equipment, at an expense of $18,000,000.

(5) Incidentally, it was matter of obvious self-interest for Alcoa to shape its own course with a view to promoting the collection of the debts mentioned. These were what was already owing to Alcoa by Aluminium's subsidiaries and what was to become due in future for the three companies which were to be taken over by it from Alcoa not already paid for in stock.

In other words, it was plainly good business for Alcoa, as a creditor of Aluminium, to assist Aluminium to get on its feet, so as to be able to discharge its obligations to Alcoa.

(6) The assets of Aluminium located in the British Empire (chiefly in Canada) were a large proportion of what it had received from Alcoa. In 1932 (the earliest date for which the evidence affords information) they constituted nearly 70 per cent of Aluminium's entire investment. The proportion is still about the same.

(7) As previously said, the properties Aluminium received in 1928 included two reduction plants in Canada. Soon afterwards Aluminium succeeded in exchanging the stock it held in the Spanish aluminum producing company (item 16 of table 10) for the theretofore unacquired balance of the stock of the Italian aluminum producing company (Alluminio Italiano—item 15 of table 10). Thus Aluminium came into complete ownership of the Italian company and of course ceased to have any interest whatsoever in the Spanish company. The total annual capacity of the Italian company was small. At the time it was 1,500 tons. Later it rose to 3,000 tons.

(8) In 1928 France, Italy and Switzerland imposed and ever since have imposed customs duties on the importation of aluminum. So far as disclosed, the sole abatement in these rates has been by Switzerland and that only on foil. This resulted from a reciprocal agreement between that country and the United States, entered into in 1936. Formerly it was necessary to procure a license from Germany in order to import aluminum into that country. That has been succeeded by a tariff which imposes taxes on imports of aluminum.

(9) Since some time in 1932 Canada has enjoyed the benefits of a preferential tariff system, which is widely prevalent throughout the British Empire. The new tariff system resulted from the so-called Ottawa Conference of 1932. Under the system aluminum and articles made from aluminum produced in Canada are entitled to admission free of duty into the United Kingdom, India and many other parts of the Empire. Non-Empire produced commodities of the same kind must pay an import duty, even when to other parts of the Empire, of 10 per cent.

It is crucial to understand the British Empire situation. Mr. Edward K. Davis made it clear in his annual report for 1932 to Aluminium stockholders. He there said (Exhibit 876, exhibit p. 4097):

"Of particular benefit to companies operating in the British Empire, are the trade agreements between Canada and the United Kingdom, Canada and Australia, Canada and New Zealand, and the United Kingdom and India, made pursuant to the program of the Ottawa Conference of July and August, 1932. With relatively unimportant exceptions, they give our products, made within the British Empire either free entry into these markets or preferential rates of duty over similar products of non-Empire countries. Other Empire trade agreements are in negotiation. The full benefit of the Ottawa trade agreements already made was not felt in 1932 since they were in operation only in the latter part of the year, but we anticipate that substantial benefits will accrue to our business on account of them."

At the trial (pp. 16114-21), on May 1, 1939, Mr. Edward K. Davis testified more fully about the situation. He expressed the view taken by Aluminium as to other countries and as to the British Empire as well. His description, which I accept, is so excellent that I think it worth while to quote from it at length.

He said—

"When Aluminium Limited commenced its business, it was not a very strong company; it was short of capital and the management of Aluminium Limited felt that the prospects of building up eventually a substantial business—a profitable business —for our group of companies was better in the relatively undeveloped parts of the world, places where the population, although enormous, had not yet reached a stage where they could use as much aluminum per capita as was the fact in the more developed parts of the world.

"The potential sales of aluminum to these undeveloped regions—these highly populated regions—looked very promising to us for the long run and we decided to spend our energies there rather than to enter more highly developed markets like the United States. * * *. In the British markets, although it is true that the British Aluminium Company was in operation in 1928, and for many years before, nevertheless we felt that the possibilities of large consumption of aluminum in the British Empire and particularly in the United Kingdom, were very much beyond what the British Aluminium Company was

likely to build up to. So that in the United Kingdom we felt, admitting the existence of another company there, that we were not working against very heavy odds.

"In countries like India, China, Japan, in none of which countries at that time was there any production of aluminum, we felt that our efforts to build up a market for ourselves were at least on all fours with everybody else, and we did not admit that we were inferior in ability to get those markets. We believed, and it has since proved to be a fact, that the governments and people in authority in those countries and regions where we chose to develop our business, were quite cordial to the development of our business, and it was helpful and encouraging. In contrasting those instances with the possibility of developing not only a profitable but a permanent business in the United States, we recognized, firstly, that we were outsiders to the United States, and our plants were without exception outside of the United States. We recognized that in order to get into the United States market it required at least one initial step and that is to pay the duty, which in the early days of Aluminium Limited was 5 cents per pound on raw material—raw aluminum—later four and now [May 1, 1939] three from Canada, and we realized that to attempt to develop our business in an important way in the United States, even after taking into account these possibilities which I have just mentioned, would involve trying to get customers in a market which so far as aluminum is concerned is probably the best or as well served with respect to aluminum as any part of the. world. The diversity of aluminum products in the United States is unequalled anywhere and the location, set-up and organization of the Alcoa has served to make aluminum easily. available to everybody in the United States.

"On balancing the advantages and disadvantages and taking fully into account the fact that our plants and organization are foreign to the United States, we decided to spend our efforts in building up a business in the regions in which my company has principally dealt for the past ten years. But at no time have we ever renounced our right to extend our business to any part of the world we choose to, including the United States, France, Germany and Switzerland, and other countries which, like the United States, have a highly developed aluminum business. * * *.

"* * *. According to my judgment, to make anything even approaching a satisfactory job of building up a profitable and permanent market in the United States would have required a great deal of expenditure of money and time. * * *.

"* * * amongst the companies which were acquired by Aluminium Limited, were four or five companies which had been trained and built up to carry on selling operations in countries foreign to the United States, such countries as the Argentine, Brazil, England, Italy, India. The selling organization acquired by Aluminium Limited was distinctly a foreign, non-United States selling organization. * * *.

"* * * sentimentally a company in the British Empire employing British people, using British materials and paying taxes to British dominions enjoys quite a noticeable sentimental preference in the United Kingdom as compared with foreign countries. That is true not only of the trade but of the entire governmental authorities. During the past ten years the sentiment in Great Britain, which is described by the slogan 'Buy British', has been quite a powerful element in enabling British companies to deal successfully as compared with non-British companies in. the United Kingdom and elsewhere in the British Empire. * * *.

"* * *. I won't say that the British put the Canadian companies quite on a par with their United Kingdom companies, but they recognize a solidarity.

"Q. But when a Canadian company comes to deal with India, Australia, New Zealand and other places, have you observed some of this sentimental advantage that you speak of? A. Yes, it exists.

"Q. And of course it exists in Canada? A. Yes."

The facts, so far recited, themselves have a direct bearing on the issue under consideration. They also constitute a background for weighing other evidence bearing particularly on the question whether there was an agreement or understanding between Alcoa and Aluminium to fix prices or to restrain imports, such as is alleged in paragraph 74 of the bill.

As I view the matter, not only has the Government failed to establish its charge or to adduce evidence which would justify a finding in its favor on the charge, but the evidence is convincing the other way:

(1) Aluminium, under the guidance of Mr. Edward K. Davis as its president, had clearly in mind all the factors I have mentioned and had in mind everything pertinent except a few things which probably could not be foreseen. These exceptions were fixing the precise amounts of debts and prices of property referred to, exchange of stock of the Spanish company for stock of the Italian company and later tariff changes.

(2) Mr. Davis also forecast the future with remarkable accuracy. He correctly appraised the "Buy British" spirit. In substance, he anticipated the establishment of the preferential tariff system of the British Empire, which was adopted soon after.

(3) He was familiar with the United States tariff system and he appreciated the effect tariff walls in other countries, like France, Switzerland, Italy and Germany, would have on trade.

(4) He believed that the best prospect for the success of his company was to extend its business within the British Empire, where at the time the aluminum business was much undeveloped, and elsewhere outside the British Empire, where previously the aluminum business had been wholly undeveloped or hardly developed at all.

(5) Accepting the facts to be substantially as I have stated them, without agreement (express or implied) between Alcoa and Aluminium, Mr. Edward K. Davis formulated, and under his leadership there has been executed, the plan under which Aluminium has operated ever since June 4, 1928.

I do not mean to imply that Mr. Davis has not had to adopt or to yield to some modifications. I do not mean that he has not sought advice. I am persuaded, however, that the Government has failed to show that he acted in combination with Alcoa or to show that there existed between Alcoa and Aluminium any agreement, expressed or implied, not to compete in each other's markets. This means that I am convinced that no conspiracy between Alcoa and Aluminium, such as the Government alleges in the bill, has been proved.

When Mr. Edward K. Davis began his task, both Canada and the United States were or seemed to be prosperous; but a financial crash followed in 1929. Almost continuously since 1929 business men have been forced to adjust their conduct to the depression which followed the crash. So far as affects the issue of whether there has been a conspiracy between Alcoa and Aluminium, such as is alleged in paragraph 74 of the bill, I am persuaded, however, that there has been no material change in the relations of Aluminium and Alcoa, as conceived by Mr. Edward K. Davis when he made his plan, and that through pursuing the plan he has led his company into its present position.

The Government recognizes that the officials of a manufacturing company are free, without infringement of the Sherman Act, bona fide to determine where, as a matter of good business and in the interest of their principal, its output had best be sold. At least I so construe what was said in the Government's original brief, pages 706-7. There, referring to the markets in which Alcoa and Aluminium had chosen to sell their products, the comment was this:

"if there existed adequate business reasons which would operate to make it unprofitable or undesirable for Alcoa and Aluminium Limited to cultivate each other's markets, the mere fact of their failure to compete standing alone would not be convincing evidence of conspiracy."

I think the statement just quoted is indisputably true. I think also that, on the Government's own test, Aluminium must be acquitted of having violated the Sherman Act by selling in the markets in which it did sell. With quite sufficient "business reasons" and influenced exclusively by those, as I see it, Aluminium's officials, on the facts in evidence, might reasonably have decided that it was undesirable to cultivate the markets which the evidence shows have been cultivated by Alcoa.

The inherent nature of the conduct of these officials did not necessarily, or even probably, embrace or bring about undue restraint of trade. It is relevant, therefore, to consider whether there was intent to accomplish that result. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 360, 361, 372, 53 S.Ct. 471, 77 L.Ed. 825; Apex Hosiery Co. v. Leader, 310 U.S. 469, 500, 501, 60 S.Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044. On this issue, in circumstances indistinguishable in effect from those here, the applicable principle is well stated in Montpelier & W. R. R. v.

United States, 2 Cir., 187 F. 271, 273. There it was said that "no man should be convicted of a crime for giving to a doubtful document an interpretation which an intelligent and honest man might easily adopt." While the Montpelier case dealt with a document, the rule as to the interpretation of facts must be the same.

At this point we might end the discussion on the question in regard to the companies choosing separate markets. Counsel have so earnestly pressed their divergent views as to the material embodied in the tables previously mentioned, however, that I feel they are entitled to have the Court express itself on the subject.

There are facts, condensed in two of the tables, without the consideration of which it would have been difficult and perhaps impossible for the responsible officials intelligently to steer the business courses of Alcoa and Aluminium, respectively, after they were separated on June 4, 1928. Of necessity those facts bore on what it was wise for the companies to do. Table 14 gives the companies' relative costs of producing aluminum. Table 15 gives the tariff rates on imports which had prevailed in the United States from time to time since soon after the organization of Alcoa.

As previously remarked, counsel do not disagree as to the arithmetical correctness of the figures in the tables. They do disagree, however, about the theory on which the first table should be made up and about the significance of the second table.

The accountant who prepared Aluminium's answer to interrogatory 179 thinks the profits of subsidiaries should be included in ascertaining the cost of producing aluminum pig (pp. 14883-6; 14933-8). Section 1 of table 14, which is designed for use in comparing the costs of the two companies, includes those profits. Section 2 eliminates them. As I understand its argument, the second section complies with the view of the Government. However, there is no occasion to determine which section is to be preferred, because I shall use section 2 as the Government prefers.

Ingot is produced by remelting pig. The cost of remelting is one-half cent a pound. The evidence shows, and by their conduct at least counsel have indicated they agree, that the comparative mill costs of the two companies producing pig (fully brought out in the evidence) afford a fair criterion for comparing the mill costs of producing ingot. In consequence, all pig costs have been used and counsel have acquiesced in their use.

Column C of table 14 purports to show that for each year from 1928 to 1937, inclusive, Aluminium's costs of producing pig were greater than those of Alcoa; column F, that for each year except 1937 the costs of Aluminium were greater and that in 1937 they were only .72 of a cent less than the costs of Alcoa. The fact, however, that the cost was less in 1937,—that is, less by .72 of a cent,—may be disregarded. This is true because the policy of each company toward trading in the territory in which the other traded had been determined long before then and has been followed ever since it was determined.

As I see it, the significance of section 2 of table 14 is that, when the companies decided on their business courses in regard to where to sell their products, both parties knew that they had to take into account that Aluminium's mill costs of producing aluminum ingot in Canada were greater than those of Alcoa in the United States. We have no way, with precision, of ascertaining how great was the influence of Canadian costs being higher. Nevertheless, the fact must be deemed, in some measure, to have retarded or contributed to retarding the coming of Canadian imports into the United States; especially when, in order to get into the United States, Canadian aluminum had to jump a tariff wall.

The evidence establishes that when aluminum produced in one country is sold in another country and the latter taxes imports, customarily it is, and long has been, sold duty prepaid by the seller. Table 15 shows that from 1928 to 1930, as I have previously called to your attention, the customs tax on imports of ingot into the United States was 5 cents a pound and from 1930 to 1937 was 4 cents a pound. I think it obvious that this tax has also been a factor. Necessarily it has hampered the selling of foreign ingot in the United States, though we cannot say exactly how much. If retardation had not resulted, would not our tariff laws have failed of their purpose and, in consequence, probably their rates have been increased?

This brings us to the discussion of Aluminium's sales of its ingot in various countries, the comparative percentages of which are stated in table 16. The only difference between the parties as to the figures is that in three instances (one in 1928, one in 1930 and one in 1934) there were variances of one-tenth of one per cent in computations. These differences are relatively petty. For that reason they will be ignored as counsel have ignored them, saying in substance that the figures in the tables are arithmetically correct. On the other hand, there has been much controversy as to how the tables should be construed; also as to what bearing the facts have on this case.

Aluminium, as I have previously explained, selected labels for each of the groups in table 16. It would prefer to have group 1 there called "domestic markets"; group 2, "foreign markets with no domestic producer"; and group 3, "foreign markets having a domestic producer."

In seeking to point out the significance of the table Aluminium's argument is as follows:

1928, 1929 and 1930 were within a period when, with the new relation between Alcoa and Aluminium in its initial stage, extraordinary things were happening. It suggests, therefore, that those years be disregarded. When the years 1931 to 1937 were reached, however, it appears that on the average 49.1 per cent (nearly half) of the sales by Aluminium went to markets in countries wherein neither the United States nor any other nation outside of the British Empire and Italy had a tariff advantage or its equivalent; also that an average of 47.2 per cent went to markets in countries having no domestic producer or having no domestic producer for a considerable part of the period and that a very small fraction (on the average 3.7 per cent) went to countries having a domestic producer or more than one such producer.

On the basis of these percentages Aluminium urges that its success is attributable or largely attributable to its having located itself where it could sell to countries wherein it would enjoy tariff protection or a similar preference which would not be accorded to an outsider and wherein it would not encounter a local producer of aluminum who would enjoy a position better than that of itself (that is, Aluminium). Accordingly, as Aluminium says, the table demonstrates that conspiracy cannot properly be deemed the cause of its growth or be deemed to have had any share in bringing about its growth.

The Government has not urged, and I do not believe it could sustain a contention, that, if Aluminium's analysis be correct, room would be left in the evidence for an inference of conspiracy. Hence, it is of great consequence to consider whether the analysis be correct.

The dispute about the table is confined to two points of classification. One relates to the British Empire; the other to Japan.

Aluminium urges that the British Empire in its entirety belongs to group 1 (domestic markets) and that Japan in its entirety belongs in group 2 (foreign markets having no domestic producer). On the other hand, the Government insists that only the part of the British Empire exclusive of the United Kingdom (which the Government says means exclusive of Great Britain and Ireland) should be retained in group 1; also that for the whole period, 1928 to 1937, the United Kingdom and, as I understand, that for the years 1935, 1936 and 1937 Japan should be transferred to group 3 (foreign markets having a domestic producer).

In support of its positions the Government points out, and it is not denied, that within the boundaries of the British Empire in 1928 to 1937 Aluminium produced no ingot except in Canada; while, apparently or impliedly, it urges that in Japan from 1935 to 1937 some ingot was produced by Aluminium and some by others.

Which of the contentions advanced by the litigants is right?

If we were merely faced with an academic debate, turning on words, I think there would be plausibility in an objection to calling the United Kingdom, so far as concerns its geographical relation to Aluminium, a "domestic" market. If the objection be good, however, it seems to me that it would lie equally to the remainder of the British Empire as well as to Italy and that, therefore, the class of domestic markets would have to disappear altogether from the table. I feel also that the difficulty arises wholly, and if not wholly, then certainly in great part, out of the lack of precision which characterizes and

is widely prevalent in the English language. Nevertheless, if we discard form and consider substance only, I think it will be clear what Aluminium means by the word "domestic" when used in the phrase "domestic markets" to describe group 1.

In the first place, ever since shortly after the 1932 Ottawa Conference aluminum produced by Aluminium in Canada, without payment of import duty, could be sold in the United Kingdom and generally in other parts of the British Empire, whereas aluminum produced outside of the British Empire, without exception, has had to pay a 10 per cent import tax before it could enter the British Empire. Preceding the adoption of the 10 per cent tax Aluminium could avail of a somewhat similar advantage over a non-British Empire producer, through the practical operation of the "Buy British" slogan.

Moreover, as I see it, the sole purpose of Aluminium in employing the words "domestic markets" was to identify the class of countries into which, on account of a tariff or some equivalent or substitute advantage, commodities belonging immediately or derivatively to Aluminium could go, that was not applicable to commodities belonging to an outsider. Otherwise, why associate Italy with the British Empire?

As matter of substance, it must be recognized that the evidence shows that since shortly after June 4, 1928, through a subsidiary, Aluminium has owned an aluminum producing plant in Italy; also that it could sell its output within the confines of Italy without competition from aluminum produced in any other country unless a tax were first paid on the importation into Italy of the non-Italian produced aluminum.

I conclude, therefore, that for the purpose of the ingot sales table 16 there is no justification for removing from group 1 therein any part of the British Empire percentages.

So far as concerns Japan, I think there are three grounds against removing its 1935-7 production figures from group 2. The first is that Aluminium's determination to adopt its program was made long previous to 1935 and there is no evidence from which, if there were no conspiracy previously, one could be inferred which began in 1935 or thereafter. The second is that, as appears by the table embodied in the Government's April, 1941, supplemental brief at page 37, in the three years, 1935-7, taken as a single period, Aluminium's sales of aluminum in Japan exceeded the total production of aluminum there by all producers combined. The third is that from the evidence it is to be inferred that Aluminium did not produce ingot in Japan, but that the ingot it sold there was imported (p. 16261; Aluminium answer to interrogatory 195, exhibit pp. 191, 205).

The comparison to which I have just referred is set out in table 17, which is as follows:

TABLE 17

*Comparison (in pounds) of (a) sales of aluminum in Japan by Aluminium with (b) the total production of aluminum in Japan by all producers, 1935-7.*

| | A | B |
|---|---|---|
| Year | Sales of aluminum in Japan by Aluminium | Production of aluminum in Japan by all producers |
| 1935 | 7,222,325 | 8,818,400 |
| 1936 | 12,306,408 | 14,770,820 |
| 1937 | 28,462,784 | 23,148,300 |
| Total | 47,991,517 | 46,737,520 |

NOTE: Column A is from Aluminium's answer to interrogatory 166 and includes sales made for the account of the other parties to the Zurich Agreement. The figures in column B are from the Government's supplemental brief, while for the same items the figures (in pounds) in Ex. 985 are 8,806,400 for 1935; 14,750,720 for 1936; and 23,116,800 for 1937 (making a total whose difference from the total in the brief is immaterial).

This table contrasts Aluminium's sales of aluminum in Japan with the total production of aluminum in Japan by everybody from 1935 to 1937.

It will be noted that the total of these sales, which are shown in column A, exceeds the total production, which is stated in column B. Why that is true is not unambiguously clear. I have discovered in the evidence no definite explanation, though of course the indication is plain that there was importation of aluminum into Japan. If the evidence were fully developed on the point, possibly complete information about the sales under the Zurich Agreement (hereafter mentioned) might shed light. Yet it is to be noted that, in table 16 (Aluminium's sales of ingot in different countries) sales for all parties to the Zurich Agreement (1931-7) were included. In order that the two tables relating to the

same general subject matter might be considered together and compared, if all the relevant facts had been brought out, it would seem that both should have been made up on the same plan.

It will be noted further that its heading shows that table 16 (Aluminium's sales) concerns only ingot, while as framed the heading of table 17 (comparison of Japan's sales and production) speaks of aluminum. It may be suggested, therefore, that different articles have been compared. I think there should be explanation of why aluminum is employed in the headings of table 17.

The reason for my wording the headings of table 17 as I did is that in its table (April, 1941, brief, p. 37) the Government used the word "aluminum"; but reference to Aluminium's answer to interrogatory 166 shows that the figures in column A actually relate to ingot and alumina, while Exhibit 985 indicates that the figures in column B deal with aluminum (though possibly meaning ingot). Even if, however, the figures in column B include some commodities other than ingot, that would be of advantage to the Government. It, therefore, has no ground of complaint of the tables.

In the way described, I have reached the conclusion that there is no support, save in respects which are wholly immaterial, for the Government's criticism of table 16 (that is, the table of Aluminium's ingot sales in foreign countries).

There is one additional circumstance of weight. While I direct attention to it, I am not forced to rely on it for support of the view I take on the present branch of the case.

Apparently the local Japanese company on which the Government chiefly predicates its contention that for the years 1935-7 Japan should be removed from group 2 is Sumitomo. If so, it may be well to note that Aluminium owns half the stock in that company and that company is not shown to produce aluminum, but confessedly is engaged in manufacturing sheet and foil (p. 16261). Indeed, as heretofore said, the inference from the proof seems inescapable that neither Sumitomo nor Aluminium produces or has ever produced aluminum in Japan and that what it fabricated or sold was imported.

Accordingly, I think the evidence does not warrant the removal of Japan from group 2 of table 16.

I believe that a good many additional phases of the facts fortify the views I have expressed about table 16 and its significance, as well as generally about the question of conspiracy between Alcoa and Aluminium subsequent to June 4, 1928. It would unduly prolong my statement, however, if I should undertake to cover all of them. Yet it may be worthwhile to mention a few things which strike me as impressive.

First: When the 1928 transfer occurred, with it went to Aluminium a system of offices and sales agencies, theretofore organized and maintained by Alcoa, in the United Kingdom and sundry other countries outside of the United States. Many of those were continued and additions were installed by Aluminium in the foreign countries where it made sales. On the other hand, Alcoa retained its own numerous offices in the United States. These were strategically located throughout the United States and were well equipped with trained salesmen. On the other hand, Aluminium did not take over from Alcoa, nor has it ever since provided itself with a sales organization in the United States.

Aluminium has had in the United States a single general office, where were stationed a few of its officials; but no one there ever has been engaged in making sales in the general trade in the United States. Moreover, following the 1928 transfer, after Alcoa's sales representatives outside of the United States had passed into the employment of Aluminium, no effort was made by Alcoa to fill their places or to form an alternative type of organization nor has it since supplied itself with sales representation in foreign countries.

In those circumstances it would have been strange if, after June 4, 1928, Aluminium had made large sales in the United States or Alcoa had made large sales in Canada or elsewhere outside of the United States to the general trade. The lack of such sales, therefore, does not justify an inference that absence of sales by each to the markets of the other, respectively, is attributable to agreement between Alcoa and Aluminium to that end.

Second: With the coming in 1937 of the prospect of war in Europe, without having soliciting agents stationed there (i. e., in Europe) to seek orders, Alcoa's sales for shipment to European countries were considerable. In 1937 the amount of those sales, of which there were direct shipments

by Alcoa to foreign customers, was 1,875,-118 pounds; in 1938 was 12,717,465 pounds; and in 1939 to June 19th was 19,-092,459 pounds.

As bearing on Alcoa's intent, it was also shown in evidence that there were sales by Alcoa to its local customers in the United States for shipment abroad, as it was informed in advance and for which it packed the goods in a way indicating their preparation for foreign shipment, of 1,326,465 pounds in 1937; 5,525,424 pounds in 1938; and 5,479,333 pounds in 1939 up to June 19th.

The figures of both types of sales for 1937 total 3,201,583 pounds; for 1938 they total 18,242,889 pounds; and for 1939, January 1 to June 19, they total 24,571,792 pounds.

These sales apparently were made to any foreigner who desired them. They are an indication, at least, that Alcoa either was not, or did not feel that it was, prohibited by agreement from selling aluminum abroad in 1937, 1938 and 1939. If not restrained in those years, there is no basis for inferring that it was so restricted in preceding years.

Third: On approaching the problem in an entirely different way, there seems to me to emerge from the evidence another ground for believing, or at least one which corroborates the belief, that during the period in question there never was an agreement between Alcoa and Aluminium not to compete in each other's markets. This is that the outcome demonstrates that the plan adopted by Mr. Edward K. Davis was of great benefit to Aluminium and probably of greater benefit than any other plan would have been. In retrospect this result appears so clear that I should hesitate to believe that one of his business acumen ever would have hampered himself, or incurred the peril of injury to his company, by abdicating its right to compete in the United States, if, in his judgment, occasion should arise.

What has Aluminium accomplished in the approximate ten to eleven years which have intervened between its organization and the giving of testimony at the trial? The evidence shows a great many things. Some of these are as follows:

(1) In 1928, when formed, Aluminium (including its constituent companies) owed upwards of $25,000,000 (created preceding June 4th) and shortly thereafter contracted other debts to Alcoa. These ran the total to above 33 millions (Exhibit 775). By June 30, 1930, their total had been reduced to 20 millions, for which bonds had been issued in 1928. Omitting obligations incurred for after-acquired property, the total indebtedness of 33 millions has been practically wiped out. At the time testimony about it was taken at the trial, the unpaid balance of $20,000,000 of bonds had been called and Aluminium had set aside the money with which to pay it (pp. 16140-1). It may be safely assumed that this balance has since been actually paid.

(2) The number of Aluminium's employees in 1928 was about 4,000. By 1939 they had increased to between 12,000 and 16,000; that is, to three times or more.

(3) The number of its offices and agencies throughout the territory in which it sold its output has greatly increased. It is difficult for me in precise terms to say how great that increase was, because it was chiefly delineated by manikins on a map.

(4) Its annual production at Arvida had increased from at the rate of 60 million pounds in 1928 to about 150 million pounds in 1938 and had largely increased at Shawinigan Falls, where in 1928 to 1937 the capacity was about 33 million pounds (pp. 14274-5; 14277; 16125-7).

(5) Aluminium now has in Canada a complete system of well integrated plants needed for the operation of an aluminum manufacturing and fabricating company. You will recall that in 1928 the company had two aluminum producing plants and experimental alumina producing plants and very inadequate fabricating plants.

(6) In 1939 Aluminium's business had increased over what it was in 1928 by threefold.

(7) Extracts from Aluminium's consolidated balance sheets for 1932 and 1938 are set out in table 18. This is as follows:

TABLE 18

*Extracts from Aluminium's year-end balance sheets (round figures).*

| | 1930* | 1932 | 1938 |
|---|---|---|---|
| Assets | $65,000,000 | $68,000,000 | $86,000,000 |
| Surplus | $ 3,000,000 | | $19,540,000 |
| Deficit | | $ 108,000 | |

* The 1930 balance sheet is not in evidence against Alcoa.

NOTE: The 1930 figures are from Ex. 388; those for 1932 from Ex. 876; and those for

1938 from Ex. 878. The 1938 surplus consists of $19,000,000 earned surplus and $540,000 capital surplus.

In the first line of this table there are set out at the left, assets; in the second line, surplus; and in the third line, deficit. The round figures are given in three columns. The first is for 1930, the second is for 1932 and the third is for 1938. These are as follows:

Assets: in 1930, $65,000,000; in 1932, $68,000,000; in 1938, $86,000,000;

Surplus: in 1930, $3,000,000; in 1938, $19,540,000;

Deficit: in 1932 of $108,000.

In the circumstances I feel that, on the evidence, it would be little short of preposterous to infer that the failure of Alcoa and Aluminium to sell in substantial quantities in the home territory of the other was attributable to agreement between them not to do so.

The Government has advanced a number of arguments to the contrary. Several, which impress me as typical, will be taken up.

First: It is alleged in paragraph 74 of the bill that the United States is a "logical" market for Aluminium; yet that, instead of selling to customers there, where it is located just next door, Aluminium went to the opposite side of the world to sell in Japan. It is contended that this points to conspiracy between Alcoa and Aluminium.

Sufficient answers are that the Sherman Act does not render it unlawful to be illogical and that it is not the Court's function to say where a litigant shall carry on its business. In the absence of governmental regulations no outsider is authorized to prescribe where business shall be done. On the contrary, the owner of a business is free to exercise his own judgment so long as he does not disregard some prohibition. As has been frequently said, the Act is composed of a mere set of prohibitions. Our sole concern, in the present branch of the case, is to discover whether one of those has been infringed.

So far as I can see, the record does not contain evidence which would warrant a finding that propinquity should have governed Aluminium. Moreover, when the outcome of Aluminium is taken into account, I believe that it becomes manifest that no one can successfully maintain that the policy of Aluminium officials was wrong or even was a mistake.

Second: It is urged that Aluminium lost by not selling in the United States. To establish this prices of 1936 and 1937 are compared.

The Government arrived at its 1936 result in this way: to ascertain the expense of Aluminium it combined as production costs (at Arvida) 10.795 cents per pound; as tariff duty, 4 cents per pound; and as transmission expense to a United States destination, .79 cents per pound, making a total of 15.585 cents. For Alcoa's price it took the one year's average of prices at actual sales as 18.82 cents. By deducting 15.585 cents from 18.82 cents it computed Aluminium's profit at 3.235 cents per pound.

In 1937 the current production cost at Arvida was the lowest at either Canadian plant during the entire period from 1928 to 1937. By an identical method, using the Arvida production cost, the Government computed the 1937 profit as 5.827 cents (Aluminium's answer to interrogatory 179, p. 29 of the sealed volume; Exhibit 1701).

The Government's method, however, impresses me as faulty. There are several defects. Two will be mentioned. The first is that if Aluminium had sold in the United States as a general practice, obviously it would have been essential that it establish and maintain sales offices and sales agents there. If so, the expense would have had to be deducted before it could have been determined whether it would have earned any profit at all. Not only is the amount of such expense not included, but it is not known. In the second place, the Government rests its computation of Aluminium's cost of selling on Aluminium's answer to interrogatory 179. The interrogatory deals only with cost of production,—not with sales costs. As was pointed out by the accountant who prepared it, whose testimony is without contradiction (pp. 14877; 14887-91), general overhead expense (p. 36, in item (k) of the sealed answer of Aluminium to interrogatory 182) has been almost entirely omitted and other items of expense of Aluminium's selling in the United States, specified by him, have been omitted from the overhead item carried in the answer to interrogatory 179.

In addition, it is not to be forgotten that our inquiry is whether the facts compel or justify an inference that conspiracy between Alcoa and Aluminium was the cause of Aluminium's refraining from selling

generally in the United States. As I see it, there is nothing to show that this was the cause.

The decision of its officials as to whether it would be best for Aluminium to sell, and, therefore, to equip itself to sell generally in the United States involved a long-range view and a comprehensive inquiry. For example, in 1936 and 1937 the import duty on aluminum coming into the United States from Canada was 4 cents a pound. Yet, as the tariff table discloses, the rate once had been 15 cents a pound. If, through a shift in Governmental policy, the United States had gone back to 15 cents a pound (11 cents a pound greater than the 4 cents tariff actually applying) not alone would the so-called 1936 profit of 3.235 cents and the so-called 1937 profit of 5.827 cents a pound have disappeared, but the 15 cents rate would have been absolutely prohibitive.

Third: Aluminium had an office in the United States at Pittsburgh up to 1930. Since then it has had an office in New York City. Mr. Edward K. Davis and, from time to time, one or two others who, while in the service of Alcoa, had had experience in selling, have been stationed at Aluminium's United States office. On this account the Government insists, in effect, that Aluminium has been equipped with an adequate sales force in the United States.

The answers are that the officers referred to had other duties; also that, in order to match an extensive and capable force such as Alcoa used in selling throughout the United States, Aluminium would have needed a fully equipped corps of skilled salesmen, stationed in various places, whose employment on the work would have been constant and would have entailed large expense. In these circumstances the matter for determination by Aluminium officials was whether, as matter of policy and in the interest of Aluminium, it was wise to sell in the United States. An unavoidable incident to deciding the question was to take into account the size and the probable expense of an organization for pushing sales in the United States.

Fourth: The Government calls attention to the fact that in table 16 (Aluminium's ingot sales in different countries) the percentages of Aluminium's sales which went to the United States in 1928, 1929 and 1930 were much larger than in later years. From this it is urged, in substance, that an inference should be drawn that the amount of annual sales since 1930 has been fixed by agreement, rather than from fair consideration of the merits.

It seems to me, however, that, without even a suspicion of collusion, there is very rational explanation of the course followed by Aluminium. This explanation rests on uncontroverted facts.

In 1928 there were deliveries on commitments outstanding on June 4th. In the two years following there were deliveries on purchases by Alcoa from Aluminium contracted for in 1929. One was for 10,000,-000 pounds arranged for in May and the other for 42,000,000 pounds arranged for in October. The delivery schedules ran well into 1930 (Exhibit 391). As previously indicated, the evidence is quite persuasive that the seller (Aluminium) was satisfied with the terms, because it brought quick money, of which need was pressing; and that the buyer (Alcoa) not only needed the additional supplies, but had a strong motive to assist the seller so as to assure its success.

The Government has also criticized the prices at which the 1929 sales were made. It insists that they were lower than average sales prices at the time in the United States.

In contrasting these average sales prices with the criticized contract prices, however, the Government takes no account of, nor does the evidence afford means of taking precise account of, the quantities and terms involved (including the place or places of deliveries) or their effect. It has been abundantly shown that those omitted features vitally affect prices. Without the missing evidence there can be no fair determination; nor can it even be inferred that there was a conspiracy from contrasting the prices at which large bulk sales were made with the prices at which small retail sales were made.

Disregarding details, however, it is plain that, whether the prices at which Aluminium sold to Alcoa in 1929 were higher or lower than a trier of facts might himself today feel they should have been, at least the difference above or below the Court's present standards would carry no implication that in 1929 there existed an agreement between the seller and the buyer with respect to whether either would sell or would not sell in the market of the other.

Again, as already indicated, the record furnishes ample explanation of the 1929 purchases. At the time Aluminium was low in cash. Alcoa had a vital stake in Aluminium's succeeding. If Aluminium did not succeed the chance of Alcoa later collecting from Aluminium the sales prices of the three companies which had been included in the 1928 transaction and were later transferred to Aluminium would have been diminished. Nevertheless, even if it be true (though it has not been proved) that in 1929 Alcoa bought from Aluminium more aluminum than it needed, it has not been shown, nor does the record contain sufficient evidence on which to base a finding, that the prices at which the purchases were made were unduly favorable to Alcoa.

Fifth: Mr. Babson of the Baush Company described an incident which he stated occurred in New York City in 1931. He testified that he sought to buy aluminum from Mr. Van Alstyne of Aluminium. At their meeting, according to Mr. Babson, Mr. Van Alstyne refused to sell and said that Alcoa was then the agent of Aluminium for making sales for it (Aluminium) in the United States (pp. 3092; 3132-3). Though accessible, Mr. Van Alstyne was not called as a witness.

On this account the Government urges, in effect, that it be taken as true that in 1931 Alcoa was the agent for Aluminium for making sales in the United States of Aluminium's aluminum. On the contrary, Alcoa and Aluminium insist that the Government has not made out a prima facie case and, hence, that there was no occasion to refute Mr. Babson's statement. For support they rely on Galbraith v. Busch, 267 N.Y. 230, 196 N.E. 36 (see also Lahr v. Tirrill, 274 N.Y. 112, 8 N.E.2d 298).

I do not concur in the position of either side,—at least in the way I understand and have stated the contentions of the parties.

On the one hand, an unavoidable premise of the Government's argument, as it seems to me, is that by neglect of a party to introduce available testimony of a friendly witness directly contradicting or designed to contradict the version of a conversation given by a witness for his opponent, the conversation as related acquires a kind of sacrosanct quality and is entitled to be accepted by the Court as true. If so, the premise is unsound in principle and flies in the face of court decisions, later mentioned, which govern me.

On the other hand, I do not think I can properly say, in the sense of the expression as used in Galbraith v. Busch, that the Government has failed to make out a prima facie case. At the March, 1941, oral argument on the present issue, as then presented, I was inclined toward the defendants. Further consideration has led me to feel, however, that the facts remove the question from coverage by the rule they invoke. At least, as I think, there is great uncertainty on the point. So also, in view of testimony Aluminium brought out by its cross examination of witnesses put on by others, I should doubt whether the situation, as it affects Aluminium, is so changed as to bring it within Lahr v. Tirrill. In consequence, in search of a solution, I have gone into the authorities from a wholly different angle.

Manifestly, the absence of Mr. Van Alstyne as a witness has not supplied and cannot supply any fact which is not supported by credible substantive evidence separately adduced. Northern Railway Co. v. Page, 274 U.S. 65, 74, 47 S.Ct. 491, 71 L. Ed. 929; Mammoth Oil Co. v. United States, 275 U.S. 13, 52, 48 S.Ct. 1, 72 L.Ed. 137. It is for this reason that I completely reject the Government's theory. On the other hand, it is the duty of the trial judge, along with all the other facts in evidence, to take into account the silence of Mr. Van Alstyne and to determine "the weight to be given" to such silence, United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 112, 47 S.Ct. 302, 71 L.Ed. 560. As said with respect to a person having an attitude friendly to one side, such as Mr. Van Alstyne must be assumed to have had at least toward Aluminium, his silence would be "a proper subject of comment". Kirby v. Tallmadge, 160 U.S. 379, 383, 16 S.Ct. 349, 350, 40 L.Ed. 463. As also said, it would be "permissible" to infer that he was not in position to deny what had been ascribed to him (Northern Railway Co. v. Page, 274 U.S. 65, 74, 47 S. Ct. 491, 71 L.Ed. 929); it would be "persuasive" that, if he had testified, what he said would have been unfavorable (Interstate Circuit v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610); and it would be fair argument for the other side. United States v. Cotter, 2 Cir., 60 F.2d 689, 692.

The decisions just referred to completely refute the Government's proposition. Moreover, when the difference in the facts in the case at bar from the facts in the New York cases is kept in mind, it will be clear that there is no material variance between the Federal and the New York cases heretofore cited. Neither the New York courts nor the Federal courts have peremptorily prescribed the weight to be given to testimony which has not been specifically denied. The trial judge determines its weight, just as he determines the weight of other testimony.

I have discovered no case in a court of good standing for its learning that goes so far as to hold that, in circumstances such as those with which we are dealing, a trial judge is deprived of the power or relieved of the obligation to determine the weight of the testimony actually before him. While such testimony cannot lawfully be ignored, yet, as in all other instances, though not directly contradicted, the Court is bound to decide the extent of its credibility.

Accordingly, in order to discharge the responsibility imposed by the controlling decisions, I have reviewed all the relevant evidence bearing on the alleged admission that Alcoa represented Aluminium in making sales of Aluminium's aluminum in the United States. In doing so I have given to the undenied Babson-Van Alstyne conversation the full weight to which I deem it entitled.

When considered in its entirety, the evidence convinces me that Aluminium did not engage or authorize Alcoa to represent it in making sales of Aluminium aluminum in the United States. So to have engaged or authorized Alcoa would have been to do one of the very things which the evidence thoroughly establishes Aluminium was in fact scrupulously careful to avoid. And I may add that, in the circumstances, it is inconceivable that Mr. Van Alstyne would have made a statement such as attributed to him by Mr. Babson.

In reaching the conclusion just stated, I expressly disclaim any intention of accusing or even suspecting Mr. Babson of knowingly telling a falsehood. I mean merely to say that I think he was mistaken and failed either to comprehend or to recollect with accuracy what Mr. Van Alstyne said.

In consequence, I feel that none of the Government's counter-arguments is persuasive and I adhere to the view that failure to trade in each other's markets is not ground for inferring that Alcoa and Aluminium were in conspiracy.

I come now to consider the last ground on which the Government has predicated its contention that there was conspiracy between Alcoa and Aluminium during approximately ten or eleven years subsequent to June 4, 1928. Two grounds have already been discussed at length. I feel, however, that it would be wasteful to go into details about the third, because it has been sufficiently dealt with in what has been heretofore said.

If I am to adhere, as I do adhere, to what I have said with respect to the first and second grounds, then, consistently, the evidence with regard to the relations of the parties must be deemed insufficient to sustain a finding that, in the period under consideration, Alcoa and Aluminium conspired to restrain trade or to restrict imports or otherwise to violate the Sherman Act.

What did the parties do? To answer the question it will be enough to give a brief outline of the outstanding features of their conduct.

When the foreign properties were separated off from Alcoa and passed into the hands of Aluminium, they lacked a great deal which would have been essential to constitute a well rounded manufacturing and selling enterprise. Aluminium was not adequately equipped to produce alumina or to fabricate from aluminum. On the other hand, Alcoa had an excess of precisely what Aluminium did not have. For the time being, therefore, there was a strong mutual interest in the exchange of surplus for deficiency.

Moreover, Aluminium had way below the cash it required. Within but little more than a year after the June 4, 1928, transaction a world-wide depression began. In varying degrees this has continued ever since. In order to meet obligations undertaken as part of the June 4, 1928, transaction, and obligations which would arise later, Aluminium had to get money; preferably, of course, by earning it. Much of Aluminium's existing debts were owing, and much of its future debts would be owing, to Alcoa. It would have been a great misfortune to Alcoa if what it had transferred were thrown back on its hands.

In consequence, it had a vital concern in the success of Aluminium. It was a matter of intelligent self-interest to help Aluminium succeed.

Another aspect of the problem was that, outside of selling, the prior experience of the head of Aluminium had ill equipped him with information about many of the foreign companies taken over. In order to form sound judgments as to their conduct, such information was essential. Where could he procure it? What was more natural than that he should seek it from Mr. Arthur V. Davis or others in the Alcoa organization?

The circumstances described seem to me sufficiently to explain the associations and the transactions between the two companies, their officials and employees, on which the Government bases its criticisms.

As I view the facts in their entirety, they do not warrant any other significance being ascribed to them. It seems to me that it is only by misinterpretation that a conclusion of misconduct can be tortured out of the evidence.

Again, gradually Aluminium has become a complete and independent organization. For the most part at varying dates, beginning in 1931 and running to 1934 or 1935, the quantum of the assailed relations has gradually but steadily diminished. Those relations, in their substantial features, were never more than temporary. At about 1935, except for closing up the Alcoa Power Company transfer and a few trifling matters, the associations and the help, which had been absolutely necessary earlier, had practically come to an end.

With the evidence affording a natural and reasonable interpretation which would relieve the post-1928 relations of any sinister meaning, I see no occasion for setting it out more fully than the outline I have given of the occurrences in the way I have done. Yet, after considering it all, I feel that in no event is there justification for inferring that during the period of 1928 to 1939 there was a conspiracy between Alcoa and Aluminium such as the bill charges.

(4) Relations of Alcoa to Foreign Aluminum Producers after June 4, 1928

We come next to consider the relations of Alcoa to the foreign producers from June 4, 1928, to date.

In paragraphs 75 to 82 it is alleged that the substance of the conspiracy was to restrict imports to and fix prices in the United States.

Except for one piece of evidence, the Government charge of Alcoa's connection with the conspiracy was that it was through Aluminium.

There are five aspects, or sub-periods, of the longer period from June 4, 1928, to date:

The first sub-period is June 4, 1928, to July 2, 1931, relating to the 1928 cartel.

The second is from July 3, 1931 to December 31, 1935, which relates to the Alliance foundation agreement.

The third is from January 1, 1936, to March 31, 1938, relating to the so-called 1936 cartel.

The fourth is since April 1, 1938, and may be spoken of as the sub-period of preparation for war and war.

The fifth, not directly related to the other four, is from 1929 to 1937, relating to certain marketing agreements.

The chief controversy is about the Alliance. I shall put that aside for the moment. I shall first discuss all the other sub-periods and then take up the subject of the Alliance.

The testimony as to the so-called 1928 cartel is vague, incomplete and quite uncertain. The Government relies, and there is nothing else on which it can rely in regard to the matter, on four conversations of American business men with foreign producers or their representatives. One of these was in 1929; two were in 1930; and one was at a somewhat uncertain date in the period from 1920 to 1930. The Government also relies on the fact, as it says, that Aluminium usually followed the 1928 cartel prices.

The first conversation was by Mr. Babson with Mr. Kaufman of the Swiss company. This is said to have occurred in 1929. There is further testimony by Mr. Babson as to conversations he had with American agents of various foreign producers in the United States during the period from 1920 to 1930 (pp. 3056-63A; 3095-3128; 3150-1). The next conversation is one by Mr. Haskell with Mr. Kaufman of the Swiss company, which took place in 1930. Another by Mr. Haskell

278

with Mr. Morrison of the British company occurred in the same year (pp. 2317-35).

Mr. Babson gave substantially this account of the conversation he had with Mr. Kaufman of the Swiss company in 1929:

Mr. Babson says he asked Mr. Kaufman for a quotation for use in the United States (meaning aluminum to be used in the United States). He says that Mr. Kaufman replied that the price would be substantially the same as Alcoa's. Mr. Babson added that he thought Mr. Kaufman said that the price was fixed; that it would be the same irrespective of where he (Mr. Babson) got the metal.

As to the period from 1920 to 1930, Mr. Babson testified that, from time to time, he tried to get price quotations from the import agents in the United States of the four major European producers. He said that he got none lower than Alcoa's quotations and that the price was always substantially the same as the price of Alcoa (pp. 3056-63A; 3095-3128; 3150-1).

Mr. Haskell told of his conversation with Mr. Kaufman of the Swiss company in 1930. He said he asked Mr. Kaufman for a price of aluminum for use in the United States and Mr. Kaufman referred him to his (Mr. Kaufman's) New York agent and said the price would be the same as that of Alcoa.

Mr. Haskell said that he did not remember Mr. Kaufman saying anything about breaking the cartel price. He says that at the previous meeting, or at previous meetings from 1924 to 1930, Mr. Kaufman had refused to break the cartel price.

He said, however, that Mr. Kaufman referred to contracts abroad and that he (Mr. Haskell) inferred that the reason Mr. Kaufman would not break the price in the United States was that there had been an agreement; but he repeated that this was an inference on his part. He added that he had failed to get a material concession in the price of ingot (pp. 2317-29).

Again, in 1930, Mr. Haskell had a conversation with Mr. Morrison of the British company. Of this his account, in substance, is as follows:

When I asked a price on aluminum in the United States Mr. Morrison referred me to his New York agent and I think said that the price would be that of Alcoa. This is what I was generally told by foreign producers in the period of 1919 to 1930. Mr. Haskell further said he did not remember Mr. Morrison saying anything about an arrangement he had with Mr. Davis; that he does not remember Mr. Morrison saying the arrangement he had related to the United States, but that he (Mr. Haskell) inferred that it did. He said also that he did not ask a quotation on any particular amount nor did he discuss deliveries.

He added that no doubt he (Mr. Haskell) had in mind his treble damage suit then pending against Alcoa and that he was seeking information which he thought would be helpful in that suit. He said also that the foreigners might have assumed from the nature of the conversation that he (Haskell) was not seeking actual purchases of aluminum. Lastly, he said that he was unable to distinguish between his recollection and his inferences (pp. 2329-35; 2691-6).

Doubtless you will recognize what I have just summarized as the identical conversations subsequent to 1928 which I recited a few days ago. They constitute the only instance, after June 4, 1928, in which the Government claims that there was any direct evidence bearing on the connection of Alcoa with any cartel.

As heretofore said, however, the testimony of the American business men I have referred to is about relations of Europeans themselves with each other and to their own 1928 cartel; also that it has no reference to Alcoa and consists of mere inferences. I think it is too indefinite to overcome square denials. When I was discussing this testimony a few days ago, in conjunction with other conversations which occurred preceding June 4, 1928, between the American business men and the foreign producers or their representatives, I gave you fully my reasons for reaching the conclusions just stated.

There were square denials of the truth of the facts as they purport to have been recited or related by these witnesses in the conversations after June 4, 1928. I find in the evidence no justifiable basis for inferring otherwise than that the denials are true.

There is testimony that Aluminium agreed to observe the 1928 cartel prices between July 3 and October 21, 1931; that is, between the date on which the so-called Alliance foundation agreement was signed and the date of the organization of the Swiss corporation that was organized for the purpose of executing or carrying out the terms of the foundation agreement. On the other hand, Aluminium was never a member of the 1928 cartel (pp. 16199-200). It only followed the cartel price of the 1928 cartel when it chose to do so. There is no basis in the evidence supporting or for inferring anything else.

So also Alcoa was never a member of the 1928 cartel. There is no credible evidence to sustain the contention that it was a member of that cartel. On the contrary, the undisputed evidence is that when Mr. Marlio and when Mr. Morrison, in the latter part of 1927 or the early part of 1928, endeavored to induce Mr. Arthur V. Davis to have Alcoa join the cartel, there was an absolute and unequivocal refusal to do so.

Skipping now, though I shall return to it, the testimony as to the Alliance, we come to the so-called 1936 cartel. You will recall that the Alliance was terminated as of January 1, 1936. It had no life after December 31, 1935. The testimony in this case—testimony, be it noted, which was undisputed—is that Alcoa officials never even so much as heard of the existence of a 1936 cartel until it was mentioned at this trial and effort then made to prove it.

There is no basis whatsoever for inferring that Alcoa joined, or for inferring that at the request of Alcoa Aluminium joined, the so-called 1936 cartel. Furthermore, the members themselves partially abandoned it on account of war preparations in 1937 and completely abandoned it on March 31, 1938.

Since April 1, 1938, the so-called 1936 cartel has been wholly dormant, if it had any existence at all, and so far as the evidence shows there was no cartel after April 1, 1938. Moreover, even if there were any such cartel, it has not now and has never had the slightest bearing on this case. Neither Alcoa nor, at the instance of Alcoa, Aluminium was ever connected with any such cartel.

I have said that there is a group of testimony as to so-called marketing agreements. There are six of these which were referred to in the evidence. Of the six only those relating to Japan and India are mentioned in the bill of complaint. They are spoken of in paragraphs 79 and 80.

The six marketing agreements were as follows:

(1) Prior to 1931, probably in 1930, a joint catalogue was issued by Aluminium and the British company. This contained prices agreed on for cooking utensils to be sold in India. There is no pretense in the evidence nor is there in the evidence basis for a pretense of Alcoa ever having the slightest connection with that catalogue or other form of agreement on the subject; nor is there any evidence that the catalogue ever affected the commerce of the United States.

(2) The second marketing agreement is the so-called Zurich Agreement. This consisted of an agreement by Aluminium, at the instance of some of the European producers of ingot, to act as agent, and it did act as agent, in selling ingot and fabricated articles in Japan. That also has no relation to this lawsuit. There is not the slightest basis for a contention even that Alcoa had anything to do with it; nor is there any evidence which would establish, or from which it can be inferred, that it had any effect on the commerce of the United States.

(3) The third agreement was in 1935. The Norsk company, the French company and Aluminium pooled their orders for sales of aluminum and aluminum products for shipment to Russia. That also has nothing to do with this lawsuit and contained no provision which has ever had any effect whatsoever on anything involved in this lawsuit. Alcoa never was a party to, and never had any connection with, that or any similar agreement affecting commerce with the country to which the articles were to go.

(4) In 1936 or 1937,—we do not know which,—Aluminium and some European producers (the precise names of which are not shown) agreed about prices for sales of fabricated goods and foil that they sent to Southeastern European markets (including Czecho-Slovakia and some Balkan States). That is subject to the same comment as has been made on the third agreement.

(5) In 1937 Aluminium and the British company agreed on selling prices of electrical conductors in the British Empire; if either sold more than half, there was to be an adjustment. That likewise is subject to the same comment.

(6) In 1937 Aluminium, the British company and the Swiss company agreed as to prices of ingot in the United Kingdom. That also is subject to the same comment.

It is enough to say with respect to the six agreements mentioned that Alcoa denies that it ever had any connection with any of them, and there is no evidence whatsoever otherwise.

This leaves for discussion only the controversy about the Alliance. That is most relied on by the Government in regard to the group of matters I am presently discussing.

The Alliance name actually was Alliance Aluminium Compagnie. It is the organization provision for which was made in the foundation agreement which was signed July 3, 1931 (as of July 1, 1931), and remained in effect until December 31, 1935.

The agreement is Exhibit 744. Outside of subsidiaries of signatories, which are of no consequence, the members of the Alliance were: Aluminium, the British Aluminium Co., Limited (or the so-called British company), Aluminium Francais (the French company), Aluminium Industrie Aktiengesellschaft Neuhausen (the Swiss company) and Vereinigte Aluminium Werke A. G. (the German company, frequently called V. A. W.). As I have said, the agreement was signed July 3, 1931; but it was to take effect as of July 1, 1931. It ceased to exist as of January 1, 1936.

There were two principal features. The first was that quotas for maximum production of aluminum by its members, and the second that prices at which the Alliance would buy unsold aluminum from its members, were to be fixed from time to time by the board of governors of the Alliance. The prices referred to were what is talked about as the Alliance buying prices. Other features were that the excess production above the stipulated maximum was to be forfeited without compensation. On the other hand, it will be observed, there was no provision for agreeing on prices of products to be sold. The votes of the members of the board were to be proportionate to the stock holdings of their respective companies in the Alliance. Aluminium had about 28 per cent of the stock. There were other features which are minor and do not concern us.

As I have said, a Swiss corporation, which was to provide the mechanics for carrying out the agreement, was formed October 21, 1931.

The allegations of the bill about the Alliance are in paragraphs 75 to 78. I shall set out briefly the substance of each of those paragraphs so far as concerns the branch of the case presently under consideration.

Paragraph 75: Aluminium was organized to enable it to enter into contractual relations with foreign aluminum producers restricting competition in world markets and curtailing imports of aluminum into the United States.

Paragraph 76: Aluminium, whose policies were directed through common control exercised over it and Alcoa by means of stock ownership, promotes agreements with foreign producers of aluminum "pursuant to which exportations of aluminum to the United States for sale therein * * * in competition with Aluminum Company have been, and are being, unlawfully restrained."

Paragraph 77: In July, 1931, Aluminium, whose policies were then directed through such common control over it and Alcoa, "acting in the latter's behalf" (that is, in behalf of Alcoa), entered into a contract (which was the so-called foundation agreement, Exhibit 744) with the British, French, Swiss and German companies. The parties and their subsidiaries were the only substantial producers of aluminum outside of the United States (except a recent development in Russia whose product was not exported). In compliance with the agreement, the Alliance Aluminium Compagnie was incorporated under Swiss law in October, 1931. The amounts subscribed and paid for stock by the members were used to purchase from Alliance stockholders their accumulated stocks of aluminum, which they had been unable theretofore to market. The foundation agreement limited future production to such amounts as should be determined by the board of governors and authorized the board to fix prices for such aluminum.

Paragraph 78: Prior to and during July, 1931, the British, French, Swiss and Ger-

man companies held large quantities of aluminum for which there was no market and in the production of which they had incurred heavy financial obligations. The intent and effect of Aluminium participating in the foundation agreement and acquiring stock in the Alliance were (1) to provide funds with which to purchase surplus stocks of aluminum in the world market, "thereby preventing the exportation of such surplus to the United States for sale therein in interstate and foreign commerce in competition with Aluminum Company at prices lower than those fixed and established by said Aluminum Company, and (2) to provide against future surplus accumulations abroad which might enter into said commerce, and (3) to suppress exportations of aluminum to the United States in the future at such prices or in such amounts as to endanger" the monopolistic control therein of Alcoa.

As previously noted, among the features of the foundation agreement (Exhibit 744) is a provision for a system of Alliance buying prices. These were to be the prices of aluminum ingot c. i. f. Antwerp. One of the purposes of making the provision in that form was to get a common base price.

The real question under the pleadings, emphasized in several different ways in the paragraphs to which I have referred and explicitly raised, is, Did Aluminium enter into the foundation agreement at the instance or request of Alcoa?

There is no claim that Alcoa itself ever signed or joined or was connected with the agreement except through Aluminium. The specific allegation is that Aluminium became a party to the agreement at the instance or the request or in behalf of Alcoa. Alcoa denies the allegation. So our crucial question is, whether that allegation is proved.

As you will recall, heretofore I have had occasion to discuss the foundation agreement. For example, see my remarks on April 13, 1939 (pp. 15293-9), when the document was admitted in evidence, and a memorandum opinion under date of November 1, 1939, embodied in the minutes at pages 21455-73 and published in D.C., 1 F.R.D. 1.

As I understand, the Government does not say that the question as to whether Aluminium joined the Alliance at the instance of Alcoa has been foreclosed. Nevertheless, there are expressions in its briefs and in its arguments which apparently lean very far toward that proposition. If, however, you will examine the minutes and the memorandum to which I have just referred, you will see that I carefully, or endeavored carefully, to safeguard what I said from any such interpretation. All I was doing in that decision was to determine a question of evidence.

In substance, I held that the New York rule, which was quite definite, applied in this case so far as concerned the admissibility of Exhibit 744. I said, in substance, that the rule on the subject, the rule as to the admissibility of a piece of evidence such as was then being considered, was that if there was evidence from which a jury could determine that the signature to or joinder in the agreement by Aluminium was at the request of Alcoa and the evidence was such that if I were the trial judge sitting in the case I would not set aside a verdict adverse to Alcoa on the issue, then the document was admissible. That is all I decided.

At the time of the ruling only a relatively small part of the evidence bearing on the issue had been taken. Much additional evidence came in later. The result is that the question before me now is wholly different from the question which was presented to me when I was asked to pass on whether to admit Exhibit 744 for consideration as evidence in this case.

As heretofore stated, the exhibit went into evidence on the 13th of April, 1939. At the time Mr. Edward K. Davis was on the stand. The admission of the exhibit is shown at page 15295A of the minutes.

The introduction of this item of evidence occurred about six weeks prior to the closing of the Government's direct case. None of the evidence after April 13, 1939, of course, was considered in passing on the question of the admissibility of the exhibit.

Subsequent to April 13, 1939, that is, subsequent to the coming in of the exhibit, a great deal of testimony was taken. Among the testimony given subsequently, there was much which has a bearing on the question now before me for determination as to whether, in fact, Aluminium's joining the Alliance was at the instance or request of Alcoa.

Following April 13, 1939, Mr. E. K. Davis remained on the stand and testified for three weeks. His later testimony covers approximately 1200 pages. Thereafter Mr. Arthur V. Davis was on the stand 29 court days. His testimony during that period covers over 3,000 pages. The testimony of those two witnesses alone, which had not come in at the time of the admission of the exhibit and which, therefore, was never considered in passing on the exhibit, covers 4200 pages of the minutes. In addition, four other Alcoa officers testified on the subject subsequent to April 13, 1939. They were Mr. Hunt, Mr. Gibbons, Mr. Stanley and Mr. I. W. Wilson. None of those had previously testified at all. The easy way to determine, immediately on looking at it, whether testimony you find in the record has been previously considered by the Court' is to note its paging. No part of the record after page 15295A has ever yet been taken into account by the Court in dealing with the question with which we are now concerned.

Mr. Edward K. Davis and the Alcoa officials squarely denied that Aluminium acted at the instance of Alcoa or on its request or in its behalf. When the proof is considered in its entirety, it does not warrant an inference that there was any such instance or request or any such action in Alcoa's behalf.

I am convinced by the evidence that, without suggestion from Alcoa or anyone connected with Alcoa, the idea of the foundation agreement originated with Mr. Edward K. Davis individually. This was after he had received a letter from Mr. Henry-Couannier in which Mr. Davis was told that the members of the 1928 cartel wanted Aluminium to join. Mr. Davis rejected the suggestion. He had an idea of his own. This is what he carried out. And he carried it out in the interest and solely in the interest, as he conceived, of Aluminium.

The depression, which had begun in 1929, still persisted. Mr. Davis had steadily resisted pressure from the European producers to join the 1928 cartel. He had resisted and continued to resist because, as he said, he regarded the 1928 cartel as a price-fixing arrangement and he was firmly opposed to price-fixing.

He stated that he believed the best chance for Aluminium's success was through sales in the British Empire and in undeveloped countries. He said that, although he did not favor price-agreeing cartels, he felt that he must in the interest of Aluminium go along with business men who did favor such cartels and among whom cartels like that of 1928 were much in vogue. He insisted, however, that the foundation agreement of 1931 was fundamentally different and was his solution or proposed solution of Aluminium's problem under the circumstances in which his company found itself.

I feel that no more reliable or candid witness than Mr. Edward K. Davis has testified in this case. I accept his account of what happened. This means that I reject the contention that there was any conspiracy, such as charged by the Government, in the organization or in the conduct of the Alliance.

With regard to the issue whether there was such conspiracy, what the officials of Alcoa named above said on the subject confirms the statement of Mr. Edward K. Davis. Nothing they have said or has been shown that they did would justify the finding that there was a conspiracy of the kind alleged by the Government or of any kind condemned by the Sherman Act.

Moreover, as elsewhere pointed out, the progress and accomplishment of Aluminium strongly indicates the wisdom, in the interest of Aluminium, of the course pursued by Mr. Edward K. Davis. That fact affords further confirmation of the truth of his testimony.

The additional evidence introduced subsequent to the ruling on Exhibit 744 when it was admitted in evidence and bearing, incidentally, on the question of whether there was a conspiracy, will be found at the following pages: pages 15302-3; 15306-10; 15334-8; 15378-82; 15403; 15407-9; 15419-21; 15519-25; 15545-8; 15590-601A; 16164-195; 16199-230; 16285-7; 16331-7; 16356-72; 16376-83; 16417-27; 16450-60; 16506-8; 16515-7; 18552-6; 19136-83; 19206-7; 19297-302; 21347-428; 21463-4; 21473; 21480-3; 21502-11; 21579; 21870-931; 22539-41; 22588-92; 22980-89; 23653-6; 33241-3; 40353-5; 40360-63; 40652; and in Exhibits 1304-5.

I shall not undertake now to summarize the whole of the testimony I have just cited. If one wish to form an independent opinion

he should read it all. In rendering the decision announced I have endeavored to base it on the entire testimony on the subject, taking everything into consideration and making up my mind where, as I conceive, the truth lies with respect to the matter.

Though I have given you a long list of pages, I believe they are correct or substantially correct. Nevertheless, it is not improbable that sometimes I may have made an error. I have not had the time and it is unlikely that, unaided, I am going to have the time to verify every page. I shall welcome the assistance of the lawyers in an effort to get the pages right.

Discussion of the Alliance might end here. However, there is another proposition which, standing alone, as I see it, is fatal to success by the Government. This is that the Government has failed to show that the foundation agreement, the Alliance or anything that ever happened under either "directly and materially" affected the foreign commerce of the United States.

Here the agreement was wholly between foreign corporations and was entered into outside of the United States. The theory of the bill is that the purpose and effect of the alleged understanding was to restrict imports and, as an incident, to avoid interference with the prices at which Alcoa sold in the United States.

Counsel agree that, in circumstances like the present, an essential element of recovery by the Government is establishing that the alleged conspiracy has directly and materially affected the foreign commerce of this country. Both sides cite United States v. Hamburg-Amerikanische P. F. A. Gesellschaft, C.C.S.D.N.Y., 200 F. 806, at page 807. I have previously referred to that decision. Both sides, as I understand, also agree that the Hamburg-Amerikanische case correctly states the governing rule of law. There it was said:

"The vital question in all cases is the same: Is the combination to so operate in this country as to directly and materially affect our foreign commerce?"

Inasmuch as the burden of proof rested on the Government and it has not proved that what occurred pursuant to the alleged conspiracy "directly and materially" affected the commerce of the United States, that alone supplies a sufficient and, as it happens, an additional reason why the Government cannot properly be sustained on its charge of conspiracy between Alcoa and the European producers or between Alcoa and Aluminium during the period that the foundation agreement was in force.

The defendants, however, need not rest and have not rested on what is merely negative. They have gone further on the facts. They have undertaken to show, and I believe have shown, that in truth neither the foundation agreement nor the Alliance nor the conduct under either "directly and materially" affected the commerce of the United States.

There are two tables, 19 and 20, which bear on this subject.

Both tables are made up largely from exhibits put in by the Government. The sources of the figures employed are stated in notes to the tables. There are numerous computations. I think they are correct, but anybody can verify them. No good reason for criticizing them or the sources from which they are derived has been given; and I believe that the Court and the parties are entitled to rely on them. As I see it, the sole problem for determination is, what do they establish?

It is true that in its briefs the Government, in substance, has urged that the Alliance prices for 1931 and 1932 carried in the first table (19) are erroneous. I do not share that view and for the moment I shall assume that those prices set out in the table are correct, but in due course the Government's point will be dealt with.

Table 19 deals with prices for the fraction of the year from July 1 to December 31, 1931, and for the whole of the years 1932, 1933, 1934, 1935, 1936 and 1937. The prices are of virgin aluminum ingot for those years. The comparison is between the annual average Alliance buying price per pound c. i. f. Antwerp in terms of United States currency at the prevailing rate of exchange with the annual average United States prices per pound (less import duty of 4 cents a pound, which was the tax at that time imposed on importations of aluminum), in terms of several things:

(1) New York market quotations;

(2) Alcoa's schedule prices; and

(3) Alcoa's actual sales prices.

These are supplemented by a statement (in terms of millions of pounds) of the

volume of imports of virgin aluminum ingot into the United States by others than Alcoa.

This table is as follows:

of an earlier year. That exception was in line D for 1936, when there was an increase by 7/100ths of a cent over the im-

TABLE 19

*Virgin alumnum ingot, 1931–7: comparison of (a) annual average Alliance buying prices per pound, CIF Antwerp, in terms of United States currency at prevailing rate of exchange, with annual average United States prices per pound (less import duty of 4¢ per pound) in terms of (b) New York market quotations, (c) Alcoa schedules and (d) Alcoa's actual sales; and (e) volume of imports into United States by others than Alcoa in terms of millions of pounds.*

| | 1931 (July 1–Dec. 31) | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 |
|---|---|---|---|---|---|---|---|
| A. Alliance buying prices | 13.94¢ | 15.54¢ | 20.07¢ | 25.26¢ | 21.75¢ | 21.79¢ | 21.86¢ |
| B. N. Y. market quotations | 19.30¢ | 19.30¢ | 19.30¢ | 17.58¢ | 16.50¢ | 16.50¢ | 16.08¢ |
| C. Alcoa schedule prices | 19.30¢ | 19.30¢ | 19.30¢ | 18.20¢ | 15.49¢ | 15.00¢ | 15.84¢ |
| D. Alcoa sales price | 18.78¢ | 17.76¢ | 15.30¢ | 14.95¢ | 14.75¢ | 14.82¢ | 15.56¢ |
| E. Imports (millions of pounds) | 5.13* | 6.05 | 15.03 | 15.51 | 16.10 | 22.57 | 21.10 |

\* Half of total imports 1931.

NOTE: Line A from Ex. 931, exhibit p. 39 (computed by averaging figures in that exhibit for half of 1931 and for whole of each of other years); line B from Ex. 75, exhibit p. 356 (less 4¢ per pound duty); lines C and D from Ex. 1744 (computed by deducting 4¢ duty from figures in columns A and B, respectively, of that exhibit); line E from Ex. 971, exhibit p. 4703 (except computed for last half of 1931).

I should explain that this table is set up in the form of lines headed A to E.

In table 19 two things stand out:

(1) In each year from 1933 to 1935, inclusive, Alliance buying prices (line A) were considerably greater than the New York market quotations (line B) or than Alcoa's schedule prices (line C) or than the actual prices at which Alcoa sold ingot (line D),—all of these things being true for each of these years. The same thing is true with respect to 1936 and 1937, but for the moment we are not interested in those years. We are not interested because the foundation agreement did not run beyond 1935.

(2) So also from 1931 to and including 1936 there is only one instance of the prices shown in New York quotations (line B) or in Alcoa's schedules (line C) or in Alcoa's actual sales (line D) when a price of a later year was greater than a price

mediately preceding year. Aside from that, only in the year 1937 were any of the prices above the corresponding prices for the previous year,—in that case 1936. The 1937 rises were very slight and undoubtedly even they were solely attributable to the war preparation demand which the evidence discloses was already in progress in 1937.

If, as is obvious from the table, Alliance prices were greater than Alcoa's prices, it would seem to follow indisputably that the existence and conduct of the Alliance from and including 1933 did not "directly and materially" affect the commerce of the United States.

In the second place, table 19 (line E) shows that from 1932 to 1936, inclusive, there was a steady increase of imports of aluminum into the United States. The slight falling off in 1937 almost surely was due to the war demand of that year in Europe.

Table 20 is as follows:

TABLE 20

*Virgin aluminum ingot, 1929–1937: comparison (in millions of pounds) of Alcoa's sales with net imports by others than Alcoa.*

| | 1929 | 1930 | 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 |
|---|---|---|---|---|---|---|---|---|---|
| A. Alcoa's sales | 81.37 | 45.86 | 22.96 | 11.21 | 26.54 | 40.99 | 53.83 | 77.87 | 95.13 |
| B. Others' imports | 15.24 | 12.46 | 10.26 | 6.05 | 15.03 | 15.51 | 16.10 | 22.57 | 21.10 |

NOTE: Line A above from line G and line B above from line E of Ex. 971, exhibit p. 4703.

This table relates to virgin aluminum ingot for the years 1929 to 1937. There is a comparison (in millions of pounds) of Alcoa's sales with net imports by others than Alcoa.

In the first line, marked A, are Alcoa's sales. In the second line, marked B, are others' imports. As I have said, all of the figures are given for each of the years 1929, 1930, 1931, 1932, 1933, 1934, 1935, 1936 and 1937.

Table 20, much in the same way as was done in table 19, furnishes two confirmatory facts. From 1932 to 1937, inclusive, Alcoa's sales of ingot steadily increased annually and from 1932 to 1936, inclusive, the imports of ingot into the United States by others than Alcoa likewise increased each year. The failure of such imports to increase in 1937 over 1936 was doubtless due to the European demand for ingot growing out of the approach of war in Europe.

Stress is laid by the Government on the inclusion of section 10 in the foundation agreement. This provided, in substance, for Aluminium converting ore into aluminum in Canada for Alcoa and returning the aluminum to the United States, without the quantity being counted as a part of Aluminium's aluminum production quota. This provision, however, is purely academic, for the reason that under it no tolling was ever done (p. 16202).

What is of more importance, and what further fortifies the conclusion that the foundation agreement did not "directly" or "materially" affect the commerce of the United States, is the fact that during the life of the foundation agreement, with the exception of Aluminium, no signer of the agreement counted shipments to the United States as any part whatsoever of its production quota under the terms of the agreement.

As heretofore indicated, the Government contends that the figures in table 19 for Alliance buying prices in 1931 and 1932 are erroneous. Even if so, however, that fact would not affect the table for subsequent years.

Furthermore, as I see the situation, the Alliance buying prices as embodied in the table for 1931 and 1932 are correct. The Government predicates its criticism of the figures on irrelevant bits of evidence. These bits are contained chiefly in Exhibits 791, 793 and 842. Those deal with prices adopted by members of the Alliance in December, 1931, and in January, 1932, as between themselves individually and their respective customers. They are not the current Alliance buying prices at all. They are prices which were to become Alliance buying prices at future dates. When adopted, and members learned of them, then in anticipation they were sometimes taken into account in making up quotations to their individual customers. In this connection see pages 15382; 15384; 15386-7; 15389-94; 15403; 15407-9; 15418-22; 15445-54; 16350-1.

It is indisputably established that not until the trial of the present case in this room had Mr. Arthur V. Davis ever seen the foundation agreement or did Alcoa or its representatives learn that this agreement had been terminated on February 14, 1936, effective as of the first of the preceding January.

It seems inconceivable that if, as charged, Aluminium had acted under the domination of Alcoa in entering into the foundation agreement, Alcoa would have been kept in ignorance of its abandonment for several years afterwards.

It is not improbable that further exploration of the facts, particularly with the help of experts, would have put the Court in position to form opinions with respect to the effect of the world-wide depression and the frequent changes in currency systems growing out of the various countries going off the gold standard. Possibly also, by the same method, the Court might have been enabled to say whether, in connection with the over-production of aluminum in the United States and in other countries at the bottom of the depression in 1931 and 1932, the Anti-Dumping Act, 19 U.S.C.A. §§ 160-173, had any economic effect on the matter. I do not conceive, however, that anything added along the lines mentioned could have nullified or even adversely affected the views I have adopted, as heretofore stated.

In consequence, I conclude that the Government has failed to establish the charge of conspiracy between Alcoa and European producers of aluminum or Aluminium or either or any of them.

I further conclude that the Government has failed by credible evidence to show that either (1) there was ever a conspiracy between Alcoa and Aluminium or (2) that since January 23, 1915, there has ever been a conspiracy between Alcoa or any of the other foreign producers to fix prices or to restrict importations or to limit the quan-

tities of production or to allocate customers or shipments to customers of aluminum or aluminum products of any kind.

This completes my consideration of the subject of conspiracy, the second main branch of the case concerning Alcoa, though incidentally, of course, concerning others. It brings us to the third main branch affecting Alcoa. This is other alleged misconduct on its part. That will now be taken up.

October 9, 1941

\* \* \* \* \* \*

## III. OTHER MISCONDUCT

As I said at the adjournment yesterday, we shall now take up the branch of the case that has been referred to as other misconduct.

There are two accusations which were much emphasized in the argument. Because of their nature I think both should be discussed. These are that Alcoa (1) charged extortionate prices and (2) made exorbitant profits. The accusations are not in the exact terms of anything alleged in the bill. Nevertheless, they will be considered as if they had been well pleaded and as they are urged by the Government. I have spoken of the accusations as being two in number. They are so intertwined, however, that in essence they are one. This appears to be the view of counsel on both sides. In its supplemental brief of April 9, 1941, page 3, the Government said: "To state that Alcoa's profits have been excessive is simply another way of stating that its prices have been excessive." In its supplemental brief of May 8, 1941, page 8, Alcoa said: "One cannot say that either profits or prices are excessive unless consideration be given to the rate of return on the capital employed in the business." I shall therefore treat the matter as a single controversy.

Alcoa strenuously denies both complaints.

As I see it, there are in form three reasons (which, in substance, can be reduced to two reasons) why the Government should not prevail on either criticism. The three reasons are (1) that, without reviewing all the pertinent evidence on the subject, if it be assumed that the contention of the Government as to what are the facts is sustained by the evidence, neither accusation, so supported and standing alone, would constitute a violation of the Sherman Act; (2) that, if the Sherman Act applies, when the pleadings are analyzed, it will appear that what the Government complained of in the bill, with respect either to prices or to profits, expressly or in essence was alleged to be a consequence or incident of monopolization by Alcoa; and (3) that, in reality, I have already held adversely to the Government on all the issues raised by the bill involving monopolization and, therefore, against all those involving prices or profits.

It is because in the circumstances stated, however, I think neither the prices nor the profits charge properly was embraced within the first or within the second branch of the case, that I added a third branch which I have entitled "other misconduct."

In support of the first proposition, that neither accusation states a violation of the Sherman Act, it is enough to call attention again to note 59 of the Socony-Vacuum case, 310 U.S. 150, at pages 225, 226, 60 S.Ct. 811, 84 L.Ed. 1129. In so far as I have discovered, that note contains the clearest and most concise statement of what the Sherman Act prohibits.

With respect to offenses, the Act consists only of prohibitions. One is monopolization; the other is conspiracy. Both words are to be taken, of course, in the comprehensive sense which I have heretofore adopted for the purpose of discussion in this case. What is neither monopolization nor conspiracy in that sense is not included or dealt with in the Sherman Act.

That their positions in regard to prices paid to and profits received by Alcoa are dependent in their nature on the allegations of the bill charging monopolization, or have heretofore been disposed of, or both, will appear from the summary of the portions of the pleadings relating to prices and profits.

On this branch of the case we are concerned with six paragraphs of the bill. These are numbers 41, 53, 98, 99, 100 and 101.

The substance of the pertinent allegations of those paragraphs with respect to prices or profits is as follows:

(1) In paragraph 41, that the profits of Alcoa to the end of 1934 were excessive and resulted from monopolization.

(2) In paragraph 53, that, by virtue of its monopolistic control of the production and sale of alumina and virgin aluminum

in the United States, Alcoa possesses the power to fix arbitrary, discriminatory and unreasonable prices.

(3) In paragraph 98, that in 1927 Alcoa was the sole producer in the United States of virgin aluminum and fixed the prices of such aluminum and of aluminum sheet; also that, through its control over the prices of ingot and the prices of sheet (which it established), it reduced the spread between those prices, with the result that thereby Sheet Aluminum Corporation was virtually forced to suspend operations and Fairmont Aluminum Company was forced to suffer serious losses, curtail its operations and establish an interlocking interest with a foreign producer in order to remain in business.

(4) In paragraph 99, that in 1924 to 1931, through being the sole producer of virgin aluminum in the United States and of a large proportion of the total domestic output of aluminum alloys, Alcoa was able to fix and did fix the prices of those articles in the United States and, by reducing the spread between such prices, drove the Baush Company out of the aluminum business.

(5) In paragraph 100, that such monopolistic control by Alcoa has been used, and it possesses power to continue, to fix arbitrary, oppressive and unreasonable prices of aluminum and aluminum products.

(6) In paragraph 101, that on March 1, 1937, through exercise of its monopolistic power aforesaid, Alcoa unwarrantably and arbitrarily advanced the carload price of virgin ingot by 1 cent per pound.

From analysis it thus appears that every accusation set out in the summary made above (a), directly or inferentially, rests on and is included in the charge of monopolization embodied in the bill and (b), in the earlier stages of the case at bar, has already been decided against the Government.

We might, therefore, refrain from further discussion of the prices and profits aspect of the matter. Nevertheless, as counsel have debated this phase of the controversy at great length, I shall go into the facts side of it.

It is recognized, of course, that, however often the same facts may have been considered heretofore, they may properly be again pressed on the Court to the extent, if any, to which they bear on any new or other question.

What the Government claims need not extend to six things. These can be compressed into three and they are as follows:

(1) That in 1926 to 1937 Alcoa sold ingot at prices grossly in excess of what it had cost Alcoa to produce it.

(2) That in 1929 to 1932 the percentage of Alcoa's decline in the price of 99 per cent virgin aluminum was considerably less than the percentage of price declines by manufacturers of certain other articles in the same general field.

(3) That in 1937 to 1939 the prices maintained by Alcoa for the commodities it produced were greatly in excess of Alcoa's cost of producing them.

There are other arguments advanced by the Government along essentially the same lines, but all of them stand or fall with one or the other of the three contentions just stated.

As already indicated, the first controversy relates to profits on ingot; that is, virgin aluminum ingot. This hinges around Exhibit 718. The contention by the Government has been referred to in argument and is understood by all participating in this case as being an insistence on what is called by it the per pound basis.

In its original brief, page 180, the Government says that the rates of profit on ingot which Alcoa received during the period 1926 to 1937 ranged from 35 per cent to 104 per cent. If that be true, then obviously the rates were very excessive; but Alcoa denies that it made any such profits or anything even remotely like them.

In the Government's brief, as well as in the title to Exhibit 718, the article involved in the exhibit is called "commercial ingot." In so far as that name is concerned, consideration will be reserved until later.

The original brief of the Government, page 180, contains a table which fully explains its position. All the figures there are per pound. Those are arranged in four columns,—A, B, C and D,—with descriptive titles and are set out for each year, that is for the years from 1926 to 1937, under the respective columns. The first column (A) gives what the Government claims was the cost in cents per pound of ingot—that is, Alcoa's cost of producing it. The second column (B) contains the Government's claim of what was the net selling price in cents Alcoa received for that pound of ingot. The difference between the first

and second columns, called profit (C), is also stated in cents. In the fourth column (D) is the rate or percentage of profit (as the Government has computed it).

For example, for the year 1926, the first year of the table, the cost (A) is put at 13.82 cents and the net selling price (B) at 26.49 cents. By subtracting the former from the latter we get 12.67 cents. That is entered in the third column (C) as the profit. The rate, which appears in the fourth column (D), as matter of mathematics has been correctly calculated. By similar procedure for other years the rates of profit, which the Government says ran from 35 per cent to 104 per cent, were arrived at.

Alcoa argues that the fault with the Government contention is that it has compared the selling price of one thing with the production cost of an entirely different thing; that it is precisely as if, in order to get the profit on the sale of an apple, the cost of producing the apple were deducted from the price at which a potato had been sold.

Specifically, Alcoa insists that the selling prices in the table of the Government, of which selling prices complaint is made, are the prices at which only two high grades of ingot were sold (one for the years 1926 to 1934, inclusive, and the other for the years 1935 to 1937, inclusive), whereas the costs in the table are the averages of the costs of producing all grades of ingot (low as well as high). Is that true? That is the question presented for decision.

The selling prices (B) included in the Government brief table for 1926 to 1934 came from subdivision (e) of Alcoa's answer to interrogatory 11 and for 1935 to 1937 from Exhibit 1701. This is without dispute. The production costs (A) in the table came from Exhibit 718. This likewise is without dispute. By inspection of interrogatory 11 it will be seen that the article for which the selling prices are given in the table through 1934, that is from 1926 to and including 1934, is 98-99 per cent ingot. So also, by inspection of Exhibit 1701, it will be seen that the article for which selling prices appear in the table for subsequent years was 99 per cent plus ingot (now commonly called 99 per cent ingot). It is further without dispute that those two commodities (namely, 98-99 per cent and 99 per cent ingot) are the articles for which selling prices are given in the Government table.

What has just been said, and is agreed on, reduces the controversy, therefore, to the inquiry whether the production costs (A) in the table for the years involved are the production costs for the same grades of aluminum; that is, are they the production costs for 98-99 ingot from 1926 to 1934, inclusive, and for 99 per cent ingot or 99 per cent plus ingot for 1935 to 1937?

Upon the point just stated there is square dispute and the argument has been elaborate. I shall deal with only enough to enable me to determine, as best I can, which side is right on this matter. It is because the production costs set out in the table of the Government were taken from Exhibit 718 that I have said that the controversy about the rate of profit for 1926 to 1937 hinges around Exhibit 718.

The production cost figures in the Government table (original brief, p. 180) were given in the last column (F) of Exhibit 718. By comparison it will be seen that for each of the years 1926 to 1937 the production costs (column A of the Government's table) are precisely the same as the "Total Net Mill Cost, Conversion Cost, Administrative Expenses and Selling Expense," which is the heading of column F in Exhibit 718.

The first column (A) of the figures in Exhibit 718 (entitled "Mill Cost of Pig Aluminum" per pound) comes from two sources. The figures for 1926 to 1933 are from the lowest line in Exhibit 717 and those for the remaining years of 1934 to 1937 are from subdivision (n) of Alcoa's answer to interrogatory 351. The sources of the figures in columns B, C and E (the only other columns not derived from mere computation) in Exhibit 718 will be mentioned later.

From a consideration of all the evidence I am persuaded (as, indeed, seems manifest) that the production cost figures in the first column (A) of the Government's original brief table (which are identical with the figures constituting column F of Exhibit 718) are Alcoa's production cost figures of aluminum ingot of all grades. That means, if what I have just stated be true, that the cost figures given in the Government table on page 180 of its original brief consist of the costs of ingot both high and low in grade. That means further that the cost figures given in column A of the Government's brief are the

cost figures of ingot of grades which run all the way from 99.75 per cent or higher grade down to and including 88 per cent grade, to which and, in a few instances, below which last named grade aluminum ingot sometimes reaches.

Among my reasons for believing that column A of the Government's brief table applies to the cost figures of aluminum ingot of all grades are the following:

(1) Mr. Risler, a Government accountant, prepared Exhibit 717. He got the figures which related to 1926-1933 from Alcoa's books and records. When on the stand he testified about the make-up of that exhibit (pp. 12788-92). He was asked, "Does this [meaning, as I think is clear, Exhibit 717] cover all the plants of the Aluminum Company of America producing pig?" His answer was "Yes" (p. 12789). I cannot conceive that by this answer Mr. Risler did not mean pig of all grades. Otherwise, I think surely he would have said that some of the grades were omitted.

(2) The title of Exhibit 717 is "Cost of producing ALUMINUM PIG as shown by the books and records of the Aluminum Company of America," followed by a star. In a starred footnote are the words "Consolidation—All Plants."

Here again, is it conceivable that the books and records of Alcoa gave "Cost of producing ALUMINUM PIG" only of 98-99 grade of pig? If other grades were omitted, why should the exhibit be silent on the subject? If the books and records of Alcoa contain nothing about grades lower than 98-99 per cent, is it possible that an accountant, who was as competent and experienced as Mr. Risler showed himself to be while testifying at the trial of this case, would have failed to mention that the books and records were blank as to some grades if that had been true? I think not.

(3) The mill cost figures for 1934-1937 came, as previously stated, from subdivision (n) of Alcoa's answer to interrogatory 351. The interrogatory asked that "the annual average cost per pound of producing pig aluminum for all Alcoa plants combined, separately for each year, 1932 through 1937" be stated, subdivided as to a number of designated items, including item (n). The unqualified answer for 1934-1937 was to the effect included for those years in column A of Exhibit 718. That was a definite representation that the information furnished covered "all Alcoa plants combined." Could the answer possibly be construed as meaning to say that such information was confined to pig aluminum of the grades 98-99 and 99 per cent? Could the answer have meant that lower grades were omitted? It seems to me plainly not.

(4) The second column (B) of Exhibit 718 purports to state the profits which accrued to Alcoa's direct subsidiaries out of the materials they furnished for the production of pig aluminum, the mill cost of which is stated in the first column of the exhibit. The purpose of ascertaining such profits to subsidiaries was to deduct them from the mill cost stated in the first column of the exhibit, with a view ultimately to determining Alcoa's cost of producing the ingot with which the exhibit dealt.

Now note that the first column (A) of the Government's brief table—I call it "brief table" to identify it and mean the table at page 180 of the Government's original brief—dealing with costs of producing aluminum, or production costs, is taken precisely and wholly from Exhibit 718. The figures in that first column of the brief table are taken from column F of Exhibit 718. For example, for the year 1926 the figure in column A of the brief table is 13.82 cents. In Exhibit 718 for the year 1926 the mill cost or production figure in the last column (F) is 13.82 cents, —identically the same figure. And so it is throughout the brief table and Exhibit 718. If that be true, and the Government has used the same figures in the brief table, and has taken the figures in Exhibit 718, then anything which in Exhibit 718 affects or has a part in bringing about the figures taken from Exhibit 718 of necessity affects the figures in the Government's brief table.

Inasmuch as it has been demonstrated that column A of the Government's brief table related to pig of all grades,—as is true according to Mr. Risler, on whom everybody who heard him testify will confidently rely both as to competency and integrity, and according to all the papers to which I have referred, and according to the oral testimony to which I have referred,—we cannot escape the conclusion that column A of the Government's brief table relates to every grade of pig aluminum. It relates to the grades which run as low as 87 and lower and to the grades

which run as high as 99.75 per cent and higher as well. Inasmuch as it has been shown that column A related to pig aluminum of all grades, it follows of necessity that column B would be erroneous unless it also covered all grades of aluminum; and yet it is undisputed that column B of the Government's brief table relates only to two grades, namely, 98-99 per cent and 99 plus per cent (commonly now called 99 per cent).

In the footnote to column B of Exhibit 718 (the one relating to the profits of direct subsidiaries of Alcoa) we are told that information as to what were the subsidiaries' profits came from two sources: for the years 1926 to 1933 from the books and records of Alcoa (when examined by Mr. Risler, the Government accountant) and for 1934 to 1937 from Alcoa's answer to interrogatory 351. An examination of those sources of information should disclose whether the figures in column B of Exhibit 718 give the profits of subsidiaries for all grades of aluminum or whether the figures are confined to grades 98-99 per cent or 99 per cent. I think that table 21, which I have prepared, contains a demonstration on that point. This table is as follows:

### TABLE 21

*Computation showing profits per pound (1926–1937) to subsidiaries of Alcoa which supplied to it materials for producing pig aluminum.*

| | Pounds of pig aluminum produced in U. S. by Alcoa. | Profits in dollars on materials supplied to Alcoa by its direct subsidiaries for producing pig aluminum. | Such profits per pound to such subsidiaries. |
|---|---|---|---|
| | *A* | *B* | *C* |
| 1926 | 147,386,177 | $2,926,813.56 | 1.98¢ |
| 1927 | 163,606,787 | 1,133,249.00 | .69 |
| 1928 | 210,543,931 | 1,744,185.14 | .83 |
| 1929 | 227,972,893 | 1,491,692.94 | .65 |
| 1930 | 229,036,636 | 2,365,431.37 | 1.03 |
| 1931 | 177,544,749 | 1,238,588.78 | .70 |
| 1932 | 104,887,619 | 474,426.04 | .45 |
| 1933 | 85,125,177 | 111,466.30 | .13 |
| 1934 | 74,177,081 | 166,686.86 | .23* |
| 1935 | 119,295,103 | 987,813.36 | .83 |
| 1936 | 224,928,899 | 2,881,841.38 | 1.28** |
| 1937 | 292,680,554 | 3,534,259.51 | 1.21 |

* Whether the profit for 1934 should be 22/100th or 23/100th of a cent depends upon a choice between two fractional thousandths of a cent in making the computation; 22/100th would disregard a slightly smaller fraction.

** So stated in subdivision (q) of Alcoa's answer to interrogatory 351, though erroneously taken from there in Ex. 718 as 1.23. Unless in column B of Ex. 718 the direct subsidiaries' profit for 1936 be taken as 1.28, the figure of 8.74 in column D of the exhibit for 1936 would not result from computation in conformity with the method therefor prescribed in the heading of that column.

NOTE: Column A is from Exhibit 721. Column B is from subdivision (d) of Alcoa's answer to interrogatory 356. Column C is computed by dividing the dollars in column B by the number of pounds in column A (see also subdivision (q) of Alcoa's answer to interrogatory 351 and column B of Exhibit 718).

This table is a computation showing profits per pound (1926–1937) to subsidiaries of Alcoa which supplied to it materials for producing pig aluminum. The years out at the left run from 1926 to 1937.

There are three columns. The first is A and is headed "Pounds of pig aluminum produced in U. S. by Alcoa." The second is B and is headed "Profits in dollars on materials supplied to Alcoa by its direct subsidiaries for producing pig aluminum." The third is C and purports to show what such profits per pound were to such subsidiaries.

The figures in column B of Exhibit 718 and the figures in column C of table 21 (profits of subsidiaries) are identical for every year, save only for a variance in 1934 of a few thousandths of 1 cent (which will be ignored). I think that all must agree that the correspondence (in practically complete identity) of these figures could not have occurred unless both came from the same source.

We turn, therefore, to an inquiry as to where the information came from and to what it related. Did it relate exclusively to 98-99 ingot, and with that only to 99 per cent or 99 plus per cent ingot also, or, on the other hand, did it relate to all grades of aluminum? If it related to all grades of aluminum in fact, then, inasmuch as the same figures are used in Exhibit 718, it must follow, as I see it, that Exhibit 718 also related to aluminum pig of all grades.

Column A in table 21 is taken from Exhibit 721. If you will turn to Exhibit 721, you will see that it gives the figures for the entire production of pig aluminum by Alcoa for the years 1926-1937. In column A of table 21 the pounds of pig aluminum produced in the United States by Alcoa correspond precisely with the statement in Exhibit 721 of the production in the United States of aluminum pig of all grades by Al-

coa for each and every one of the years from 1926 to 1937.

Column B of table 21 is taken from subdivision (d) of Alcoa's answer to interrogatory 356 and states in terms of dollars the profits to subsidiaries on materials supplied by them to Alcoa for production by Alcoa of pig aluminum.

Column C of table 21 is computed by dividing the dollars in column B by the number of pounds shown in column A of the table.

As I have said, column C of table 21 is identical with column B of Exhibit 718.

Turn to Exhibit 721 and examine it. It gives the entire production each year in the United States of all pig aluminum, and hence of pig aluminum of all grades, for each of the years 1926 to 1937.

If you will look at Exhibit 721, you will see that the title is "Alcoa's Production of Pig Aluminum." You will see also that its first column has the heading "In the United States." It follows that the table represents that it contains every pound of every grade of pig aluminum produced by Alcoa in the United States for the several years covered. If you will compare those figures for the years 1926 to 1937 with column A of table 21, you will find that the figures in the first column of table 21 are the precise figures which make up the first column of Exhibit 721, so far as concerns the years 1926 to 1937.

There is no escape, therefore, from the conclusion that Exhibit 721 in its first column includes every pound of pig aluminum that was produced by Alcoa for all the years involved. By taking that poundage annually and then from subdivision (d) of Alcoa's answer to interrogatory 356 getting the total yearly profits in dollars on materials supplied to Alcoa by its direct subsidiaries for producing pig aluminum, you can for yourself, as I have done for myself, work out in cents what was the profit per pound of those subsidiaries for those years.

Having worked out the yearly profits in the way explained and compared them with column B of Exhibit 718, I have found that the two are precisely identical. Accordingly, if, in making up Exhibit 721, aluminum ingot of all grades was included, then of necessity it follows that in making up column B of Exhibit 718 to cover the profits of the direct subsidiaries of Alcoa, so also aluminum pig of every grade was included in that table itself (Exhibit 718).

Because the figures for subsidiaries' profits in table 21 come from a computation resting on Alcoa's entire production of aluminum pig during the years involved there is no escape from the conclusion that those profits in Exhibit 718 came from a computation based on the same entire production. In other words, what is inescapable is that the Government's computation of the profits of subsidiaries (column B of Exhibit 718) is made up by taking account of Alcoa's aluminum of all grades, low as well as high.

What is covered by the materials cited is confirmed by Alcoa's answer to subdivision (b) of interrogatory 9 and by Exhibit 459. There it is made unambiguous that the production of pig at all of Alcoa's United States plants was given. Indeed, the name and the location of each of the plants are there given as included in the computation.

It may be noted also that all the documentary evidence referred to was introduced by the Government itself (pp. 9203-4; 10027; 12809; 16561-3; 18173).

I regard the evidence, particularly Alcoa's answer to interrogatory 357 and Exhibit B to Alcoa's answer to interrogatory 355, both introduced by the Government, coupled with the testimony of Mr. Risler (pp. 12793-4), as showing that columns C and E of Exhibit 718 likewise relate to Alcoa's entire production of ingot.

I think there is no occasion to go further into details as to those columns. I say this because, even if those two columns did not include anything with respect to ingot lower in grade than 98-99 per cent, what has been discussed in detail as to other columns of Exhibit 718 has destroyed the value of the exhibit as a support of the Government.

The testimony is not full or precise as to the ranges of grades of aluminum content in Alcoa's ingot; but it clearly appears that it has been great. It abundantly appears that it frequently ran as low as 94 per cent and that it went lower; and a consideration of Exhibits 1423 and 1642, in combination, shows incontrovertibly that it ran much under 94 per cent,—in one or more types of products to less than 87 per cent.

The Government urges in refutation (1) that Exhibit 718 is entitled "Commercial Ingot" and that the evidence establishes that this phrase means 98-99 per cent and 99 per cent ingot; (2) that Alcoa has not introduced evidence to show what was the cost of producing ingot. To these contentions I think there are responses which are adequate.

As to the first contention, that the title of Exhibit 718 is "Commercial Ingot," it may be pointed out that no sort of labeling of the exhibit can determine its content. What is actually embraced in the columns below the headings is what governs the decision of what, in substance and in fact, goes to make up each of the elements of production. Furthermore the Government directed attention to no evidence to sustain its assertion, or possibly it should be called intimation, that from 1926 to 1934 "commercial ingot" consisted of 98-99 per cent grade and, as I read them, the testimony of Mr. Hunt (p. 22307) and Alcoa's answer to interrogatory 28(b), cited by the Government in a footnote on page 180 of its original brief for its support, do not sustain the statement, in effect, that "commercial ingot" was the term employed exclusively to describe 98-99 and 99 per cent ingot.

As to the second contention, that Alcoa has not introduced evidence to show what was the cost of producing ingot, it is enough to say that the burden is not on Alcoa to show the cost or the items of cost of producing ingot. While I should have liked to have the information, I cannot properly cast blame on Alcoa for its absence (if it be absent) from the record.

Indeed, I think there is merit in an explanation which has been offered by Alcoa for its not introducing proof. In substance, it says that when Exhibit 718 came in, the document did not carry the suggestion that it had the meaning now sought to be attributed to it by the Government; also that the first time it realized that the Government took such position was after the Government's original brief of December 2, 1940, was submitted. This was long subsequent to the close of taking testimony in the preceding August, and too late, therefore, for putting in evidence with respect to the items of such cost.

So also it must be borne in mind that the burden of putting in proof with respect to the matter was on the Government.

There is another and entirely independent ground for rejecting the Government's view as to the significance of Exhibit 718. You will recall that Exhibit 718 was gotten up by Mr. Risler, upon whom, as I have said heretofore, I think everybody engaged in this trial was willing always to rely as to his good faith. If there were any difference of opinion as to him, it was not as to his good faith, but as expressed was merely an argumentative statement as to whether he may have made some mistake.

Again, in a footnote to Exhibit 718 the following statement was expressly made:

"Alcoa's Amended Answer to Interrogatory No. 355—Exhibit 'A' shows that for the years 1932 to 1937, inclusive, the following Overhead Expenses were not included in the Administrative Expenses or the Selling Expenses:—Freight and Express, Duty Paid, Interest and Discount Paid, Cash Discount on Sales, Royalty Paid, Premiums and Special Items, Expense of A. M. I. Lease, Idle Plant Expense, Rent Expense—Buffalo, Cleveland, Detroit, Edgewater."

What is the significance of the omissions from Exhibit 718 of the items described in the note thereto? I think this can best be brought out by a compilation of statistics. For that reason I have prepared table 22, which is as follows:

TABLE 22

*Comparison of Alcoa's general overhead with aggregate amounts annually of items mentioned in note to Ex. 718 as omitted from that exhibit, 1932–1937.*

| | Total general overhead A | Amounts of omitted items B |
|---|---|---|
| 1932 | $11,184,290.97 | $ 4,638,922.14 |
| 1933 | 10,586,925.23 | 4,446,422.06 |
| 1934 | 11,123,928.92 | 4,237,447.33 |
| 1935 | 11,977,042.01 | 3,733,343.43 |
| 1936 | 12,257,401.61 | 3,261,199.88 |
| 1937 | 14,624,961.37 | 3,996,231.12 |

Aggregate overhead $71,754,550.11
Total of items omitted therefrom $24,313,566.01

NOTE: Column A is composed of totals of, and column B is computed from items under heading of "other overhead expenses" in, Ex. A to further answer of Alcoa to interrogatory 355, sheets 1 to 6, pp. 38–43.

In table 22 there is a comparison of Alcoa's general overhead with the aggregate amounts annually of the items mentioned in the note to Exhibit 718 as omitted from the exhibit for 1932-37.

To the left of the first column are the years from 1932 to 1937, which are the years mentioned in the note.

In the first column, A, the heading is "Total general overhead." In the second column, B, the heading is "Amounts of omitted items." It will be observed that the items called "Other overhead expenses" in the further answer of Alcoa to interrogatory 355 are described therein and in the note to Exhibit 718 (as not included in that exhibit) in the very same words.

Opposite each year the figures are given in dollars under both of the headings. I shall not read all the detailed figures; but the aggregate overhead shown by column A of table 22 is $71,754,550.11 and the total of the items omitted from the aggregate overhead is $24,313,566.01. In other words, the omitted items constitute more than one-third of the total general overhead.

It seems to me manifest that the failure to include the omitted items reduces the production costs by the respective amounts of those items for the years involved. To that extent the size of the computed annual rate of profit was increased.

The omission of so large a proportion as more than one-third of the total general overhead also so minimizes the value of Exhibit 718 that, as it would seem to me, it is not possible to rely on the exhibit to produce the figures as they are set out in its last column, which constitutes the basis on which the Government's brief table depends, namely, the figures that make up column A of the Government's brief table.

The Government says (brief of May 8, 1941, p. 3) that Alcoa stated in its further answer to interrogatory 355 that such omitted items should not be included as part of the cost of any aluminum product; but I fail to find there or in the footnote of Exhibit 1748 (exhibit p. 7186), as I interpret them, or elsewhere, any such statement by Alcoa.

I think there are in the Government's table at page 180 of its original brief other defects than those I have mentioned; but I think also that it would be useless to pursue them.

I have intentionally refrained at this time from going into the much-disputed question as to whether there is justification for the Government's interpretation of the material in the case as establishing a so-called "per pound" basis for calculating the rate of profit on every item produced by Alcoa or produced by any manufacturer or sold by any merchant. At a later stage, however, I shall go into that matter.

For the reasons I have assigned, my conclusions are as follows:

(1) The production cost of ingot, as stated in column F of Exhibit 718, and as used in column A of the table on page 180 of the Government's original brief, relates to ingot of all grades.

(2) Such production cost, as there set out, may not properly be compared with the selling price of 98-99 per cent and 99 per cent grades of ingot, set out in column B of that table (to which grades the selling prices in that column exclusively relate), in order to compute rate of profit.

(3) It follows that the Government has failed to establish its claim that the rates of Alcoa's profit on ingot for the years 1926-1937 ranged from 35 per cent to 104 per cent or to establish what the rate of profit was for any of those years.

This brings us to the second argument of the Government in the branch of the case now under consideration. That is as to comparative price declines. The Government says that in 1929 to 1932 the percentage of Alcoa's decline was less than the percentage declines of other specified articles.

In its original brief (pp. 175-6) the Government states that during the period 1929-1932 Alcoa's annual selling prices for 99 per cent virgin aluminum fell only 8 per cent; whereas, according to the Government, the selling prices of five other designated articles in the same general field fell in varying degrees ranging from 39 per cent to 71 per cent.

The commodities with which the fall in the price of virgin aluminum's selling prices is contrasted are (1) new aluminum clippings, (2) cast aluminum scrap, (3) electrolytic copper, (4) copper wire and (5) zinc.

For purposes of discussion it will be assumed that the figures assembled and the computations made by the Government, in regard to these matters, are correct.

Nevertheless, so far as I can discover or has been pointed out to me, there is a total lack of evidence of what were the varying influences which, during the period in question, faced the producers of the commodities concerned or which were responsible for bringing about the several declines stated for articles other than aluminum included in the table.

The use of such evidence, or evidence of that kind, is essential to a determination of the issue. It is judicially known that the years 1929 to 1932 presented numerous novel difficulties to business men; also that these were not identical in all lines of business. In order to appraise the relative demands for changes in prices in several branches of business, it would be necessary, therefore, to have evidence as to what were the conditions and what were their effects in each branch.

294

In consequence, in the absence (as here) of such evidence, we cannot properly accept as correct the comparisons made by the Government.

We come now to the third argument made by the Government in support of its position on this aspect of the case. This relates to annual earnings and expense statements that were issued by Alcoa. Exhibit 1721 contains such statements for three years.

The Government argues that in 1937-39, as shown by that exhibit, the prices at which Alcoa sold articles it produced greatly exceeded Alcoa's cost of producing them.

For a number of years past,—how long I do not know and it is not shown,—Alcoa every year has compiled a statement of its earnings and expenses. As I have said, those for the three years of 1937, 1938 and 1939 have been introduced in evidence and compose Exhibit 1721. These statements together, as embodied in the exhibit, consist of 43 pages. The commodities are not the same every year. Yet, in large measure, there is general identity and the scheme followed in making up the statements is the same for each year.

In the column near the left there are set out the names of numerous commodities in which Alcoa dealt during the year designated. To the right of the commodity column there are three sets of major columns. The first is headed "Sales"; the second, "Cost of Goods Sold"; and the third (which is at the extreme right), "Profit." Immediately beneath the title of each major column there are names given to sub-columns. Under the "Sales" heading there are three sub-columns. One of these is headed "Weight"; the next is headed "Amount"; the third of the sub-columns is headed with the word "Ave." (meaning yearly average). Below the "Cost of Goods Sold" there are a column headed "Amount" and a column headed "Ave." Under the heading "Profit" there are two sub-columns, one headed "Amount" and the other "Ave."

It is undisputed that what is included in the last column under "Profit" is what is commonly spoken of as the "Gross Profit" on the particular commodity that is described at the extreme left, in the "Commodity" column, in the same line in which, at the extreme right, the gross profit is stated.

Near the end of the statement for each year there are sets of figures of Alcoa's costs on various accounts in producing the commodities; but these figures, as all agree and as is manifest on inspection, were not taken into account in making up the gross profits figures throughout the body of the statement in the last column to the extreme right.

In its original brief, pages 182-5, the Government furnished 22 instances in Exhibit 1721 in which it says that the rate of approximate net profits during the period of the exhibit ranged from 54 per cent to 181 per cent. Alcoa squarely disputes the correctness of the Government's statement of each net profit claimed. It says that all are grossly wrong. Thus arises the question which must now be dealt with.

The Government has explained its computation of the rate of net profit on only one item and has furnished an exposition of how that computation was made (original brief, pp. 182-3). Observe particularly the note, part of which is on page 182 and part of which is on page 183. It is of importance to understand that note.

In exposition it appears that, in form, the Government's scheme is quite simple. Its chief feature is to reach a percentage figure (hereinafter, for convenience, called the key) for use in multiplying gross profits in order to ascertain net profits.

The procedure for using the key consists of two steps. These are as follows: (1) Ascertain the percentage or rate of gross profit for each commodity. (2) Multiply the gross profit, so arrived at, by the percentage which constitutes the key.

The ascertainment of the percentage of the gross profit is by dividing the gross profit in cents for the commodity (as set out in sub-column headed "Ave." under the column headed "Profit") by the cost of that commodity in cents (as set out in the sub-column "Ave." under the column "Cost of Goods Sold"). The multiplication of the gross profit by the key, in the way I have explained, will give the percentage or rate, as the Government claims, of the net profit on the commodity; and be it noted, this key percentage which is used for performing the multiplication, according to the Government's claim, may be used with respect to any item or commodity in the table. Note also that the

key has been obtained by the investigation, according to a certain process, of but one item in the entire exhibit.

The crucial importance of the key percentage figure is manifest. While, as I have said, it has been arrived at by consideration of a single commodity, it has been used by the Government to compute the alleged net profits scheduled in the Government's brief as having been received by Alcoa on the other 21 commodities included in the Government's brief (pp. 184–5).

Let me go a bit further. As I have said, the way in which the key percentage was reached is explained in the note to which I invited your attention at pages 182–3 of the Government's original brief. The device there described is complex and quite difficult to apply. On this account, for the moment, I shall not undertake to analyze it. Rather, I shall content myself for the moment with merely saying that 79 per cent is the key percentage adopted by the Government for the application of its formula. I ask you, however, to remember that 79 per cent is the key which the Government applies for computing the net profit gain by Alcoa on every item in Exhibit 1721.

Perhaps the method followed by the Government in computing the rate of net profit for a particular commodity will be somewhat clarified by an illustration. For example, let us take the first item on the first page of Exhibit 1721.

The commodity selected is pig of the grade of 99.5 per cent or better. The facts relating to it, as set out in the exhibit, are as follows: It sold for 17.99 cents a pound. Its cost of production was 10.16 cents a pound. The difference between those two (that is, the gross profit) is 7.83 cents a pound. By dividing the 7.83, which was the gross profit, by the 10.16, which was the cost of production, we get a percentage of 77 per cent. That, according to the method under examination, is the rate of gross profit. The rate of net profit to Alcoa on that commodity in 1937, the year it was sold, was 79 per cent of the 77 per cent. This (omitting fractions) is 60 per cent.

Another illustration that is worthwhile examining is the commodity used by the Government in making its computation when it adopted 79 per cent as the key percentage figure (original brief, p. 182). This commodity is taken from line 32 of page 29 of the exhibit; it is 2S–3S alloy sheet strip.

According to the exhibit, the sales price of the sheet mentioned was 29.61 cents per pound and the cost of production was 14.88 cents per pound. The difference, or gross profit (in the sense in which the word is being used), therefore was 14.73 cents a pound. Dividing 14.73 by 14.88 (which was the cost of production) we get .99. This means that the gross profit on that commodity was 99 per cent. Multiply the 99 per cent by 79 per cent (the key) and we get 78 per cent. 78 per cent (according to the Government) is the net profit that Alcoa received on this commodity in 1939, the year it was sold.

The use of the key percentage figure, however, is of even greater significance than I have previously stated. The Government's view on this point is stated at page 183 of its original brief. Explanation of how to use the key in ascertaining the rate of net profit on its other commodities is given in a footnote on that page as follows:

"By applying this same procedure, it is possible to reduce the *gross* profit, as stated by Alcoa, to an approximate *net* profit which makes allowances for all cost items covered by Alcoa in its own cost exhibits (Ex. 1748). Since the percentages would be the same for any commodity in Alcoa's Statement of Earnings and Expenses, the approximate net profit can be ascertained by taking 79% of the stated gross profit."

Again, in the body of the brief, on the same page, it is stated:

"Similarly, the net profit on other items listed in Alcoa's Statement of Earnings and Expenses is approximately 79% of the gross profit as stated therein."

Why the Government regards the key as correct, or justifies the use made of it, is not explained.

In Exhibit 1721 there are quite a large number of commodities. 1718 of those items are there scheduled. Of these there are 166, on each of which, according to the face of the exhibit itself, there was an actual loss on the average for the year, instead of a profit.

In addition, as appears by table 23, there are numerous instances in which, on the face of the exhibit, the average profits for the year were small. The table is as follows:

TABLE 23

*Computation from Exhibit 1721 of approximate percentages (1937–9) of Alcoa's gross profits per pound (column C), averages of which gross profits purport*

*to be stated on the face of such exhibit, on certain commodities bearing line numbers (column B) of exhibit pages (column A), without making cost deductions mentioned in section 2 of the note below.*

| Exhibit pages | Commodities line numbers | Approximate percentages of gross profits on commodities, arranged in the order in which the commodities are arranged in column B |
|---|---|---|
| A | B | C |
| **1937** 1 | 29; 41 | 20; 1 |
| 2 | 5; 38; 49 | 23; 5; 12 |
| 3 | 1 | 23 |
| 4 | 4-5; 17; 23 | 2; 2; 17; 23 |
| 5 | 3; 6; 10 | 4/10; 12; 14 |
| 7 | 7 | 2 |
| 8 | 33 | 16 |
| 9 | 4 | 10 |
| 10 | 35 | 1 |
| 11 | 7 | 12 |
| 12 | 1; 5; 8; 11; 17; 19-23; 25-32; 34; 36-37 | 2/10; 6; 19; 5; 1; 2; 3; 1/10; 4; 4; 3; 3; 2; 1; 3; 6; 11; 2; 11; 3; 3 |
| 13 | 1-4; 8-26; 28-30; 32-34 | 2; 2; 2; 4; 3; 3; 4; 3; 2; 3; 5; 5; 1; 0; 1; 3; 2; 2; 13; 9; 10; 6; 11; 3; 4; 3; 13; 4; 3 |
| **1938** 16 | 9 | 18 |
| 17 | 8; 42; 45 | 24; 7; 24 |
| 18 | 9-10; 12; 15; 44 | 9; 22; 16; 14; 16 |
| 19 | 6 | 17 |
| 20 | 29-30; 32; 38; 43 | 14; 9; 13; 3; 1 |
| 21 | 3; 21 | 12; 0 |
| 22 | 23; 28; 33; 40 | 14; 12; 6/10; 3 |
| 23 | 7-9; 29 | 13; 16; 24; 9 |
| 24 | 31; 32 | 24; 15 |
| 26 | 3; 6-7; 9; 29; 30; 31; 33; 35-37 | 1; 4; 5; 16; 5; 10; 2/10; 1; 6; 3; 5 |
| 27 | 1; 4; 6-10; 12-6; 18-20; 22; 24-32; 34; 36-8 | 9/10; 8; 5; 17; 3; 4; 3; 4; 2; 4; 7; 4; 2/10; 6; 3; 1; 2; 2; 3; 3; 1; 1/10; 5; 7; 6; 7; 1; 2; 14 |
| 28 | 1; 5 | 5; 8 |
| **1939** 30 | 30 | 12 |
| 31 | 32 | 8 |
| 32 | 17; 26; 32; 49 | 8; 15; 18; 10 |
| 33 | 3; 35 | 11; 19 |
| 34 | 12; 27; 33; 36 | 5; 14; 16; 14 |
| 35 | 1; 34 | 18; 2 |
| 36 | 8; 10; 13; 15; 20; 38 | 16; 23; 16; 17; 12; 6 |
| 38 | 9; 23 | 22; 1/10 |
| 39 | 4; 10 | 16; 14 |
| 41 | 5-6; 18; 32; 34; 36-40 | 3; 5; 23; 5; 9/100; 3; 1; 5; 2; 3 |
| 42 | 1; 4-20; 22; 24-33; 36; 38; 40; 42 | 7/10; 4; 4; 24; 1; 4; 2; 3; 7/10; 3; 3; 3; 8/10; 21; 3; 3; 2; 2/10; 4; 2; 3/10; 10; 1; 6; 5; 8; 5; 5; 3; 1; 2/10; 2; 11 |
| 43 | 2-3; 5-6; 10 | 3; 10; 11; 4; 2 |

SUMMARY

In the several years covered, the table above gives in column C instances of percent rates of gross profits as follows:

| | |
|---|---|
| 1937, ranging from 0 to 23%, total | 68 |
| 1938, ranging from 0 to 24%, total | 69 |
| 1939, ranging from 9/100 to 24%, total | 72 |
| For three years, total | 209 |

NOTE: *Section 1.* Column A gives the pages of the exhibit on which will be found the names and weights of the commodities whose several line numbers, under the heading "Line No." in the exhibit, are set out under column B above, opposite the respective exhibit pages as given in column A. In column B are given the line numbers of the commodities on the exhibit pages, which are designated in column A above, opposite such numbers. In column C (without fractions, except where the profits stated are less than 1%) are given the approximate percentages of the gross profits on the commodities, arranged in the same order as those commodities are arranged in column B.

*Section 2.* Before net profits of commodities can be ascertained, additional deductions from gross profits must be made. Without now determining of what all the deductions should consist, in part they arise out of the omission from costs of goods sold, as set out in the exhibit opposite the several commodities listed, of certain items of costs. Among those are the properly allocated shares of each commodity (if obtainable) in given totals of several items, designated in the exhibit, not already included in computing gross costs. The aggregates of these, stated in the exhibit, are $7,621,025.65 for 1937 (p. 11, lines 15 to 20, without additional cost figures being given at p. 14 for the Pacific Coast Division corresponding to those given for that division in 1938 at p. 28); $8,069,518.22 for 1938 (p. 25, lines 6 to 11, and the last three items following the word "total" near the bottom of p. 28); and $6,678,003.58 for 1939 (p. 40, lines 4 to 9, without additional cost figures being given at p. 43 for the Pacific Coast Division corresponding to those given for that division in 1938 at p. 28). As shown by the evidence (pp. 39062–78) and as conceded by the Government (original brief, pp. 182–3), other items of cost of the goods sold must also be deducted.

When computing the rates of percentages in column C, no costs were taken into account except those included in the figures, under the heading "cost of goods sold," set opposite the several individual commodities throughout the body of the exhibit.

This table purports to be a computation from Exhibit 1721 of the approximate percentages (1937-9) of Alcoa's gross profits per pound (Column C), averages of which gross profits purport to be stated on the face of such exhibit, on certain commodities bearing line numbers (Column B) of this table, of exhibit pages (stated in

Column A of this table), without making cost deductions mentioned in section 2 of the note below.

In other words, if I may explain it again, this table has computed information for each of the three years 1937, 1938 and 1939. It includes computations of a comparatively small fraction of the total upwards of 1600 items. It identifies with precision the item with respect to which the computation is made. That identification is accomplished by giving in column A of the table the exhibit page from which the commodity is taken and in column B the line numbers of the commodities, as will appear in the exhibit. In column C there is computed the approximate percentages of the gross profits on each of these commodities that has been so described in column A and column B. In addition, you will note that in column C, where the percentage of the gross profits on each of these commodities is stated, the percentages are arranged in the identical order in which the commodities are arranged in column B. In consequence, you will be able, in using the table, to identify the percentage in column C as it relates to an identified commodity covered by reference to columns A and B.

The first item which I shall take up by way of illustration is the first one in the exhibit. This is to be identified by looking under column A and there you will find the exhibit page 1. In column B, under commodities, you will find the two figures, 29 and 41, separated by a semi-colon. In column C you will find in the same line the figures 20; 1. Now this means that for commodity 29 on page 1, which you can immediately put your hand on, the approximate percentage of gross profits is 20 per cent,—29 being the first commodity line number given under B and 1 being the page number given under A. The commodity number being the first of the commodity numbers appearing under column B, the percentage figure given in column C must be the first figure in that column. The second commodity dealt with in column B is 41 of page 1. In column C the second figure given is 1. That means, therefore, that 1 is the percentage of the gross profit on the commodity just described in line 41 on page 1 of the exhibit.

I have said that there are in this exhibit 1718 items. I have told you that there are 166 items as to which, on the face of the exhibit, there was an actual loss, instead of a profit, for the year in which it was sold.

In table 23 I have made no effort to be exhaustive. But, without making the effort, in the table there are identified 209 commodities with respect to which the average gross profits during the years 1937-9 ran from nothing to 24 per cent. Now, if we take 21 per cent of the gross profit and deduct it (that is, if the 79 per cent key be applied in compliance with the Government's formula), the maximum of the average yearly net profit of the last group of commodities mentioned, without the fractions (which are ignored), would be 18 per cent.

Adding the 166 commodities on which there were affirmative losses and the 209 commodities on which the highest net average profit was but 18 per cent, there is a total of 375 commodities on which at least it may be said that either there were no profits or the net profits were moderate.

The evidence as to how the annual reports embodied in Exhibit 1721 were constructed and as to how, if at all, computations with respect to profits could be made is not full or satisfactory (pp. 39044-5; 39051-79; 39491-92A). Several things, however, are clear:

(1) The reports are merely for statistical purposes and were not designed for use in computing profits,—certainly not for learning what were the profits on the aluminum content of the respective commodities (pp. 39072-4; 39492).

(2) There are some elements of cost which are not included in these reports and how or where, if at all, some of such elements can be found, or what are omitted, is not established (pp. 39070-74. See also p. 39492A).

In these circumstances let us turn back to Exhibit 1721 itself.

As I conceive, there are several ways by which, without resort to anything outside of the exhibit,—that is, relying on the exhibit standing alone,—the position of the Government as stated in the extracts quoted above from page 183 of its original brief—by which I understand is meant it justifies its "per pound basis"—can be demonstrated to be erroneous. I feel that it will be enough to point out two of such ways. I feel also that, unless the Government can sustain the position mentioned, its proposition with respect to Alcoa having received profits running from 54 per cent to 181 per cent, or any other higher rates, has not been proved.

298

In the first place, as previously noted, there are 166 items in the sale of each of which, according to the exhibit, Alcoa suffered a loss. If the theory of the Government for the use of a per pound basis or the use of a 79 per cent key be sound, then it would follow, of necessity, that, in determining whether it had earned a net profit, Alcoa would have as much warrant for employing one of the commodities on which there was a loss as the Government would have for selecting the commodities on which, on the face of the exhibit, the profit was large.

In the second place, as appears by table 23, in 1937 there were 68 commodities on which the range of the rates of gross profits was from nothing to 23 per cent per pound; in 1938 there were 69 commodities on which the range of the rates of gross profits was from nothing to 24 per cent per pound; and in 1939 there were 72 commodities on which the rates of gross profits ranged from 9/100th of 1 per cent to 24 per cent per pound. In other words, during the three years period there were 209 commodities on the sale of which Alcoa's rates of gross profits were from nothing to 24 per cent.

As remarked with respect to the cases in which Alcoa suffered losses, so here it may also be said that if the Government may select a commodity on which to predicate its profit computation, or from which to derive a key or index figure, manifestly it should be equally open to Alcoa to select a modest profit or a no profit item on which to base a computation or from which to derive its key or index figure.

What all this means, as I conceive, is that it is wholly erroneous to select a single commodity and by use of that alone to reach a key or an index figure and then to apply such key or index to every commodity sold by Alcoa during the entire three years or during any one of the years.

■ I feel that it is but matter of common sense to say that one engaged in merchandising commodities, when in active competition, in order effectively to compete, will be forced to vary, and, in the absence of an effort to drive his competitors out of business, should be free to vary, the rate of profit he makes on the sales of particular commodities.

■ I am convinced that the only method which can be applied reasonably and fairly is one which takes into account the entire business for the year as a single unit. That method not having been applied,—and the material from which such result can be obtained not having been put in evidence, unless it be the material which I shall next discuss,—I feel compelled to conclude that the Government has failed to prove its charge that Alcoa exacted exorbitant profits on particular items.

This brings us to the much discussed question of Alcoa's average earnings.

In Exhibit 1665 Alcoa presented a list of figures which, according to its contention, shows that the average of its earnings for the 51-1/3 years of its business existence (from the year ending August 31, 1889, to the year ending December 31, 1939) was approximately 10 per cent. The Government submitted Exhibit 1006 for the years 1892 to 1937, inclusive, from which it concluded that the average earnings were only a small fraction in excess of 10 per cent. The difference between the two figures arrived at by the Government and by Alcoa is negligible and may be ignored.

Mr. Collins, an accountant for Alcoa, made the computation in Exhibit 1665 and fully explained it. To absorb his theory perhaps it would be well to read all or substantially all his testimony. However, I think the following would give a fair representation of his statement (pp. 36384-430; 39759-896; 39937-40030; 40039-53).

It is not even suggested that the figures themselves in Exhibit 1665 are inaccurate. Indeed, they are accepted. The sole criticism by the Government is that the theory on which the percentage was arrived at by Mr. Collins was wrong. Is that true?

In essence, as I understand Mr. Collins, what he did was to ascertain from the books what was the average rate of earnings on a base consisting of three items. These items were: (1) investment by the stockholders in Alcoa's capital stock; (2) earnings of Alcoa which had been "plowed back" by issuance of stock dividends to the stockholders; and (3) undistributed earnings on hand in the Alcoa treasury. The argument in behalf of Alcoa is that all these three types of monies had actually been employed by the company in making earnings and, hence, were entitled to be taken into account in ascertaining what the rate of its earnings had been.

Mr. Collins made a very persuasive statement of his views. No accountant appeared to refute him. What is the best and fairest method is somewhat perplexing.

It seems to me plain, however, that there can be no valid objection to inclusion in the base for computation of all receipts on issuance of capital stock, whether such receipts be money or property, nor to inclusion of the plowed back earnings. Both indisputably were parts of the company's capital and were employed by it in producing the earnings. If there be room for controversy, I feel that necessarily it is confined to the question of the extent to which (if at all), in solving the rate of earnings problem, it is proper to include in the computation base earnings on hand which have not yet formally passed into a status equivalent to having been received by the company on the issuance of stock. Yet I believe it is indisputable that net funds in the treasury of a company, which had reached there as bona fide earnings, might properly be included in stating the net worth of the company. If so, then surely it is difficult, if not impossible, to distinguish between that treatment of such net earnings and their inclusion as the third element of the base for computing the rate of earnings as heretofore described.

█ In the absence of advice to the contrary by one skilled in economics or accountancy, or both, at least I should be strongly inclined to adopt the view that the third element mentioned should be included in the base. I go further and say that this view impresses me as right. So also I say that I have discovered nothing in what the Government has presented, either in evidence or in argument, which would warrant exclusion of the third element from the base for the computation or would warrant finding as a fact that the rate of average earnings of Alcoa, over the period of its existence, has exceeded approximately 10 per cent, as insisted by Mr. Collins.

Another angle of approach is to inquire, on the evidence, what figure should this Court adopt as a criterion for determining whether a particular rate of average earnings is exorbitant? Perhaps the rates prevailing with other concerns may have a bearing on what is reasonable; but this has not been gone into directly or even generally by counsel and has not been touched on more than casually. Without hearing counsel, I should hesitate finally to adopt the suggested test. Nevertheless, I shall call attention to what the record shows on the point.

So far as I can recall or has been brought to my attention, no evidence has been introduced which would assist me in answering the inquiry, unless it be that which, apparently as an incident, came from witnesses in regard to the financial histories of their own companies. The purpose of such evidence, so brought in, seemingly was to establish that competitors of Alcoa, whose officials or employees took the stand at the trial, were financially capable of competing.

From representatives of seven companies of the kind mentioned, testimony about the financial history of their respective companies was adduced. Taken as a whole, this testimony indicates that these companies have made earnings as large as, or in the neighborhood of as large as, and some even larger than, Alcoa has made. But I do not refer to it for the purpose of drawing attention to that phase of the matter. What I think it does show without dispute, and what I rely on it for, is that Alcoa did not employ the power ascribed to it by the Government,—which certainly was great,—in preventing the companies involved from competing with it.

I have heretofore given the names of the seven companies and the substance of the statements of their representatives. The companies and the references to what was said are as follows:

(1) Advance Aluminum Castings Corporation, of Chicago and Rockford, Illinois, at pp. 28707-12; 28795-9.

(2) Blackhawk Foundry & Machine Co., of Davenport, Iowa, at pp. 28068-70; 28096-7; 28142.

(3) Bohn Aluminum & Brass Corp., of Detroit, in Exhibits 1507 and 1508 (see also Exhibit 1509, where it appears that Bohn itself estimated its net profits for 1912–1939 at $22,000,000; and Exhibits 1510 and 1511, containing further anaylses of Bohn earnings).

(4) Century Metalcraft Corp., of Chicago or Lake Forest, Illinois, at pp. 28416-22; 28444.

(5) Club Aluminum Products Co., of Chicago or nearby, at pp. 29876-80; 29893-95A.

(6) Enterprise Aluminum Co., with plants at Massilon, Ohio, and Etonton, Georgia, at pp. 31957-9; 31990.

(7) West Bend Aluminum Company, of West Bend, Wisconsin, at pp. 31832-9.

There are a few of the figures about the interpretation of which there is a bit of ambiguity in the testimony. I have

construed them as best I could; but, for the purpose for which I am now about to use them, the differences are immaterial and the details need not be gone into. I have prepared table 24 on the subject. This is as follows:

## TABLE 24

Computation of net earnings of seven of Alcoa's competitors engaged, wholly or partly, in branches of the aluminum business during periods including years stated in column B below and continuing to the end of 1939, with exceptions specified in the note.

| A | B | C | D | E | F | G | H | I |
|---|---|---|---|---|---|---|---|---|
| Name of competing company | Beginning year | Capital stock issued for cash or property and outstanding | Stock issued for earnings and outstanding | Total present capital stock outstanding | Stock paid off out of earnings and retired | Dividends paid from earnings | Net worth at end of 1939 | Total net earnings (D + F + G + H − C) |
| 1. Advance | 1919 | $ 15,000 | $ 735,000 | $ 750,000 | $20,000 | $ 1,043,000 | $1,068,000 | $ 2,851,000 |
| 2. Blackhawk | 1920 | 47,500 | 00 | 47,500 | 00 | 70,000 | 280,000 | 302,500 |
| 3. Bohn | 1925 | 1,556,000 | 1,340,000 | 2,896,000 | 00 | 11,967,000 | 8,954,000 | 20,705,000 |
| 4. Century Metalcraft | 1933 | 129,000 | 00 | 129,000 | 00* | 499,000 | 354,000 | 724,000 |
| 5. Club | 1932 | 12,000 | 00 | 12,000 | 00 | 210,000 | 320,000 | 518,000 |
| 6. Enterprise | 1914 | 50,000 | 550,000 | 600,000 | 00 | 703,000 | 962,000 | 2,165,000 |
| 7. West Bend | 1911 | 150,000 | 00 | 150,000 | 00 | 1,766,000 | 1,455,000 | 3,071,000 |

* $27,000 called "capital" was borrowed and paid off out of earnings (minutes, pp. 28419-22); but due to uncertainty as to whether stock was issued for it, it is omitted from the table.

NOTE: The figures for Bohn (No. 3) include two months of 1924 and for Century Metalcraft end on March 31, 1939.

There are nine columns in the table. In column A are given the names of the seven companies I have spoken of. In column B is given the approximate year when each company, or one of the companies out of which it grew by merger, began business. With a single exception (specified in the note to the table), the figures for all companies run to a given date. That date is December 31, 1939. The excepted company (Century Metalcraft) runs to March 31, 1939, the end of its fiscal year.

During the period for each company there are set out: the capital paid in by the stockholders, whether in money or property, which is still outstanding (column C); the amount, if any, of earnings plowed back for which stock is still outstanding (column D); the total capital derived from contributions paid in by stockholders and earnings plowed back for which capital stock is still outstanding (column E); the amount of stock, if any, paid off out of earnings and retired (column F); the dividends to stockholders paid out of earnings (column G); the net worth of each company at the end of the period (column H); the total net earnings during the whole period, made up by adding together the amount of stock issued for earnings and still outstanding, the amount of stock paid off out of earnings and retired, the dividends paid from earnings and the net worth at the end of the period, and subtracting the amount of the capital from the sum thus obtained (column I). In other words, column I is made up by adding columns D, F, G and H and subtracting column C from the total.

Round figures only are used. In some instances the testimony furnishes the precise figures for the columns. In others they are computed from material found in the evidence. So also the dates are only approximate and, other than as stated, details are lacking. In consequence, it would be impossible with accuracy to compare the results with what the evidence discloses on corresponding points in regard to Alcoa. I shall not attempt, therefore, to reach any estimate of the rate of profits earned by any of the seven companies. It is not for this purpose that I have assembled the facts or embodied them in the table. What I had in mind in gathering the figures and putting them into the table, and what I think they establish, is this: They prove that Alcoa's power was not employed to drive any of the seven competitors out of business; but that, on

the contrary, those companies have flourished.

Now note that in column B only the beginning year is stated. Advance, the first company, to the end of 1939, therefore, had been in business approximately 21 years; Blackhawk had been in business 20 years; Bohn, 15 years; Century Metalcraft, 7 years; Club, 8 years; Enterprise, 26 years; and West Bend, 29 years. In other words, none of these was a fly-by-night company but all were genuine and substantial business concerns.

It is interesting also to note what the capital of each company was and compare that with what the total net earnings were, without going into details.

In the case of Advance the capital issued for cash or property, and still outstanding, was $15,000. The stock issued for earnings, and outstanding, totalled $735,000. There is, therefore, a total present capital stock outstanding of $750,000. The total net earnings of the company, as appears by column I, made up in the way I have explained, was $2,851,000.

In the case of Blackhawk the capital issued for cash or property, and still outstanding, was $47,500; but no stock which is now outstanding was issued for earnings. The total net earnings, shown in column I for that company, was $302,500.

In the case of the Bohn Company the capital stock issued for cash or property and outstanding was $1,556,000 and the stock issued for earnings and still outstanding was $1,340,000,—making a total of present capital stock outstanding, whether derived from stock that was paid for in cash or property or stock issued for earnings, of $2,896,000. The total of its net earnings set out in column I for the period was $20,705,000.

In the case of Century Metalcraft the capital stock issued for cash or property and outstanding was $129,000, with none issued for earnings and outstanding. The total net earnings in column I for this company was $724,000.

In the case of Club Aluminum the total capital stock issued for cash or property and outstanding was $12,000, with none issued for earnings and still outstanding. The total of the net earnings in column I of that company was $518,000.

In the case of Enterprise the capital stock issued for cash or property and outstanding was $50,000 and stock issued for earnings and outstanding was $550,000, making a total of present capital stock outstanding of $600,000. The total net earnings of that company, set out in column I, was $2,165,000.

In the case of the West Bend Company the capital stock issued for cash or property and outstanding was $150,000, with none for earnings and outstanding. The total of its net earnings, set out in column I, was $3,071,000.

Another feature that should be observed is that only one of the seven companies has even a substantially large capital. That is Bohn. Its total capital stock outstanding is $2,896,000. Of this 54 per cent was received from stockholders, paid in cash or property, and 46 per cent from earnings. The capital of the other companies, in varying amounts, runs down to Club, whose total capital is $12,000.

Still another feature, graphically brought out by the table, is the futility of an attempt to measure relative net earnings or relative profits, or relative capacity to produce net earnings or to produce profits, exclusively on the basis of dollars of capital invested. As all of us know, in business as in the other departments of life, intangibles play a part. It is impossible to translate such a part into terms of percentages.

The indication of the existence of competition and of its nature is strongly corroborative. The overwhelming weight of the testimony, coming from customers and competitors alike, shows that, while Alcoa competed actively, it was fair. Apart from the spread controversy, elsewhere commented on, I think the quantum of complaints during a period of over 50 years of Alcoa's method of competing was astonishingly small. I think I have discussed the principal or typical (if not all) of the complaints definitely disclosed by the evidence. If there be others of substance which are not typical and which I have overlooked mentioning, I feel sure that they are mere isolated instances. Moreover, the facts as to those isolated instances are completely overcome by the overwhelmingly greater weight of proof the other way. That proof exculpates Alcoa wholly or substantially from blame.

Table 24 contains seven concrete illustrations. To that showing several further showings, which are more or less pertinent, should be added.

While perhaps not of great moment, one of the Government witnesses, who was quite antagonistic to Alcoa, said that, after

studying its balance sheets, he thought that Alcoa "had never made an extortionate profit but a very reasonable profit." He also expressed hearty approval of Alcoa's practice of plowing back its earnings because, as he said, of "unusual obsolescence, in the discoveries in the art of aluminum production" (p. 5936). The witness was Mr. Uihlein and that is what he said.

Another witness, whose company had been a buyer of Alcoa products, testified that Alcoa had been unusually reasonable in making unsolicited reductions in prices of pistons (pp. 31420-23; 31430-33).

Several other witnesses testified to the prevalence of the same practice, particularly in cases where, after long term contracts had been made, there was a reduction in price before the termination of the contract, of which the customers were given the benefit.

Perhaps also it should not be overlooked that Exhibit 1006, prepared by the accountant for the Government, and Exhibit 1665, prepared by the accountant for Alcoa, show that Alcoa has suffered annual losses for three years. In round figures these were as follows:

| | *Exhibit 1006* | *Exhibit 1665* |
|---|---|---|
| In 1921 | $5,200,000 | $5,900,000 |
| 1922 | 6,000,000 | 5,900,000 |
| 1932 | 2,900,000 | 2,900,000 |

In 1921 Exhibit 1006 stated that the loss by Alcoa for the year was $5,200,000 while Exhibit 1665 put it at $5,900,000.

In 1922 Exhibit 1006 stated the loss that year at $6,000,000 while Exhibit 1665 stated it at $5,900,000.

In 1932 Exhibit 1006 and Exhibit 1665 each stated the loss for that year at $2,900,000.

The Government's argument in support of its charge that Alcoa made exorbitant profits will next be examined. It rests, principally if not wholly, on three events. One occurred in 1904, another in 1909 and the third in or about and connected with 1925. In so far as these three events possess a characteristic in common, I think it is the alleged fault of plowing back earnings.

In 1904 Alcoa declared a stock dividend of 100 per cent. In 1909 it declared another stock dividend of 500 per cent. In each instance the par of the stock was $100 a share. In 1925, in connection with or pursuant to the reorganization of that year, each common stockholder of the old company received 7 shares of preferred stock and 6 shares of common stock of the new reorganized company. The par of the preferred was $100 and of the common was $5 a share. Accordingly, each old stockholder received stock of the par value of $730.

Predicated on these three events, the Government says that a person who paid $100 for a share of Alcoa stock previous to 1904, and has continued to hold it since, now has stock of the present Alcoa of a par of $8,760. For that reason, as the Government claims, for his $100 paid preceding 1904 such a stockholder today holds stock of the par of $8,760 and that this furnishes the correct measure of the extent to which the company has profited (Government's original brief, pp. 186-7; reply brief, p. 69).

The facts as stated by the Government— the facts as distinguished from the conclusions—are not disputed. Only the conclusions are denied. The argument has a sound of plausibility. The issue is, however, whether the test is correct. I think not. Some of the reasons for the view I take will be stated.

In the first place, as I see it, what the Government relies on is a showing of how the stockholders have apportioned among themselves their respective participations in the ownership of the corporation; whereas, obviously what we are concerned with, and all that we are here concerned with, is what the company as an entity, and solely as an entity, has done as between itself and its customers. It is from the customers alone that the company has received its earnings. It is the customers alone who were directly affected by the single thing out of which the company's income arose. In a way it is true to say that it is the customers who were the exclusive source of the income. Of course the stockholders were affected also; but they were affected only as a consequence of what the customers did.

If my analysis be right, then it seems clear that the Government's contention goes off into a complete irrelevancy. It has undertaken here, as seems to me, to use an inapplicable test, somewhat as it did in its effort to apply a "per pound basis" (e. g., original brief, p. 180) as the test of profits on the sale of individual items of commodities.

In the second place, so far as concerns the plowed back earnings of 1904 and 1909,

if there was fault (save to the limited extent of eleven months following February 2, 1909, when the Bradley patent expired), those earnings that were plowed back in 1904 and 1909 were made by the company during the period when it had patent protection. If through the patent monopoly its earnings were large,—and it seems to me certain that the patent monopoly was the chief, if not the exclusive, factor in enhancing the earnings of the period which included those years,—that is the result of the enjoyment of an advantage which the law conferred on the company. This would appear, therefore, to be unassailable.

Moreover, if failure or refusal of the company to forego the patent advantage constituted misbehavior, that would not now, 37 or 32 years later, justify imposition of a penalty which, though indirectly, ultimately at least would be exacted from a vastly changed list of stockholders.

In the third place, in so far as concerns the rearrangement of stock in or pursuant to the 1925 reorganization, when we turn to the facts directly affecting the corporation, it would seem that a reasonable view of what actually happened would be this: (1) The old stockholders got in the new company what was the equivalent of some rearrangement of their participation. (2) For any increase in the total of the par value stock issued to carry out the reorganization, the company received wholly new consideration and was fully paid, such payment being partly in cash and partly in property.

No one, of course, complains or could properly complain of the company for having accepted cash as a portion of the payment. The property it received was the so-called Lower Development on the Saguenay River. Apart from the cash, that property constitutes the entire fresh consideration which came to the company in payment for all the stock which constituted the increase in the total of the par value (that is, outside of what was paid for in cash).

The evidence as a whole, especially in the light of subsequent facts, fails to show that an excessive price was paid to Mr. Duke for the Lower Development. That evidence indicates, and distinctly tends to show, that this property was not over-valued when the new company parted with it to Aluminium for $17,000,000 (exclusive of what was paid for improvements, which brought the total purchase price to $35,-000,000). Indeed, in other connections in this case, the Government has criticized Alcoa for getting too little for the property when it was sold to Aluminium. If it was worth $17,000,000 to Aluminium, how can it properly be said that it was greatly over-valued or over-valued at all in 1925, when taken at that figure?

The Government has also criticized the earnings of 1939 as being too large. Before dividends or income taxes, in round figures, the amount of the earnings for that year was $49,000,000. It is enough to say three things in response: (1) The earnings of 1939 more than doubled those of 1938. This was undoubtedly due to the added business which came to Alcoa because of preparation for war in which European countries were engaged or were about to become engaged. (2) In the workout, those earnings constituted 20.62 per cent on the stockholders' equity. (3) That percentage has been taken into account in computing the average percentage of earnings for the entire period of the company's existence (for the good years alike as for the bad years; for 1939 alike as for 1921, 1922 and 1932 when there were great losses).

The average for 51-1/3 years, the entire business life of Alcoa, has been at the rate of 9.96 per cent or, as we have taken it, at the rate of 10 per cent a year if the computation by Mr. Collins be correct.

After considering all the alternatives which counsel on both sides have suggested or which the Court submitted to counsel for debate, I have found no method that impresses me as more nearly correct and fair than the one presented by Mr. Collins in Exhibit 1665. According to that, the averages of the company per year, on the stockholders' equity, have been as follows: (1) Earnings, 9.96 per cent. (2) Dividends paid, 4.88 per cent. (3) Earnings put back into the business, 5.08 per cent.

The test for measuring the rate of profits toward which I lean, and which (in the absence of a better suggestion) I prefer and shall adopt, rests wholly on earnings. The total per cent, column C of Exhibit 1665, as will be observed, is made up by combining the per cent of dividends paid and the per cent of earnings put back into the business, columns E and G of the exhibit (pp. 36414; 36416). Has the Government proposed any more equitable method of measuring the reasonableness of the

profits which went to the company as the result of its operations? I think not.

If the percentages stated be correct, then I feel at least it can be said that Alcoa has not been shown to have made exorbitant profits.

I disclaim having demonstrated to a certainty that the theory of Mr. Collins is right. I go further: I frankly concede that, individually, I do not know enough either about economics or about accountancy to be able, without full economic or accounting evidence, to gain a feeling of certainty as to what precise formula on the subject is correct. On the other hand, I do say with confidence that the Collins theory has not been proved to be wrong and that the Government has not, by evidence, established its own theory; nor does the evidence sustain any other theory as a substitute for that of Mr. Collins.

Accordingly, I conclude that the Government has failed to show the guilt of Alcoa either (1) of the charge of having exacted extortionate prices or (2) of the charge of having made exorbitant profits.

Parenthetically, it should be added that this Court has never said that there have not been instances in which particular prices of individual commodities or instances in which particular profits on sales of individual commodities may have been high or higher than the Court today thinks were justifiable. But what the Court has said is that the Government has not, by evidence, established the charges it made as to either prices or profits.

This being another instance of failure of proof in the case at bar, I have given consideration to whether the Court should reserve jurisdiction of charges, if hereafter made by the Government against Alcoa of future excessive prices or future excessive profits. For several reasons, however, I think there is no warrant for adopting as to either of those matters the procedure which I have offered to adopt, on condition, in the case of a charge of future undue spread; but I shall mention only one. Because of that reason, I feel that it would be positive error to follow the same procedure as to charges of future other misconduct.

I am convinced, as I have heretofore indicated, that neither the charge as to prices nor the charge as to profits, as made in the bill, states a cause of action under the Sherman Act. It would, therefore, be an anachronism to reserve jurisdiction of what later occurs relating to either matter. In essence, such a reservation of jurisdiction would be tantamount to authorizing the maintenance of a lawsuit which, if brought, the Court would be bound by law to dismiss on motion.

There is another circumstance, to which I have made brief reference above, which should now be emphasized. It has a very direct bearing on the charges of other misconduct with which we have been dealing, as well as on the entire group of charges against Alcoa, including the charges of monopolization and conspiracy.

The matter which I deem particularly worthy of further consideration at the moment centers about virgin aluminum. As so frequently has been pressed by the Government, it is in virgin aluminum that the chief seat of the entire series of Government complaints against Alcoa is to be found.

With respect to virgin aluminum produced by Alcoa there is irrefutable proof that three classes of commodities are and long have been active competitors with Alcoa. These are (1) virgin aluminum produced in Europe, which is imported into the United States; (2) secondary aluminum produced from scrap; and (3) other materials and metals (e. g., steel, copper, zinc, plastics, etc.) which seek sales or the products from which seek sales among the same customers and for the same uses that are sought by virgin aluminum or by the products therefrom.

It is interesting also to note that competition by the first of these, namely, imported virgin aluminum, is conceded by the Government; also that paragraph 46 of the bill goes far toward conceding competition by the second; and that paragraph 38 of the bill outright does concede competition by the third.

In so-called peace time, practically without cessation for many years, despite tariffs designed to limit its importation, foreign virgin aluminum has come into this country. Once here, it has competed with Alcoa's domestic virgin aluminum which is offered for sale in the United States. The record contains a mass of evidence in support of this statement.

In paragraph 46 of the bill, secondary or "scrap" aluminum is referred to as "competitive," and a "small portion" as "fully competitive," with virgin aluminum.

Until 1910, or thereabout, customarily scrap was thrown away. No use was made of it at all. Mr. Peter Markey (now with the Bohn Company but at the time connected with Alcoa) and an associate then bought scrap in Cleveland (from White Motor Co.) at 1 cent a pound. Since that date the business of purchase, recovery and preparation of scrap has greatly advanced. The business has progressed so far that now secondary aluminum in large quantities produced from scrap is constantly traded in on the market and has been so bought and sold in increasing quantities for many years.

In so far as I have heard no one has ever suggested, and certainly there is no justification for saying, that there are not demands which cannot be satisfied except out of virgin aluminum. Sometimes it is specified as mere matter of preference. At other times the nature of the article to be produced or the use to which the article is to be put is such as actually to require primary aluminum for its manufacture. On the other hand, it has been abundantly shown that, at periods of varying length after aluminum products have been originally fabricated and sold on the market, scrap therefrom or secondary aluminum produced from such scrap has come back, and has continued to appear, on the market in large volume.

Over a long series of years, and apparently indefinitely, after their allotted periods of usefulness in their original form have expired aluminum products have shown that they are capable of returning, and actually have returned, to the market in the form of scrap over and over again. This habit of scrap is so fixed that today there are many specialized dealers in it throughout the United States. In addition, numerous important concerns are engaged in producing and selling secondary aluminum made from such scrap.

Out of secondary aluminum produced from such scrap it is established without contradiction that, through use of well known processes, save (so far as disclosed) a possible grade which is of 99.75 per cent or higher purity, aluminum of every grade can be produced of the same chemical composition as if it had been produced from virgin aluminum and some factories claim that they can produce from secondary aluminum all the commodities that can be produced from primary aluminum listed in

Exhibit 1423, which includes aluminum of 99.75 per cent purity (exhibit p. 6474).

From 1922 to 1936 the average production of secondary aluminum in the United States was upwards of 75,000,000 pounds a year and in 1937 it exceeded 125,000,000 pounds. Some cooking utensils companies at times have manufactured their entire annual output in the United States from secondary aluminum. It also has not been unusual for important companies in this country to sell or consume in the production of commodities they fabricated much more secondary than primary aluminum (e. g., Exhibits 1462, 1473, 1506 and 1513. See also Exhibits 1440, 1441, 1443, 1444, 1463, 1552, 1553, 1558 and 1559. See further the summaries by the Government and by Alcoa of Government specifications, with respect to use of primary and secondary aluminum, Exhibits 1464 and 1676 for identification, and minutes, pp. 41587-95, with citations there given).

Generally the price of secondary aluminum is less than the price of primary aluminum. Ordinarily the price of secondary aluminum ranges from about 1 cent to about 2 cents a pound lower, though at times it has fallen to 6 cents below and at other times it has been but 1/4 of 1 cent a pound lower. But what is indicative of the value of secondary aluminum as a competitor of, and of its being competitive to the extent that it does compete with, primary aluminum is the fact that at times, and under appropriate market conditions, secondary aluminum is sold at prices higher than the price of primary aluminum.

Paragraph 38 of the bill declares that steel, nickel, tin, zinc, copper and lead are the "chief industrial competitors" of aluminum. Numerous witnesses, without contradiction, have also established that there are many metals and materials (those named in the bill, as well as others) which, in a variety of fields, are constantly seeking to displace aluminum; likewise that, in many fields, aluminum is constantly struggling to displace those metals and materials.

After all, it should not be forgotten that the Sherman Act is predicated on the assumption that undeterred competition will prevent restraint of trade or undue restraint of trade if that end is ever to be accomplished. We are forced to rely on that assumption and on it alone. It is all the help that the statute affords us.

306

In summarizing the entire situation with respect to Alcoa, let me add that there are two angles from which the results as to that company should be covered. My conclusions, therefore, are as follows:

(1) On the negative side, I feel that the evidence compels the finding that it has not been shown that Alcoa is guilty of any of the violations of the Sherman Act of which it is accused in the bill. These offenses are monopolization, conspiracy and other misconduct,—although, as previously stated, I do not think that any of the statements in the bill with respect to misconduct charges a crime. The terms monopolization and conspiracy, of course, are to be understood as being used in the comprehensive sense in which, for the purpose of this case, they have been defined and heretofore have been used. They embrace all the prohibitions contained in the Act.

(2) On the positive side, it appears without contradiction that there exist in the United States adequate supplies of bauxite and water power. There is no way of measuring the influence on success of intangible characteristics, such as good character, good will and community pride. Disregarding those, however, I think it clear that, with the access to the two raw materials of ore and power named which is and, save when prevented by a patent, always has been open to everybody in the United States, anyone possessing the four cardinal tangible elements of intelligence, industry, courage and money or credit is and has been able, with confidence, to go into the production of virgin aluminum. Anyone in the United States outfitted with the four prerequisites I have mentioned is now free, and since the expiration of the Bradley patent in 1909 has been free, to produce virgin aluminum. All such a person needs, or for 30 years past has needed, in addition are bauxite (or some proper substitute for it) and water power (or some proper substitute for it). No one stands in his way or, so far as has been shown, unless armed with a patent has ever stood in his way of obtaining either bauxite or water power or of his producing aluminum therefrom. He may encounter competition in buying bauxite or water power, but such competition is unobjectionable.

In the past others than Alcoa have considered going into the virgin aluminum branch of the industry. Without, so far as appears, anything emanating from Alcoa having been done to prevent or obstruct,

all except the Reynolds Metals Company have refrained and, by choice, have left the field to Alcoa. Just before the close of the trial, however, evidence was introduced disclosing that the Reynolds Metals Company had formed a plan to produce virgin aluminum. If the plan succeed, then competition with Alcoa will exist hereafter in producing the only commodity needed from which it is possible for competition in the production of all commodities fabricated out of aluminum to spring.

No one with certainty can forecast what the future holds. Nor can the Court properly give weight to the Reynolds Company entering on the production of virgin aluminum beyond treating it as a single item, along with other items, of evidence indicating or having some tendency to show that, since its patents expired, or, if that be too early, since the 1912 consent decree in the Pittsburgh case, Alcoa has not excluded from the field anyone who desired to produce virgin aluminum in the United States.

I think we can feel confident, however, that, unless forbidden by decree, Alcoa will compete with any newcomer. Such competition is precisely what the statute encourages and, if we may judge the future by the past thirty years, I believe that we may expect that such competition will be fair as well as vigorous.

The result is, as I feel, that Alcoa and those represented by its counsel at this trial are entitled to have the bill dismissed as against them, with the proviso that, if the Government wish, jurisdiction may be reserved with respect to charges of certain specified future offenses on the terms and conditions that have been stated. On the settlement of the findings, counsel may be heard by memorandum on the question of whether, in order to be effective, it will be necessary that the reservation, if there be reservation, extend beyond Alcoa itself and, if so, to whom.

Up to this time the discussion in this case has been primarily, and frequently exclusively, with respect to Alcoa and those standing with it.

## IV. DEFENDANTS OTHER THAN ALCOA GROUP

There are, however, defendants additional to the Alcoa group. These consist of one company, with some of its officials, and two individual companies, which remain to be discussed.

## (1) Aluminium Limited

The first group of these is Aluminium and its officials, all of whom stand or fall together. The only charge against them is conspiracy. This has been fully covered in the discussion of the same charge against Alcoa. There is no occasion to repeat what was there said and there is but a single aspect on which I deem it pertinent to add a comment.

In connection with my discussion of Alcoa where Aluminium was concerned, I took occasion, as I thought was pertinent and indeed as I believe was demanded, briefly to comment on Mr. Edward K. Davis as a witness. In connection with the Aluminium group, however, it seems to me there is like occasion to add somewhat to that comment.

I think that Mr. Edward K. Davis, president of Aluminium, has a mind of his own. It is clear that he has, as I feel he deserves, the confidence of the directors and stockholders of his company. He has been their leader from its organization. They have backed him and have given him a rather free hand. I believe he is entitled to the chief credit for the success of the Aluminium enterprise under quite difficult conditions.

Mr. Davis was on the stand before me for seven and one-half weeks. I observed him closely. He impressed me, and I venture to say I believe he impressed everybody in this courtroom who heard him, as honest, frank and careful. I think I should accept, and I do accept, his testimony. With that testimony, along with all the other facts, I think the Government has failed to show that Aluminium or any of the defendants connected with it has violated the Sherman Act.

If what I have said be true, then it follows that there is no warrant for the award of relief against the Aluminium group of defendants.

## (2) Aluminum Manufactures, Inc.

An individual defendant, standing alone in this case, is Manufactures.

Paragraph 7 contains the only mention of Manufactures in the bill. What was there said is merely descriptive. Plainly it states no cause of action against that company.

In the evidence only two things of consequence were brought out with which the name of Manufactures is connected. Without conceding that it goes so far, the limit of what it can, with any reason whatever, be argued has been shown, is this: (1) that Alcoa used Manufactures as an instrumentality by which to gain and hold control of the castings business and (2) that Manufactures turned over certain patents to the Cleveland Piston Patent Estate and received therefor certificates of interest, which were distributed, among others, to the Packard Motor Car Company and to Alcoa, who were engaged in producing pistons.

Indisputably, neither of the things just mentioned (in and of itself) states nor do the two combined state a violation of the Sherman Act. Moreover, it should be noted that participation by Manufactures in the piston matter was not even claimed in the bill.

Little of the evidence relating to castings or to pistons was received against Manufactures. Even though, however, all the evidence admitted against others in which Manufactures was mentioned were considered, what previously has been said about castings and pistons, while we were discussing the case against Alcoa, disposed of the case as it affects Manufactures. It would not show any violation of law.

For the reasons stated before, I think there cannot properly be a recovery against Manufactures.

## (3) Aluminum Goods Manufacturing Company

Lastly, we come to Goods, a corporate defendant, standing apart by itself.

The charges against Goods were stated heretofore in connection with the charges against Alcoa. Except with respect to two things hereafter mentioned—which either were not put in evidence against Alcoa or did not relate to it—the evidence recited in the prior discussion of the charges against Alcoa completely refutes the charges against Goods. At this stage that evidence will not be repeated.

The matters concerning Goods not already disposed of are as follows:

(1) Aluminum Products Company now is, and ever since 1911 has been, a manufacturer and seller of certain aluminum cooking utensils. It is not a party to this suit. In 1911 it produced a roaster. Apparently this was not a four-piece round roaster and there is doubt from the testimony as to whether anyone else was then manufacturing an article of its precise kind (pp. 11381–5).

Nevertheless, for the purpose of the question being considered at the moment, it will be assumed that in 1911 the Products Company was producing and selling four-piece round roasters.

In 1911 Goods and Products made an agreement. This provided that Goods would discontinue manufacturing a four-piece round roaster set, in consideration of Products placing with Goods an order for 10,000 coffee percolators at $1.00 each (pp. 11361–448; Exhibit 617).

There is no proof that the arrangement was ever carried out. It must either have been fully carried out or have been abandoned many years ago; long before this suit was commenced.

Assuming, however, that what Goods did in 1911 (30 years ago) was a violation of the Sherman Act, there are two grounds why there should be no punishment; (1) It is very doubtful whether the charge of the offense can reasonably be brought within the allegations of the bill. (2) On account of the age, as well as the trifling nature, of the misconduct claimed, it would not now be basis for an injunction and it would be absurd to suggest, nor has it been suggested, that because of it Goods should be dissolved.

If the contract be entitled to any weight whatever, all that could properly be accorded it is to consider it, in connection with all of the evidence on the subject, in determining the intent of Goods.

(2) An investigator of the Federal Trade Commission testified about some talk he had in 1923 with George Vits, then president of Goods and now deceased. The witness says that in the conversation the Goods president admitted that Goods was dominated by Alcoa (pp. 17997–8; 18117–8).

Before discussing the merits of this charge, I wish first to direct your attention to something that was said by the Supreme Court in 1859. Its statement was as follows (Lea v. Polk County Copper Company, 21 How. 493, 504, 16 L.Ed. 203):

"* * * courts of justice lend a very unwilling ear to statements of what dead men had said."

I am persuaded, however, that the investigator either did not correctly understand or, when on the stand before me, did not rightly recollect what Mr. Vits had said. On the contrary, in my view, the credible evidence so firmly establishes that Alcoa did not in fact dominate Goods and that Mr. Vits and his associates out in the neighborhood of the plants did dominate Goods that I do not believe that its president ever conceded that Alcoa did dominate Goods.

Accordingly, I conclude that no violation of the Sherman Act by Goods has been established.

## V. CONCLUSION

Near the beginning of the delivery of my decision, in stating the difficulties I faced, one of them described was the responsibility, peculiarly heavy in this case, of having to pass on the credibility of a good many witnesses.

Where a trial judge has before him a group of wilful falsifiers, the task of separating truth from untruth is relatively easy. In the case at bar in my judgment we have not had that class of witnesses. Nevertheless, we have had quite a number who are of the type that give a great deal of trouble to a trial judge. I think I may fairly say of this group of witnesses that for the most part they consisted of what are sometimes called wishful thinkers. The world is full of the type and all of us are familiar with it. Where an individual forms an opinion and has a preconceived idea as to what the facts are, he often testifies according to his preconception, rather than according to the facts. We have had a good deal of that in this case.

Then again, we have had several witnesses who were extremely biased. I do not accuse those men of intending to do wrong. The probability is that they were born that way and they can't help it.

There is one feature, however, about the witnesses that gives me pleasure. That is this: Though sometimes a duty, it is extremely disagreeable to indulge in comment on witnesses which is harsh. I think that any properly minded trier of facts will endeavor to avoid it. I feel that the position occupied by a judge is such that, when he unnecessarily criticizes witnesses, it is cowardly. So it is a satisfaction to me that I have not deemed it required that I speak severely of any witness or that I go farther than, in the general way I have explained, to tell you that there were witnesses here whose testimony I do not think was entitled to great weight and some whose testimony on important points, according to my view, was not entitled to even a featherweight of influence in leading me to a conclusion.

The astonishing thing is the great number of witnesses who appeared on the stand,

competitors as well as customers of Alcoa, who have completely exculpated Alcoa from blame and have praised its fairness as well as its helpfulness to the aluminum industry. I think I should add that such conduct of those witnesses, nearly all of whom were entirely independent, is in great part a tribute to Mr. Arthur V. Davis.

I shall try to avoid any invidious distinctions in anything I shall say about Mr. Davis. There are, according to the proof, —and that is all I am relying on,—a number of men who in the little more than fifty years of the life of this company have contributed very materially to its success. Two names out of the many in the early history of the company stand out. They are Captain Hunt and Mr. Hall.

Mr. Davis entered the employment of Alcoa on the first day of September, 1888, and, therefore, was a member of the beginner group. He has been continuously with the company ever since. His connection with it is precisely the period covered by a number of the exhibits, including the accounting exhibits, that show the business growth of Alcoa.

At the start he worked as a laborer He daily wore overalls. He not infrequently was forced to whistle for his pay. When this small company was seeking to raise its initial capital of $20,000 only, Mr. Arthur V. Davis had no part because he did not have the money. Yet by 1900, practically, he had become the real leader in Alcoa. From that date to this date increasingly he has continued to be the leader and I think I am making no invidious distinction when I say that it is he who, chiefly and primarily, has built up and made Alcoa what it is today.

I say this not because I have any interest whatsoever in paying a tribute to an individual. That is none of my concern. I say it as introductory to what I wish to add about Alcoa itself in connection with the final disposition of this case.

Aluminum is in its infancy. From the evidence I am convinced that any man may properly look to enormous developments of aluminum in the future. Mr. Davis has been with the company since its birth. The entire existence of the company thus far has been within the period of his active business career. He knows more about the company and has contributed more to its advancement than any man alive,—and, although specific evidence was not taken about the matter, I think probab-

ly than any one no longer living. He began with the company when what was produced was so rare and so small in quantity that it was locked in the office safe overnight. In the early days aluminum was so unknown and so far from being a commercial article that it sold at $8.00 a pound,—though I gather from the proof that very little of it went at that price. Later, however, it did sell at $5.00 a pound. Now it has reached the point where, shortly before the close of the testimony in this case, it was shown that it was selling at 18 cents a pound.

Under the leadership of Mr. Davis the company has done many intelligent things Among the best of these is the establishment of a research organization, equipment, facilities and staff. On the laboratories alone it has spent $2,300,000.

Furthermore, Alcoa has not been selfish about research and the uses of it. On the contrary, the evidence establishes that it has been genuinely generous. The aluminum industry has had the benefit in large measure of what has been done by Alcoa.

Under these circumstances, and for reasons such as I have recited in part and for many other reasons, I am convinced and I wish to put on the record the statement that in my judgment it would be greatly contrary to the public interest either to dissolve or to enjoin Alcoa I add what I have just said to what I have heretofore said, that, as I feel, there is no warrant in fact or in law for dissolving or for enjoining Alcoa.

Since I found out what the case before me was, I have assumed that, whatever the decision, there would be an appeal.

Those who are not familiar with the daily grind of this court would be surprised if they should know, in the full way that any member of this court does know, the great number of litigants who come into this court with their grievances who are, or many of whom are, from the humbler walks of life and many of whom are almost wholly without financial resources. They ask help or relief to the extent that it can be granted by the court. Not infrequently litigants of this kind are represented by lawyers who, to say the least, are not highly qualified or experienced. It is with regard to litigants of the type just mentioned that a judge of this court feels the greatest responsibility. It is in the case of litigants like that, who are helpless and who in no event can ever enjoy the privilege of an ap-

peal, that responsibility weighs heavily on the shoulders of a trial judge.

Among the difficulties I recited near the beginning of my present opinion, in explanation of the problem upon which I was about to enter in seeking to render a decision, was not the difficulty of having before me a litigant who would be unable to appeal if he lost in this court. I have assumed, and I suppose properly assumed, that both litigants are, and certainly both principal litigants are, amply able to prosecute an appeal. That has been and is today a great comfort to me. The comfort to me is that, recognizing as I do my own fallibility,—although I think my decision is right,—I do not want to do injustice to any man. For this reason I welcome an appeal.

That brings me, therefore, to * * * the settlement of the findings, for which a schedule must be fixed.

The plan for formulation of the findings was explained to counsel I think at the time or shortly after the closing of the taking of testimony in August, 1940. That date is pretty well fixed on my mind, because I recall that counsel asked whether I desired proposed forms of findings to accompany their briefs and I answered no.

I think at that time I also said that I thought the best method would be, and one that was frequently used, was this:

Let the winning side first propose findings and a time be fixed for service of a copy of those proposed findings on their opponents. Thereafter the losing side should have a reasonable period in which to consent to or approve or propose modifications of or to propose additions to or substitutes for the winner's proposed findings. After the counter-findings are proposed, then the winning side should have opportunity to acquiesce in or oppose the modifications or proposed substitutes (if any). I also suggested that as nearly as practicable, unless you could point out a good reason otherwise, the findings approximately follow the order of the allegations of the bill, the advantage being the greater ease with which they could be checked. I suggested also that if counter-findings should be proposed, they bear the same numbers and be in the same order as the findings originally proposed. In that connection I explained that if in place of one proposed finding of the winning side it was the desire of the losing side to substitute several findings, they bear the same number with letters. For example, assume that the proposed finding is 123; assume that instead of that the losing side desires three findings substituted. Number those 123-A, 123-B and 123-C. I think you will find that if you do that, you will greatly subserve your own convenience and also I am sure it will serve my convenience.

I further suggested that, along with the final submission of proposed findings, you furnish me a memorandum or brief in support of your own proposed findings and stating the grounds of opposition, if you objected to findings proposed by your opponent.

What is of most importance in connection with your memoranda is that you state as definitely as you can the page references to the minutes and the exhibit references you rely on and desire me to examine in support of your own contentions.

* * * * *

I am entirely willing to hear, and anxious to hear, any suggestions by you gentlemen. It occurred to me, and I have had in mind, to suggest that you confer among yourselves and try to agree on a schedule that you know would be mutually convenient.

* * * * *

October 10, 1941

* * * * *

I think also that it may assist you if I recite briefly some phases of the history of findings insofar as they have affected procedure in this court.

For many years preceding 1930 the practice here in equity cases had been for the judges to write full memoranda or opinions stating the facts as they determined them and the law, as they viewed it, which governed.

In 1930 the Supreme Court adopted Equity Rule 70½, 281 U.S. 773; 28 U.S.C.A. § 723 Appendix (applicable only in equity suits). It caused a lot of discussion in this court. The district judges were troubled about how to comply with it and yet keep the calendar up to date. Upon inquiry, however, they were told unofficially by several appellate judges to whom they were subordinate, in substance, that the practice which had theretofore prevailed in the Southern District of New York was satisfactory.

Accordingly, subsequent to Equity Rule 70½ going into effect, the old practice (described above) continued to be used in this court, without change and, so far as I have been able to learn, without criticism,

until the ruling by the Supreme Court, during this trial, in the Interstate Circuit case, Interstate Circuit v. United States, 304 U.S. 55, 58 S.Ct. 768, 82 L.Ed. 1146.

Under the rule as enforced in this court prior to the Interstate Circuit decision the problem of findings was relatively simple. As I understand the decision, however, it construed Equity Rule 70½ to require meticulous findings. The provisions of that rule and in the new Rules of Civil Procedure, rule 52, 28 U.S.C.A. following section 723c, prescribing what findings shall consist of, are identical. It follows that the Interstate Circuit case must be complied with as an authoritative interpretation of the existing rule about findings.

██ Understanding the rule in that way, I feel it my duty to make meticulous findings in the present case. In order to do so, unavoidably a great deal of time will be consumed.

There is another thing or, in fact, there are two things I must add.

The first is this: As I announced at some time, when counsel on both sides expressed their desire for an early decision, I could not possibly comply with that request unless I confined my oral opinion to the crucial issues in the case; not going into numerous other issues, which were not crucial. In consequence there are a good many allegations in the bill on which I have not yet passed. I have considered all of them, but I have not dealt with them in my opinion. Nevertheless, to the extent I hereafter determine to be necessary, I will make findings on them.

The second thing is this: There are many allegations in the bill which, if the pleading were subject to the new rules of civil procedure, I think would be stricken out on motion. Among these are a number which merely describe historical matters and do not raise issues in the suit.

Doubtless evidence as to some of the historical matters would be relevant; but my impression is that, if so, admissibility of evidence concerning them would not depend on their being pleaded. Nevertheless, without at the moment finally deciding the question, I fear that failure on my part to make findings on them, as well as on other matters pleaded which do not raise pertinent issues, might be regarded by the Supreme Court as disobedience of their rules.

\*　　\*　　\*　　\*　　\*

For the reasons indicated, I have concluded to follow my original idea of a time-table. This means that I shall give three months from the date of the filing of my revised opinion for the defendants to serve proposed findings; three months after copy of the proposed findings is served for the Government to serve proposed counter-findings; and one month after copy of the counter-findings is served for the defendants to propose rebuttal findings.

\*　　\*　　\*　　\*　　\*

Memoranda in support of findings, 10 days after service of the rebuttal findings. That means you will have a little time on the rebuttal findings.